# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

---------------------------------------------------x

TROY SIMS, individually, and on behalf of
all others similarly situated,

     Plaintiff,

   v.

FIRST HORIZON NATIONAL
CORPORATION; GERALD L. BAKER; J.
KENNETH GLASS; SIMON F. COOPER;
JAMES A. HASLAM, III; COLIN V.
REED; MARY F. SAMMONS; ROBERT
B. CARTER; R. BRAD MARTIN; VICKI
R. PALMER; WILLIAM B. SANSOM;
ROBERT C. BLATTBERG; MICHAEL D.
ROSS; LUKE YANCY III; JONATHAN P.
WARD; GEORGE E. CATES; PENSION,
SAVINGS AND FLEXIBLE
COMPENSATION COMMITTEE;
ROBERT E. ELLIS; FIRST TENNESSEE
BANK, N.A.; HIGHLAND CAPITAL
MANAGEMENT CORPORATION;
MARTIN & COMPANY, INC.; and DOES
1 – 100,

     Defendants

Civil Action No.


CLASS ACTION COMPLAINT

---------------------------------------------------x

## **COMPLAINT**

## **Introduction**

Plaintiff Troy Sims brings this action, individually and on behalf of all others similarly

situated, to recover losses to the First Horizon National Corporation Savings Plan ("Plan") from

May 1, 2002 to April 28, 2008 (the "Class Period").  Class Members work or worked for First

Horizon National Corporation ("First Horizon" or the "Company") and are Plan participants (and

their beneficiaries) for whose account Plan fiduciaries acquired or held shares of First Horizon

common stock ("First Horizon Stock"), First Horizon's proprietary mutual funds ("First Funds"), or both, during the Class Period.

From May 1, 2002 through a date early in 2006, the Plan's fiduciaries maintained investment offerings in the First Funds for which First Horizon was the investment advisor, even though most of those funds under-performed their peers.  Plan fiduciaries did not select the First Funds because they were prudent retirement investments, but rather because offering the funds generated fees to First Horizon and its affiliates, and helped maintain the viability of the funds.

In addition, the Plan's largest investment at all times has been in the First Horizon Common Stock Fund ("Company Stock Fund").  As of December 31, 2005, more than 50% of the Plan's assets—$317,598,814—was invested in First Horizon Stock.  Such a large percentage of Plan assets were concentrated in First Horizon Stock because not only did the Company make automatically invest matching contributions in the Company Stock Fund—it **required** participants to invest in the Company Stock Fund and First Horizon Stock in order to receive the match.

The Company Stock Fund was an imprudent retirement investment from at least January 1, 2006 because First Horizon was not fairly and accurately disclosing the risks and likely consequences of a number of its banking practices such that the Plan was purchasing shares of First Horizon Stock at an inflated price.  Among items that were not disclosed to participants were the lowering of its underwriting standards; the scope and circumstances of its involvement with subprime and Alt-A loans; problems with its risk management; and its increasing use of off-balance sheet transactions.  Whereas shares of First Horizon Stock traded at $38.44 per share on December 30, 2005, shares closed at $10.99 on April 28, 2008, when First Horizon announced that it was ending its cash dividend and issuing new shares to raise $600 million of capital.

2

Thus, as a result of Defendants' fiduciary breaches, the Plan has suffered huge losses on its investment in First Horizon Stock, the stock no longer pays a cash dividend, and the Plan's holdings of the stock are about to be further diluted by the new offering.

## NATURE OF ACTION

1.     This class action asserts claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), to recover losses to the Plan arising from (i) the selection of First Horizon's proprietary First Funds as investment options for the Plan without employing a prudent selection process untainted by conflict, and (ii) the investment of Plan assets in First Horizon Stock when Plan fiduciaries knew or should have known that material information about the Company's financial problems had not been disclosed.  Plaintiff further seeks additional equitable relief to the extent that it is needed to protect the interests of Plan participants and beneficiaries.  Once these losses are restored to the Plan, Plaintiff requests that the amounts restored be distributed among the class members' current and prior accounts to remedy the harms alleged in a manner that the Court deems proper and equitable.

2.     Defendants were or are ERISA fiduciaries of the Plan during the Class Period, whose responsibilities included, *inter alia*, selecting and monitoring the investments offered to participants, prudent investment of Plan assets, and/or providing participants with complete and accurate information as to the risks of each investment.  As more fully described below, Defendants were obligated to comply with ERISA-imposed fiduciary duties to act prudently and in the sole interest of the Plan and its participants and beneficiaries.

3.     Defendants breached their fiduciary duties (i) by causing participants' retirement savings to be invested in First Horizon Stock when doing so was imprudent because of the

Company's increased exposure to losses from subprime and Alt-A mortgages, residential construction loans, and other problem lending, and its incomplete and inaccurate public disclosures of such exposure; (ii) by, until early in 2006, selecting and investing in First Funds because these funds generated fees for First Horizon and its affiliates, rather than as a result of a prudent selection process; and (iii) by failing to provide complete and accurate information to participants regarding the Company Stock Fund and the First Funds as investment options for participants' retirement savings.

4.       This action is brought to recover millions of dollars in losses to the Plan which Plaintiff alleges were caused by Defendants' fiduciary breaches.

## JURISDICTION AND VENUE

5.       This action is brought pursuant to the civil enforcement provisions of ERISA § 502, 29 U.S.C § 1132.  The Court has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1) as well as 28 U.S.C § 1331.

6.       ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1), provides for nationwide service of process.  As all Defendants are residents of the United States, this Court has personal jurisdiction over them.

7.       Venue is proper in this District pursuant to ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1), since Defendant First Horizon has its headquarters in Memphis, Tennessee; and since many of the fiduciary breaches for which relief is sought are believed to have occurred in this District.  Venue is also proper in this District under 28 U.S.C. §1391(b) & (c) because some Defendants reside in, have principal executive offices in, and/or regularly do business in, this District.

## PARTIES

8.     **Plaintiff Troy Sims**.  Troy Sims is a resident of Spokane, Washington.  Mr. Sims was an employee of First Horizon from 2003 through October 2007 and is a participant in the Plan.  His account was invested in the Company Stock Fund and the First Funds during the relevant periods.

9.     **Defendant First Horizon National Corporation.**  First Horizon is a national financial services institution with more than 13,000 employees.  First Horizon is a Tennessee corporation headquartered in Memphis.  First Horizon is a fiduciary of the Plan because it exercised authority or control over the assets of the Plan and exercised discretionary authority with respect to the management and administration of the Plan.

10.     **Defendant Members of First Horizon Board of Directors.**  The members of First Horizon's Board of Directors (the "Board") are fiduciaries because they exercised discretionary authority with respect to the management and administration of the Plan.  The Director Defendants (named below) are persons who serve or served on the Board during the Class Period, and who knew or should have known about the facts and circumstances that rendered First Horizon Stock an imprudent retirement investment for Plan assets.  On information and belief, the Director Defendants apointed—and therefore had a fiduciary duty to monitor—the Plan's investment fiduciaries and the members of the Pension, Savings and Flexible Plan Committee.  Moreover, the Director Defendants who were members of the Board's Compensation Committee specifically assumed the responsibility "to review the appropriateness of the issuance of Corporation common stock under the terms of the Savings Plan as required by

resolutions of the Board as adopted from time to time."  Specifically, the Director Defendants are:

a.  **Defendant Gerald L. Baker** became President and Chief Executive Officer and a director of First Horizon and Defendant First Tennessee Bank National Association ("First Tennessee") on January 29, 2007.  From November 2005 to January 29, 2007, Mr. Baker was Chief Operating Officer of First Horizon and First Tennessee.  Prior to November 2005, Mr. Baker was Executive Vice President of First Horizon and First Tennessee and President—First Horizon Financial Services; and prior to January 2006, Mr. Baker was President—Mortgage Banking and President and Chief Executive Officer of First Horizon Home Loan Corporation. He served on the Credit Policy and Executive Committee of the Board until April 9, 2007.  He is a fiduciary of the Plan because he serves on the Board.

b.  **Defendant J. Kenneth Glass** was the Chief Executive Officer of First Horizon until January 29, 2007 and served on the Board until April 2007.  He was the Chair of the Credit Policy and Executive Committee.  He was a fiduciary of the Plan during the Class Period because he served on the Board.

c.  **Defendant Simon F. Cooper** has been a director of First Horizon since 2005.  He serves on the Audit Committee.  He is a fiduciary of the Plan because he serves on the Board.

d.  **Defendant James A. Haslam, III** has been a director since 1996.  Mr. Haslam currently serves on the Compensation Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

e.     **Defendant Colin V. Reed** has been a director since April 2006.  He serves on the Audit Committee and the Nominating and Corporate Governance Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

f.     **Defendant Mary F. Sammons** has been a director since 2003.  Ms. Sammons currently serves on the Compensation Committee and the Nominating and Corporate Governance Committee of the Board.  She served on the Audit Committee of the Board until January 29, 2007.  She is a fiduciary of the Plan because she serves on the Board.

g.     **Defendant Robert B. Carter** was elected as a director of First Horizon in July 2007.  He serves on the Audit Committee and the Nominating and Corporate Governance Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

h.     **Defendant R. Brad Martin** has been a director since 1994.  Mr. Martin is the Chair of the Compensation Committee and he also serves on the Credit Policy and Executive Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

i.     **Defendant Vicki R. Palmer** has been a director since 1993.  She serves as Chair of the Audit Committee.  She is a fiduciary of the Plan because she serves on the Board.

j.     **Defendant William B. Sansom** has been a director since 1984.  He serves on the Credit Policy and Executive Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

k.     **Defendant Robert C. Blattberg** has been a director since 1984.  He serves as a member of the Compensation Committee and as Chairman of the Nominating and Corporate Governance Committee.  He is a fiduciary of the Plan because he serves on the Board of First Horizon.

l.       **Defendant Michael D. Rose** has been a director since 1984.  He serves as Chairman of the Credit Policy and Executive Committee of the Board; he also served on the Nominating and Corporate Governance Committee of the Board until January 29, 2007.  He is a fiduciary of the Plan because he serves on the Board of First Horizon.

m.       **Defendant Luke Yancy III** has been a director since 2001.  He serves on the Audit Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

n.       **Defendant Jonathan P. Ward** served on the Board from 2003-2007.  Defendant Ward served on the Compensation Committee and the Nominating and Corporate Governance Committee.  He is a fiduciary of the Plan because he served on the Board during the Class Period.

o.       **Defendant George E. Cates** served on the Board from 1996 until 2005.  He is a fiduciary of the Plan because he served on the Board during the Class Period.

11.      **Defendant Pension, Savings and Flexible Compensation Committee** ("Committee") is the administrator of the Plan according to the Plan's SEC Form 11-K for the fiscal year ended December 31, 2006, dated June 29, 2007.  The Committee is a fiduciary of the Plan with responsibility for the operation and administration of the Plan, and for communications with the participants.

12.      **Defendant Robert E. Ellis** is Senior Vice President – Manager Financial Operations of First Horizon.  He is a fiduciary of the Plan because he is a member of the Committee.  Collectively, Defendant Ellis and the Committee are referred to as the Committee Defendants.

13.      **Defendant First Tennessee Bank, N.A.** was or is a fiduciary of the Plan during the Class Period because its division, First Tennessee Advisory Services, with offices at 530 Oak

Court Drive, Memphis, TN  38117, served as an investment adviser to the First Funds in which the Plan invested.

14. **Defendant Highland Capital Management Corporation,** with offices at 6077 Primacy Parkway, Memphis, TN 38119, was a fiduciary of the Plan during the Class Period because it managed mutual funds that were held by the Plan through early 2006 and it was a wholly-owned subsidiary of First Horizon until early 2006.

15. **Defendant Martin & Company, Inc.,** with offices at 165 Madison Avenue, Third Floor, Memphis, TN 38103, was a fiduciary of the Plan during the Class Period because it managed mutual funds that were held by the Plan through early 2006 and it was a wholly-owned subsidiary of First Horizon.

16. **Defendants DOES 1-100** are additional Plan fiduciaries whose exact identities and fiduciary functions will be ascertained through discovery.  The information and documents on which Plaintiff's claims are based are, very likely, solely within Defendants' possession and control.  Therefore, to the extent necessary and appropriate in light of discovery, Plaintiff will amend his Complaint or seek leave to amend to add such other fiduciaries as defendants.

## FACTUAL ALLEGATIONS

### The Plan

17. The Plan is a defined contribution plan and an individual account plan.  Under its terms, a participant may authorize payroll deductions from 1% to 100% of eligible pay (subject to certain legal limitations) as contributions, to be invested in one or more of a number of options selected by the Plan's investment fiduciaries for employee contributions.

18. The Plan allows participants to make pre-tax contributions (from 1% to 90% of eligible pay) and after-tax contributions (from 1% to 10% of eligible pay).

19.     Participants may also rollover amounts representing distributions from other defined benefit and/or defined contribution plans.

20.     The Company makes two types of contributions on behalf of participants to the Plan—matching contributions and savings contributions.  After one year of service, all participants are eligible for matching contributions.

21.     Until some recent date in 2008, all participants except First Horizon Home Loan Corporation participants were required to invest in the Company Stock Fund in order to receive matching contributions.  Matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund.  According to an April 15, 2008 Proxy Statement, that requirement was dropped in early 2008, i.e., only after the Plan's holdings of First Horizon Stock had lost more than half of its value.

22.     Matching contributions are automatically invested in the Company Stock Fund.

23.     Each participant's account is credited with the participant's contributions, the Company's contributions and Plan earnings, and is charged with an allocation of asset management fees, Plan losses and certain other recordkeeping expenses.  Such allocations are based on participant contributions or account balances.

24.     Participants direct their contributions into various investment options selected by the Plan's investment fiduciaries, and may change their investment authorizations at any time.

25.     One of the options selected by the Defendant investment fiduciaries is the Company Stock Fund.  As of December 31, 2005, more than 50% of the Plan's assets— $317,598,814—were invested in the Company Stock Fund.

26.     Until approximately March, 2006, the funds offered to Plan participants included several proprietary funds of First Horizon, the "First Funds."  The First Funds were managed by

Highland Capital Management Corporation and Martin & Company, Inc., wholly-owned subsidiaries of First Horizon.  Transactions related to these mutual funds, as well as transactions related to First Horizon Stock, qualify as party-in-interest transactions under ERISA.

27.     As of December 31, 2004, the Plan held assets of more than $87 million in three First Funds mutual funds—the Capital Appreciation I Fund, the Core Equity I fund, and the Intermediate Bond I Fund.

28.     As of December 31, 2005, the Plan held some $8.449,747 in the Capital Appreciation I Fund; $44,939,572 in the Core Equity I Mutual Fund; and $17,777,946 in the Intermediate Bond I Fund.  Those Plan holdings represented 6.7%, 12.8% and 5.5 % of those mutual funds, respectively, and 7.1%, 16.8% and 6.0% of the Class I shares in those funds.

29.     The First Funds were not selected by a prudent selection process.  Rather, they were selected because of the fees generated for First Horizon and its affiliates and because the investment of Plan assets in the First Funds supported the viability of the funds.  A prudent process is one which considers exclusively the best interests of the Plan's participants and beneficiaries with respect to the funds to be offered for their retirement savings.  Here, the First Funds were offered because of the benefits to First Horizon and its affiliates.

30.     Defendant First Tennessee served as the sub-manager for the First Funds.  It was not until after February 2006, when Karen Kruse, First Tennessee's Senior Vice President of Wealth Management, admitted that First Tennessee was reconsidering whether the mutual fund management business "was a core competency for us," that the First Funds were removed from the Plan and other funds were offered to the Plan's participants.  Before that, the continued offering of the First Funds was a representation that the Funds were prudently selected and

monitored by the Plan's investment fiduciaries based on the exclusive interests of the participants in the Plan.

31.     First Horizon sold its interest in the "First Funds" in a merger with Goldman Sachs Asset Management funds in early 2006.

32.     The selection of the First Funds mutual funds by the Plan's investment fiduciaries was only changed when First Horizon decided to exit the mutual fund business.

**First Horizon's Financial Condition and Problems During the Class Period**

33.     First Horizon is a bank and financial holding company which spent years touting itself as a growing and dynamic "national" company.  Throughout the Class Period, First Horizon's principal source of cash flow, including cash flow to pay dividends on its stock, has been from its principal subsidiary, First Tennessee.

34.     Between January 1, 2005 and April 28, 2008, First Horizon—through its subsidiaries First Tennessee and First Horizon Home Loan Corporation—provided mortgage banking services in 44 states, and promoted itself as one of the country's 20 largest mortgage loan originators.  During the first part of the Class Period, First Horizon and its affiliates wrote and securitized ever increasing numbers of subprime and Alt-A mortgage loans, home equity loans, and construction loans, for which reduced underwriting standards were used.  By doing so, First Horizon was able build loan volume and appear more dynamic as a financial institution. First Horizon touted its growth in its drive to become a national financial institution, but it failed to adequately disclose that this growth came at the expense of sound banking practices, and, instead, was based on lax underwriting, and the issuance of loans on terms which created an unacceptably high likelihood of non-payment.  While First Horizon disclosed that there was a risk that some of its customers may not repay their loans and that collateral might be insufficient

to avoid a loss, it failed to disclose that this risk had materially increased because of its underwriting practices and its failure to adequately manage this enhanced risk, and it failed to make adequate loss loan provisions in its financial reporting.

35.     First Horizon was in the business of selling or securitizing its mortgage and home equity loans, but it failed to adequately disclose the extent to which recourse could be sought from it given the complexities of the securities and of the securitization market.  While it claimed to adequately manage the risks associated with the sale and securitization of its loans, it knew, when Plan participants did not and could not know, the facts and risks associated with First Horizon's risk management.

36.     First Horizon concentrated risk management functions in its Audit Committee, and otherwise failed to adequately oversee its own risk management.  It failed to adequately disclose the systemic problems in its risk management.

37.     First Horizon's securitizations included securitization through government sponsored enterprises and proprietary securitizations of nonconforming first-lien and second-lien mortgages and home equity loans.  The latter did not conform to the standards for sale or securitization to government agencies and created risks that there might not be an adequate market for such securities, which were not adequately disclosed.

38.     Although it lowered underwriting standards and was becoming heavily involved in high risk mortgage and home equity lending, including subprime and Alt-A loans, First Horizon maintained relatively flat loan loss provisions.  For example, the Company's 2005 Annual Report states that it increased loan loss provisions from $48.4 million in 2004 to $67.1 million in 2005, but reported that a portion of the increase "related to losses in the areas impacted by Hurricanes Katrina and Rita."  First Horizon predicted "relatively stable" asset quality and

stated that asset quality performance during 2005 was "relatively strong."  During that period, First Horizon expanded its sales force and mortgage originations grew 25 percent or $4.2 billion, while refinancing grew 7 percent or $1 billion.  "Loans securitized and sold into the secondary market increased 18 percent to $34.6 billion as origination volume increased."

39.     First Horizon inadequately reserved for loan losses to take into account that it had lowered its underwriting standards.

40.     In its 2005 Annual Report, First Horizon touted the 83% growth of commercial construction loans in 2005 without disclosing risks inherent to that portfolio.  First Horizon and Defendant Baker—then First Horizon's Chief Operating Officer—described the Company's construction lending as operating pursuant to "a program of carefully managed growth with this business."  The 2005 Annual Report credited "the favorable housing environment" as a factor in that growth as well as the expansion of its sales force and its geographic reach.  It did not attribute the growth to its lowered underwriting standards, or disclose the extent to which the growth depended on such lowered underwriting standards.

41.     First Horizon utilized what it referred to as "Super Expanded Underwriting Guidelines," in its loan business.  These standards allowed for FICO scores, loan-to-value ratios and debt-to-income ratios that were significantly less restrictive than the Company's standard full/alternative documentation loan programs.  First Horizon did not adequately disclose that it had failed to make adjustments in its loss provisions to take into account its lowered underwriting standards.

42.     At December 31, 2005, First Horizon reported off balance sheet commitments at a "Contractual amount" of more than $17 billion, without adequately disclosing the effects of such off balance sheet items on its expected future financial condition.  2005 Annual Report.

43.     In its 2005 Annual Report, First Horizon represented that in providing for loan losses it used an "analytical model based on historical loss experience adjusted for current events, trends and economic conditions."  "[A]sset quality in general should remain relatively stable based on expected economic conditions with normal short-term fluctuations; however, asset quality performance during 2005 was relatively strong."

44.     First Horizon showed an increase in shareholders' equity from $1.9 billion in 2004 to $2.1 billion in 2005.  2005 Annual Report.

45.     First Horizon touted its "enterprise-wide approach to risk governance, measurement, management and reporting including an economic capital allocation process that is tied to risk profiles used to measure risk-adjusted returns."  2005 Annual Report.  It did not disclose that its risk management procedures were not adjusted to take into account the increased risks associated with its reduced underwriting standards and practices.

46.     In its 2005 Annual Report First Horizon reported that it had investment grade ratings from all three of the rating agencies and that it recognized the need to maintain such ratings: "Maintaining adequate credit ratings on debt issues is critical to liquidity because it affects the ability of FHN to attract funds from various sources, such as brokered deposits or wholesale borrowings of which FHN had $10.1 billion and $6.2 billion on December 31, 2005 and 2004, respectively…."  First Horizon did not disclose that the banking practices in which it was engaged, including lowered underwriting standards, and involvement in subprime and Alt-A loans, that were likely in the future to cause its credit ratings to be lowered in the future.

47.     By December 31, 2006, First Horizon's credit ratings had begun to decline.

48.     In its 2005 Annual Report, First Horizon stated that it had 13,000 employees serving customers through hundreds of offices located throughout 46 states.  The 2005 Annual

Report contained a Chairman's Message from Defendant Glass dated February 1, 2006, which stated, "Our national expansion strategy also worked well."  Glass also stated, "As I look at 2006, I'm encouraged about the opportunities that exist in our businesses and the progress we are making toward our commitment of $50 million in earnings enhancements."

49.     In 2004, First Horizon Home Loans securitized and sold approximately $19.3 billion in mortgage loans.  In 2005, First Horizon Home Loans securitized and sold approximately $16.6 billion in mortgage loans.  In its 2005 Annual Report, First Horizon disclosed that:

> Certain of FHN's originated loans, including non-conforming first-lien mortgages, second lien mortgages and HELOC originated primarily through FTBNA, do not conform to the requirements for sale or securitization through government agencies.  FHN pools and securitizes these non-conforming loans in proprietary transactions.  After securitization and sale, these loans are not reflected on the Consolidated Statements of Condition [except for certain circumstances].  On December 31, 2005 and 2004, the outstanding principal amount of loans in these off-balance sheet business trusts was $20.0 billion and $11.3 billion, respectively. Given the significance of FHN's origination of non-conforming loans, the use of single-purpose business trusts to securitize these loans is an important source of liquidity to FHN.

50.     In other words, in one year, from 2004 to 2005, First Horizon almost doubled the amounts of off-balance sheet loans, while simultaneously describing the loan transactions so opaquely that Plan participants could not assess the risks to the Company related to those items.

51.     First Horizon depended "significantly" on its "ability to sell or securitize first and second mortgage loans and home equity lines of credit…." 2005 10-K at p. 18.  It did not disclose or did not adequately disclose the risks to such securitization.

52.     In its 2005 Annual Report, First Horizon stated that it had "a significant concentration in loans secured by real estate" but they were "geographically diversified nationwide."  First Horizon also represented that it "did not have any concentrations of 10

percent or more of total commercial, financial and industrial loans in any single industry." By that date, First Horizon knew or should have known that it was likely to experience further deterioration in its national home builder, and commercial real estate lending through its First Horizon Lending offices.

53.     In a November 15, 2005 press release, then-CEO Defendant Glass stated:

> We believe we have in place the leadership and accountability that will help us achieve our efficiency objectives in the short and long term, solidify our leadership position in Tennessee, expand our retail and commercial banking businesses nationally and continue to be a national player in mortgage banking and capital markets.

54.     Commenting on his new responsibilities as Chief Operating Officer, Defendant Baker stated in the same press release:

> [W]e have grown both our Tennessee and national businesses, making us confident of our strategic direction. We will continue our plan of disciplined growth and remain focused on our core values, which lead to greater profitability and enhanced shareholder value.

**The Truth Emerges**

55.     Late in the summer of 2006, First Horizon allowed the first bad news about the Company's deteriorating financial condition to slowly dribble out. On August 29, 2006, in a press release, First Horizon admitted that:

> First Horizon National Corporation (First Horizon) (NYSE:FHN) announced today that it expects mortgage banking earnings to be unfavorably impacted this quarter by two unrelated events. The further deterioration in the current mortgage environment is expected to reduce pre-tax operating earnings by approximately $35 million as compared to the second quarter, and the settlement of a class action lawsuit is anticipated to create an estimated $21 million pre-tax accrual.
>
> Mortgage banking operating earnings for the first two months of this quarter have been unfavorably impacted by lower gain on sale

margins, further reductions in mortgage production and increased costs to hedge the servicing risks.

The recent drop in the 10-year treasury rate and the resulting inversion of the yield curve have changed the dynamics within the mortgage secondary market. As a result, First Horizon Home Loan's gain on sale margins fell significantly below second quarter levels, and the costs increased to hedge servicing risks. After realizing 122 basis points in gain on sale margins in the second quarter, we currently expect margins to range between 85 basis points and 90 basis points in the third quarter based on product delivery trends. Additionally, this environment is expected to increase net hedging costs by approximately $5 million as compared to second quarter.

Mortgage banking industry-wide production has also weakened as the housing market has continued to slow. Although third quarter originations have traditionally been higher than second quarter levels, First Horizon's recent application trends foreshadow approximately a $1 billion reduction in originations and deliveries this quarter.

These three issues could reduce third quarter pre-tax operating earnings by $35 million in comparison to the second quarter. Although we currently expect some modest improvement in mortgage banking in the fourth quarter, the current operating environment suggests that mortgage banking operations will only be in the range of break-even in the fourth quarter while our other two businesses should continue to perform in line with expectations.

56.     First Horizon blamed the "current mortgage environment" rather than its own aggressive banking practices and the relaxation of its underwriting standards and other banking practices for losses in its mortgage portfolio.  And First Horizon failed to stem the problems.  It continued to make subprime real estate loans, Alt-A loans and other non-conforming loans ignoring the declining market for those loans.

57.     On September 29, 2006, First Horizon announced the "transition[ing]" of its Chief Financial Officer and the search for a successor.

58.     On October 18, 2006 First Horizon issued a press release announcing the

Company's earnings for Third Quarter 2006, which stated:

> "We remain confident in our core strategy which continued to show progress in the third quarter," said First Horizon National Corporation Chairman and CEO, Ken Glass.  "In this period, we expanded our retail/commercial banking footprint, experienced the positive impact of cross-sell penetration, and made gains in the development and distribution of capital markets products other than fixed income. We believe that our vision of organically creating a national financial services organization and recruiting high-performing, experienced talent will deliver above-industry performance and provide long term value to our shareholders."
>
> \*        \*        \*
>
> Provision for loan losses increased to $23.6 million in third quarter 2006 from $22.4 million last year.  The 2005 provision included $3.8 million of hurricane losses.  Excluding this item, the provision for loan losses would have been $18.6 million.  The $5.0 million increase primarily reflects an expectation of slowing economic growth and the migration of a few loans to the watch list….
>
> \*        \*        \*
>
> "While macro environment issues will continue to impact earnings growth into next quarter, our overall strategy continues to position our business for strong sustained earnings growth," concluded Glass.

59.     In a January 17, 2007 press release, Defendant Glass was quoted as stating:

> 2006 was a unique year for the company, as our financial performance was marked by a number of unusual and one time items such as the sale of our merchant business. We recognize that given this, it will be difficult for you to get a good fix on our 2007 earnings. Therefore, we have decided for 2007 to offer more specific guidance.  For 2007, we expect the company to produce earnings for the full year at or above the current market consensus of $2.80.

60.     First Horizon's 2006 Annual Report was entitled "Positioned for Growth."  First

Horizon was not positioned for growth.  It was on an unsustainable course.

61.     As of March 1, 2007, First Horizon and Defendant Baker were still touting First

Horizon's national expansion strategy:

> We are very clear about our strategic vision.  Our goal is to expand
> our banking franchise to select markets nationwide using our
> targeted relationship approach. . .
>
> [W]hat we're proud to move forward with is an organization that is
> stronger at its foundation and better positioned to find stability
> amid financial market uncertainty.  And it's this repositioning that
> we believe will offer our shareholders the confidence of a more
> consistent return on the investments they make.

March 1, 2007 letter from Defendant Baker in 2006 Annual Report.

62.     On April 18, 2007, First Horizon announced first quarter 2007 earnings of $70.5

million or $0.55 per diluted share.

63.     It was not until that date that First Horizon announced in a press release that it

was finally no longer going to underwrite, process or fund subprime loans, but it was going to

continue its Alt-A loans.  The April 18, 2007 press release quotes Defendant Baker as stating:

> We are working hard to return mortgage to historical levels of
> profitability through our strategy of building our prime, retail
> origination business. …  Accordingly, we have made the decision
> to no longer underwrite, process and fund nonprime loans.  Our
> nonprime business, which represents less than two percent of our
> mortgage loan production, has resulted in a reasonable level of
> repurchase activity for which we have adequate reserves to cover
> estimated remaining losses.  However, reduced investor appetite
> for this product has diminished gain-on-sale margins drastically;
> therefore, we believe market risk no longer justifies the modest
> potential rewards and believe it is better to service retail customer
> needs through broker relationships.   In contrast, our Alt-A
> business, which represented 20 percent of our first-lien production
> in first quarter 2007, has prime-type credit characteristics despite
> the non-standard loan structures, with an average FICO of over
> 715 and continues to price appropriately.  The majority of our Alt-
> A production is securitized and to-date, no residual or credit
> support structures have been retained and we have not seen any
> material repurchase activity from these loans.

64.     The Company also stated in its April 18, 2007 press release:

> Provision for loan losses increased to $28.5 million in first quarter 2007 from $23.0 million in fourth quarter 2006, primarily reflecting an increase in both homebuilder and one-time-close construction loans on the watch list...The nonperforming assets ratio related to the loan portfolio decreased to 56 basis points in first quarter 2007 from 58 basis points in fourth quarter 2006 due to the resolution of these previously identified problem loans and as overall low levels in the retail and commercial loans portfolios outweighed the expected increase in construction lending. The allowance to loans ratio was 99 basis points in first quarter 2007 compared to 98 basis points in fourth quarter 2006. Nonperforming assets were $135.9 million on March 31, 2007, compared to $139.0 million on December 31, 2006.

65.     Baker also stated in the press release:

> We are maintaining our focus on disciplined asset quality management with tightened guidelines in both retail and construction lending. We still expect asset quality to be solid for the full year of 2007 with net charge-offs averaging between 30 and 40 basis points for the year.

66.     In late May and early June, First Horizon Stock closed around $40 per share.

67.     On July 17, 2007, Fitch downgraded the lower tranches of two Alt-A Trusts offered and managed by First Horizon, series 2006 AA-3 and Series 2006-F-2.   Fitch downgraded the lowest two tranches (the BB tranche became B+, the B tranche was downgraded to CCC and assigned "distressed recovery" ratings) and put the BBB tranche on "ratings watch negative."

68.     In a July 19, 2007 press release, First Horizon announced that charge-offs decreased during the second quarter of 2007:

> The net charge-off ratio decreased to 41 basis points in second quarter 2007 from 48 basis points in first quarter 2007 as net charge-offs declined to $23.0 million from $26.6 million in first quarter 2007. Provision for loan losses increased to $44.4 million in second quarter 2007 from $28.5 million in first quarter 2007, with the increase split between recognition of $7.7 million of losses for a non-strategic loan portfolio that was sold during the

quarter and additional provisioning. Excluding the impact of the sold loans, the provision would have been $36.7 million for second quarter 2007. The nonperforming asset ratio increased to 81 basis points in second quarter 2007 from 56 basis points in first quarter 2007.

69.    On July 19, 2007, First Horizon Stock closed at $37.74 per share, down 24 cents. Over the next three months, First Horizon's share price decreased approximately 20%, reaching $29.65 on September 11, 2007.

70.    The July 19, 2007 press release also announced that First Horizon would pursue the sale, closure or consolidation of 34 branches in its four national full-service banking markets of Atlanta, Baltimore, Dallas and Northern Virginia, while continuing to offer mortgage loans in these markets through First Horizon Home Loan Corporation.

71.    On September 12, 2007, First Horizon CEO Jerry Baker announced plans to cut up to 50 percent of its mortgage sales force and shrink the real estate portfolio on its balance sheets by making further changes in its consumer and construction lending businesses.  At that time, First Horizon noted that it was not planning to grow.  Instead, it was shrinking and cutting back as well as planning to make other adjustments, including:

- Shrinking the real estate portfolios on its balance sheet by making further changes in its consumer and construction lending business.  New originations are expected to decline significantly as a result of continued product and program changes and the retention of only the most productive sales people.

- Cutting back-office support in consumer and construction lending as production is reduced.

- Exiting selected national markets for business banking.

- Transitioning the national cross-sales of deposit products to an Internet-based model, eliminating the need for banking specialists in mortgage offices.

72.     The September 12, 2007 press release quoted Defendant Baker as stating:

> "This strategic shift will reduce our real estate exposure and position us appropriately for the expected ongoing contraction of the housing market," said Baker. "As we focus our energy on continuing to build our strong banking franchise in Tennessee, we will enhance shareholder value by deemphasizing our more volatile national businesses, improving short-term profitability and increasing longer-term returns."

73.     On October 17, 2007, First Horizon Stock closed at $25.04 per share.

74.     On October 18, 2007, First Horizon announced that it experienced a loss in third quarter 2007 of $14.2 million, or 11 cents per share, compared with net income of $22.1 million, or 17 cents a share, a year earlier.  Reflecting the "deterioration" of credit markets, the company's mortgage banking operations posted a pretax loss of $45.8 million, up from a second quarter pretax loss of $16.1 million.

75.     Upon announcement of the third quarter results, First Horizon's share price dropped to $23.69 per share on October 18, 2007.

76.     On December 21, 2007, First Horizon announced that its mortgage business expected to lose money in the fourth quarter of 2007 and that it expected to set aside an additional $150 million in anticipation of unpaid loans.  The loan loss provision for the fourth quarter exceeded First Horizon's combined provision for the first three quarters of 2007.  Many of these unpaid loans were a result of defaults from residential developers that borrowed money to buy properties in Florida, California, Virginia, Georgia and Nevada.  The December 21, 2007 press release stated:

> Additional Loan Loss Reserves
>
> First Horizon recently completed a review of its reserve for loan losses and real estate portfolios, with an emphasis on higher-risk markets. As a result of that review, First Horizon expects to increase its reserves in the fourth quarter, with an anticipated total provision of approximately $150 million that should significantly

exceed net charge-offs of roughly $50 million. The additional reserves are largely attributable to inherent losses within its residential construction portfolios -- One-Time Close and Homebuilder -- from discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada….

Mortgage Segment Impacts

First Horizon expects its mortgage segment to report a fourth quarter 2007 pre-tax loss. While based on preliminary estimates and subject to changing market conditions through the end of this quarter, this anticipated loss is driven by three areas:

Approximately $70 million of goodwill impairment resulting from updated valuation of the mortgage segment; Volatility of mortgage rates and intra-mortgage spread widening since the beginning of December, which has adversely impacted gain-on-sale margins and hedging performance by roughly $40 million; and Potential adjustments to the carrying values of mortgage servicing and valuation of non-conforming products in light of current market conditions.

77.     Throughout the fourth quarter 2007, First Horizon's stock price continued to drop, closing the year at $17.78 per share.

78.     On January 17, 2008, First Horizon announced a loss of $248.6 million or $1.97 per diluted share in fourth quarter 2007 compared to a net loss of $14.2 million or $.11 per diluted share in third quarter 2007 due to rising loan-loss reserves and a reduction in the value of mortgage servicing rights.  The Company also reduced its dividend by 56 percent to 20 cents per share.

79.     With respect to loan losses, First Horizon stated:

The net charge-off ratio was 93 basis points in fourth quarter 2007 compared to 57 basis points in third quarter 2007 as net charge-offs increased to $50.8 million from $31.4 million in third quarter 2007. Provision for loan losses increased to $156.6 million in fourth quarter 2007 from $43.3 million in third quarter 2007. Provisioning for fourth quarter 2007 reflects recognition of inherent losses within residential construction portfolios, including One-Time Close and Homebuilder Finance, related to discontinued

product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada. The nonperforming asset ratio increased to 166 basis points in fourth quarter 2007 from 113 basis points in third quarter 2007.

80.     In the January 17, 2008 press release,  Defendant Baker is quoted as stating:

Current market conditions require definitive management actions to adequately address the operating environment and to position the company for consistent revenue growth and greater return for our shareholders…. As such, we have acted in several key areas by increasing loan loss reserves, reducing our mortgage servicing assets and national lending businesses, implementing productivity enhancements, and selling or reducing low returning operations. In combination with our dividend reduction, these changes should improve our capital position in 2008 and allow us to make the proper investments that leverage the fundamental strength of our Tennessee banking franchise.  …

We will continue to make further significant adjustments to our mortgage and related lending businesses, including pursuing strategic alternatives to further reduce our exposure to these areas.

81.     During all that bad news, First Horizon continued to make matches in Company

Stock.

82.     During a January 17, 2008 earnings conference call, First Horizon's Chief

Financial Officer Bryan Jordan stated:

. . . As we disclosed in late December the additional reserves primarily reflect **higher inherent losses in segments of our national one time close and home builder portfolios, which together represent $4.1 billion or about 19% of our total loan portfolio.**

In Home Builder Finance we continue to see the greatest problems in weak national housing markets such as Florida, California, Arizona, Nevada, Virginia and Georgia. Where falling home prices are driving entire loss severities and where a large supplies of unsold homes are pressuring builders and consumers. **Florida and California alone represent about 22% of our total $2.1 billion builder portfolio but account for over 50% of our non-**

**performers in this portfolio.** Our one time close portfolio is also experiencing significant pressures in these national markets.

4Q 2007 Investors Conference Call (emphasis added).

83. That conference call continued:

**Fred Cannon – KBW**

Good morning. I wonder if you could walk us through a bit more on the one-time flows product, in particular. Essentially what went wrong on that product, in terms of the structure of it and the loss content you are seeing? **If I remember correctly, historically you have implied that you thought that was a fairly safe product and would perform like first mortgages; that isn't occurring. Now it sounds like it is performing more in line with the national homebuilder portfolio.**

Also, was there any kind of breakdown in your risk management regarding that product?

**Bryan Jordan**

The one-time close is a product, just to restate, is an individual construction loan for an individual borrower to build a home. It is often made in a scenario where the homebuilder is – it also includes a take-out into a permanent structure. The average loan size is about $435,000 or so.

The issues that we are seeing in the portfolio are largely driven by a couple of major factors. **In a lot of cases, the portfolio had an Alt-A structure or an Alt-A take-out.   A lot of the problems that we are seeing today are in the products that we significantly curtailed in 2006 and into 2007.**   For example, stated income product and other expanded approval products.   We are seeing the greatest deterioration in those products. You have got the overall slowdown in the real estate markets driving the ability of buyers to sell the home they are in, move into this one; a number of different factors from the economy affecting it.   The biggest drivers in general have been the difficulties in the real estate market and the unavailability of financing and the ability to sell some of those products.

**Fred Cannon – KBW**

So just on that note, so essentially the risk characteristic that created this issue were alt-A stated income issues? Secondly, you said that essentially you would make this loan to an individual

26

while you still had another mortgage on another property, and then therefore it was essentially a second home loan to individuals and that was another risk characteristic?

**Bryan Jordan**

It wasn't always a second home loan. It was intended to be a first and that was part of the approval where you would sell the existing home, you would move the equity over. But clearly **a [stepped] product is more susceptible to misrepresentation and fraud.**

**Dave Miller**

Fred, those expanded guideline type of products also tended to be more for some of the higher-risk markets. So with the slowdown in some of those areas that sort of exacerbated the issue.

**Fred Cannon – KBW**

You are talking about my home state of California, I bet.

**Gerald L. Baker**

That would be one, Fred.

Id. (emphasis added).

84.    On January 17, 2008, Standard & Poor's Ratings Services cut its long-term credit rating on First Horizon to "BBB+" from "A-," as well as the counterparty credit rating on its subsidiary, First Tennessee, to "A-/A-2" from "A/A-1."

85.    On January 28, 2008, First Horizon announced that it will pull out of national home building and commercial real estate lending everywhere except in Tennessee and a few other parts of the Southeast.  David Flaum, "First Horizon Cuts Back Lending," Memphis Commercial Appeal (January 29, 2008).

86.    On March 3, 2008, Moody's Investors Services downgraded First Horizon based on concerns about its exposure to commercial real estate.

87.    On March 10, 2008, Fitch Ratings gave a negative outlook to First Horizon due to "continuing weakness in FHN's construction lending portfolio and rising non-performing assets

27

in homebuilder finance portfolio and construction loans made directly to consumers for single family loans, which comprise approximately 20% of total loans."

88.     On March 20, 2008 JPMorgan Securities Inc. downgraded First Horizon shares to "Neutral" citing rapid deterioration of home equity loans as a major short-term risk.  In a note to clients, analyst Steven Alexopoulos pointed to evidence that loan losses for the industry are rapidly spreading from residential construction loans to home equity loans:

> "A weakening economy and declines in home prices are the two ingredients that tend to drive mounting home equity losses," he said. "Listening to what bank managements have said during the quarter, it appears to us that all of the pieces are in place for the industry to see meaningful deterioration in home equity loans in the first quarter."  …
>
> First Horizon is especially at risk, as 18 percent of the Memphis, Tenn.-based bank's loans are home equity products, Alexopoulos noted.

"JPMorgan downgrades First Horizon," Associated Press, March 20, 2008

89.     On April 1, 2008, Morgan Stanley initiated coverage of First Horizon with "underweight."

90.     On April 28, 2008, First Horizon announced that it would no longer pay its dividend in cash, but would make it instead in shares of common stock, and that it was issuing up to $600 million in new shares priced at $10.00 per share, thereby diluting its existing shares of common stock.  April 28, 2008 Press Release; April 29, 2008 Press Release.

91.     On May 8, 2008, First Horizon's stock price hit a 12-year low when it dropped to $10.35 per share before closing at $10.36.

## THE LAW UNDER ERISA

92.    **The Statutory Requirements**.  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; ... and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

93.    **The Duty of Loyalty**.  ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries...."

94.    The duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly if they occur.  A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the fiduciaries themselves or plan sponsor.

95.    **The Duty of Prudence**.  ERISA imposes on a plan fiduciary the duty of prudence, that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...."

96.    **The Duty to Inform**. The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail: 1) a duty not to misinform; 2) an affirmative duty to

inform when the fiduciary knows or should know that silence might be harmful; and, 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  The duties to disclose and inform recognize that a disparity may exist, and in this case did exist, between the training and knowledge of fiduciaries, on the one hand, and of participants, on the other.

97.    **The Duty to Investigate and Monitor Investment Alternatives**.  For pension plans such as this one, the duties of loyalty and prudence entail a duty to independently investigate and continually monitor the merits of the investments offered by the plan, such as the merits of offering employer securities, to ensure that each investment is a suitable option for the plan.

98.    **The Duty to Monitor Appointed Fiduciaries**.  Fiduciaries who have the responsibility for appointing other fiduciaries have a concomitant duty to monitor the fiduciaries they appoint.  The duty to monitor entails giving information to, and reviewing the performance of, the appointed fiduciaries.  For defined contribution plans such as the Plan, monitoring fiduciaries must ensure that appointed fiduciaries:

a    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

b.    are knowledgeable about Plan operations and goals, and the behavior and characteristics of Plan participants;

c.    Select investment options for the Plan based on the prudence of the options for the Participants and not the fees to be generated by affiliates of the Plan's sponsor;

d.    Review the reasonableness of the fees charged to the Plan in relation to the services performed;

e.      Are provided with adequate financial resources to discharge their duties;

f.      Have adequate information to perform their duty of overseeing plan investments in employer stock;

g.      Have access to outside, impartial advisors when needed;

h.      Maintain adequate records which document information on which they based decisions and analysis of plan investment options; and

i.      Report regularly to monitoring fiduciaries.

Monitoring fiduciaries must then review, comprehend and approve the conduct of the hands-on fiduciaries they appointed.

99.      **The Duty to Follow Plan Documents with Prudence**.  A fiduciary may not avoid liability by rote reliance on the language of plan documents without considering its impact on his fiduciary duties.  While the plan sponsor may specify the basic structure of a plan, within limits, the fiduciary may not blindly follow plan documents if it would lead to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

100.      **404(c) Defense Inapplicable.**  ERISA § 404(c), 29 U.S.C. § 1104(c), provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for the selection of imprudent investments for the plan. Before § 404(c) will apply, it must be shown that participants in fact exercised "independent control" over investment decisions within the meaning of 29 C.F.R. § 2550.404c-1.

101.      As alleged, Defendants failed to provide participants with complete and accurate information regarding First Horizon Stock in the Plan; the financial condition of the Company; the facts surrounding the selection of the funds offered to participants; and the comparison of those funds to other funds that an independent fiduciary would have selected.  The Department

of Labor's § 404(c) regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant."  Accordingly, § 404(c) does not apply here, and the defendants remain liable for losses suffered by participants during the Class Period.

102.    In addition, § 404(c) does not apply to any losses resulting from any matching contributions which were automatically invested by the defendants in the First Horizon Stock, since participants did not exercise independent or any control over those investments.

103.    Because the information and documents on which Plaintiff's claims are based are, for the most part, solely within Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  After Plaintiff has had the opportunity to conduct discovery, Plaintiff will to the extent necessary and appropriate amend her Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that support each of the following counts below.

## CLAIMS FOR RELIEF

## COUNT I

**Failure to Prudently and Loyally Manage Plan's Investment in First Horizon Stock
(Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C. § 1104 by First
Horizon, Director Defendants and Committee Defendants)**

104.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully set forth herein.

105.    At all relevant times, Defendants named in this Count acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and of the assets of the Plan.

106.     By at least January 1, 2006, First Horizon, the Director Defendants, the Committee Defendants and others including John Does, knew or should have known that First Horizon Stock was not a suitable and appropriate investment for the Plan due to the Company's undisclosed exposure to losses due to the deteriorating quality of its loan portfolio, its dependence on securitization of subprime, Alt-A and other troubled loans, the problems in its residential construction and other loans, and its failure to adequately account for those problems including by not having adequate loan provisions.

107.     Notwithstanding this knowledge, Defendants named in this Count breached their fiduciary duties by, among other things, failing to review the appropriateness of First Horizon Stock as an investment fund for the Plan, requiring participants to invest in the Company Stock Fund in order to receive a matching contribution from the Company, automatically investing Company matching contributions in the Company Stock Fund, acquiring new shares of First Horizon Stock at artificially inflated prices, and concentrating more than 50% of the Plan's assets in First Horizon Stock despite the risks associated with such a concentration.

108.     Upon information and belief, Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, among other things: failing to engage independent fiduciaries that could make independent judgments regarding the Plan's investments in First Horizon Stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made First Horizon Stock a unsuitable investments for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and in each of these failures, by otherwise placing the Company's interests above those of the participants.

109.     As a direct and proximate result of these breaches of fiduciary obligations as alleged, the Plan, and indirectly Plaintiff and other Plan participants and beneficiaries, have lost millions of dollars.

110.     Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II

### Breach of Duties of Loyalty and Prudence by Causing the Plan to Invest in First Funds (Violation of ERISA § 404, 29 U.S.C. § 1104 by All Defendants)

111.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

112.     At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

113.     Defendants, by their actions and omissions in authorizing or causing the Plan to invest in First Funds, to purchase products and services from First Horizon subsidiaries and affiliates, and to pay investment management and other fees in connection therewith to First Horizon subsidiaries and affiliates, put First Horizon's financial interests ahead of the Plan's interests.  In doing so, Defendants breached their duties of prudence and loyalty to the Plan under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

114.     As a direct and proximate result of these breaches of duty, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars.  Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a), Defendants are liable to restore all losses suffered by the Plan caused by their breaches of fiduciary duty in the selection

of funds for the Plan and investment of Plan assets.

## COUNT III

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries (Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C. § 1104 by All Defendants)

115.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

116.    At all relevant times, Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control in the management of the Plan and of Plan assets.

117.    Because investment in the Company Stock Fund was, by definition, not diversified, it carried an inherently high degree of risk.  This risk made Defendants' duty to provide complete and accurate information particularly important for the Company Stock Fund and investments of Plan assets in First Horizon Stock.

118.    First Horizon, the Director Defendants, the Committee Defendants and others including John Does breached their duty to inform by failing to provide complete and accurate information regarding First Horizon Stock, the extent of the Company's exposure to losses in connection with the deteriorating quality of its residential construction loans and mortgages, the Company's artificial inflation of the value of the stock, and, generally, by conveying incomplete and inaccurate information about the soundness of First Horizon Stock and the Company Stock Fund as a retirement investment.

119.    All Defendants breached their duty to inform by failing to provide complete and accurate information regarding the financial benefits that First Horizon and its affiliates were receiving in connection with investing Plan assets in the First Funds, and the fact that the First

Funds were selected by Plan fiduciaries because of the fees generated to First Horizon and its affiliates rather than through a prudent selection process.

120.     These actions and failures caused Plan participants and beneficiaries to make and maintain substantial investments in First Horizon Stock in the Company Stock Fund and in the First Funds at a time when Defendants knew or should have known that First Horizon Stock and the First Funds were not prudent investment options for the Plan or Plan participants.

121.     As a direct and proximate result of these breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other participants and beneficiaries, have lost millions of dollars.

122.     Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of their fiduciary duties.

## COUNT IV

### Failure to Monitor the Plan's Fiduciaries
### (Breach of Fiduciary Duties in Violation of ERISA, 29 U.S.C. § 1104(a)(1) by First Horizon and the Director Defendants, and Against First Horizon Under Agency Principles)

123.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

124.     At all relevant times, First Horizon and the Director Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), for the Plan because they were charged with, responsible for, and otherwise assumed the duty of, appointing, monitoring, and, when necessary, removing Plan fiduciaries, including but not limited to trustees, plan administrators, investment advisors, investment managers, and any other as yet unidentified First Horizon employees or agents to whom such duties were delegated.

125.     First Horizon and the Director Defendants breached their fiduciary duties by failing to adequately monitor the trustees, plan administrators, and other persons, if any, to whom management of Plan assets was delegated.  These Defendants knew or should have known that the other fiduciaries were imprudently allowing the Plan to offer First Horizon Stock and the First Funds and investing plan assets in them when it was not prudent to do so.  Despite this, they failed to take action to protect Plan participants from the failures of these other fiduciaries.

126.     These Defendant fiduciaries, in discharging their monitoring and oversight duties, were required to disclose to other fiduciaries directly involved in investment of Plan assets accurate information about the financial condition and practices of the Company.  By remaining silent and failing to provide such information to the other fiduciaries, these Defendants breached their monitoring duties under ERISA.

127.     In summary, Defendants named in this Count breached their monitoring duties by:

a.       failing to adequately monitor the investing fiduciaries' investment of Plan assets;

b.       failing to adequately monitor the Plan's other fiduciaries' implementation of Plan terms, including but not limited to investment of plan assets in First Horizon Stock and the First Funds;

c.       failing to disclose to the investing fiduciaries material facts about the financial condition and practices of the Company that Defendants named in this Count knew or should have known were material to loyal and prudent investment decisions about the Plan's acquisition and retention of First Horizon Stock in the Company Stock Fund and of the First Funds, and with respect to implementation of Plan terms; and

       d.      failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets.

128.    First Horizon is also liable for breaches of duty by the Director Defendants, the Committee Defendants, and other agents and employees including John Does for the losses caused by them, under the law of agency, including principles of vicarious liability and *respondeat superior*; and First Horizon is liable as indemnitor of these Defendants under corporate law and First Horizon's articles of incorporation and other documents of corporate governance.

129.    As a direct and proximate result of these breaches of fiduciary duties alleged, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, have suffered losses of millions of dollars.

130.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by the breaches of fiduciary duties by Defendants named in this Count.

## COUNT V

### Breach of Co-Fiduciary Duties
### (Breach of Co-Fiduciary Duties in Violation of ERISA § 405, 29 U.S.C. § 1105, by All Defendants)

131.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

132.    A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be

liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

133.     By virtue of all facts and events alleged herein, and at all relevant times, all Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a), 29 U.S.C. §1104(a), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the breaches. Accordingly, defendants are each liable for the others' violations pursuant to ERISA § 405(a)(2) and (3), 29 U.S.C. § 1105(a)(2) and (3).

134.     First Horizon, First Tennessee, Highland Capital Management Corporation and Martin & Company, Inc. are liable under Section 405 because, among other things, they knowingly participated in and/or concealed the Committee Defendants' breaches of their duty of loyalty by investing Plan assets in the First Funds in order to generate financial benefits for themselves, rather than because such funds were prudent retirement investments for Plan participants.

135.     First Horizon and the Director Defendants are liable under Section 405 because their own fiduciary breaches in failing to appropriately monitor the fiduciaries they appointed, enabled appointed fiduciaries such as the Committee Defendants to breach their duties under

ERISA by, among other things, continually selecting the Company Stock Fund and the First

Funds as investment options for the Plan when it was imprudent or disloyal to do so.

136.     Further, all Defendants knew that the other defendants had breached their duties

under Section 404 by continuing to offer the Company Stock Fund and/or the First Funds as

investment options, and to direct and approve investment of matching contributions in First

Horizon Stock, when it was imprudent, disloyal and contrary to ERISA to do so, yet they failed

to make reasonable efforts to remedy the situation.

137.     As a result of their breaches of Section 405 of ERISA, Defendants have caused

the Plan to suffer financial losses for which they are jointly and severally liable, pursuant to

Section 409 of ERISA.

## CLASS ACTION ALLEGATIONS

138.     Plaintiff brings this class action on behalf of a Class defined as:

> Participants in and beneficiaries of the First Horizon National
> Corporation Savings Plan ("Plan"), excluding Defendants, whose
> accounts in the Plan were invested in First Horizon Stock on or
> after January 1, 2006, and/or the First Funds on or after the date six
> years prior to the filing of the Complaint.

139.     Class certification is appropriate under Rule 23(b)(1)(A) & (B) and 23(b)(2) of

the Federal Rules of Civil Procedure.

140.     The Class consists of more than 15,000 individuals and is so numerous that

joinder of all members is impracticable.

141.     There are questions of law and fact common to the Class, which include:

a.     Whether all or some of Defendants are fiduciaries;

b.     Whether various of the Defendants breached their fiduciary obligations to

the Plan and participants by causing the Plan to offer the Company Stock Fund as an investment

option given that Defendants knew or should have known that, because of First Horizon's undisclosed financial problems, purchases of the Stock were being made at inflated prices;

      c.      Whether various of the defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to make and maintain investments in First Horizon Stock at a time as it was not prudent to do so;

      d.      Whether various of the Defendants failed to conduct a prudent investment selection process with respect to the First Funds to be offered by the Plan and instead selected First Funds because of their benefits to First Horizon and its affiliates;

      e.      Whether various of the defendants breached their fiduciary obligations to the Plan and participants by providing incomplete and inaccurate information to participants, and by preventing participants from exercising "independent control" over investments in the Company Stock Fund as a result;

      f.      Whether the Company and the Director Defendants breached their fiduciary obligations to the Plan and participants by failing to prudently monitor the investment selection procedures and other activities of the Plan's other fiduciaries, including the administration of the Plan, such that the interests of the Plan and Plan participants were not adequately protected and served;

      g.      Whether all of the Defendants, by failing to comply with their specific fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled and/or caused their co-fiduciaries to violate of ERISA and, despite knowledge of such breaches, failed to make reasonable efforts to remedy them, and are each liable for the others' violations pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a).

h.       Whether as a result of fiduciary breaches by the defendants, the Plan, participants and beneficiaries have suffered losses.

142.    Plaintiff's claims are typical of the Class.

143.    Plaintiff will fairly and adequately protect the interests of the Class.  He has no interest that is antagonistic to or in conflict with the interest of the Class as a whole, and he has engaged competent counsel experienced in class actions and ERISA actions of this nature.

144.    This action is properly maintainable as a class action for the following independent reasons and under these portions of Rule 23:

a.       Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications which would establish incompatible standards of conduct for Defendants with respect to their obligations under the Plan.  Fed. R. Civ. P. 23(b)(1)(A).

b.       The prosecution of separate actions by members of the Class would create a risk of adjudications for individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1)(B).

c.       Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.  Fed.R.Civ.P. 23(b)(2).

d.       Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed.R.Civ.P. 23(b)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.      Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

2.      Declare that Defendants, and each of them, have breached their fiduciary duties to the Plan's participants and beneficiaries;

3.      Issue an order compelling Defendants to restore to the Plan all losses suffered by the Plan as a result of these breaches, including restoring the return on investments that the Plan, Plaintiff, participants and beneficiaries would have realized had Defendants discharged their duty of prudent and loyal investment of Plan assets;

4.      Order equitable restitution and other appropriate equitable monetary relief against Defendants;

5.      Award such other equitable or remedial relief as may be appropriate, including permanent removal of Defendants from any positions of trust with respect to the Plan and appointment of independent fiduciaries to administer the Plan;

6.      Enjoin Defendants, and each of them, from any further violations of ERISA fiduciary responsibilities, obligations and duties;

7.      Order Defendants or successor fiduciaries to allocate Plan recoveries to the accounts of all participants who had any portion of their account balances invested in the First Horizon stock in proportion to the accounts' losses attributable to the decline in First Horizon's stock price;

8.      Award Plaintiff attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

9.      Award such other and further relief as the Court deems equitable and just.

Respectfully submitted,

/s/ Ellen M. Doyle_____
Ellen M. Doyle[1]
edoyle@stemberfeinstein.com
William T. Payne
wpayne@stemberfeinstein.com
John Stember
jstember@stemberfeinstein.com
Stephen M. Pincus
spincus@stemberfeinstein.com
Joel R. Hurt
jhurt@stemberfeinstein.com

Stember Feinstein Doyle & Payne, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
(412) 281-8400

Date: May 9, 2008

---

[1] All attorneys are members of the Bar of the U.S. District Court for the Western District of Tennessee.