**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| TROY SIMS and JOHN YOST, individually, and on behalf of all others similarly situated, | Civil Action No. 08-02293 |
| Plaintiffs, | Judge S. Thomas Anderson |
| v. | Magistrate Judge Charmiane G. Claxton |
| FIRST HORIZON NATIONAL CORPORATION, et al, | |
| Defendants | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL DISMISSAL**

Ellen M. Doyle
Pamina Ewing
Stephen Pincus
Joel R. Hurt
**STEMBER FEINSTEIN
DOYLE & PAYNE, LLC**
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 281-8400
Fax: (412) 281-1007

Counsel for Plaintiffs

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PROCEDURAL HISTORY....................................................................................3

III.    THE FACTS PLED IN THE COMPLAINT ..........................................................5

    A.      All Parties Are Properly Before This Court............................................................5

    B.      A Portion Of The Plan Was An ESOP And The Plan Required Participants To Invest Their Contributions In Employer Stock In Order To Receive A Company Match. ....................................................................................................................6

    C.      First Horizon Failed To Report And Properly Account For Known Risks Concerning Its Loan Portfolio ...............................................................................8

    D.      First Horizon Failed To Increase Its Loan Loss Reserves In Light Of Its Increasingly Risky Loan Portfolio And Data That The Markets Where Its Loans Were Concentrated Were Collapsing...................................................12

    E.      First Horizon Ignored Government Guidance Concerning Credit Risk, Nontraditional Mortgage Product Risks, And Loan Loss Reserves. ....................13

    F.      Defendants Failed To Prudently Respond To First Horizon's Loan Quality Problems By Halting Further Purchases Of First Horizon Stock At Inflated Prices....................................................................................................................16

IV.     ARGUMENT.......................................................................................................22

    A.      Introduction...........................................................................................................22

    B.      Count I States A Claim On Which Relief May Be Granted ..................................22

        1.      Dismissal of Plaintiffs' allegations is not appropriate under the controlling standards regarding Defendants' failure to prudently and loyally manage the Plan's investment in First Horizon Stock. ...........................................22

        2.      Defendants' Motion to Dismiss Plaintiffs' Count I claims should be denied ...................................................................................................25

        3.      Defendants' settlor function argument provides no basis for dismissing Count I ....................................................................................................26

        4.      The Kuper presumption provides no basis for dismissing Count I ...........28

          a.     The Kuper presumption does not apply on motions to dismiss .....28

          b.     Defendants' Kuper argument fails on the merits ..........................32

              (1)    Kuper controls, not Wright ................................32

              (2)    Defendants' "dire circumstances" argument fails..............33

              (3)    Defendants' "unique circumstances" argument fails.........36

C.     Defendants' Argument That The Plan's Losses Resulted Completely From Larger Economic Forces Rather Than Their Conduct Should Be The Subject Of Discovery Rather Than A Motion To Dismiss. .................................................37

D.     The Conduct Of Others In The Financial Industry Did Not Relive Defendants Of Their Fiduciary Duty To The Plan .................................................................39

E.     Count III States A Claim Upon Which Relief May Be Granted And Should Not Be Dismissed ....................................................................................................43

       1.     Plaintiffs' allegations ................................................................43

       2.     Controlling principles ...............................................................44

       3.     Contrary to Defendants' claim, they had a duty to disclose information relevant to participants' investment decisions ...........................................45

       4.     Defendants do not establish that, contrary to Plaintiffs' specific allegations, they made adequate disclosures...............................49

       5.     Defendants' securities law argument is unavailing ...................52

F.     Defendants' Motion To Dismiss Should Be Denied Because It Relies On Materials That Should Not Be Considered On Such Motions..............................53

G.     Counts IV And V Should Not Be Dismissed........................................................56

V.     CONCLUSION.................................................................................................................58

# TABLE OF AUTHORITIES

**Cases**

Abadeer v. Tyson Foods, Inc., 2009 WL 203239 (M.D.Tenn. July 10, 2009) ............................ 22

Ames v. American Nat. Can Co., 170 F.3d 751 (7th Cir. 1999) ................................................. 48

Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) .................................. 22

Banks v. Healthways, Inc., 2009 WL 211137 (M.D.Tenn. Jan 28, 2009) .................................... 30

Bassett v. National Collegiate Athletic Ass'n, 528 F.3d 426 (6th Cir. 2008) ............................. 54

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ...................................................................... 22

Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195 (3d Cir. 2006) ........................................... 41

Best v. Cyrus, 310 F.3d 932 (6th Cir. 2002) ............................................................................... 27

Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139 (2d Cir.
    1997) ................................................................................................................................. 48

California Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036 (9th Cir.
    2001) ................................................................................................................................. 45

Cent. States, S.E. & S.W. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559 (1985) ....... 28

Chao v. Hall Holding Co., Inc., 285 F.3d 415 (6th Cir. 2002) ............................................ passim

Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970) ................................................. 41

Commercial Money Center, Inc. v. Illinois Union Ins. Co., 508 F.3d 327 (6th Cir. 2007) .......... 54

Curtiss-Wright v. Schoonejongen, 514 U.S. 73 (1995) ............................................................... 48

Gee v. UnumProvident Corp., 2005 WL 534873 (E.D.Tenn. Jan. 13, 2005) .............................. 53

Gregg v. Transportation Workers of America Intern., 343 F.3d 833 (6th Cir. 2003) ................. 44

Howard v. Shay, 100 F.3d 1484 (9th Cir. 1996) ......................................................................... 22

In re ADC Telecommunications, Inc. ERISA Litigation, 2004 WL 1683144 (D.Minn. July 26,
    2004) ................................................................................................................................. 32

In re AEP ERISA Litig., 327 F.Supp.2d 812 (S.D.Ohio 2004) ....................................... 30, 48, 53

In re Calpine Corp., 2005 WL 1431506 (N.D.Cal. March 31, 2005) .......................................... 48

In re Cardinal Health, Inc. ERISA Litig., 422 F.Supp.2d 1002 (S.D.Ohio 2006) ........................ 29

In re CMS Energy ERISA Litig., 312 F.Supp.2d 898 (E.D.Mich. 2004) ......................... 29, 36, 48

In re Countrywide Financial Corp. Securities Litigation, 588 F.Supp.2d 1132 (C.D.Cal. 2008). 42

In re Diebold Erisa Litigation, 2008 WL 2225712 (N.D.Ohio May 28, 2008) ..................... 31, 48

In re Direct General Corp. Securities Litigation, 398 F.Supp.2d 888 (M.D.Tenn. 2005) ........... 56

In re Ferro Corp. ERISA Litig., 422 F.Supp.2d 850 (N.D.Ohio 2006) ........................... 33, 37, 52

In re First American Corp. ERISA Litigation, 2008 WL 5666637 (C.D.Cal. July 14, 2008) ...... 34

In re Ford Motor Co. ERISA Litigation, 590 F.Supp.2d 883 (E.D.Mich. 2008) ............. 27, 30, 34

In re General Motors ERISA Litig., 2006 WL 897444 (E.D.Mich. Apr. 6, 2006) ........... 29, 36, 48

In re Huntington Bancshares Inc. Erisa Litigation, 2009 WL 330308 (S.D.Ohio Feb 9, 2009)... 30

In re Polaroid ERISA Litigation, 362 F.Supp.2d 461 (S.D.N.Y. 2005) ........................................ 32

In re The Goodyear Tire & Rubber Co. ERISA Litig., 438 F.Supp.2d 783 (N.D.Ohio 2006).... 29, 37, 52

In re Unisys Sav. Plan Litigation, 74 F.3d 420 (3d Cir. 1996) ................................................. 46, 47

James v. Pirelli Armstrong Tire Corp., 305 F.3d 439 (6th Cir. 2002) .................................... 46, 48

Krohn v. Huron Memorial Hosp., 173 F.3d 542 (6th Cir. 1999) ............................................ 44, 45

Kuper v. Iovenko, 66 F.3d 1447 (6th Cir. 1995) ................................................................... passim

LaLonde v. Textron, Inc., 369 F.3d 1 (1st Cir. 2004) ............................................................... 31

LaRue v. DeWolff, Boberg & Assocs., Inc., 128 S.Ct. 1020 (2008) .......................................... 23

Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266 (3d Cir. 1998) ........ 40, 41

Opper v. Hancock Securities Corp., 250 F.Supp. 668 (S.D.N.Y. 1966) ...................................... 41

Passa v. City of Columbus, 123 Fed.Appx. 694, 2005 WL 372305 (6th Cir. 2005) ................... 56

Pfahler v. National Latex Products Co., 517 F.3d 816 (6th Cir. 2007) ........................................ 46

Rankin v. Rots, 278 F.Supp.2d 853 (E.D.Mich. 2003) .............................................. 29, 31, 36, 48

Real Estate Inc. v. Abramson, 901 F.Supp. 952 (E.D.Pa. 1995) ................................................ 55

Reich v. Hall Holding Co., 990 F.Supp. 955 (N.D.Ohio 1998) .................................................... 27

S.E.C. v. Dain Rauscher, Inc., 254 F.3d 852 (9th Cir. 2001) ....................................... 41

S.E.C. v. Geon Industries, Inc., 531 F.2d 39 (2d Cir. 1976).......................................... 41

Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983) ........................................................ 22

Sherrill v. Fed.-Mogul Corp. Ret. Programs Comm., 413 F.Supp.2d 842 (E.D.Mich. 2006)...... 29

Shirk v. Fifth Third Bancorp, 2009 WL 692124 (S.D.Ohio Jan 29, 2009) .................................. 30

Shirk v. Fifth Third Bancorp., 2007 WL 1100429  (S.D.Ohio Apr. 10, 2007) ..................... 30, 36

Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998) ........................................... 46, 48

Texas & P. Ry. Co. v. Behymer, 189 U.S. 468 (1903) .................................................. 40

The T.J. Hooper, 60 F.2d 737 (2d Cir. 1932) ............................................................. 40

U.S. v. Philip Morris Inc., 116 F.Supp.2d 131 (D.D.C. 2000) ...................................... 55

United States v. Paducah Towing Co., 692 F.2d 412 (6th Cir. 1982) ........................... 42

Varity Corp. v. Howe, 516 U.S. 489 (1996) ................................................................. 44

Vermilye & Co. v. Adams Express Co., 88 U.S. 138 (1874) ....................................... 41

Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565 (6th Cir. 2008) ...................... 55

Wright v. Oregon Metallurgical Corp., 360 F.3d 1090 (9th Cir. 2004)............................... passim

**Statutes**

29 U.S.C. § 1002.............................................................................................. 26, 43, 56

29 U.S.C. § 1103.............................................................................................. 26

29 U.S.C. § 1104.............................................................................................. 23, 24

29 U.S.C. § 1105.............................................................................................. 57

29 U.S.C. § 1109.............................................................................................. 23, 25

29 U.S.C. § 1132.............................................................................................. 25

# I.      INTRODUCTION

Plaintiffs seek in this class action to recover losses to the First Horizon National

Corporation Savings Plan ("Plan") caused by Defendants' breaches of fiduciary obligations

under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Class

members either work or worked for First Horizon National Corporation ("First Horizon" or the

"Company") and are Plan participants, or are beneficiaries of Plan participants.  Plaintiffs

challenge two distinct sets of fiduciary breaches, those involving imprudent investment in First

Horizon common stock ("First Horizon Stock") and those involving imprudent investment in

First Horizon proprietary mutual funds ("First Funds").[1]

Regarding First Horizon Stock, Plaintiffs challenge Defendants' continued acquisition of

new shares between January 1, 2006 and July 14, 2008 ("Class Period").  Notwithstanding that

over 50 percent of Plan assets were already invested in First Horizon Stock at the beginning of

this Period and that Defendants knew or should have known that the Stock price was inflated

because First Horizon had not adequately disclosed its financial condition, Defendants continued

to acquire new shares for the Plan.  In addition, Defendants not only invested matching

contributions in a First Horizon Stock fund ("Company Stock Fund"), but for most of the Class

Period, Defendants also enforced a Plan restriction requiring that participant contributions be

---

[1] Plaintiffs' First Funds claims challenge Defendants' selection and retention in the Plan of First
Horizon's proprietary funds.  Plaintiffs allege and documents provided by Defendants show that
the First Funds underperformed comparable nonproprietary funds but carried higher fees than the
median of an appropriate comparison group.  Plaintiffs allege that Plan fiduciaries did not select
the First Funds because they were prudent retirement investments but because the Funds
generated fees for First Horizon and its affiliates, and helped maintain the Funds' viability.
Plaintiffs' First Funds claims are not at issue in Defendants' Motion to Dismiss.  Plaintiffs' First
Funds claims were the subject of Defendants' summary judgment motion, which the Court
denied without prejudice by Order entered June 23, 2009.  See Dkt. #80.

invested in Company Stock in order to receive the Company match, even though such investments were imprudent.

In purchasing First Horizon Stock at inflated prices and obliging participants to do the same or forego matching contributions, Defendants breached their fiduciary duties of prudence and loyalty.  Defendants knew or should have known that the Stock price was inflated because they knew or should have known that First Horizon was not fairly and accurately disclosing the unprecedented risks in its loan portfolio.  First Horizon touted a "national" growth strategy without properly disclosing that this strategy was based on a proliferation of risky products, including subprime mortgages, Alt-A mortgages, low documentation loans, Home Equity loans ("HELOCs"), second mortgages, and construction loans, or properly recognizing these risks in setting loan loss provisions and allowances.  By failing to properly account for and report its greatly increased risks and failure to reserve for those risks, First Horizon overstated its financial condition and inflated its income.

Defendants thus caused or enabled the Plan to purchase shares of First Horizon Stock at inflated prices, conduct that numerous courts have recognized constitutes a fiduciary breach. First Horizon Stock traded at $38.44 per share on December 30, 2005, closed at $10.99 on April 28, 2008, and hit a 12-year low on July 14, 2008, when it dropped to $4.52 before closing at $5.04 per share.  Amended Complaint ¶ 142.  Yet throughout the Class Period, Defendants continued to cause or permit the Plan to purchase additional First Horizon Stock.

In their motion to dismiss, Defendants ask this Court to find as a matter of law that the drastic drop in the price of First Horizon Stock and enormous losses suffered by the Plan and its participants were due exclusively to external factors and entirely unforeseeable to fiduciaries.  To support Defendants' claim to no liability as a matter of fact, Defendants cite newspaper articles,

speeches, and the like concerning the global financial crisis.  Defendants also assert that First

Horizon's circumstances were never "dire" during the Class Period, but fail to mention that in

late 2008 the Company was the beneficiary of a massive intervention in the financial industry by

the United States Treasury pursuant to which it sought and obtained a federal bailout of $866

million.  See First Horizon 2009 10-K at 9.

District courts in this Circuit applying Sixth Circuit law are virtually unanimous in

holding that the issues raised in Defendants' motion to dismiss should not be decided on a

motion to dismiss.[2]  Defendants not only ignore almost all of this authority, but they downplay

the controlling Sixth Circuit case, Kuper v. Iovenko, 66 F.3d 1447 (6th Cir. 1995).  Instead,

Defendants rely throughout their brief on Wright v. Oregon Metallurgical Corp., 360 F.3d 1090

(9th Cir. 2004) (see Defendants' Brief at 3, 15, 16 n.17, 17, 18, 21, 30), which **criticizes** the

Kuper presumption that carries the day in the Sixth Circuit.  See Wright, 360 F.3d at 1097.

## II.    PROCEDURAL HISTORY

Plaintiffs Troy Sims and John Yost filed the class action complaint that commenced this

action (Dkt. #1) on May 12, 2008, seeking to recover losses to the Plan.  On July 14, 2009, the

Court held a scheduling conference in this matter, and allowed Plaintiffs to amend their

complaint and Defendants to file a motion to dismiss.

On September 17, 2008, Plaintiffs filed a five-count Amended Complaint (Dkt. #29)

("Complaint").  The Complaint alleges five claims:

- Count I:  failure to prudently and loyally manage the Plan's investment in
  First Horizon Stock in violation of ERISA § 404, 29 U.S.C. § 1104;

---

[2] As discussed below, eleven district courts agree with Plaintiffs on this point; one arguably
agrees with Defendants.

- Count II:  breaches of duties of loyalty and prudence by causing the Plan to invest in First Funds in violation of ERISA § 404, 29 U.S.C. § 1104;

- Count III:  breach of the duty of loyalty by failing to provide complete and accurate information to participants and beneficiaries in violation of ERISA § 404, 29 U.S.C. § 1104;

- Count IV:  failure to monitor the Plan's fiduciaries in violation of ERISA § 404, 29 U.S.C. § 1104(a)(1); and

- Count V:  breach of co-fiduciary duties in violation of ERISA § 405, 29 U.S.C. § 1105.

Defendants' motion to dismiss addresses Count I and those parts of Counts III, IV, and V that concern Plaintiffs' allegations of imprudent investment in First Horizon Stock.

On September 26, 2008, Defendants proposed a stay of discovery pending resolution of Defendants' anticipated dispositive motions.  On October 21, 2008, Defendants filed a Motion to Dismiss that relied on thirty-one exhibits, as well as a Motion for Partial Summary Judgment, which relied on twenty-four exhibits.  On December 9, 2008, Plaintiffs filed a Motion for Discovery and Supplemental Brief in Opposition to Defendants' Motion to Stay, asserting that the Court should require Defendants to respond to discovery requests before the Court ruled on the pending dispositive motions.

Following a ruling by the Magistrate Judge, Defendants filed objections.  On June 23, 2009, the Court overruled in part and sustained in part those objections, denied Defendants' summary judgment motion without prejudice, and ordered that discovery be stayed pending a ruling on Defendants' motion to dismiss.  Dkt. #80.

Other than exchanging Rule 26(a)(1)(A) initial disclosures, the parties have engaged in no discovery whatsoever with each other.  December 8, 2008 Affidavit of Ellen M. Doyle (Dkt. #57-1) ¶ 12.  No document requests or interrogatories have been exchanged, and no depositions have been taken.  Id.

4

### III.   THE FACTS PLED IN THE COMPLAINT

**A.    All Parties Are Properly Before This Court.**

Named Plaintiffs Sims and Yost were First Horizon employees and are Plan participants. Complaint ¶¶ 8-9.  Their accounts were invested in the Company Stock Fund during the Class Period.  Id.  Defendants do not challenge Plaintiffs' standing or interest to pursue these claims.

All Defendants were sued in their capacity as Plan fiduciaries.  Defendant First Horizon is a Plan fiduciary because it exercised authority or control over Plan assets and exercised discretionary authority with respect to Plan management and administration.  Id. ¶ 10.

The individual Defendant members of the First Horizon Board of Directors (the "Director Defendants") are Plan fiduciaries because they exercised discretionary authority with respect to Plan management and administration.  Id. ¶ 11.  In addition, the Director Defendants appointed – and therefore had a fiduciary duty to monitor – the members of both the Retirement Investment Committee ("Investment Committee") and the Pension, Savings and Flexible Plan Committee ("Administrative Committee").  Id.  Moreover, the Director Defendants who were members of the First Horizon Board's Compensation Committee specifically assumed the responsibility "to review the appropriateness of the issuance of Corporation common stock under the terms of the Savings Plan as required by resolutions of the Board as adopted from time to time."  Id.

The Defendant Investment Committee is a Board-appointed committee appointed with responsibility for the establishment of Plan investment policy.  Id. ¶ 15.  Individual members of the Investment Committee also are Defendants herein.  Id.  Under Section 7.5 of the First Tennessee National Corporation Savings Plan and Trust, amended and restated effective September 1, 2003, the Investment Committee was to review trust investments on a regular basis, develop and communicate to the trustee an investment strategy appropriate to the purposes

of the Plan; determine the strategic array of asset classes available under the trust; establish appropriate benchmarks for each asset class, and at appropriate intervals evaluate the performance of the trustee and any investment managers against those benchmarks; and take other actions.  Id.

Defendant Pension, Savings and Flexible Compensation Committee ("Administrative Committee") is the administrator of the Plan according to the Plan's SEC Form 11-K for the fiscal year ending December 31, 2006, dated June 29, 2007.  Id. ¶ 16.  Individual members of the Administrative Committee also are Defendants.  Id.  The Administrative Committee is a Plan fiduciary with responsibility for Plan operation and administration, and for communications with the participants.  Id.  This Committee is established under the Plan and appointed by First Horizon to administer the Plan.  Id.  The Administrative Committee is specifically named as the fiduciary responsible for directing the Trustee of the ESOP with respect to investments.  Id.

**B.     A Portion Of The Plan Was An ESOP And The Plan Required Participants To Invest Their Contributions In Employer Stock In Order To Receive A Company Match.**

The Plan is a defined contribution plan which provides each participant with an individual account.  Complaint ¶ 18.  At all times, the Plan's largest investment has been in the Company Stock Fund.  Id., Introduction.  As of December 31, 2005, more than 50 percent of the Plan's net assets available for benefits – $317,598,814 – was invested in First Horizon Stock.  Id. ¶ 28.  Such a large percentage of Plan assets was concentrated in First Horizon Stock not only because the Company invested matching contributions[3] in the Company Stock Fund but also because, until some date in 2008, all participants except First Horizon Home Loan Corporation

_____

[3] In addition to making matching contributions, First Horizon also makes savings contributions on behalf of participants.  Id. ¶ 22.

6

participants were **required** to invest in the Company Stock Fund in order to **receive** matching contributions.  Id. ¶ 23.

One part of the Plan is an Employee Stock Ownership Plan ("ESOP").  Id. ¶ 27.  The ESOP portion of the Plan is designed to invest primarily in Company Stock.  Id.  The Plan's ESOP provisions authorized the trustee to "invest Trust assets in savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds or other investments desirable for the Trust" or in cash.  Id. (quoting 2007 Plan Document § 13.3)).

The Plan proffered by Defendants as controlling expressly provides that "[n]otwithstanding anything to the contrary contained in the Trust Agreement, the Trust shall not have the power or authority…to make any purchase of Employer Stock on terms which are not in compliance with the applicable provisions of the Plan and Trust and the applicable provisions of the Code."[4]  Plan (Def. Ex. 3) ¶ 13.9.  The Plan likewise provides that the Trustee does not have power or authority "to follow the directions of the Plan Administrator if the Trustee knows or, from the facts of which it is aware, should know that the directions are not made in accordance with the Plan or the Code or are contrary to the Plan or the Code."  Id.

The Plan states that ESOP assets "will be invested primarily in Employer Stock" but also specifically allows other investments, stating that the Trustee "also may invest Trust Assets in savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds or other investment desirable for the Trust…or Trust Assets may be held in cash."  Id. ¶ 13.3.  Investments of the ESOP are directed by the Administrative Committee.  Complaint ¶ 16.  Within any given three month window, the Trustee "may use its judgment as to the time of purchase of common stock of the Corporation," and any "independent purchasing agent"

_____

[4] The "Code" is a reference to the Internal Revenue Code.  See Plan ¶ 1.10.

7

appointed by the Trustee "shall have discretion as to the time of purchase" of First Horizon

Stock.  Id.  The Plan characterizes the independent purchasing agent's actions as "investment

decisions made in the exercise of the agent's discretion as described above."  Id.

**C.**     **First Horizon Failed To Report And Properly Account For Known Risks Concerning Its Loan Portfolio.**

Plaintiffs have alleged that Defendants should not have continued to acquire and invest in

First Horizon Stock during the Class Period because they knew or should have known that the

price of the Stock was inflated because First Horizon was not properly reporting and accounting

for the known risks of its deteriorating loan portfolio.  Prior to and during the Class Period, First

Horizon engaged in increasingly risky loan activity, including subprime, Alt-A, low

documentation loans, HELOCs, second mortgages, and construction loans, while simultaneously

failing to book adequate loan loss provisions and reserves.  Complaint ¶ 163.

More specifically, during the first part of the Class Period, First Horizon and its affiliates

wrote and securitized ever increasing numbers of subprime and Alt-A mortgage loans, second

lien mortgage loans, home equity loans and lines of credit, and construction loans, using for all

reduced underwriting standards and/or non-traditional financing arrangements.  Id. ¶ 45.

Between 2003 and 2007, First Horizon vastly increased its exposure to three higher-risk lending

products: HELOCs; commercial construction loans to single-family builders ("Homebuilder"

loans); and retail real estate construction loans to individual consumers to build homes ("One

Time Close" loans).  Id. ¶ 46.  By 2006, retail residential real estate products, primarily HELOCs

and other home equity loans, constituted 40 percent of total loans, with commercial construction

loans comprising 11 percent of total loans, and retail construction "One Time Close" loans

comprising an additional ten percent of total loans.  Id. (citing 2006 Annual Report at 30).

In addition, First Horizon failed to disclose, or to adequately disclose, that HELOCS and loans backed by undeveloped collateral were inherently riskier than government-sponsored entity conforming first-lien mortgages.  Id. ¶ 47.  Moreover, First Horizon failed to disclose, or to adequately disclose, the risks in increasing its underwriting of second-lien loans, second mortgages, and loans secured by homes to be built where borrowers already had existing mortgages on their current homes.  Id.  Instead, First Horizon, over the course of several years of rapid portfolio growth in these product areas, continued to maintain that risk-profiles for these portfolios were "stable," and that overall asset quality was "strong."  Id.

First Horizon also used "Super Expanded Underwriting Guidelines" in its loan business. Id. ¶ 49.  These standards allowed for FICO scores, loan-to-value ratios and debt-to-income ratios that were significantly less restrictive than the Company's standard full/alternative documentation loan programs.  Id.

First Horizon did not disclose or did not adequately disclose that it had failed to make adjustments in its loss provisions and loss reserves to take into account its huge transition into higher risks loans and lowered underwriting standards.  Id.

First Horizon also became increasingly reliant on secondary markets to securitize and sell its loans, as a result of its decision to shift into much riskier loans (e.g., subprime, HELOCs and Adjustable Rate Mortgages or "ARMS") that did not conform with government-sponsored entity guidelines for federally insured mortgage loans.  Id. ¶ 51.  In 2003, First Horizon securitized and sold $40.9 billion of conventional and federally insured mortgage loans, and had $6 billion in off-balance sheet business trusts for the purpose of securitizing and selling to secondary market investors.  Id.  At year end 2006, First Horizon securitized and sold only $13.8 billion of

conventional and federally insured mortgage loans, and reported approximately $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales.  Id.

First Horizon pursued these risky practices as part of its "national expansion strategy" of transforming itself from a regional bank to national powerhouse.  Thus, between January 1, 2005 and April 28, 2008, First Horizon provided mortgage banking services in 44 states, and promoted itself as one of the country's 20 largest mortgage loan originators.  Id. ¶ 45.  In its 2005 Annual Report, First Horizon stated that it had 13,000 employees serving customers through hundreds of offices located throughout 46 states.  Id. ¶ 62.  The 2005 Annual Report touted the success of "Our national expansion strategy."  Id.

First Horizon's national expansion strategy was based on unsustainable banking practices.  First Horizon and its affiliates wrote and securitized ever increasing numbers of subprime and Alt-A mortgage loans, second lien mortgage loans, home equity loans and lines or credit, and construction loans, using reduced underwriting standards and/or non-traditional financing arrangements.  Id. ¶ 45.  By doing so, First Horizon was able to build loan volume and to appear more dynamic as a financial institution.  Id.

At the same time that First Horizon touted its growth in its drive to become a national financial institution, it failed to adequately disclose that this growth came at the expense of sound banking practices, and, instead was based on lax underwriting, and the issuance of loans on terms which created an unacceptably high likelihood of non-payment.  Id. ¶ 48. While First Horizon disclosed a risk that some customers might not repay their loans and that collateral might be insufficient to avoid a loss, it failed to disclose that this risk had materially increased because of its underwriting practices and its failure to adequately manage this enhanced risk.  Id.

First Horizon failed to disclose or adequately disclose various other risks related to its changed business model, including the extent to which recourse could be sought from it on securitized loans, the increasing risks associated with its shift to off-balance sheet transactions, and how this could affect the levels of capital held.  Id. ¶ 53.  In addition, First Horizon failed to adequately oversee its own risk management.  Id. ¶ 54.  It also failed to adequately disclose the systemic problems in its risk management and its lack of competency in assessing and managing risks related to its national expansion and reduced underwriting.  Id.

Further, First Horizon failed to adequately disclose that the sustainability of its new business model relied on continued real estate growth and appreciation of real estate values. Id. ¶ 55.  First Horizon also failed to adequately disclose that its products, particularly its non-mortgage Homebuilder, One-Time Close construction, condo developer and HELOC products, were susceptible to losses due to significant downturn in the general housing market or a credit crunch in the general economy, including a severe reduction in the availability of credit or an increase in interest rates.  Id.

In the midst of all these failures to disclose, First Horizon on October 18, 2006 issued a press release stating in pertinent part "[w]e believe our vision of organically creating a national financial services organization and recruiting high-performing, experienced talent will deliver above-industry performance and provide long term value to our shareholders."  Id. ¶ 90.  On March 1, 2007, Defendant Baker stated "[w]e are very clear about our strategic vision. Our goal is to expand our banking franchise to select markets nationwide using our targeted relationship approach."  Id. ¶ 94.

**D.      First Horizon Failed To Increase Its Loan Loss Reserves In Light Of Its Increasingly Risky Loan Portfolio And Data That The Markets Where Its Loans Were Concentrated Were Collapsing.**

As First Horizon pursued its national strategy and increased its investment in securitized mortgage products, it failed to address this heightened risk by increasing its loan loss provisions and reserves.  Id. ¶ 66.  For example, First Horizon increased its mortgage loan origination volume in 2005 by $4.2 billion, or 17 percent, and increased its delivery of loans into the secondary market to $34.6 billion, or 18 percent.  Id. ¶ 73.  However, despite these huge increases, First Horizon failed to increase its loan losses provisions and reserves or make changes to its risk-assessment methods; indeed, First Horizon announced that its ratio for allowance for loan losses to loans, net of unearned income, was **lower**, "primarily reflecting the stable risk profile of both the commercial and retail loan portfolios."  Id. (quoting 2005 Annual Report, at 6, 30-31).

As discussed below, regulatory government entities issued guidance which First Horizon should have taken into account when, among other things, it established its loan loss allowances. First Horizon also should have taken into account that its loans were geographically concentrated in states like Florida, California, Washington and Nevada, where there were clear signs that the boom in housing market was over by early 2006.  Id. ¶ 50.

Notwithstanding the federal guidance and market data, First Horizon continued to use the same methodology for determining relevant considerations for loss levels as it had historically used, without taking into account the far riskier nature of its portfolio.  Id. ¶¶ 77, 85.

First Horizon admits that in 2008 and fourth quarter 2007, it "conducted focused portfolio management activities to identify problem credits and to ensure appropriate provisioning and reserve levels."  Id. ¶ 134.  First Horizon should have focused on provisioning and reserve levels

as soon as it began its riskier practices – including increased use of subprime, Alt-A, nontraditional mortgages, ARMS, HELOCs, second-lien mortgages and construction loans.  First Horizon most certainly should have attended to these matters when the market began to slide and governmental officials reissued its warnings in 2006.

Also in its 2005 Annual Report, First Horizon represented that in providing for loan losses, it used an "analytical model based on historical loss experience adjusted for current events, trends and economic conditions."  Id. ¶ 69.  First Horizon also claimed therein that it "uses the best information available to establish the allowance for loan losses." Id. ¶ 76.  First Horizon's description of its model was not adequate for outsiders to assess whether its loan loss reserves and provisions were reasonable and timely updated to reflect changes in economic conditions.  Id. ¶ 69.  But because First Horizon did not disclose the actual methodology used or the flaws in the methodology used, it was impossible for participants to know those flaws.  Id. ¶ 77.  First Horizon's loan loss reserves and provisions were wholly inadequate in light of the unprecedented risks which it assumed.  Id. ¶ 69.

**E.     First Horizon Ignored Government Guidance Concerning Credit Risk, Nontraditional Mortgage Product Risks, And Loan Loss Reserves.**

In May 2005, October 2006, and December 2006, the federal government issued three sets of guidance describing a series of measures that financial institutions should adopt if they engaged in precisely the risky loan activities in which First Horizon engaged during the Class Period.  It now appears that First Horizon flouted many if not most of the basic protective steps urged by the government.  First Horizon's failure to comply with the federal guidelines further evidenced the Company's over-exposure to excessive risk.  Because Defendants knew or should have known from their management positions about First Horizon's risk exposure and failure to properly reserve, and that its reporting and accounting were improper and that the risks of

13

investing in First Horizon were inadequately disclosed, their continued purchase of First Horizon Stock was at inflated prices and hence imprudent.

On May 16, 2005, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS"), and the National Credit Union Administration issued "Credit Risk Management Guidance for Home Equity Lending" ("Credit Risk Guidance").  Complaint ¶ 56.  The Credit Risk Guidance warned that financial institutions "may not be fully recognizing the risk embedded in these portfolios" and that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values."  Id. ¶¶ 57-58.

In addition, the Credit Risk Guidance stated that "prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt," and "should consider a borrower's income and debt levels and not just a credit score."  Id. ¶ 59.  Further, "underwriting standards for interest-only and variable rate HELOCs should include an assessment of the borrower's ability to amortize the fully drawn line over the long term and to absorb potential increases in interest rates."  Id. ¶ 60.  The Credit Risk Guidance also recommended that financial institutions with home equity concentrations as well as higher risk portfolios perform sensitivity analyses on key portfolio segments.  Id. ¶ 61.

Notwithstanding the Credit Risk Guidance, First Horizon continued to use the same methodology for determining relevant considerations for loss levels as it had historically used without taking into account the far riskier nature of its portfolio.  Id. ¶ 77.

In October 2006, the OCC, the Federal Reserve, the FDIC, the OTS, and the National Credit Union Administration jointly issued the "Interagency Guidance on Nontraditional

Mortgage Product Risks" ("2006 OCC Guidance"). Id. ¶ 80. The OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime" mortgage products by ensuring that loan terms and underwriting standards were consistent with prudent lending practices, which require a credible analysis of a borrower's repayment capacity. Id. The 2006 OCC Guidance provided that such loans should be underwritten based on a borrower's ability to make fully-amortizing payments at the fully-indexed interest rate. Id. ¶ 81. For products like payment option ARMs that permit negative amortization, the 2006 OCC Guidance provided that a lender should base its underwriting analysis on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan. Id.

Even after the 2006 OCC Guidance was issued, First Horizon continued to initiate interest-only mortgages, ARMs, HELOCs, and second-lien mortgages which were far more risky and did not take into account the OCC Guidance. Id. ¶ 82 (citing First Horizon website).

On December 13, 2006, governmental banking agencies including the OCC issued an Interagency Policy Statement on the Allowance for Loan and Lease Losses ("12/13/06 Policy Statement"). Id. That Statement provided that "Estimated credit losses should reflect consideration of all significant factors that affect the collectability of the portfolio as of the evaluation date." Id. The 12/13/06 Policy Statement directed management to "consider those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience." Id. ¶ 83. According to the 12/13/06 Policy Statement, "if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity." Id. ¶ 84.

15

As with the Credit Risk Guidance and the 2006 OCC Guidance, First Horizon and the

Director Defendants delayed conforming their practices to the 12/13/06 Policy Statement,

thereby delaying recognition of loan losses and avoiding necessary increases in loan loss

reserves.  Id. ¶ 85.  First Horizon also failed to take into account that its loans were

geographically concentrated in states where there were clear signs that the boom in housing

market was over by early 2006, which also should have led the Company to increase its reserves.

Id. ¶ 50.

**F.**    **Defendants Failed To Prudently Respond To First Horizon's Loan Quality Problems By Halting Further Purchases Of First Horizon Stock At Inflated Prices.**

In an August 29, 2006 press release, First Horizon blamed the "current mortgage

environment" rather than its own aggressive banking practices and the relaxation of its

underwriting standards and other banking practices for losses in its mortgage portfolio.  Id. ¶ 88.

First Horizon continued to make subprime real estate loans, Alt-A loans and other non-

conforming loans, ignoring the declining market for those loans.  Id.

On October 18, 2006, First Horizon issued a press release which stated that "We remain

confident in our core strategy which continued to show progress in the third quarter," and that

"While macro environment issues will continue to impact earnings growth into next quarter, our

overall strategy continues to position our business for strong sustained earnings growth." Id.

¶ 90.  In a January 18, 2007 earnings call, First Horizon stated with regard to construction

lending that "we believe this business line is well positioned for continued growth without

significant additional asset quality risk."  Id. ¶ 92.  In a March 1, 2007 letter, Defendant Baker

claimed in reference to the bank's construction lending practices, "And as always, we apply strict

underwriting standards."  Id. ¶ 95.

On April 18, 2007, First Horizon announced that it was ceasing underwriting, processing and funding of subprime loans, but would continue to offer Alt-A loans, which represented 20 percent of new originations of first lien mortgages.  Id. ¶ 97.  The April 18, 2007 press release quotes Defendant Baker as stating in pertinent part:

> **Our nonprime business**, which represents less than two percent of our mortgage loan production, has resulted in a reasonable level of repurchase activity **for which we have adequate reserves to cover estimated remaining losses**…In contrast, our Alt-A business, which represented 20 percent of our first-lien production in first quarter 2007, has prime-type credit characteristics despite the non-standard loan structures, with an average FICO of over 715 and continues to price appropriately. The majority of our Alt-A production is securitized and to-date, no residual or credit support structures have been retained and we have not seen any material repurchase activity from these loans…We are maintaining our focus on disciplined asset quality management with tightened guidelines in both retail and construction lending. **We still expect asset quality to be solid for the full year of 2007** with net charge-offs averaging between 30 and 40 basis points for the year.

Id. ¶¶ 98-99 (emphasis added).

In late May and early June of 2007, First Horizon Stock closed at around $40 per share.  Id. ¶ 100.  Thereafter, Fitch downgraded various tranches of Alt-A Trusts offered and managed by First Horizon.  Id. ¶ 101.

On September 12, 2007, First Horizon announced plans to cut up to 50 percent of its mortgage sales force and shrink the real estate portfolio on its balance sheets by making further changes in its consumer and construction lending businesses.  Id. ¶ 105. First Horizon also stated that it was:

- Shrinking the real estate portfolios on its balance sheet by making further changes in its consumer and construction lending business. New originations are expected to decline significantly as a result of continued product and program changes and the retention of only the most productive sales people;

- Cutting back-office support in consumer and construction lending as production is reduced;

- Exiting selected national markets for business banking; and

- Transitioning the national cross-sales of deposit products to an Internet-based model, eliminating the need for banking specialists in mortgage offices.

Id.

On October 17, 2007, First Horizon Stock closed at $25.04 per share.  Id. ¶ 107. In an October 17, 2007 conference call, Defendant Bryan Jordan, First Horizon Chief Financial Officer, estimated loan losses for the rest of 2007 of "probably another $20 million maybe $30 million in charges."  Id. ¶ 108 (quoting October 17, 2007 Conference Call Transcript).  Jordan assured investors that First Horizon was on top of monitoring its problem loans.  Id. ¶ 109.

After the market closed on October 17, 2007, First Horizon announced that it lost $14.2 million, or 11 cents per share, in the third quarter, compared with net income of $22.1 million, or 17 cents a share, a year earlier.  Id. ¶ 108.  Reflecting the "deterioration" of credit markets, the company's mortgage banking operations posted a pre-tax loss of $45.8 million, up from a second quarter pre-tax loss of $16.1 million.  Id.  Upon announcement of the third quarter results, First Horizon's share price dropped to $23.69 on October 18, 2007.  Id. ¶ 110.

On December 21, 2007, First Horizon announced that its mortgage business expected to lose money in the fourth quarter of 2007, and that it expected to set aside an additional $150 million in anticipation of unpaid loans, over 50 percent higher than what CFO Jordan had estimated two months earlier.  Id. ¶ 111.  The loan loss provision for the fourth quarter exceeded First Horizon's combined provision for the first three quarters of 2007.  Id.  Many of these unpaid loans were a result of defaults from residential developers that borrowed money to buy properties in Florida, California, Virginia, Georgia and Nevada.  Id.  Throughout the fourth quarter of 2007, First Horizon's stock price continued to drop, closing the year at $17.78 per share.  Id. ¶ 112.

18

On January 17, 2008, First Horizon announced a loss of $248.6 million or $1.97 per diluted share in the fourth quarter of 2007 compared to a net loss of $14.2 million or $0.11 per diluted share in the third quarter of 2007, due to rising loan-loss reserves and a reduction in the value of mortgage servicing rights.  Id. ¶ 113.

Supplemental materials contained in an 8-K filed the same day disclosed that the consumer real estate, homebuilder, and "One Time Close" portfolios contained concentrations of loans in California, Virginia and Florida.  Id. ¶ 115.

During a January 17, 2008 earnings conference call, CFO Jordan stated:

. . . As we disclosed in late December the additional reserves primarily reflect **higher inherent losses in segments of our national one time close and home builder portfolios, which together represent $4.1 billion or about 19% of our total loan portfolio.**

In Home Builder Finance we continue to see the greatest problems in weak national housing markets such as Florida, California, Arizona, Nevada, Virginia and Georgia. Where falling home prices are driving entire loss severities and where a large supplies of unsold homes are pressuring builders and consumers. **Florida and California alone represent about 22% of our total $2.1 billion builder portfolio but account for over 50% of our non-performers in this portfolio.** Our one time close portfolio is also experiencing significant pressures in these national markets.

Id. ¶ 118 (quoting 4Q 2007 Investors Conference Call) (emphasis added).

On January 17, 2008, Standard & Poor's Ratings Services cut its long-term credit rating on First Horizon to "BBB+," as well as the counterparty credit rating on its subsidiary, First Tennessee, to "A-/A-2" from "A/A-1."  Id. ¶ 121.

Throughout this period, First Horizon continued to make matches in Company Stock.  Id. ¶ 117.

On January 28, 2008, First Horizon announced that it would pull out of national home building and commercial real estate lending everywhere except in Tennessee and a few other

19

parts of the Southeast.  Id. ¶ 122.

On March 3, 2008, Moody's Investors Services downgraded First Horizon based on concerns about its exposure to commercial real estate.  Id. ¶ 125.  On March 10, 2008, Fitch Ratings gave a negative outlook to First Horizon due to "continuing weakness in FHN's construction lending portfolio and rising non-performing assets in homebuilder finance portfolio and construction loans made directly to consumers for single family loans, which comprise approximately 20% of total loans."  Id. ¶ 126.  On March 20, 2008, JPMorgan Securities Inc. downgraded First Horizon shares to "Neutral" citing rapid deterioration of home equity loans as a major short-term risk.  Id. ¶ 127.  On April 1, 2008, Morgan Stanley initiated coverage of First Horizon with "underweight" – that it will perform below its peers in the industry over the next 12 to 19 months.  Id. ¶ 128.

On April 28, 2008, First Horizon announced that it would no longer pay its dividend in cash, but would make it instead in shares of common stock, and that it was issuing up to $600 million in new shares priced at $10.00 per share, thereby diluting its existing shares of common stock.  Id. ¶ 129.

First Horizon's Impaired Loans increased from $9,993,000 on December 31, 2006 to $50,761,000 on June 30, 2007 to $372,494,000 on June 30, 2008.  Id. ¶ 131.

On July 14, 2008, First Horizon announced that it lost $19.1 million during the second quarter, compared to earnings of $22.1 million during the same quarter the previous year.  Id. ¶ 139.  The company also stated that it would set aside $220 million to cover loan losses, compared to $44.4 million a year earlier, and net charge-offs were $127.7 million during the second quarter.  Id.  The company also reaffirmed that charge-offs for the year would be between $385 million and $485 million.  Id.  That day, First Horizon's stock price hit a 12-year low when

it dropped to $4.52 before closing at $5.04 per share.  Id. ¶ 142.  The close of First Horizon's stock at $5.04 meant that the stock was down over 72 percent for 2008.  Id. ¶ 143.

On September 2, 2008, First Horizon announced that it expected that as a result of "persisting market weakness and their ongoing efforts to aggressively address problem loans," latest projections indicated that 2008 full-year net charge offs could be approximately $100 million above the range announced in July 2008.  Id. ¶ 145.  The next day, Standard & Poor's cut First Horizon's long-term counterparty ratings one to BBB, two notches above junk status.  Id. ¶ 146.[5]

In the second half of 2008, as a result of a massive federal intervention in the banking industry, First Horizon received, *inter alia*, $866 million under the Troubled Assets Relief Program ("TARP").[6]  First Horizon 2009 10-K at 9.  Despite this massive infusion of federal support, the reported value of First Horizon Stock held in the Plan declined by $59,120,637 over the course of 2008.  See 2008 Plan 11-K at 9.

In sum, Defendants continued to acquire First Horizon Stock for the Plan for all of the employer match, and to require the acquisition of even more First Horizon Stock at the direction of participants as a condition to receiving that match even though they knew or should have known that First Horizon had huge undisclosed problems, its share price was inflated, and the global financial situation made such investments precarious.

---

[5] While First Horizon's present circumstances obviously are not alleged in the September 17, 2008 Complaint, it is noteworthy that recent developments belie Defendants' claim that "FHN's efforts to navigate the credit crisis have begun to pay dividends."  Defendants' Brief at 12.  On July 17, 2009, First Horizon posted a loss of $123.2 million, or 58 cents per share, for the second quarter of 2009, compared to $19.1, or 10 cents a share, a year earlier.  It was the company's fifth-straight quarterly loss.  Loan-loss provisions rose 10% from a year earlier.  The net charge-off rate climbed to 4.77% from 3.9% in the first quarter, while nonperforming assets rose to 6.15% from 5.98%.  See First Horizon Form 8-K, filed July 17, 2009.

[6] Other federal relief was provided to financial institutions, including the FDIC's Temporary Liquidity Guarantee Program, which allows banks to issue debt with high ratings backed by the FDIC.

# IV.    ARGUMENT

## A.    Introduction

The Complaint states claims upon which relief may be granted and easily satisfies the requirements of Fed.R.Civ.P. 8.  Defendants are not left guessing as to the nature of the claims against them.

A complaint's "factual allegations must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  "On a motion to dismiss, the complaint's well-pled factual allegations are treated as true and the Court construes such allegations in the light most favorable to the plaintiff, with all reasonable inferences in the plaintiff's favor."  Abadeer v. Tyson Foods, Inc., NO. 09-00125, 2009 WL 2032397, * 3 (M.D.Tenn. July 10, 2009).

## B.    Count I States A Claim On Which Relief May Be Granted.

### 1.    Dismissal of Plaintiffs' allegations is not appropriate under the controlling standards regarding Defendants' failure to prudently and loyally manage the Plan's investment in First Horizon Stock.

ERISA is "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, (1983).  Consequently, ERISA fiduciaries "'must act for the exclusive benefit of plan beneficiaries.'"  Chao v. Hall Holding Co., Inc., 285 F.3d 415, 425-26 (6th Cir. 2002) (quoting Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996)).

The fiduciary duties are set forth in ERISA § 404(a)(1), which states:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-

(A) for the exclusive purpose of:

22

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

…and

(D) in accordance with the documents and instruments governing the plan....

29 U.S.C. § 1104(a)(1).

Under ERISA, Plan fiduciaries charged with selecting investment alternatives and with managing investment of Plan assets are required to act in accordance with ERISA's Prudent Man standard of care, which requires that fiduciaries act "solely in the interests of the participants and beneficiaries" and "for the exclusive purpose" of providing benefits and paying expenses of the plan, and with "care, skill, prudence and diligence."  ERISA § 404(a), 29 U.S.C. § 1104(a).  Any Plan participant or beneficiary may bring an ERISA action for fiduciary breach against fiduciaries, "who shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . "  ERISA § 409(a), 29 U.S.C. § 1109(a); see also LaRue v. DeWolff, Boberg & Assocs., Inc., 128 S.Ct. 1020 (2008).

As noted, part of the Plan at issue here is an ESOP.  "Under ERISA, a plan that invests primarily in shares of stock of the employer that creates the plan is referred to as an ESOP." Chao, 285 F.3d at 425.  Congress intended ESOPs to function as both "an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership." Id. (citations omitted).

In discussing the duties of ESOP fiduciaries, the Sixth Circuit emphasized that "[c]learly, the duties charged to an ERISA fiduciary are 'the highest known to the law.'" Chao, 285 F.3d at 426 (citations omitted).  The fiduciary's obligations further are "strict" and "detailed."  Id. (citing Moench v. Robertson, 62 F.3d 553, 560 (3d Cir. 1995)).  When enforcing these duties, "the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." Chao, 285 F.3d at 426 (citations omitted).

Although ESOPs can be much riskier than typical ERISA plans, ESOP fiduciaries "are still held to their fiduciary responsibilities." Id. at 425.  This is so because "the purpose of ESOPs cannot override ERISA's goal of ensuring the proper management and soundness of employee benefit plans." Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995).  Under ERISA, "a fiduciary may only follow plan terms to the extent that the terms are consistent with ERISA." Id. (citing 29 U.S.C. § 1104(a)(1)).

Further, although ERISA includes certain statutory exemptions for ESOPs, including from the general diversification requirements, these exemptions:

> [D]o [ ] not relieve a fiduciary . . . from the general fiduciary responsibility provisions of [29 U.S.C. § 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion . . . nor does it affect the requirement . . . that a plan must be operated for the exclusive benefit of employees and their beneficiaries.

Chao, 285 F.3d at 425 (quoting Kuper, 66 F.3d at 1458).

ESOPs fiduciaries are held to their fiduciary responsibilities because:

> [T]he statutory exemptions for ESOPs do [ ] not relieve a fiduciary...from the general fiduciary responsibility provisions of [29 U.S.C. § 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion . . .

24

nor does it affect the requirement . . . that a plan must be operated for the
exclusive benefit of employees and their beneficiaries.

Kuper, 66 F.3d at 1458.

### 2.    Defendants' Motion To Dismiss Plaintiffs' Count I claims should be denied.

Plaintiffs proceed in Count I against First Horizon, Director Defendants, the Investment

Committee and its members, the Administrative Committee and its members, and other John

Doe Defendants (collectively, "Count I Defendants") pursuant to ERISA §§ 502(a)(2) and

409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a).  Plaintiffs allege that the Count I Defendants knew

or should have known that First Horizon Stock was not a suitable and appropriate investment for

the Plan due to the Company's undisclosed exposure to losses attributable to the deteriorating

quality of its loan portfolio, its dependence on securitization of subprime, Alt-A and other

troubled loans, the problems in its residential construction and other loans, and its failure to

adequately account for and report those problems, including by employing inadequate loan loss

provisions and reserves.  Complaint ¶ 163.  Plaintiffs further allege that these Defendants

breached their fiduciary duties by, among other things, failing to review the appropriateness of

First Horizon Stock as an investment option for the Plan, failing to review whether it was

prudent to invest Plan assets in First Horizon Stock while material information regarding its

financial condition had not been reported or disclosed, and causing the Plan to acquire new

shares of First Horizon Stock at artificially inflated prices, at a time when  more than 50 percent

of the Plan's assets were already in First Horizon Stock.[7] Id. ¶ 164.

---

[7] While Defendant fiduciaries adhered to or purported to adhere to Plan terms in connection with
some of these actions, as Plaintiffs discuss below, it is a breach of fiduciary duty and an ERISA
violation to follow plan terms when so doing results in imprudent investment in company stock.

Defendants ask the Court to dismiss Count I based on two theories.  Defendants first argue that Count I fails to state a claim on which relief may be granted because "the matching provisions and the ESOP are matters of plan design – a quintessentially settlor function to which ERISA's fiduciary provisions do not apply."   Second, Defendants assert that Plaintiffs fail to state a claim because their allegations cannot overcome a purportedly controlling presumption that all investment in First Horizon Stock remained prudent throughout the Class Period.

Neither of Defendants' Count I theories is persuasive.  Most fundamentally, courts in the Sixth Circuit have held time and again based on Sixth Circuit precedent that the questions raised by Defendants' motion are not to be decided on Rule 12(b)(6) motions to dismiss but rather only after discovery.  However, even if Defendants could pass this procedural barrier, their arguments fail on the merits, again based on Sixth Circuit principles.

### 3. Defendants' settlor function argument provides no basis for dismissing Count I.

Defendants' settlor function argument is flawed because it ignores ERISA's mandate that all Plan assets be held in trust and managed by a fiduciary.  See 29 U.S.C. § 1103(a).  ERISA has a broad definition as to who constitutes a fiduciary with respect to management of Plan assets, stating:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Count I Defendants thus are fiduciaries to the extent that they had "any authority or control respecting management or disposition" of Plan assets.

Under Kuper, plan provisions that prohibit ESOP diversification do **not** relieve fiduciaries of their obligation to diversify when circumstances warrant it:  "**the purpose and**

**nature of ERISA and ESOPs preclude a plan's per se prohibition against diversification or liquidation**." 66 F.3d at 1457 (emphasis added).  The court explained:

> [T]he purpose of ESOPs cannot override ERISA's goal of ensuring the proper management and soundness of employee benefit plans . . . Therefore, a plan provision that completely prohibits diversification of ESOP assets necessarily violates the purposes of ERISA.  **ERISA provides that a fiduciary may only follow plan terms to the extent that the terms are consistent with ERISA**. 29 U.S.C. § 1104(a)(1).  In <u>Moench</u>, the Third Circuit held that a fiduciary's argument that he was prohibited from diversifying an ESOP under the terms of the plan that he administered was untenable because it was "inconsistent with ERISA inasmuch as it constrain[ed] the [fiduciary's] ability to act in the best interest of the beneficiaries."  We agree and thus reject defendants' argument that the Plan provisions left them no discretion to diversify.

66 F.3d at 1457 (discussing <u>Moench v. Robertson</u> (some citations omitted)).

As one district court applying <u>Kuper</u> and <u>Moench</u> has explained:

> **…[T]he investment of a plan's assets is a fiduciary function, and an ESOP trustee or fiduciary *must*, by statutory definition, have discretion to act in accordance with the best interest of the ESOP and its participants when deciding if and how to invest the ESOP's assets**. <u>See</u> 29 U.S.C. § 1104(a)(1); <u>Cf</u>. <u>Kuper</u>, 66 F.3d at 1457 ("a fiduciary's argument that he was prohibited from diversifying an ESOP under the terms of the plan was untenable because it was 'inconsistent with ERISA inasmuch as it constrain[ed] the [fiduciary's] ability to act in the best interest of the beneficiaries'") . . . This mandatory fiduciary discretion is particularly important in transactions involving the purchase by an ESOP of its sponsor's securities.  **Congress clearly intended the fiduciaries' strict duties of care and loyalty to safeguard such transactions from the danger of self-dealing.**

<u>Reich v. Hall Holding Co.</u>, 990 F.Supp. 955, 963-64 (N.D.Ohio 1998) (some citations omitted) (emphasis added); <u>Best v. Cyrus</u>, 310 F.3d 932, 935 (6th Cir. 2002) (trustee not limited to duties described in plan document, but must carry out ERISA fiduciary duties).

<u>In re Ford Motor Co. ERISA Litigation</u>, 590 F.Supp.2d 883 (E.D.Mich. 2008), provides further grounds for rejecting Defendants' theory that Count I's claims of imprudent investment do not implicate fiduciary duties:

The plaintiffs recognize that the plan documents themselves required plan funds to be invested primarily or exclusively in Ford stock.  Ford asserts that because these were instructions to the plan fiduciary, it cannot be liable in its fiduciary role for following them, even if doing so was imprudent . . . such a holding would be contrary to the plain language of ERISA, which as noted requires fiduciaries to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of this subchapter*." 29 U.S.C. § 1104(a)(1)(D) (emphasis added). The Supreme Court has declared that "trust documents cannot excuse trustees from their duties under ERISA". . . Indeed, ERISA would be almost impotent if it permitted settlors to exempt their fiduciaries from its requirements with a simple stroke of the pen . . .

…But Kuper makes this issue superfluous: if amending the plans were indeed a fiduciary act (which seems unlikely), Ford could be liable if the amendments required imprudent management of the plans. But if in following those instructions (by acquiring and holding company stock) Ford actually did manage the plans imprudently in its fiduciary capacity, that would independently create liability under § 1104(a)(1). In other words, **since in this case Ford managed the plans in accordance with the instructions that it wrote into the documents, it will be liable for any imprudence in the instructions as a result of following them, regardless of whether it would also be liable for giving them.**

Id. at 889 (emphasis added and some citations omitted).

Here, the Plan provided authority to invest ESOP assets "primarily in Employer Stock," but also to invest them in "savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds or other investment desirable for the Trust . . . or Trust Assets may be held in cash."  Plan (Def. Ex. 3) ¶ 13.3.  See also See DOL Opinion No. 83-6A, 1983 WL 22495 ("primarily" means more than 50 percent "**over the life of the plan**"; instances may arise when investment of more than 50 percent would violate ERISA § 404) (emphasis added).

For these reasons, Defendants' first argument for dismissal should be rejected.

### 4.      The Kuper presumption provides no basis for dismissing Count I.

#### a.      The Kuper presumption does not apply on motions to dismiss.

Defendants' second argument for dismissal is that Plaintiffs' allegations fail to overcome a judicial presumption – in this Circuit, the Kuper presumption – that investment in employer

stock was prudent.  See <u>Kuper</u>, 66 F.3d 1447.  The vast majority of authority within the Sixth

Circuit holds that employer stock claims like those made here should not be decided in the

context of motions to dismiss.  A recent district court decision sums up the case law:

> Moreover, denial of Defendants' motion is consistent with the actions taken by other courts in the Sixth Circuit that have uniformly denied motions to dismiss in company stock cases.  In the Eastern District of Michigan, these cases include:

> 1. <u>In re General Motors ERISA Litig.</u>, 2006 WL 897444, *11 (E.D.Mich. Apr. 6, 2006), denying a motion to dismiss even when: (1) "throughout the six-year class period General Motors had been a solvent and profitable business enterprise"; (2) even when assets increased; (3) even when stockholders' equity increased and; (4) even when General Motors never failed to pay dividend.

> 2. <u>Sherrill v. Fed.-Mogul Corp. Ret. Programs Comm.</u>, 413 F.Supp.2d 842, 853-56 (E.D.Mich. 2006), denying a motion to dismiss even when no allegations of fraud.

> 3. <u>In re CMS Energy ERISA Litig.</u>, 312 F.Supp.2d 898, 914 (E.D.Mich. 2004), denying a motion to dismiss even where breach of fiduciary duty claims do not sound in fraud.  <u>Id.</u> at 909. And holding that while "certain exemptions exist in the law for ESOPs under ERISA...a fiduciary retains the general responsibilities set forth in [29 U.S.C. § 1104]."

> 4. <u>Rankin v. Rots</u>, 278 F.Supp.2d 853, 865-66 (E.D.Mich. 2003), denying a motion to dismiss even where ERISA breach of fiduciary duty claims do not sound in fraud.

> Outside the Eastern District of Michigan, and throughout the Sixth Circuit, other courts have also reached a similar result. Some of these cases include:

> 1. <u>In re The Goodyear Tire & Rubber Co. ERISA Litig.</u>, 438 F.Supp.2d 783, 794 (N.D.Ohio 2006), denying a motion to dismiss and finding that "Plaintiffs need not plead that Goodyear was on the brink of an impending collapse ..."

> 2. <u>In re Cardinal Health, Inc. ERISA Litig.</u>, 422 F.Supp.2d 1002, 1033 (S.D.Ohio 2006), denying a motion to dismiss and adopting <u>In re AEP</u> holding that "requiring Plaintiffs to affirmatively pled facts overcoming the ESOP presumption violates Rule 8(a)'s notice pleading requirement."

> 3. <u>In re Ferro Corp. ERISA Litig.</u>, 422 F.Supp.2d 850, 860 (N.D.Ohio 2006), denying a motion to dismiss and stating that <u>Kuper</u> does not require

pleading "impending collapse." "Nowhere in the [Moench] opinion does the Third Circuit limit its holding to companies facing such dire circumstances."

4.  In re AEP ERISA Litig., 327 F.Supp.2d 812, 829 (S.D.Ohio 2004), denying a motion to dismiss and finding that "[P]resumptions are evidentiary standards that should not be applied to motions to dismiss."

5.  Shirk v. Fifth Third Bancorp., 2007 WL 1100429, *9 (S.D.Ohio Apr. 10, 2007), denying a motion to dismiss and finding that "[i]t is inappropriate on a motion to dismiss to make a factual finding as to whether the Plan qualifies as an ESOP."[8]

In re Ford, 590 F.Supp.2d at 917 (citations shortened).[9]  Almost all of these cases address and apply the Sixth Circuit's ruling in Kuper.

The context in which Kuper was decided also is pertinent.  After discovery, the claim was submitted to the district court for a decision on the merits based on the parties' briefs, proposed findings of fact and conclusions of law, and the stipulated record.  66 F.3d at 1452.  One district court thus concluded that "[t]here are two important points to be gleaned from Kuper":

First, the fact that the Plan requires investment in [company] stock will not *ipso facto* relieve the [defendants] of their fiduciary obligations to prudently invest or to diversity. Second, **whether or not they have breached their fiduciary duties requires development of the facts of the case.** The result of these two points is

---

[8] Following discovery, the Shirk court subsequently entered **summary judgment** for the defendants.  Shirk v. Fifth Third Bancorp, 2009 WL 692124, *21 (S.D.Ohio Jan 29, 2009).

[9] After Ford was decided late last year, the Tennessee district court in Banks v. Healthways, Inc., 2009 WL 211137 (M.D.Tenn. Jan 28, 2009), became at least the eleventh Sixth Circuit district court to conclude that dismissal at this stage would be improper, noting that "**Courts have found that dismissal under either Kuper or Moench is inappropriate at the motion to dismiss stage of the proceedings.**" Id. at *2 (emphasis added).  Also after Ford, and apparently for the first time in this Circuit, an Ohio district court dismissed company stock claims in In re Huntington Bancshares Inc. Erisa Litigation, 2009 WL 330308 (S.D.Ohio Feb 9, 2009).  The court concluded that the complaint there "merely sets out the 'formulaic recitation of the elements' of their breach of fiduciary duty cause of action"; further, the defendant there had "unequivocally disclosed" its subprime exposure.  Id. at *8, 10.  In any event, Huntington is completely out of step with all other employer stock cases decided in this Circuit, which unanimously conclude that such cases should not be decided on motions to dismiss.

that [the plaintiff] has stated a claim against them; whether or not she will prevail is another matter to be determined later.

Rankin v. Rots, 278 F.Supp.2d at 879.

Another district court similarly explained that in Kuper, "the Sixth Circuit gave no indication at all that it was creating a pleading standard, and instead merely identified facts in the record that led it to conclude that the trial court did not abuse its discretion in finding in favor of the defendants."  In re Diebold Erisa Litigation, 2008 WL 2225712, *9 (N.D.Ohio May 28, 2008).  The district court concluded that "[c]ourts have consistently rejected application of Kuper at the pleading stage in the manner proposed by Defendants," i.e., as a basis for dismissal.  Id.

While the First Circuit has not adopted the Kuper presumption, its reasoning in connection with its Fed.R.Civ.P. 12(b)(6) analysis applies here with full force:

> Because the important and complex area of law implicated by plaintiffs' claims is neither mature nor uniform . . . we believe that we would run a very high risk of error were we to lay down a hard-and-fast rule (or to endorse the district court's rule) based only on the statute's text and history, the sparse pleadings, and the few and discordant judicial decisions discussing the issue we face.  Under the circumstances, **further record development-and particularly input from those with expertise in the arcane area of the law where ERISA's ESOP provisions intersect with its fiduciary duty requirements-seems to us essential to a reasoned elaboration of that which constitutes a breach of fiduciary duty in this context**.

LaLonde v. Textron, Inc., 369 F.3d 1, 6 (1st Cir. 2004) (emphasis added).  The court reasoned:

> Consider, for example, a (purely hypothetical) scenario under which plaintiffs unearth during discovery documents showing that, during the class period, the Textron officials responsible for administration of the ESOP were concerned that Textron was not going to survive its downsizing and wanted the plan documents to be amended so as to keep their employees from investing in a dying venture. Consider further a scenario under which the plaintiffs uncover evidence that these officials were dissuaded from so acting by higher-ups concerned about sustaining the company's stock price until stock options that they held could vest.  Such evidence…might well be sufficient (much would depend on the nature of the

> additional factual development to which we previously alluded) to support a
> finding that the Textron defendants had breached their fiduciary duty to the class.

369 F.2d at 7; see also In re Polaroid ERISA Litigation, 362 F.Supp.2d 461, 475 (S.D.N.Y.

2005) ("Whether a plaintiff has overcome the presumption of prudence is an evidentiary

determination that is ill-suited to resolution on a motion to dismiss"); In re ADC

Telecommunications, Inc. ERISA Litigation, 2004 WL 1683144, *6 (D.Minn. July 26, 2004)

("[R]ecent decisions have refrained from applying the [Moench] presumption at this procedural

junction, finding that such evidentiary rules should not be applied on a motion to

dismiss…[d]etermination of whether Defendants 'could not have believed reasonably that

continued adherence' to heavy investment in [the employer's] stock was prudent under the

circumstances is better decided after greater elucidation of the facts.").

### b. Defendants' Kuper argument fails on the merits.

#### (1) Kuper controls, not Wright.

Defendants cite the Ninth Circuit's ruling in Wright v. Oregon Metallurgical Corp., 360

F.3d 1090 (9th Cir. 2004), and district court rulings in California and Georgia to establish that

"some Courts have questioned whether fiduciaries can be held liable, under any circumstances,

for not liquidating EIAP or ESOP holdings in employer stock."  Defendants' Brief at 16 and 16

n.17.  The position of courts in other circuits is immaterial on this point because the Sixth Circuit

plainly holds to the contrary.

In Kuper, the Sixth Circuit adopted the Third Circuit's holding in Moench that an ESOP

fiduciary's decision to invest in employer securities should be reviewed for an abuse of

discretion.  66 F.3d at 1459.  Under Kuper and Moench, courts presume that a fiduciary's

decision to remain invested in employer securities was reasonable.  Id.  A plaintiff may rebut this

presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision. Id.

### (2)    Defendants' "dire circumstances" argument fails.

Defendants assert that to survive a motion to dismiss, Plaintiffs must "allege facts showing that fiduciaries knew that [First Horizon's] circumstances were exceptionally dire, such that its continued viability was in question." Defendants' Brief at 2-3. Defendants similarly maintain that Count I must be dismissed because Plaintiffs have not alleged "extraordinary circumstances." Id. at 17. Once again, Defendants cite only to non-Sixth Circuit authority to support their legal propositions. Id. at 3. Defendants fail to note that courts applying Sixth Circuit authority (i.e., Kuper) have consistently rejected Defendants' position.

> As the court explained in In re Ferro Corp. ERISA Litig.:
>
> Nowhere in [Moench] does the Third Circuit limit its holding to companies facing such dire circumstances. More importantly, the Sixth Circuit opinion adopting the Moench presumption, has a much broader holding: "[a] plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." Kuper, 66 F.3d at 1459. Nowhere in the opinion does the Sixth Circuit use the words "impending collapse."

422 F.Supp.2d 850, 860-61 (N.D.Ohio 2006).

The defendant in Ferro relied on the Ninth Circuit's ruling in Wright, 360 F.3d 1090 (9th Cir. 2004). The Ferro court explained that while under the Ninth Circuit's ruling in Wright, plaintiffs must allege that a "company's financial condition is seriously deteriorating," the **Sixth Circuit** "does not have these requirements."[10] Id. at 861 (citing Kuper, 66 F.3d at 1459); see also In re Goodyear, 438 F.Supp.2d 783, 794 (N.D.Ohio

---

[10] As the Ferro court pointed out, the Ninth Circuit in Wright **criticized** the Third and Sixth Circuits for adopting the Moench presumption. See Wright, 360 F.3d at 1097.

2006) ("<u>Moench</u> does not limit its holding to companies facing an 'impending collapse'

and <u>Kuper</u> has a much broader holding and never uses the words 'impending collapse.'").

 As another court observed, "several Sixth Circuit district courts have made clear

that an ERISA fiduciary's duty to divest a plan of company stock is not limited to

circumstances where a company is facing imminent or impending collapse."  <u>Ford</u>, 590

F.Supp.2d at 907.  The <u>Ford</u> court explained:

> As in the multitude of cases cited above, Defendants' impending collapse
> argument must be rejected here.  The standard simply makes no sense in a case
> like this and its application would result in needless and avoidable waste of
> participants' retirement savings.  **ERISA's duties of prudence and loyalty are
> the "highest known to the law."  Lowering the prudence bar to the point
> that a fiduciary is required to sell company stock only after it has become
> worthless is impossible to square with ERISA's stated mission of
> "establishing standards of conduct, responsibility, and obligation for
> fiduciaries of employee benefit plans, and ... providing for appropriate
> remedies, sanctions, and ready access to the Federal courts."**  ERISA § 2(b),
> 29 U.S.C. § 1001(b).  **Such a standard is akin to requiring monitoring of a
> patient only after he is dead.**

<u>Id.</u> (some citations omitted and emphasis added).

 Defendants' reliance on <u>Wright</u> fails for another reason.  As noted, Defendants cite

<u>Wright</u> for the proposition that Plaintiffs were obliged to allege that fiduciaries knew that

First Horizon's circumstances were exceptionally dire and its continued viability was in

question.  Defendants' Brief at 3.  Defendants fail to note that the Ninth Circuit's

subsequent ruling in <u>In re Syncor ERISA Litigation</u>, 516 F.3d 1095 (9th Cir. 2008),

entirely undercuts this argument.  Under <u>Syncor</u>, "[w]hile financial viability is a factor to

be considered, it is not determinative of whether the fiduciaries failed to act with care,

skill, prudence, or diligence."  516 F.3d at 1002.  Accordingly, as the court explains in <u>In

re First American Corp. ERISA Litigation</u>, 2008 WL 5666637, *5 (C.D.Cal. July 14,

2008), under <u>Syncor</u>, "a plaintiff need not necessarily allege that the company's financial

34

situation is 'seriously deteriorating' in order to state a claim for breach of the duty of prudence." Id., *5.

The Syncor court recites a number of circumstances which could support a finding that fiduciaries who did not divest themselves of company stock violated the prudent man standard. 516 F.3d 1102-03. This could occur, for example, where a company's stock was artificially inflated by an illegal scheme about which the fiduciaries knew or should have known. Id. at 1102. In reversing summary judgment in favor of defendants accused of holding and acquiring company stock for an employee stock ownership plan in the face of allegations of illegal practices, the Court concluded:

> We find that genuine issues of material fact exist regarding whether Defendants breached the "prudent man" standard set forth in 29 U.S.C. § 1104(a). The "prudent man" standard of care requires a fiduciary to discharge his duties with respect to a plan solely in the interest of participants "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims." 29 U.S.C. § 1104(a)(1)(B).

Id. at 1103.

Also regarding "dire circumstances," Plaintiffs would note what First Horizon has not – while the Company has not failed, that may be due in part or even in whole to the fact that the United States Government has bailed it out, to the tune of close to almost nine hundred million dollars. See First Horizon 2009 10-K at 9.

Defendants attempt to downplay the seriousness of their financial position. As Plaintiffs have alleged, First Horizon Stock dropped 88.25% during the class period from $38.44 per share on December 30, 2005 to $4.52 on July 14, 2008, which was a 12-year low. Complaint, Introduction. In response, Defendants claim that "the value of FHN stock declined in lock-step with the rest of the financial industry." Defendants' Brief at 20. To establish this point,

35

Defendants compare the relative price of First Horizon Stock with the Standard and Poor's ("S&P") Bank Index, which includes stock throughout the banking industry.  See chart at Defendants' Brief at 10 n.15.  Defendants' chart shows that while the S&P Bank Index declined , First Horizon Stock declined between 20 percent and 30 percent more than the general banking index.  See id.

A far more accurate comparison is the following weekly chart which compares FHN stock (bottom line, shown in blue) with the Dow Jones U.S. Regional Banks Index Fund (middle line, shown in red) and using the S&P 500 (top line, shown in green) as a baseline:[11]



**(3)     Defendant's "unique circumstances" argument fails.**

In addition to arguing that Plaintiffs have not alleged "dire circumstances," Defendants also argue that Count I should be dismissed because Plaintiffs have not alleged so-called "unique circumstances."  Defendants' Brief at 18.  In this connection, Defendants aim to the convince the Court that the Sixth Circuit district court rulings Rankin, CMS, General Motors, Shirk,

---

[11] This Yahoo Finance chart records the prices from May 1, 2006 (IAT fund inception date) through July 14, 2008 (end of proposed class period).

Goodyear, and Ferro all have no application here because they involved so-called "unique circumstances" and the present case allegedly does not.[12] Id. at 18, n.18.  The "unique circumstances," as characterized by Defendants, include "accounting gimmickry" and "improper accounting."  Id.

Defendants cite no authority for their novel and conveniently all-encompassing "unique circumstances" standard.  Certainly, neither Kuper nor Chao include any such concept.  Not even the Ninth Circuit's ruling in Wright, cited repeatedly by Defendants throughout their brief, states anything about "unique circumstances."

The Complaint here states claims for fiduciary breaches related to the Plan's investment in First Horizon Stock under what should be "unique circumstances," including failing to take actions in light of the known undisclosed problems with the Company's financial condition, under-reserving for losses, and inflation of the Stock's price as set forth above.

**C.     Defendants' Argument That The Plan's Losses Resulted Completely From Larger Economic Forces Rather Than Their Conduct Should Be The Subject of Discovery Rather Than A Motion To Dismiss.**

Defendants' chief substantive defense on Count I, and indeed the centerpiece of their entire brief, is the theory that because sundry other banks and government officials allegedly failed to anticipate the housing bust and its impact on bank stock, First Horizon should be exonerated of any liability under ERISA.  Throughout their brief, Defendants return again and

---

[12] Defendants' attempt to distinguish In re Diebold Erisa Litigation, 2008 WL 2225712, and In re AEP ERISA Litig., 327 F.Supp.2d 812, is even more strained than the imaginary "unique circumstances" standard.  Defendants assert as somehow dispositive that these district court cases **within the Sixth Circuit** "completely ignore the precedent establish by the **Ninth and Third Circuits.**"  Defendants' Brief at 18 (emphasis added).  Because Diebold and AEP were decided in the Sixth Circuit, they properly rely on Kuper v. Iovenko and district court rulings within the Sixth Circuit that apply Kuper, not on Ninth Circuit and Third Circuit authority.  See Diebold, 2008 WL 2225712, *6-11; AEP, 327 F.Supp.2d at 827-833.  So too should, of course, this Court.

again to two notions:  (1) the current economic crisis renders them blameless for any Plan losses; and (2) neither Defendants nor anyone else could have foreseen the economic consequences that began manifesting themselves in August 2007.  See, e.g., Defendants' Brief at 1-2, 7-10, 12, 19. Thus, according to Defendants, "the single event that precipitated FHN's difficulties and its resulting stock decline was an unprecedented, unforeseen global financial crisis that struck in August 2007."  Defendants' Brief at 19 (emphasis omitted).  Defendants further assert that "there are simply no facts that plaintiffs have or could have pled reasonably inferring that defendants should have foreseen a catastrophic financial crisis that neither federal regulators nor the most sophisticated firms on Wall Street saw coming…"  Id. (emphasis omitted).

There is substantial evidence that by the beginning of 2006 at the latest, Defendants knew or should have known of the graves risks of investing Plan assets so heavily in First Horizon Stock.  More specifically, Plaintiffs allege that by at least January 1, 2006, fiduciary Defendants knew or should known that First Horizon Stock was not a suitable and appropriate Plan investment due to First Horizon's "undisclosed exposure to losses due to the deteriorating quality of its loan portfolio, its dependence on securitization of subprime, Alt-A and other troubled loans, the problems in its residential construction and other loans, and its failure to adequately account for and report those problems including by not having adequate loan loss provisions and reserves."  Complaint ¶ 163.

Defendants dispute that they could have had such knowledge at that time because, allegedly, "federal regulators and other economic experts maintained a positive review of the housing market and problems in the subprime mortgage market until well into 2007." Defendants' Brief at 7.  Indeed, Defendants would have the Court conclude that the housing crisis was "unanticipated" before August 2007.  See Defendants' Brief at 1 (discussing the

"unanticipated nature" of the housing crisis "as late as July 2007").  Defendants claim that "the difficulties in FHN's loan portfolios [between late-2007 and mid-2008]" were not foreseeable in January 2006 or indeed until much later.  See Defendants' Brief at 19.

Such allegations go far beyond the scope of the inquiry for this Court in this case, particularly on a motion to dismiss.[13]  The issues for this Court are whether Plan fiduciaries gave appropriate consideration to the risks of investing in First Horizon Stock during the period from January 1, 2006 through July 14, 2008 in light of what the fiduciaries knew or should have known about First Horizon's financial condition and prospects.  Whether First Horizon's financial problems were a product of its own management's making through reckless practices, including lowering underwriting standards while failing to increase reserves, is a matter for discovery, not speculation.  The Court should not sort out these matters now, in the context of a motion to dismiss, before any formal discovery or input from experts.

**D.     The Conduct of Others In The Financial Industry Did Not Relieve Defendants Of Their Fiduciary Duties To The Plan.**

Defendants contend that because "some of the most venerated financial institutions of our time" supposedly were "blind-sided," this excuses Defendants' own apparent failure to anticipate the consequences of their own actions and omissions.  See Defendants' Brief at 1.

_____

[13] While Plaintiffs do not believe that Defendants' allegations regarding general economic forces are appropriately considered in connection with the pending motion to dismiss, Plaintiffs have researched these matters and, should the Court so wish, can provide citations to and copies of numerous pertinent news and finance articles, scholarly papers, and books.  These materials tend to refute Defendants' allegations that the current economic crisis renders them blameless for any Plan losses and that neither Defendants nor anyone else could have foreseen the events that began manifesting themselves in August 2007.  Plaintiffs do not submit these materials herewith because these matters are beyond the scope of Defendants' motion, which simply goes to whether Plaintiffs have stated claims for breach of fiduciary duty.

ERISA Section 404(a) sets the standard of care for fiduciaries here, and the Sixth Circuit has referred to the ERISA standard as the "highest known to law." Chao, 285 F.3d at 426.

Furthermore, under a long line of precedent, the wrongdoing or negligence of others does not excuse one's own actionable conduct. Writing for the Supreme Court in 1903, long before the passage of ERISA, Justice Oliver Wendell Holmes famously held: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & P. Ry. Co. v. Behymer, 189 U.S. 468, 470 (1903). Judge Learned Hand refined this concept in The T.J. Hooper, 60 F.2d 737 (2d Cir. 1932):

> [I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission…

Id. at 740.

More recently, in Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266 (3d Cir. 1998), the defendants submitted multiple affidavits from investment brokers stating that the brokers followed the same allegedly fraudulent investment practices as the defendants. The defendants argued that the universal industry custom established that they did not have the requisite scienter to violate securities law.[14]  The Third Circuit flatly rejected this argument:

> [W]e are not unmindful of the fact, deemed determinative by the district court, that execution of customer orders at the NBBO was a practice "widely, if not almost universally followed" in the securities industry during the class period.  Under the district court's logic, a Section 10(b) defendant would be entitled to summary judgment even if it were her regular practice to knowingly violate the duty of best execution, so long as she could identify a sufficient number of other broker-dealers engaged in the same wrongful conduct to be able to argue in good faith that the

_____

[14] No showing of scienter is required in ERISA breach of fiduciary duty cases.

underlying duty was "ambiguous." We cannot accept an analysis that would produce such a result.

**Even a universal industry practice may still be fraudulent**. See <u>Chasins v. Smith, Barney & Co.</u>, 438 F.2d 1167, 1171-72 (2d Cir. 1970) (non-disclosure of widespread industry practice may still be non-disclosure of material fact.); <u>Opper v. Hancock Securities Corp.</u>, 250 F.Supp. 668, 676 (S.D.N.Y.) (industry custom may be found fraudulent, especially on first occasion it is litigated) <u>aff'd</u>, 367 F.2d 157 (2d Cir. 1966); <u>see also</u> <u>Vermilye & Co. v. Adams Express Co.</u>, 88 U.S. 138 (1874). Indeed, the SEC recently completed an investigation in which it found that certain practices by NASDAQ market makers, not at issue here, were fraudulent even though they were widely followed within the industry. <u>See</u> Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and the NASDAQ Market, 1996 SEC LEXIS 2146 (Aug. 8, 1996).

<u>Id.</u> at 274 (emphasis added and some citations omitted or shortened). The Third Circuit later

explained that the "touchstone" of its decision in <u>Newton</u> was that "universal industry practices

are not 'outcome determinative.'" <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, <u>455 F.3d 195</u>, 219 (3d

Cir. 2006) (rejecting district court's determination that industry custom was outcome

determinative); <u>see also</u> <u>S.E.C. v. Geon Industries, Inc.</u>, 531 F.2d 39, 52-53 (2d Cir. 1976) ("[A]

whole calling may have unduly lagged in the adoption of new and available devices. It never

may set its own tests, however persuasive be its usages.").

In <u>S.E.C. v. Dain Rauscher, Inc.</u>, 254 F.3d 852 (9th Cir. 2001), the asserted industry

standard was set in part by the defendant himself, who was one of the first of the securities

professionals to participate in the challenged practice. <u>Id.</u> at 857.  The Ninth Circuit observed,

"Because the industry was comprised of only a few participants who controlled the practice, the

standard they developed could fall short of a standard of reasonable care. There is also a risk in

such a circumstance that the standard setters will engage in a 'race to the bottom' to set the least

demanding standard to assess their conduct." <u>Id.</u>  The court concluded that while the industry

standard is a relevant factor, "the controlling standard remains one of reasonable prudence." <u>Id.</u>;

see also <u>United States v. Paducah Towing Co.</u>, 692 F.2d 412, 426 (6th Cir. 1982) ("The accepted

practice in an industry, however, is not a conclusive measure of reasonableness. A generally

accepted industrial practice may still be negligence.").

In a recent ruling that rejected precisely the theory advanced by Defendants here, a

California district court ruled as follows:

> It is not the Court's role to speculate on the causes of the current economic
> situation…However, it is the Court's task to manage this litigation efficiently and
> avoid wasteful arguments. For the past year, almost all Defendants have recited-at
> hearings and in their papers-that an "unprecedented" external "liquidity crisis"
> caused all (or most) of Countrywide's decline.
>
> The CAC's basic theory is simple: Countrywide's operations so diverged from
> soundness that Countrywide's repeated assurances of good practices, quality loan
> origination, and consistently prudent underwriting guidelines were rendered false.
> This triggered a sharp decline in the value of Countrywide-related securities as the
> truth emerged. Even as the market began its recent downturn, Countrywide held
> itself out for a long while as situated differently from other subprime lenders.
> Thus, the CAC alleges, Countrywide's continued misrepresentations and
> omissions-made concurrently with some alleged corrective disclosures-extended
> the class period into early 2008.
>
> It is true, the dramatic market shifts will raise complicated questions on damages.
> It will be the fact-finder's job to determine which losses were proximately caused
> by Countrywide's misrepresentations and which are due to extrinsic or
> insufficiently linked forces.
>
> **The Court will not be distracted by liquidity versus solvency and other
> macroeconomic arguments. The CAC's allegations invite the cogent and
> compelling inference that Countrywide's deteriorating lending standards
> were causally linked to at least some of the macroeconomic shifts of the past
> year. The CAC alleges that reasonable people may differ about how much of
> situation is attributable to Countrywide and its industry. For example, it
> quotes Treasury Secretary Paulson as having said, "[T]his turbulence wasn't
> precipitated by problems in the real economy. This came about as a result of
> some bad lending practices."**

<u>In re Countrywide Financial Corp. Securities Litigation</u>, 588 F.Supp.2d 1132, 1173-74

(C.D.Cal. 2008) (emphasis added).

Defendants here ask the Court to conclude on a motion to dismiss that First Horizon "took immediate action to contain risk and reposition itself to navigate this unprecedented crisis." Defendants' Brief at 10. Citing its own press releases and other of its own representations, First Horizon states that in 2007 and 2008, it shrank certain portfolios, took steps to eliminate certain products in certain markets, and the like. Id. at 10-12. Even if it were true, which may not be assumed on Defendants' motion to dismiss, that First Horizon took certain actions during the Class Period to eliminate some of its highest risk practices, likely at the insistence of regulators, this did not obviate the need for the Defendants to act to protect the Plan from imprudent investment in First Horizon Stock until First Horizon adequately disclosed material facts concerning its financial problems.

**E.      Count III States A Claim Upon Which Relief May Be Granted And Should Not Be Dismissed.**

   **1.      Plaintiffs' allegations**

In Count III, Plaintiffs allege that at all relevant times, all Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control in the management of the Plan and Plan assets. Complaint ¶ 173. Because investment in the Company Stock Fund was, by definition, not diversified, it carried an inherently high degree of risk. This risk made Defendants' duty to provide complete and accurate information particularly important for the Company Stock Fund and investments of Plan assets in First Horizon Stock. Id. ¶ 174.

Plaintiffs allege that Defendants breached their duty to inform by failing to provide complete and accurate information regarding the soundness of First Horizon Stock and the Company Stock Fund as a retirement investment. Id. ¶ 175. Defendants also failed to provide Plan participants with complete and accurate information regarding, among other things:

43

- the extent of the Company's exposure to losses in connection with the deteriorating quality of its residential construction loans and mortgages;

- the Company's failure to properly reserve for the losses; and

- the resulting Company's artificial inflation of the value of the stock.

Id. ¶¶ 49, 175-76.

### 2.      Controlling principles

It constitutes a breach of ERISA's duty of loyalty for a fiduciary to materially mislead beneficiaries.  Gregg v. Transportation Workers of America Intern., 343 F.3d 833, 844 (6th Cir. 2003) (citing Varity Corp. v. Howe, 516 U.S. 489, 505 (1996)).  A fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements were made negligently or intentionally.  Gregg, 343 F.3d at 844.  A trustee "'is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person.'"  Id. at 847-48 (quoting Restatement (Second) of Trusts § 173, cmt. d (1959)).  Defendants have an affirmative obligation to provide plaintiffs with material information whether or not they asked for it.  Id. at 848.  Further, the Sixth Circuit has held:

> we have been admonished by the Supreme Court to interpret the trust-like fiduciary standards ERISA imposes "bearing in mind the special nature and purpose of employee benefit plans." Varity, 516 U.S. at 497.  Accordingly, we agree with the conclusion of our sister circuits that the "duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful."

Krohn v. Huron Memorial Hosp., 173 F.3d 542, 548 (6th Cir. 1999)(citations omitted).

    **3.**    **Contrary to Defendants' claim, they had a duty to disclose information material to participants' investment decisions.**

Until late in the Class Period, Plan participants could not receive the employer match unless they directed their Plan contributions into the Company Stock Fund.  Complaint ¶ 23.  Directing contributions into the Company Stock Fund constituted an investment decision, which required that participants and beneficiaries have all information material to that investment decision.  In addition, because Defendants were also directing the purchase of other shares of First Horizon Stock for the Plan, it was incumbent upon them to assure that they not purchase shares until and unless the Company's financial problems were adequately disclosed.  Otherwise, as alleged by Plaintiffs, the price of the shares was artificially inflated.

    Defendants suggest that they had no obligation to disclose information material to participants' investment decisions because, Defendants argue, ERISA's disclosure requirements are sharply circumscribed.  Defendants' Brief at 24-25.  According to Defendants, they had no duty to disclose **anything** that ERISA does not specifically mandate be disclosed, such as SPDs and annual government reports.  See id.  The Sixth Circuit's ruling in Krohn defeats any argument that ERISA disclosure requirements are so limited:

> ERISA's fiduciary duty provisions incorporate the common law of trusts, which governed benefit plans before ERISA's enactment.  As set out in the Restatement (Second) of Trusts, a trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person."  Moreover, we have been admonished by the Supreme Court to interpret the trust-like fiduciary standards ERISA imposes "bearing in mind the special nature and purpose of employee benefit plans."  Accordingly, **we agree with the conclusion of our sister circuits that the "duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful**."

Krohn, 173 F.3d at 548 (citations omitted and emphasis added); see also California Ironworkers

Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1045 (9th Cir. 2001) ("ERISA

imposes upon fiduciaries a general duty to disclose facts material to investment issues").

In a ruling that the Sixth Circuit specifically endorsed as its position in James v. Pirelli

Armstrong Tire Corp., 305 F.3d 439,455 (6th Cir. 2002), the Third Circuit held as follows on the

precise point at issue here:

> We can discern no reason why our admonitions that "when a [fiduciary] speaks, it
> must speak truthfully[ ]", and when it communicates with plan participants and
> beneficiaries it must "convey complete and accurate information that [is] material
> to [their] circumstance [ ]", should not apply to alleged material
> misrepresentations made by fiduciaries to participants regarding the risks
> attendant to a fund investment, where, as here, the participants were charged with
> directing the investment of their contributions among the Plans' various funds and
> the benefits they were ultimately provided depended on the performance of their
> investment choices.

In re Unisys Sav. Plan Litigation, 74 F.3d 420, 442 (3d Cir. 1996).

Defendants ignore Pirelli and Unisys, and argue that under Sprague v. General Motors

Corp., 133 F.3d 388 (6th Cir. 1998), ERISA Section 404(a) carries no disclosure obligations

beyond specific enumerated obligations like the SPD requirement.  See Defendants' Brief at 25.

Pirelli and numerous district court rulings in this Circuit foreclose this reading of Sprague.

In Pirelli, the Sixth Circuit held that "an employer or plan administrator fails to discharge

its fiduciary duty to act solely in the interest of the plan participants and beneficiaries when it

provides, on its own initiative, materially false or inaccurate information to employees about the

future benefits of a plan."  Pirelli at 455; see also Pfahler v. National Latex Products Co., 517

F.3d 816, 830 (6th Cir. 2007) (same).

As noted, Pirelli also embraced Unisys.  See 305 F.3d at 455 ("with respect to the

situation presented when an employer on its own initiative disseminates false and misleading

information about a benefit plan, the position of the Sixth Circuit is aligned with that of the Third

Circuit in Unisys"). Id. Unisys not only holds that fiduciaries have a duty to of disclosure

information material to investment decisions, but specifically rules that whether subject

communications run afoul of this duty is **a question of fact to be decided at trial**:

> Turning our attention to the record, we find a number of triable issues. Clearly there is evidence of several communications made by Unisys to plan participants on an individual, group or systematic basis regarding the nature of and risks associated with [the] investments…**Whether the communications constituted misrepresentations and whether they were material under the principles we have articulated are questions of fact that are properly left for trial.** At this point, we observe that what was stated, as well as what was left unstated, by Unisys in its communications to plan participants is relevant…Unisys was…obligated to impart to participants material information of which it had knowledge that was sufficient to apprise the average plan participant of the risks associated with investing in the Fixed Income and Insurance Contract Funds in view of the purchases of the Executive Life GICs and the financial condition Executive Life presented in 1990. Moreover, in this regard, we do not, as Unisys urges, distinguish between "public" and "non-public" information nor do we limit Unisys' duty to disclose to the latter. We do not see any reason under the circumstances for doing so, and at any rate, Unisys included public data, (credit ratings, for example), in its communications to plan participants.

Id. at 442-43 (emphasis added and citation omitted).

In addition, two district courts in this Circuit have applied Pirelli and rejected

Defendants' interpretation of Sprague on precisely this point.

> GM quotes a 1998 Sixth Circuit case, in which the court noted, "It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed." Sprague v. Gen. Motors Corp., 133 F.3d 388, 405 (6th Cir. 1998). But more recently, **the Sixth Circuit has recognized that "the basic concept of a fiduciary duty…'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'"** James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 455 (6th Cir.2002) (quoting Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 548 (6th Cir. 1999)). See also Unisys Erisa, 74 F.3d at 441 ("an ERISA fiduciary has a duty under section 1104(a) to convey complete and accurate information when it speaks to participants and beneficiaries regarding plan benefits"). Thus, ERISA not only prohibits GM from conveying false information, it also requires GM to provide complete information when speaking to Plan participants, when it knows that silence may be harmful. Thus, **Plaintiffs' allegation that the GM Defendants "fail[ed] to provide complete and accurate information" states a**

**viable claim for relief.** Moreover, this allegation is sufficiently specific, since it does not "sound in fraud." Plaintiffs may pursue this theory under Count II without amending the Complaint.

In re General Motors ERISA Litigation, 2006 WL 897444, *16 (E.D.Mich. 2006) (emphasis

added); see also In re Diebold Erisa Litigation, 2008 WL 2225712, *5 (N.D.Ohio May 28, 2008)

("Defendants cite Sprague...However, in a subsequent case directly addressing Sprague, the

Sixth Circuit held (and characterized Sprague as so holding) that a breach of fiduciary duty claim

may be maintained where an employer '*on its own initiative* provides inaccurate and misleading

information about the future benefits of a plan" (quoting Pirelli, 305 F.3d at 455 (6th Cir. 2002)

(emphasis in the original).

While Defendants do not cite either In re General Motors or In re Diebold, Defendants

acknowledge that other district court rulings within this Circuit refute their argument.  According

to Defendants, In re AEP ERISA Litig. , 327 F.Supp.2d at 832, In re CMS Energy ERISA Litig.,

312 F.Supp.2d at 915-16, and Rankin, 278 F.Supp.2d at 877-78, run afoul of, and largely ignore,

so-called "dispositive authority" cited by Defendants.  Defendants' Brief at 26 n.22.  However,

the supposed "dispositive authority" on which Defendants rely derives almost exclusively from

other circuits.  See Defendants' Brief at 25-26 (citing In re Calpine Corp., 2005 WL 1431506

(N.D.Cal. March 31, 2005); Ames v. American Nat. Can Co., 170 F.3d 751 (7th Cir. 1999);

Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139 (2d Cir.

1997); Jensen v. SIPCO, Inc., 38 F.3d 945 (8th Cir. 1994)).[15]

---

[15] As noted, Defendants also rely on Sprague to make their point, but, as shown, the Sixth Circuit in Pirelli foreclosed any such reliance.  Finally, Defendants cite Curtiss-Wright v. Schoonejongen, 514 U.S. 73 (1995), which predates the Sixth Circuit's ruling in Pirelli, and provides no support for Defendants' position.

**4.** **Defendants do not establish that, contrary to Plaintiffs' specific allegations, they made adequate disclosures.**

Defendants argue that First Horizon's public disclosures adequately disclosed its credit risks. Defendants' Brief at 26-27. However, Defendants fail to take issue with Plaintiffs' basic allegation that First Horizon failed to provide complete and accurate information regarding First Horizon Stock, the extent of the Company's exposure to losses in connection with the deteriorating quality of its residential construction loans and mortgages, the Company's artificial inflation of the value of its stock, and generally, by conveying incomplete and inaccurate information regarding about the soundness of First Horizon Stock and the Company Stock Fund as a retirement investment. See Defendants' Brief at 6 (section purporting to establish that "FHN provided detailed disclosures regarding it lending practices…").

In attempting to show that their disclosures were adequate, Defendants point to a select few statements and attempt to inflate them into adequate disclosure. Notably, Defendants argue that First Horizon "specifically described geographic risks associated with its national platform," citing one source for this claim, page 21 of the 2005 10-K. Defendants' Brief at 6. This page includes one short paragraph on "Geographic Risks" that explains that while the Company's strategy was to make its banking business national, "at present…a majority of our banking business in grounded in, and depends upon, the major Tennessee markets." 2005 10-K (Def. Ex. 8) at 21. Defendants cite no other geographic risks. See id.

Plaintiffs' allegations regarding the Company's geographic risks have nothing to do with the fact that First Horizon originated as a Tennesee institution. Specifically, Plaintiffs allege as follows:

> First Horizon failed to adequately disclose that it a large percentage of loans, including those backed by undeveloped collateral, were concentrated in states including Florida, California, Washington and Nevada. Moreover, First Horizon

inadequately reserved for loan losses by failing to take into account that its loans were geographically concentrated in states where there were clear signs that the boom in housing market was over by early 2006.

Complaint ¶ 50.

First Horizon itself admitted much later that loans involving Florida, California, and Nevada as well as Virginia and Georgia (but **not** Tennessee) were the source of its problems, stating in a December 21, 2007 press release:

> The additional reserves are largely attributable to inherent losses within its residential construction portfolios – One-Time Close and Homebuilder – from discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada…

Id. ¶ 111; see also id. ¶ 114 (quoting another First Horizon press release concerning troubled markets in Florida, California, Virginia, Georgia and Nevada).  Indeed, as Plaintiffs have alleged, loans issued in California comprised approximately 7.8 percent of total loans held by First Horizon.  Id. ¶ 115 (citing First Horizon 8-K filed January 17, 2008 at 17).  As First Horizon's Chief Financial Officer Bryan Jordan stated in a January 17, 2008 earnings conference call:

> In Home Builder Finance we continue to see the greatest problems in weak national housing markets such as Florida, California, Arizona, Nevada, Virginia and Georgia. Where falling home prices are driving entire loss severities and where a large supplies of unsold homes are pressuring builders and consumers. **Florida and California alone represent about 22% of our total $2.1 billion builder portfolio but account for over 50% of our non-performers in this portfolio.**

Id. ¶ 118 (quoting 4Q 2007 Investors Conference Call).  The fact that First Horizon noted its Tennessee origins and original focus hardly serves to disclose the risks associated with its high concentration of loans in Florida and California.

Defendants similarly suggest that a single mild statement concerning potential lower loan growth constitutes ample disclosure of "securitization risks."  See Defendants' Brief at 6.  The Company selectively quotes from a brief passage which states as follows in full form:

> If we were unable to continue to sell or securitize our loans at current levels, we would seek alternative funding sources to fund loan originations and meet our other liquidity needs. If we were unable to find cost-effective and stable alternatives, that failure could negatively impact our liquidity and could potentially increase our cost of funds and lower our loan growth.

See Def. Ex. 8 at 19.  First Horizon's "disclosure" concerning "securitization risks" thus assumes that its greatest outside risk was lowered loan growth.

Defendants also tout the "14 pages" of the 2005 Annual Report concerning "risk management practices."  Defendants' Brief at 6.  This section does not disclose risks – to the contrary, it paints a picture of a Company with all risks well under control.  Thus, for example, the subsection concerning "liquidity management" sets forth factors that purportedly establish First Horizon's "continuous availability of funds."  Def. Ex. 9 at 25-27.  Nothing in this subsection suggests cause for concern regarding liquidity.  See id.

Defendants also claim that First Horizon explicitly disclosed risks it faced in the event of an economic downturn, citing another brief provision.  Defendants' Brief at 6 (citing Def. Ex. 8 at 17).  This stated, "[A]n economic downturn (local, regional or national) can hurt our financial performance in the form of higher loan losses, lower loan levels, lower deposit levels and lower fees from transactions and services.  **These risks are faced by all financial services companies and we have in place processes and tools that we believe allow us to monitor and manage those risks**." Def. Ex. 8 at 17 (emphasis added).  Once again, this does not serve to place participants on notice that First Horizon was not properly monitoring or managing its risks – it merely recites the purported fact that its risks were no different from any of those faced by all

51

other financial services companies and states that the Company **was** properly managing and monitoring those risks.  It is Plaintiffs' position in this suit that First Horizon did NOT have in place processes and tools that allowed proper monitoring and management of risks.

Finally, First Horizon notes its basic acknowledgment that credit ratings are important for liquidity.  Defendants' Brief at 6 (citing Def. Ex. 9 at 28-29).  The obvious and undeniable linkage between credit ratings and liquidity hardly serves to put participants on notice of the many actions taken by First Horizon that put both its credit ratings and liquidity at grave risk.

### 5.    Defendants' securities law argument is unavailing.

Making yet another argument repeatedly rejected by the courts, Defendants claim that Count III somehow asserts that First Horizon was obliged to violate the federal securities laws. Defendants' Brief at 28-29.  Most fundamentally, regardless of the information available, it is not a violation of the securities laws to refrain from purchasing stock.  See, e.g., Rankin v. Rots, 278 F.Supp.2d at 877-78 (adopting position of Department of Labor set forth in the Department's amicus brief in the Tittle v. Enron litigation).  The insider trading rules require corporate insiders to refrain from buying stock if they have material, nonpublic information about the stock.  The "disclose or abstain" securities law rule is therefore entirely consistent with, and indeed contemplates, a decision not to purchase a particular stock.  See Condus v. Howard Sav. Bank, 781 F.Supp. 1052, 1056 (D.N.J. 1992) (violation of insider trading requires buying or selling of stock).  Thus, had Defendants stopped making new purchases of First Horizon Stock, they would not even arguably have violated the securities laws.

In any event, numerous courts in the Sixth Circuit and elsewhere have rejected the argument that the securities laws somehow let ERISA defendants off the hook.  See, e.g.., Goodyear, 438 F.Supp.2d 783 (N.D.Ohio 2006) (gathering cases to this effect); In re Ferro

<u>Corp.</u>, 422 F.Supp.2d 850, 862 (N.D.Ohio 2006) ("[F]ederal securities laws do not relieve

ERISA fiduciaries from their duties owed to plan participants."); <u>In re AEP ERISA Litig.</u>, 327

F.Supp.2d 812, 824 (S.D.Ohio 2004) (declining to dismiss case based on the argument that, to

comply with ERISA, Defendants would have had to violate the federal securities laws).

     As one court has explained:

> That one particular method of complying with their fiduciary obligations under
> ERISA might have also subjected Defendants' to liability for insider trading is not
> sufficient to negate those fiduciary obligations entirely.  ERISA, at least in this
> context, and the federal securities laws share a common goal: disclosure of
> material financial information. The fact Defendants may have been subject to both
> disclosure obligations in this case cannot possibly excuse their failure to comply
> with either . . . Further, and again assuming the truth of the allegations in the
> Complaint, courses of action were available to Defendants which would have
> complied with both their ERISA fiduciary duties and the federal securities laws
> (e.g., making full disclosure to both plan participants and beneficiaries and the
> investing public or discontinuing further purchases of UnumProvident stock) . . .
> Moreover, Defendants' attempt to avoid ERISA liability by contending one
> possible method of complying with its ERISA duties (i.e., selective disclosure)
> would have exposed them to liability under the securities laws is misleading in
> that Defendants may have, in fact, already violated the securities laws either by
> participating in the misconduct itself or by failing to make public disclosures
> required by the securities laws and regulations.

<u>Gee v. UnumProvident Corp.</u>, 2005 WL 534873, *14 (E.D.Tenn. Jan. 13, 2005); <u>see</u> <u>also</u> <u>In re</u>

<u>Syncor ERISA Litigation</u>, 351 F.Supp. 2d 970, 985 (C.D.Cal. 2004) ("Defendants may not avoid

any duty they might have to disclose by hiding behind the securities laws.").

**F.**    **Defendants' Motion To Dismiss Should Be Denied Because It Relies On Materials That Should Not Be Considered On Such Motions.**

     In urging the Court to dismiss Plaintiffs' claims under Rule 12(b)(6), Defendants rely on

31 exhibits.  Notably:

- Defendants proffer a newspaper article to establish that the subprime mortgage crisis was "unanticipated" and that it "blind-sided . . . some of the most venerated financial institutions of our time" (Defendants' Brief at 1 and 1 n.1);

- Defendants proffer speeches and articles to establish that "federal regulators and other economic experts maintained a positive view of the housing market and problems in the subprime mortgage market well into 2007" and that the speech makers all believed that "problems with subprime mortgages were contained and unlikely to affect other loan portfolios or market sectors." (Id. at 7-9);[16]

- Defendants proffer First Horizon press releases and other statements to establish that in the fall of 2007, the Company "took immediate action to contain risk and reposition itself to navigate the unprecedented crisis." (Id. at 10-11).

To justify their reliance on such materials, Defendants argue that the Court should consider "certain publicly available materials" submitted in support of Defendants' Rule 12(b)(6) motion. Id. at 4 n.3. To justify consideration of "publically available **materials,**" First Horizon cites authority for the proposition that the Court may consider "public **records**." Id. (citing Bassett v. National Collegiate Athletic Ass'n, 528 F.3d 426 (6th Cir. 2008), and Commercial Money Center, Inc. v. Illinois Union Ins. Co., 508 F.3d 327 (6th Cir. 2007)). Defendants do not attempt to justify their equation of "publically available materials" with "public records," and Bassett and Commercial Money provide no basis for such an equation.

The newspaper articles, speeches, press releases, and the like relied on by Defendants **are**

---

[16] Among other things, Defendants proffer a speech given by Federal Reserve Chairman Ben S. Bernanke on May 17, 2007. See Defendants Dismissal Ex. 18. While Defendants submit the speech to establish that Chairman Bernanke allegedly did not anticipate "significant spillover" from the developing subprime crisis, the speech in fact underscores the need to fully investigate First Horizon's actions in connection with subprime mortgages. Bernanke referenced, e.g.:

- Increasing lender use of "risk-layering" – combining weak borrower credit histories with other risk factors, such as incomplete income documentation or very high cumulative loan-to-value ratios;
- Incentive structures that tied originator revenue to number of loan closings made increasing loan volume, rather than insuring quality, the objective of some lenders;
- Some borrowers may have been misled about the feasibility of paying back their mortgages.

**not** "public records" and may not be considered on a motion to dismiss.[17]  As explained in <u>U.S.</u> <u>v. Philip Morris Inc.</u>, 116 F.Supp.2d 131, 154 (D.D.C. 2000), courts may take the "public record into account when deciding motions to dismiss," but "that record includes only certain official documents, not mere newspaper articles."  <u>Id.</u> at 154 (citing Fed.R.Evid. 803(8)); see also <u>J/H</u> <u>Real Estate Inc. v. Abramson</u>, 901 F.Supp. 952, 955 (E.D.Pa. 1995) (holding that "press releases, securities analyst reports, teleconference transcripts, and magazine and newspaper articles" are not public records and may not be considered on motion to dismiss).

Even if Defendants' articles, speeches, and press releases proffered were deemed to be public records, the Court still could not consider them for the purpose offered.  While courts may take judicial notice of public records on motions to dismiss, they may do so **only** to conclude that the record exists or was made, **not** to prove the truth of facts in those public records.  The Sixth Circuit explained last year that "'on a motion to dismiss, we may take judicial notice of another court's opinion **not for the truth of the facts recited therein,** but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'"  <u>Winget v. JP Morgan</u> <u>Chase Bank, N.A.</u>, 537 F.3d 565, 576 (6th Cir. 2008) (emphasis added; citation omitted).  The Sixth Circuit approved the district court's reliance on a bankruptcy court pleading because "the district court did so not in a way that took judicial notice of the facts in the paragraph, but rather in a way that took notice that Winget made an objection to the Sale Order based largely on the same claims in the Complaint, and then later withdrew that objection."  <u>Id.</u>

The Sixth Court explained further in another ruling:

---

[17] Plaintiffs note that while they cite Defendants' press releases in their Complaint, they do so not to establish the truth of the matters asserted by Defendants therein but rather to show the nature and timing of Defendants' public disclosures.

All circuits to consider the issue have noted that a court may take judicial notice of at least some documents of public record when ruling on a Rule 12(b)(6) motion . . . The majority of these courts, however, have held that the use of such documents is proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein . . . Further, in general a court may only take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned . . . In general, the majority of the cases which do not allow a court to take judicial notice of the contents of a public record do so because there is no way for an opposing party, prior to the issuance of the court's decision, to register his or her disagreement with the facts in the document of which the court was taking notice. **Thus, in order to preserve a party's right to a fair hearing, a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute.**

Passa v. City of Columbus, 123 Fed.Appx. 694, 679 (6th Cir. 2005) (unpublished; emphasis added and citations omitted); see also In re Direct General Corp. Securities Litigation, 398 F.Supp.2d 888, 893 (M.D.Tenn. 2005) ("When deciding a motion to dismiss a claim for securities fraud, a court may consider the contents of relevant public disclosure documents which are required to be filed with the Securities and Exchange Commission ("SEC") and are actually filed with the SEC . . . Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.") (citation omitted).[18]

## G.    Counts IV And V Should Not Be Dismissed.

In Count IV, Plaintiffs allege that First Horizon, First Tennessee, and the Director Defendants acted as Plan fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and breached their fiduciary duties by (a) failing to adequately monitor the

---

[18] The exhibits relied on by Defendants in seeking dismissal raise additional questions that need to be sorted out in discovery.  Notably, Defendants rely on copy of what they say is the 2007 SPD.  See Def. Ex. 5.  However, this document appears to be part of an employment manual, not an SPD in compliance with controlling regulations.  It also is noteworthy that Defendants did **not** proffer a copy of the mid-2005 SPD in effect at the beginning of the class period.  Nor did Defendants proffer the October 2006 SPD.

investing fiduciaries' investment of Plan assets; (b) failing to adequately monitor the Plan's other

fiduciaries' implementation of Plan terms, including but not limited to investment of plan assets

in First Horizon Stock and the First Funds; (c) failing to disclose to the investing fiduciaries

material facts about the financial condition and practices of the Company that Defendants named

in this Count knew or should have known were material to loyal and prudent investment

decisions about the Plan's acquisition and retention of First Horizon Stock in the Company Stock

Fund, and with respect to implementation of Plan terms; and (d) failing to remove fiduciaries

whom they knew or should have known were not qualified to loyally and prudently manage the

Plan's assets.  Id. ¶¶ 181, 184.

In Count V, Plaintiffs alleged that all Defendants breached their co-fiduciary duties under

ERISA § 405(a), 29 U.S.C. § 1105(a).  This provision states in pertinent part:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> > (1)      if he participates knowingly in, or knowingly undertakes to
> > conceal, an act or omission of such other fiduciary, knowing such
> > act or omission is a breach; or
> >
> > (2)      if, by his failure to comply with section 404(a)(1) in the
> > administration of his specific responsibilities which give rise to his
> > status as a fiduciary, he has enabled such other fiduciary to commit
> > a breach; or
> >
> > (3)      if he has knowledge of a breach by such other fiduciary, unless he
> > makes reasonable efforts under the circumstances to remedy the
> > breach.

Defendants' arguments for dismissing portions of Counts IV and V are based solely on

their arguments that Count I and part of III should be dismissed.  See Defendants' Brief at 29-30.

Accordingly, for the same reasons that Counts I and III state claims, so too do Counts IV and V.

### III.   CONCLUSION

For all these reasons, the Court should deny Defendants' motion for partial dismissal.


Date:  August 18, 2009

Respectfully submitted,
s/Ellen M. Doyle
Ellen M. Doyle
edoyle@stemberfeinstein.com
Pamina Ewing
pewing@stemberfeinstein.com
Stephen Pincus
spincus@stemberfeinstein.com
Joel R. Hurt
jhurt@stemberfeinstein.com

STEMBER FEINSTEIN DOYLE &
PAYNE, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
(412) 281-8400

*Attorneys for Plaintiff*

58

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2009, the foregoing document was filed electronically with the Clerk of Court using the ECF system which will send notification of such filing to those persons registered in this case with the ECF system.


Respectfully submitted,


s/Ellen M. Doyle
Ellen M. Doyle