# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

|  |  |
|---|---|
| TROY SIMS and JOHN YOST, individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | No.  2:08-CV-02293 |
| FIRST HORIZON NATIONAL CORPORATION, et al., | Judge S. Thomas Anderson |
| Defendants. | |

## DEFENDANTS' REPLY MEMORANDUM OF FACTS AND LAW IN SUPPORT OF THEIR MOTION TO DISMISS COUNT I, AND PORTIONS OF COUNTS III, IV, AND V OF THE AMENDED COMPLAINT

Charles C. Jackson (admitted *pro hac vice*)
Sari M. Alamuddin (admitted *pro hac vice*)
Thomas F. Hurka (admitted *pro hac vice*)
Christopher J. Boran (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois  60601
Telephone:  (312) 324-1000
Fax:  (312) 324-1001
E-mail:  charles.jackson@morganlewis.com

R. Mark Glover
Baker Donelson
165 Madison Avenue
First Tennessee Building
Memphis, Tennessee  38103
Telephone:  (901) 577-2222
E-mail:  mglover@bakerdonelson.com

Counsel for Defendants First Horizon National Corporation, et al.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT .......................................................................................................... 5

I.      Count I Fails To State A Plausible Claim For Failure To Prudently And
        Loyally Manage The Plan's Investment In FHN Stock ................................... 5

        A.      Plaintiffs' Pre-*Twombly* Cases Do Not Excuse Their Failure To
                Plead Facts Plausibly Overcoming The *Kuper* Presumption ................................. 6

        B.      Plaintiffs' Conclusory Allegations Fail To Establish A Plausible
                Claim Under Any Construction Of *Kuper*. ............................................................. 8

                1.      Plaintiffs Cannot State An ERISA Claim By Second-
                        Gussing FHN's Business Decisions ........................................................ 9

                2.      A Mere Decline In Stock Price Does Not Suffice To State
                        A Claim ................................................................................................... 10

                3.      Plaintiffs' Conclusory Assertions That The Fiduciaries
                        Knew of Undisclosed Risks Associated With FHN's
                        Lending Practices Do Not State A Plausible Claim Under
                        ERISA. .................................................................................................... 14

II.     Count III Should Be Dismissed Because Plaintiffs Have Failed To Allege
        A Plausible Claim Of Fiduciary Non-Disclosure ............................................ 17

        A.      Plaintiffs Attack Only Non-Fiduciary Communications. ...................................... 18

        B.      FHN Provided Extensive Disclosures On The Very Risks Plaintiffs
                Claim Were Not Mentioned ..................................................................................... 19

                1.      FHN Disclosed Risks Associated With Its Loan Portfolios .................. 19

                2.      There Is No Plausible Basis For Plaintiffs' Assertion That
                        The Fiduciaries Should Have Known That FHN's Loss
                        Reserves Were Inadequate. .................................................................... 24

                3.      There Is No Basis For Plaintiffs' Assertion That The
                        Fiduciaries Should Have Concluded That FHN's Stock
                        Price Was Inflated .................................................................................. 24

III.    Plaintiffs' Failure To Monitor And Co-Fiduciary Liability Claims Fail As
        A Matter Of Law ............................................................................................... 25

CONCLUSION. .................................................................................................... 25

## TABLE OF AUTHORITIES

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................................................*passim*

*Banks v. Healthways, Inc.*, 2009 WL 211137 (M.D. Tenn. Jan. 28, 2009) ................................. 6

*Bassett v. Nat'l Collegiate Ath. Ass'n.,* 528 F.3d 426 (6th Cir. 2008) ...................................... 15

*Bell Atlantic, Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................*passim*

*Bovce v. Coopers Lybrand C.P.A.,* 272 F3d 356 (6th Cir. 2001) ............................................... 15

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991) .............................................................. 16

*Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132
(C.D. Cal. 2008) ....................................................................................................................... 17

*Edgar v. Avaya*, 503 F.3d 340, 349 n. 14 (3d Cir. 2007) .......................................................... 7

*Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F. Supp. 2d 783
(N.D. Ohio 2006).......................................................................................................................... 7

*Gregg v. Transp. Workers of Am. Int'l.*, 343 F.3d 833 (6th Cir. 2003)...................................... 18

*Hill v. Tribune Co.*, 2006 WL 2861016 (N.D. Ill. Sept. 29, 2006) ................................................ 7

*Hunter v. Caliber Sys., Inc.,* 220 F.3d 702 (6th Cir. 2000)......................................................... 19

*Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842
(S.D. Ohio 2009) ...............................................................................................................*passim*

*In re AEP ERISA Litig.*, 327 F. Supp. 2d 812 (S.D. Ohio Aug. 10, 2004)............................. 7, 17

*In re Bausch & Lomb Inc. ERISA Litig.*, 2008 WL 5234281
(W.D.N.Y. Dec. 12, 2008)...............................................................................................4, 7, 15, 19

*In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004).............................. 7, 17

*In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681 (W.D. Tex. 2008) ......................................... 7

*In re Diebold ERISA Litig.*, 2008 WL 22257128 (N.D. Ohio May 28,2008).............................. 7

*In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850 (N.D. Ohio 2006)..................................... 7

*In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 8835 (E.D. Mich. 2008) ............................ 6

*In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606
(N.D. Tex. 2008) .................................................................................... 7

*In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996) ......................................... 18

*James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 4393 (6th Cir. 2002) .................................... 18

*Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243 (5th Cir. 2008) ......................................11, 19

*Krohn v. Huron Mem. Hosp.*, 173 F.3d 542 (6th Cir. 1999) ....................................... 18

*Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1997)......................................................*passim*

*Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444 (6th Cir. 2003)...................................... 18

*Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995).........................................................2, 6, 8

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) ...................................... 7, 13, 14, 15, 20, 24

*Rankin v. Rotts,* 278 F. Supp. 2nd 853 (E.D. Mich. 2003 ......................................... 17

*Rogers v. Baxter Int'l Inc.*, 521 F.3d 702 (7th Cir. 2008) ......................................... 11

*Shanhechian v. Macy's, Inc.,* No. 1:07-CV-00828 (S.D Ohio Aug. 14, 2009........................... 10

*Shirk v. Fifth Third Bancorp.*, 2007 WL 1100429 (S.D. Ohio) ......................................... 6

*Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310 (N.D. Ga. 2006)...................................... 21

*Summers v. State Street Bank & Trust Co.*, 453 F.3d 404 (7th Cir. 2006).................................. 10

*Syncor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008)........................................................ 8

*Ward v. Avaya*, 299 Fed. Appx. 196 (3d Cir. 2008)........................................................ 7, 8

*Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004)...............................10, 25

## STATUTES AND RULES

ERISA Section 404(a), 29 USC §1104(a) ....................................................2, 6, 10, 16

Fed. R. Civ. P. 12(b)(6) ......................................................................... 17

# INTRODUCTION

The financial crisis that began in August 2007 was unprecedented and is continuing. First Horizon National Corporation ("FHN"), however, has remained a healthy, well-capitalized financial institution that has substantially outperformed its peers over the past thirteen months. Though much of the blame for the financial crisis has been directed at the proliferation of so-called "subprime" loans, FHN never had much to do with these products.  In fact, as of October 2007, subprime loans represented exactly 0% of FHN's mortgage originations.  Plaintiffs do not seriously dispute any of these facts.  Nevertheless, their Amended Class Action Complaint ("Amended Complaint") – through bald assertions and with the benefit of hindsight – seeks to hold the FHN fiduciaries liable for failing to predict in January 2006 that FHN's stock price would decline amid the financial crisis that commenced 20-months later.  Under plaintiffs' view of ERISA, such allegations entitle them to massive discovery to investigate their theories of liability.  But this is not the law.

In two recent opinions the Supreme Court clarified what is required for a plaintiff to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-54 (2009); *Bell Atlantic, Corp. v. Twombly*, 550 U.S. 544, 554-70 (2007).  Under this precedent, plaintiffs cannot escape dismissal by way of "labels and conclusions" and "a recitation of the elements" of their claims. *Twombly*, 550 U.S. at 555.  Instead, they must state a claim that is not merely conceivable but that is in fact *plausible.  Id.*  Under this standard, "a district court must . . . insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 558.  Despite the Amended Complaint's 200+ paragraphs of allegations and an ensuing 58-page brief, plaintiffs have failed to satisfy this basic standard.

Plaintiffs' theory of liability in Count I is that, as of January 2006, a reasonable fiduciary would not have continued to allow the FHN stock fund, which plaintiffs concede is an ESOP

under ERISA, to be included among the numerous investment alternatives in the Company's 401(k) Plan (the "Plan").  It is undisputed that, while the Plan did not require participants to invest in FHN stock, it did require that FHN stock be made available for voluntary investment. Under these circumstances, fiduciaries are entitled to a presumption that their decision to honor the terms of the plan and continue to permit investment in employer stock was prudent.  *Kuper v. Iovenko*, 66 F.3d 1447, 1457-59 (6th Cir. 1997) (adopting test set forth in *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995)).   This presumption of prudence is overcome only under extraordinary circumstances, such as a threat to the company's ongoing viability, fraud or other misconduct.  (*See* 10/21/08 Def. Mem. at 17-18 (Doc. # 41-2).)

Nothing like that is alleged here.  Recognizing their dilemma, plaintiffs argue that the Court should not apply the *Kuper* presumption just yet.  (Pls. Mem. at 28-32.)  But the notion that courts should simply ignore the potentially dispositive effect of *Kuper* at the pleadings stage flies in the face of *Twombly*'s admonition that a claim's "basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558. It also is contrary to a host of circuit and district court authority issued since *Twombly*.  It should therefore be rejected.

Regardless, plaintiffs' claim fails under any construction of *Kuper*.  They have not alleged any plausible factual basis for believing that a reasonable fiduciary under the circumstances would have overridden both the terms of the Plan and the participants' voluntary investment decisions by closing and divesting the FHN stock fund.  *See* 29 U.S.C. § 1104(a)(1)(B).  The only well-pleaded fact plaintiffs have offered to support their claim is that FHN's stock price declined during the class period – but this is insufficient as a matter of law under *Kuper*, 66 F.3d at 1460.  It also is unremarkable considering that the entire industry has

suffered large declines amid the ongoing financial crisis.  Plaintiffs do not offer a single, solitary fact to support their bald assertion that the FHN fiduciaries should have seen this coming, much less that a reasonable fiduciary would have concluded that FHN stock was imprudent by no later than January 2006.

To the contrary, publicly-available information makes clear that a reasonable fiduciary would not have purged the Plan of FHN stock.  Plaintiffs begin by arguing that FHN received a federal "bailout" in November 2008.  (Pls. Mem. at 3.)  Setting aside that this fact is not pled in their Amended Complaint, what plaintiffs unwittingly characterize as a "bailout" was in fact the government's considered investment in FHN stock pursuant to the Corporate Purchase Program ("CPP").  In the words of the U.S. Department of Treasury, CPP investments are only available to "healthy, viable institutions that are recommended by their applicable federal banking regulators."  *See infra* at 11 n.6.

Moreover, FHN maintained investment grade debt ratings and remained "well capitalized" under regulatory standards throughout the class period.   Further, fiduciaries of several large public pension funds (who have their own fiduciary duties to their participants) invested heavily in FHN stock during the class period.  Indeed, between April and August 2008, these fiduciaries *increased* their collective holdings in FHN stock from 1.5 million to more than 2.3 million shares.  Since that same time, FHN's stock price has jumped approximately 168%.  In short, the circumstances that have prevailed, both during and since the class period, demonstrate the implausibility of plaintiffs' contention that no reasonable fiduciary would have continued to permit voluntary investment in FHN stock.  Count I should be dismissed.

Plaintiffs' fiduciary nondisclosure claim (Count III) also is meritless.  This claim is predicated on a series of conclusory allegations that the FHN fiduciaries failed to disclose the

risks associated with the Company's lending practices.  Plaintiffs cannot reach first base on this claim.  They have not identified a single *fiduciary* communication that was allegedly misleading. And their arguments that ERISA claims can be predicated on allegedly misleading *corporate* communications misread Sixth Circuit precedent.

But even were the Court to consider corporate communications, plaintiffs' claim still fails.  The Amended Complaint identifies a number of risks associated with FHN's business that plaintiffs claim were not disclosed.  However, as set forth in defendants' opening brief, FHN provided extensive disclosures on the very risks plaintiffs claim were never mentioned. Confronted with these disclosures, plaintiffs respond by simply dismissing them as insufficient under their own subjective standards.  (Pls. Mem. at 49-52.)   As post-*Twombly* decisions addressing such claims make clear, however, plaintiffs cannot state a plausible claim by ignoring FHN's disclosures and flatly asserting that they are inadequate.  *See, e.g., In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 856 (S.D. Ohio 2009); *In re Bausch & Lomb Inc. ERISA Litig.*, 2008 WL 5234281, at *8 (W.D.N.Y. Dec. 12, 2008).

In sum, plaintiffs have not offered any well-pleaded factual allegations of impending financial collapse, serious corporate misconduct, or even that FHN's lending practices were more risky than those of other financial institutions.  They merely allege that FHN's stock price declined, and use hindsight to assert that the defendants should have seen this coming.  If plaintiffs' view of ERISA and federal pleading standards were correct, virtually any bank that offered company stock as part of a 401(k) plan over the past three years violated ERISA and should be subject to extensive and disruptive discovery.  But plaintiffs' view is mistaken, and they come nowhere close to pleading "enough factual matter" "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Accordingly, their claims should be dismissed.

**ARGUMENT**

I.     **COUNT I FAILS TO STATE A PLAUSIBLE CLAIM FOR FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S INVESTMENT IN FHN STOCK.**

In *Twombly*, 550 U.S. 544, the Supreme Court disavowed the liberal "no set of facts" pleading standard widely applied over the past 50 years.  The Court instructed that, to survive a motion to dismiss, a plaintiff must present enough factual matter "to raise a right to relief that is plausible on its face."  *Id*. at 562-63, 570.  Accordingly, "a district court must . . . insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed[.]"  *Id*. at 558.  "[I]t is one thing to be cautious before dismissing a . . . complaint in advance of discovery . . ., but it is quite another to forget that proceeding to . . . discovery can be expensive."  *Id*.

This summer, the Court further clarified the "plausibility standard" adopted in *Twombly*.  *Iqbal*, 129 S. Ct. at 1949-54.  The Court explained that "[t]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. at 1949 (quoting *Twombly*).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id*. at 1950 (quotation omitted).  Moreover, allegations that are merely consistent with unlawful conduct do not establish a plausible claim, particularly when an "obvious alternative explanation exists[.]"  *Id*. at 1951 ("[Allegations that the FBI] . . . arrested and detained thousands of Arab Muslim men . . . .  [were] consistent with petitioners' purposefully designating detainees . . . because of their race, religion, or national origin.  But given more likely explanations, [including that they were detained because of potential links to al Qaeda], [the allegations] did not plausibly establish th[at] purpose."); *see also Twombly*, 550 U.S. at 565-67 (finding that, in light of "common economic experience," well-pleaded, non-conclusory

allegations of parallel behavior did not establish a "plausible suggestion of conspiracy" or "unlawful agreement" in violation of the Sherman Act).

Count I should be dismissed because, at a minimum, plaintiffs were required to allege facts plausibly demonstrating that a reasonable fiduciary under the circumstances facing the FHN fiduciaries during the class period would not have continued to permit Plan participants to voluntarily buy or hold FHN stock.  *Kuper*, 66 F.3d at 1457-59; *see also* 29 U.S.C. § 1104(a)(1)(B) (fiduciary conduct must be measured under the "circumstances then prevailing").  Instead, plaintiffs offer only conclusory assertions.  Thus, they have failed "to 'nudge' [their] claim . . . 'across the line from conceivable to plausible.'"  *Iqbal*, 129 S. Ct. at 1952 (quoting *Twombly*, 550 U.S. at 570); *see also In re Huntington*, 620 F. Supp. 2d at 851-53.

A.    **Plaintiffs' Pre-*Twombly* Cases Do Not Excuse Their Failure To Plead Facts Plausibly Overcoming The *Kuper* Presumption.**

The legal standard against which the Court must test the plausibility of plaintiffs' imprudence claim was set forth in *Kuper*, 66 F.3d at 1457-59.  Under that standard, plaintiffs must allege facts plausibly overcoming the strong presumption that a fiduciary's decision to permit investment in employer stock was prudent.  *Id.* at 1458; *see also Moench*, 62 F.3d at 571.

Plaintiffs do not really argue that their allegations are sufficient to overcome the prudence presumption.  Rather, they seek to excuse the insufficiency of their pleadings by arguing that the Court cannot apply the presumption on a motion to dismiss.  (Pls. Mem. at 28-32.)  Plaintiffs' contention is without merit.  First, the only cases plaintiffs cite that actually support their contention were decided before *Twombly*.[1]  But *Twombly* disavowed the "no set of facts"

---

[1] Several of the cases plaintiffs cite to support their contention that the prudence presumption does not apply on a motion to dismiss either expressly found to the contrary, or found the presumption inapplicable because – *unlike here* – the parties disputed whether the company stock fund was an ESOP.  *See In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 905 (E.D. Mich. 2008) (finding that presumption is a proper basis for dismissal); *Banks v. Healthways, Inc.*, 2009 WL 211137, at *2 (M.D. Tenn. Jan. 28, 2009) (finding presumption not applicable because unclear if plan was an ESOP); *Shirk v. Fifth Third Bancorp.*, 2007 WL 1100429, **9-10 (S.D. Ohio) (finding that *if*

pleading standard applied in those cases,[2] and the Court's clarification of what is required to survive a motion to dismiss is entirely consistent with application of the prudence presumption at this stage. *See Twombly*, 550 U.S. at 558 ("[A claim's] basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."); *see also Iqbal*, 129 S. Ct. at 1950 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

Since *Twombly*, courts have routinely applied the prudence presumption at the dismissal stage.[3] Moreover, it would be contrary to the very purposes served by the prudence presumption, *see Kuper*, 66 F.3d at 1459 (avoiding catch-22 type liability), to withhold consideration of the presumption's potentially dispositive effect "at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558. Accordingly, this Court should

---

the plan were an ESOP then the presumption would apply but not warrant dismissal in light of specific allegations overcoming the presumption). The *In re Diebold ERISA Litig.*, 2008 WL 2225712, at *8 (N.D. Ohio May 28,2008) court held that the presumption did not apply because it was too early to determine whether the plan was an ESOP; the court's further discussion of the presumption was therefore *dicta*.

[2] *See, e.g.*, *In re Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F. Supp. 2d 783, 789 (N.D. Ohio 2006) (stating that a complaint will not be dismissed unless "the plaintiff undoubtedly can prove *no set of facts* in support his claims that would entitle him to relief" (emphasis added)); *In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 857 (N.D. Ohio 2006) ("A claim will not be dismissed unless it appears beyond reasonable doubt that the [plaintiff] can prove *no set of facts* to support his claim which would entitle him to relief." (emphasis added)); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 904 (E.D. Mich. 2004) (stating that the court will "only dismiss the complaint if plaintiffs can prove *not set of facts* in support this claim which would entitle them to relief" (emphasis added/quotation omitted)); *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 818 (S.D. Ohio Aug. 10, 2004) ("A motion to dismiss may be granted, only if it is clear that no relief could be granted under any set of facts that could be proved . . . ." (quotation omitted)).

[3] *E.g.*, *Ward v. Avaya*, 299 Fed. Appx. 196, 200-01 (3d Cir. 2008) (affirming Rule 12(b)(6) dismissal based on presumption); *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008), *aff'g Hill v. Tribune Co.*, 2006 WL 2861016, at *19 (N.D. Ill. Sept. 29, 2006) (dismissing claims because allegations were insufficient to overcome the presumption); *Edgar v. Avaya*, 503 F.3d 340, 349 n. 14 (3d Cir. 2007) (affirming Rule 12(b)(6) dismissal on presumption grounds); *In re Bausch & Lomb Inc.*, 2008 WL 5234281, at **5-6 (granting motion to dismiss on presumption grounds); *In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681, 693 (W.D. Tex. 2008) (same); *In re: RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 614 (N.D. Tex. 2008) (granting motion to dismiss and explicitly rejecting prior authority holding that presumption was inapplicable at the pleading stage because it pre-dated *Twombly*); *In re Huntington*, 620 F. Supp. 2d at 851-53 (finding dismissal of imprudence claims based on bank's alleged "overexposure" to sub-prime and other troubled loans appropriate with or without the presumption).

analyze plaintiffs' allegations under the controlling legal presumption adopted in *Kuper* and dismiss Count I on that basis.

### B.    Plaintiffs' Conclusory Allegations Fail To Establish A Plausible Claim Under Any Construction Of *Kuper.*

As demonstrated in defendants' opening brief, only extraordinary circumstances not present here – such as a threat to a company's ongoing viability or serious misconduct – are sufficient to overcome the *Kuper* presumption.  (*See* 10/21/08 Def. Mem. at 17-18.)  Plaintiffs' contention that this misconstrues *Kuper*'s holding simply ignores relevant case law (Pls. Mem. 33-37), in which courts have granted or denied motions based on the absence or presence of such circumstances.  *Compare Ward*, 299 Fed. Appx. at 200-01 (granting motion to dismiss absent evidence of impending collapse, despite precipitous stock decline from $22 to less than $2) *with Moench*, 62 F.3d at 557-59 (finding that presumption might have been overcome where company stock plummeted 98% to 25 center per share and company had filed for bankruptcy).

Here, Plaintiffs have not alleged facts showing that FHN's viability was ever in question, nor that there was any fraud or illegal conduct.  Further, despite their assertion that FHN did not properly account for and report its loans, there is not a single allegation that FHN was ever required to restate its financials.[4]  Accordingly, the Amended Complaint comes nowhere near what is required to overcome the *Kuper* presumption.

Regardless, under any construction of *Kuper*, plaintiffs claim fails because they have not plausibly alleged that a reasonable fiduciary under the circumstances that prevailed during the

---

[4] The absence of any such allegations distinguishes plaintiffs' claim from the pre-*Twombly* decisions they cite. (10/21/08 Def. Mem. at 18 n. 19 (citing various cases involving bankruptcy, severe corporate misconduct, admitted accounting improprieties and the like).)  *See also Shanehchian, infra* (involving affirmative misrepresentations that were incorporated into ERISA plan documents).  Similarly, Plaintiffs' reliance on *In re Syncor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008) is misplaced.  (Pls. Mem. at 34.)  That case involved fiduciaries who took part in an illegal, international bribery scheme that, once disclosed, resulted in a nearly 50% drop in Syncor's stock price.  *In re Syncor*, 516 F.3d at 1095-97.  No such allegations are present here.

class period would have disregarded the Plan and closed or forcibly divested the FHN stock fund
(*see* 10/21/08 Def. Mem. at 15-21).   *See In re Huntington*, 620 F. Supp. 2d at 851-53 (holding
that plaintiffs' imprudence claim based on undisclosed risks associated with subprime lending
failed to state a claim, with or without consideration of the *Kuper* presumption).

1.      **Plaintiffs Cannot State An ERISA Claim By Second-Guessing FHN's
        Business Decisions.**

At their core, plaintiffs' allegations and brief take aim at FHN's *business decisions*, not
fiduciary conduct.   Plaintiffs repeatedly disparage FHN's decision *prior to the start of the class
period* to expand its regional banking services to a national market.   (Am. Cmpl. ¶¶ 45, 62; Pls.
Mem. at 85.)[5]   Plaintiffs complain that, as part of its national expansion, FHN increased the
number of loans it issued to homebuilders and commercial developers.   But that is what banks
do:  *they lend money*.   Plaintiffs do not allege that FHN's loans differed or were more risky than
those of comparable institutions.   Moreover, their conclusory assertion that FHN wrote "ever
increasing" numbers of "subprime" and "Alt-A" loans (Am. Cmpl. ¶ 45), is belied by FHN's
various public filings.   These filings demonstrate that subprime lending played virtually no role
in FHN's business during the class period, and that Alt-A lending was just 6% of FHN's
mortgage business in 2007 and continually diminished throughout the class period.   (10/21/08
Def. Mem. at 20, 27.)  Plaintiffs' brief does not respond to these points.

---

[5] Despite failing to allege that FHN's lending practices were somehow riskier than those of other institutions,
plaintiffs devote an entire section in their brief to arguing that FHN cannot justify their "actionable conduct" by
arguing that others in the industry acted similarly.  (Pls. Mem. at 40.)   This argument is a red-herring, and
completely mischaracterizes defendants' arguments.   Defendants' opening brief demonstrates that plaintiffs'
allegations fail to establish any plausible basis for concluding that a reasonable fiduciary *under the circumstances
then prevailing* would have concluded in January 2006 (or any point thereafter) that FHN stock was so imprudent
that no participant should be  permitted to voluntarily buy or hold it.  (10/21/08 Def. Mem. at 15-21.)   In response,
plaintiffs have not offered any specifics for why the fiduciaries should have predicted, and therefore should be held
liable for, a stock decline that affected the entire industry.   Instead, they offer only "labels and conclusions,"
*Twombly*, 550 U.S. at 555, regarding FHN's business practices that come nowhere near stating a *plausible* claim
under ERISA.  *See In re Huntington*, 620 F. Supp. 2d at 851-53.

Regardless, plaintiffs cannot base an ERISA claim on allegations that FHN's business decisions harmed its financial condition and the value of its stock. *See In re Huntington*, 620 F. Supp. 2d at 849 ("Plaintiffs' contention that Huntington's merger with Sky Financial adversely affected the bank's financial condition simply does not state a claim for breach of fiduciary duty under ERISA."); *Kuper*, 66 F.3d at 1456 ("[B]usiness decisions by an ERISA employer are not governed by [ERISA] section 1104's fiduciary standards."); *cf. Shanehchian v. Macy's, Inc.*, No. 1:07-CV-00828, Slip Op. at 14-16 (S.D. Ohio Aug. 14, 2009) (noting that business decisions that hurt the plan are not actionable but finding allegations of affirmative misrepresentations that were incorporated into plan documents were sufficient to overcome *Kuper* presumption).

### 2.   A Mere Decline In Stock Price Does Not Suffice To State A Claim.

Virtually the only well-pleaded, non-conclusory factual allegation plaintiffs offer to support their imprudence claim is that FHN's stock price declined during the class period. But it is well-settled that even dramatic stock declines are insufficient to state a claim under ERISA Section 404(a), 29 U.S.C. 1104(a). *See, e.g., Kuper*, 66 F.3d at 1460 (dismissing imprudence claim despite 80% drop in stock price); *Ward v. Avaya*, 299 Fed. Appx. 196, 200-01 (3d Cir. 2008) (affirming dismissal despite stock decline of $22 to less than $2 per share); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); *In re Huntington*, 620 F. Supp. 2d at 852-53 (finding that bank stock's decline from $22 to $7 did not state a claim).

There are two key reasons why such allegations cannot establish an imprudence claim under ERISA Section 404(a). First, single stock ESOP investments are inherently volatile and fiduciaries are neither encouraged nor expected to try to outsmart, or "time," the market when managing them. *See Kuper*, 66 F.3d at 1457 (ESOPs involve "much greater risk than the typical diversified ERISA plan"); *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 411 (7th Cir. 2006) ("[D]etermining the 'right' point, or even range of 'right' points, for an ESOP fiduciary to

break the plan and start diversifying may be beyond the practical capacity of the courts to determine."). Rather, fiduciaries are expected to manage plan assets in view of "the long-term horizon of retirement investing." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008); *see also Rogers v. Baxter Int'l Inc.*, 521 F.3d 702, 705 (7th Cir. 2008) ("a [long-term] buy-and-hold strategy . . . [is] particularly appropriate for pension investments" because it leaves investors "unaffected by the volatility in market prices"). Second, as *Kuper* recognized, there is an inherent "catch-22" facing ESOP fiduciaries: they might be sued for following the plan if company stock declines, but they also might be sued for breaking the plan if the stock subsequently recovers. *Kuper*, 66 F.3d at 1459.

Plaintiffs offer nothing in either their Amended Complaint or their brief to avoid these principles. Instead, plaintiffs begin by embellishing that in "late 2008" FHN received "a federal bailout." (Pls. Mem. at 3.) But this *non-allegation* would not support their claim even if it had been pled in their Amended Complaint. What plaintiffs cynically refer to as a "bailout" was the government's considered *investment* in FHN preferred stock – which pays a dividend rate of 5% per year – pursuant to the Capital Purchase Program ("CPP"). (Alamuddin Decl., Ex. 1 (2009 10-K) at 9-10.) As the U.S. Department of Treasury itself has made clear, "CPP is not a bailout[,]" and only "*healthy, viable institutions that are recommended by their applicable federal banking regulators*" are eligible for CPP investments.[6] Despite plaintiffs' pejorative labels, the government's investment in FHN stock only confirms that FHN was and continues to be a healthy and viable institution.[7]

---

[6] Alamuddin Decl., Ex. 2 (U.S. Department of the Treasury, *Road To Stability: Factsheet on Capital Purchase Program*) at 1.

[7] Plaintiffs not only mischaracterize the CPP investment as a "bailout," but they also misleadingly assert that defendants "fail[ed] to mention" it in their brief. This is nonsense. As is clear from the 2009 10-K plaintiffs cite for this false proposition, the CPP investment did not take place until November 2008, *after* defendants filed their opening brief on October 21, 2008. (*See* Alamuddin Decl., Ex. 1 (2009 10-K) at 9-10.)

Furthermore, as defendants noted in their opening brief, FHN's stock price declined in tandem with the rest of the banking industry amid the financial crisis that began in August 2007. (10/21/08 Def. Mem. at 10.)  Plaintiffs claim that they have provided a "more accurate" chart showing that FHN underperformed a regional banking index.  (Pls. Mem. at 36.)  But the chart they provide is blatantly distorted in scale (the -40%, -60%, and -80% quartiles are widened), and does nothing to support their claim.  Indeed, since the end of the strategically-tailored class period, FHN stock has *substantially outperformed* the index on which plaintiffs rely:



(Source: www.google.com/finance.)  There simply is no plausible basis for plaintiffs' suggestion that a reasonable fiduciary would have concluded that FHN stock was so imprudent that it had to be purged from the Plan when FHN's "stock price essentially moved in tandem with . . . other regional banks."  *In re Huntington*, 620 F. Supp. 2d at 852.

Indeed, that FHN's stock price has rebounded approximately 168% since the end of the class period (FHN closed at $13.51 on August 14, 2009, compared to $5.04 on July 14, 2008) proves not only the prudence of a long-term investment strategy, but also the wisdom of *Kuper*'s warning that courts must be sensitive to the catch-22 fiduciaries face when employer stock declines.  *See Kuper*, 66 F.3d at 1459; *see also Ward*, 299 Fed. Appx. at 200-01 (3d Cir. 2008)

(affirming dismissal despite stock decline of $22 to less than $2 per share, reasoning in part that

stock price rose after the class period); *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008).

Plaintiffs also ignore publicly available information demonstrating that plaintiffs have not

stated a plausible claim:

- FHN stock generated positive returns on 46% of the trading days during the class period (*see* Alamuddin Decl., Ex. 3). *See Kuper*, 66 F.3d at 1451 (noting that despite 80% decline in stock value, Quantum stock generated a positive return on 181 of 402 trading days – 45% of the time – during the class period).

- At all times during the class period, bank regulators designated FHN as "well capitalized" (the highest designation). (10/21/08 Def. Mem. at 20.)

- At all times during the class period, FHN maintained investment grade credit ratings. (*Id.*)

- Despite economic turmoil, FHN at all times remained profitable in core businesses. (*Id.*)

- Analysts continued to recommend buying or holding FHN stock throughout the class period, even when its stock price hit its class period low. (*Id.*)

- Subprime lending played virtually no role in FHN's business during the class period. (*Id.* at 20, 27.)

- FHN took decisive action to protect its business and its shareholders in response to the financial crisis. (10/21/08 Def. Mem. at 20.)

Moreover, even before the government's determination that FHN was a healthy, viable

institution worthy of its investment, four of the nation's largest public pension funds – whose

managers have strict fiduciary duties – made substantial investments in FHN stock. (Alamuddin

Decl., Ex. 4)[8]  In fact, between April and August 2008, while plaintiffs were filing their original

complaint, these funds dramatically *increased* their collective holdings in FHN stock from 1.5

---

[8] Institutional investment managers who exercise investment discretion over $100 million or more in registered securities must report their holdings to the SEC in a document called Form 13-F. (*See* http://www.sec.gov/answers/form13f.htm.) Information reflected in the Form 13-F documents filed by the following four public pension funds are summarized and included in Exhibit 4 to the Declaration of Sari M. Alamuddin: (i) the California Public Employees Retirement System, (ii) the New York State Teachers Retirement System, (iii) the California State Teachers Retirement System, and (iv) the New York State and Local Retirement System.

million shares to more than 2.3 million shares.  (*Id.*)  These facts "leave[] no question that Plaintiffs' allegations that the holding of [employer] stock and the continued offering of that stock during the Class Period fails to 'raise a right to relief above the speculative level . . .'"  *In re Huntington*, 620 F. Supp. 2d at 851 (quoting *Twombly*); *cf. Pugh*, 521 F.3d at 701-02 (finding that publicly available investment information refuted conclusory assertion of fiduciary imprudence).

### 3. Plaintiffs' Conclusory Assertions That The Fiduciaries Knew of Undisclosed Risks Associated With FHN's Lending Practices Do Not State A Plausible Claim Under ERISA.

Plaintiffs allege that the fiduciaries knew there were undisclosed risks associated with FHN's lending practices.  Because these allegations amount to nothing more than "labels and conclusions" and a "formulaic recitation of the elements" of their imprudence claim, they do not support a plausible claim under ERISA.  *Iqbal*, 129 S. Ct. at 1949.

First, there is no plausible support for plaintiffs' assertion that FHN's "ever increasing" exposure to allegedly high risk loans rendered its stock imprudent.  (Pls. Mem. at 8; Am. Cmpl. ¶ 45.)  In fact, the Company's public filings show that FHN's subprime exposure was miniscule and *diminished* during the class period.  Not only were these loans limited to FHN's Mortgage Banking business,[9] but they comprised just 2% of mortgage originations at the start of 2007 and were completely eliminated by October 2007.  (10/21/08 Def. Mem. at 20.)  Similarly, FHN's Alt-A loans were made to borrowers with an average FICO score of 715 (well-above average), and were reduced to just 6% of mortgage originations in 2007.  (*See id.*)  Accordingly, plaintiffs offer no facts – just "labels and conclusions" that do not "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

---

[9] FHN's Mortgage Banking business accounted for less than 30% of FHN's pre-tax income in 2004 and 2005. (2005 Ann. Rtp. (Doc. # 41-15) at 4.)

Second, plaintiffs have not sufficiently alleged that FHN failed to disclose risks associated with its lending practices.  As demonstrated in defendants' opening brief and discussed *infra* at 19-24, various public filings, including those referenced in the Amended Complaint, demonstrate that FHN provided extensive disclosures throughout the class period on the very risks plaintiffs claim were never mentioned.  Confronted with these disclosures, plaintiffs argue vaguely that they were somehow insufficient.  (Pls. Mem. at 48-52.)  "Plaintiffs cannot satisfy their pleading burden by ignoring the content of the disclosures and conclusorily asserting that they were incomplete."  *In re Huntington*, 620 F. Supp. 2d at 856; *see also In re Bausch & Lomb Inc.*, 2008 WL 5234281, at *8 (dismissing nondisclosure claim because complaint "allege[d] no specific facts" but only "unwarranted inferences' and 'unsupported conclusions' 'cast in the form of factual allegations'").[10]

Third, plaintiffs' contention that the fiduciaries should have known that FHN stock was imprudent because of undisclosed, inadequate loan loss reserves is baseless.  (Am. Cmpl. ¶¶ 69, 163.)  These allegations simply observe, with the benefit of 20/20 hindsight, that FHN had to increase its loan loss reserves during the class period.  This "says nothing about whether the defendants were on notice of potential problems beforehand," and thus comes nowhere near establishing a plausible claim of fiduciary breach.  *Pugh*, 521 F.3d at 700; *see also In re Huntington*, 620 F. Supp. 2d at 853 n.11 (finding allegations that inadequate loan loss reserves failed to state a claim for imprudent investment in employer-bank's stock); *Ciresi v. Citicorp*,

---

[10] The court may properly consider FHN's public filings in deciding this motion.  Not only are the filings defendants cite referenced throughout the Amended Complaint, but they are central to plaintiffs' claims.  *See, e.g., Bassett v. Nat'l Collegiate Ath. Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (court may consider public records and documents that are central to claims); *Bovee v. Coopers Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001) (courts may consider SEC filings on a motion to dismiss).  To the extent *Shanehchian*, No. 1:07-CV-00838, Slip Op. 18, suggests otherwise, it is wrongly decided.

782 F. Supp. 819, 821 (S.D.N.Y. 1991) (allegation that bank failed to establish adequate reserves "in essence tr[ies] to penalize banking institutions for failing to show greater clairvoyance").

Finally, as the Supreme Court explained in *Twombly* and *Iqbal*, allegations that are merely consistent with a right to relief cannot survive a motion to dismiss when, "[g]iven more likely explanations, they do not plausibly establish" plaintiffs' claims. *See Iqbal*, 129 S. Ct. at 1951; *Twombly*, 550 U.S. at 565-67. Here, plaintiffs allege that the fiduciaries should have known that FHN's stock price would decline because of its allegedly risky lending practices. But the much more plausible explanation is that FHN's difficulties were not foreseeable to a reasonable fiduciary because they were precipitated by a sudden, unanticipated economic crisis. *See Twombly*, 550 U.S. at 565 (considering plausibility of plaintiffs allegations "in light of common economic experience"); *In re Huntington*, 620 F. Supp. 2d at 853 ("Defendants cannot be held to a standard that would require them to predict the future of the financial markets so as not to breach their fiduciary duties under ERISA.").

Plaintiffs argue that the Court should ignore the fact that the financial industry did not anticipate the sudden credit and liquidity crisis because "the wrongdoing or negligence of others does not excuse one's own actionable conduct." (Pls. Mem. 39-43.) Plaintiffs' contention misses the point. FHN has not argued that the financial crisis is a shield from liability. Rather, FHN has pointed out facts relevant to determining what a reasonable fiduciary would have done "under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). This inquiry is entirely consistent with the Supreme Court's reasoning that courts need not blind themselves to "common economic experience," *Twombly*, 550 U.S. at 565, or other "obvious alternative explanation[s]," *Iqbal*, 129 U.S. at 1951, when evaluating the *plausibility* of alleged

misconduct.[11]   Moreover, while plaintiffs argue that "[t]here is substantial evidence that at the beginning of *2006 at the latest*" defendants should have predicted FHN's stock decline, the only thing they offer to support this contention is their conclusory assertion that FHN had "undisclosed exposure to losses" due to subprime loans and the like.  (Pls. Mem. at 38 (emphasis added).)  This bald assertion is not enough to "nudge[] [plaintiffs'] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

Accordingly, Count I should be dismissed for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

## II.   COUNT III SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE A PLAUSIBLE CLAIM OF FIDUCIARY NON-DISCLOSURE.

The Amended Complaint contains various conclusory allegations that FHN failed to disclose risks associated with its lending practices.  Conspicuously missing is any allegation that any statement in FHN's various public filings and disclosures was false.  Nor is there any allegation that FHN was required at any point to restate its financials.[12]   The sole basis for plaintiffs' nondisclosure claim is their flat assertions that, in hindsight, the fiduciaries should have known that FHN's disclosures were insufficient.

There are two fundamental deficiencies in plaintiffs' claim.  First, plaintiffs have not identified any fiduciary communication or conduct upon which to base their claim.  (10/21/08

---

[11]  Plaintiffs' reliance on *In re Countrywide Financial Corp. Securities Litigation*, 588 F.Supp. 2d 1132, 1173-74 (C.D. Cal. 2008), is unhelpful to their claims for at least three reasons.  (Pls. Mem. at 42.)  First, *Countrywide* was a securities case addressing loss causation, not an ERISA case addressing what a reasonable fiduciary should have known.  Second, the *Countrywide* plaintiffs relied on numerous confidential witnesses and specific internal documents as opposed to conclusory allegations in support of their claims that lending standards had deteriorated. *Id.* at 1145.  Third, the Court found that, unlike here, the *Countrywide* plaintiffs specifically pled that Countrywide's lending standards helped cause the economic crisis.  *Id.* at 1174.

[12]  The absence of such allegations distinguishes this case from the other cases within this Circuit, such as *In re CMS*, 312 F. Supp. 2d (involving restated SEC filings after investigation revealed fictitious sales to increase revenue), *In re AEP*, 327 F. Supp. 2d 812 (involving systematic fraud over years), and *Rankin v. Rotts*, 278 F. Supp. 2d 853 (E.D. Mich. 2003) (involving Kmart's bankruptcy and filing of restated financial statements after improper accounting practices were revealed), where motions to dismiss have been denied.

Def. Mem. at 22-26.)  Second, even if FHN's corporate filings and disclosures could constitute fiduciary communications, plaintiffs have failed plausibly to allege that any of these filings were deficient, much less that the fiduciaries should have known they were deficient.  (*Id.* at 26-27.)

### A.    Plaintiffs Attack Only Non-Fiduciary Communications.

Plaintiffs quote at length from excerpts of cases they claim support their assertion that fiduciaries can be held liable for corporate communications.  (Pls. Mem. at 44-47.)  However, these cases stand only for the unremarkable proposition that when a fiduciary communicates *directly* with plan participants *regarding plan benefits*, he has an obligation to tell the truth and provide all pertinent information regarding the specific benefits discussed.[13]  *Compare Gregg v. Transp. Workers of Am. Int'l.*, 343 F.3d 833 (6th Cir. 2003) (involving unions' statements in participant bulletins and town hall meeting that insurance premiums could not increase) *with Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 454 n.2 (6th Cir. 2003) (citing *Pirelli, Krohn, Sprague* and finding that "we have recognized such claims only where the misrepresentation in question involves the availability and extent of plan benefits.").

Here, plaintiffs have not pointed to a single fiduciary communication regarding benefits. Instead, their claim is based entirely on general *corporate* communications which would be made regardless of whether FHN sponsored a benefit plan covered by ERISA.  Moreover, the mere fact that these filings may have indirectly affected the Plan (via stock price fluctuations) does not somehow transform them into fiduciary communications regarding benefits.  *See Kirschbaum*,

---

[13] *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542, 548-51 (6th Cir. 1999) (involving alleged failure to provide critical information when discussing participants' ability to apply for long term disability benefits following car crash); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 443 (6th Cir. 2002) (involving employer communications to participants regarding whether benefits could be changed during retirement); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 442-43 (3d Cir. 1996) (finding that because fiduciaries made affirmative communications directed specifically at plan participants regarding their benefits, section 404(a) was applicable, but noting that it was "not determin[ing]" whether employer had a duty under ERISA Section 404(a) "to communicate anything at all to the Plans' participants about these matters in the first place").

526 F.3d at 256-57 (holding that alleged misrepresentations in SEC filings provided no basis for liability under ERISA); *see also Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 719 (6th Cir. 2000) ("[I]t is not the exercise of discretion alone that makes an employer's action subject to fiduciary standards. . . . Rather, the exercise of discretion *must relate to plan management or administration*." (emphasis added)); *In re Bausch & Lomb Inc.*, 2008 WL 5234281, at *7 ("[S]tatements concerning a company's financial condition become subject to ERISA fiduciary duties only if they are made in an ERISA fiduciary capacity, which means that the statements are made by the plan administrator and are intentionally connected to statements regarding a plan's benefits."). Accordingly, because plaintiffs have failed to identify any allegedly misleading *fiduciary* communications, Count III should be dismissed insofar as it is directed at FHN stock.

**B.     FHN Provided Extensive Disclosures On The Very Risks Plaintiffs Claim Were Not Mentioned.**

According to plaintiffs, the fiduciaries breached their duty of loyalty to Plan participants by failing to disclose: (i) risks associated with FHN's loan portfolios, (ii) that FHN's loan loss reserves were inadequate; and (iii) that FHN's stock was "artificially inflated." (Pls. Mem. at 44.) Plaintiffs ignore entirely the extensive disclosures FHN made throughout the class period.

**1.     FHN Disclosed Risks Associated With Its Loan Portfolios.**

The Amended Complaint recites in conclusory fashion various categories of risk associated with FHN's loan portfolios that allegedly went undisclosed. However, the very public filings plaintiffs reference in their Amended Complaint belie any plausible suggestion that FHN failed to disclose its risks, much less that the fiduciaries should have deemed the numerous disclosures inadequate. (10/21/08 Def. Mem. at 26-27.)

First, contrary to plaintiffs' assertions (Pls. Mem. at 49-50), FHN disclosed loan concentrations in specific states, including those where the slowdown in the housing market was

most pronounced.  For example, in a 2007 financial supplement filed with the SEC, FHN provided charts listing the top 10 states in which its Homebuilder and One Time Close loans were concentrated.  (10/21/08 Def. Mem. at 27 (citing Q4 2007 Fin. Supp. at 17, Doc. #41-17).) The charts also listed the percentage of loans in these states that were "nonperforming."  (*Id.*)  In response, plaintiffs simply argue that these disclosures should have been made sooner.  (Pls. Mem. at 50.)  "Plaintiffs cannot satisfy their pleading burden by ignoring the content of the disclosures and conclusorily asserting that they were incomplete."  *In re Huntington*, 620 F. Supp. 2d at 856; *see also Pugh*, 521 F.3d at 700 (evidence that problems emerged "says nothing about whether the defendants were on notice of potential problems beforehand").

Second, contrary to plaintiffs' conclusory allegations (*e.g.,* Am. Cmpl. ¶¶ 53, 163), defendants provided extensive disclosures throughout the class period regarding the risks and extent of its loan securitizations.  (*See, e.g.,* 2005 10-K (Doc. # 41-14) at 18-19 (discussing securitization and related risks); 2005 Annual Report (Doc. # 41-15) at 27 (quantifying loans securitized through government agencies and through proprietary transactions), 43-44 ( discussing securitizations and foreclosure risks), 101-03 (Note 24 detailing outstanding securitizations).)  The following is just one brief example of these disclosures:

> We depend *significantly* on our ability to sell or securitize first and second mortgage loans and home equity lines of credit (which we refer to as HELOC).  Those actions involve the sale of whole loans or of beneficial interests in loans.  *Although the market for loans is substantial, if it experiences difficulties we may be unable to sell or securitize our mortgage or HELOC loans at all,* or at favorable pricing levels.  If we were unable to continue to sell or securitize our loans at current levels, we would seek alternative funding sources to fund loan originations and meet our other liquidity needs.   If we were unable to find cost-effective and stable alternatives, *that failure could negatively impact our liquidity* and could potentially increase our cost of funds and lower our loan growth.

> When we sell or securitize mortgage and HELOC loans, we sometimes do so with *limited or full recourse*, which means, in effect, that we will take some or *significant financial responsibility for the loan if it defaults. Additional information* concerning these risks is set forth under the caption "Foreclosure Reserves" beginning on page 43. . .   In many cases, we sell or securitize loans with no recourse.  However, if a loan sold with no recourse defaults, *we could still bear responsibility to the buyer* if the loan did not conform to representations we made to the buyer at the time of the sale.  We manage that risk of non-conformity through origination and documentation controls and procedures.

(2005 10-K (Doc. # 41-14) at 18-19 (emphasis added).)

Plaintiffs' only response to the obvious contradiction between FHN's extensive disclosures and their allegations is to label two sentences from the above quote as being too "mild."  (Pls. Mem. at 51.)  Once again, "[p]laintiffs cannot satisfy their pleading burden by ignoring the content of [FHN's] disclosures and conclusorily asserting that they were incomplete."  *In re Huntington*, 620 F. Supp. 2d at 856; *see also Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 1310, 1333 (N.D. Ga. 2006) (dismissing claim where complaint "contained numerous instances of press releases and articles detailing Delta's financial condition").

Third, FHN also made extensive disclosures regarding risk management.  Specifically, FHN devoted no less than 14 pages of its 2005 Annual Report (Doc. # 41-15) to discussion of various risk management issues.[14]  For example:

- On pages 30-31 FHN discussed its process for setting its loan loss reserves, explaining: "The adequacy of the allowance for loan losses is analyzed quarterly. . . .  An analytical model, based on *historical loss experience adjusted for current events, trends and economic conditions*, is used to assess the adequacy of the allowance for loan losses. . . ." (emphasis added).

- FHN further explained on pages 44-45 that one of the "critical assumptions underlying" its estimates regarding reserves was that "the period of history used for historical loss factors is *indicative of the current environment*."

---

[14] Similar discussion and disclosures were provided in each of FHN's Annual Reports during the proposed class period.  (*E.g.,* 2006 Annual Report (Doc. # 41-16) at 30-37.)

- On pages 34-35, FHN disclosed more detailed information regarding the establishment of its allowance for loan losses based on the above risk grades, as well as detailed information on how it determines reserve rates for its loans and the factors it considers in making adjustments to reflect current conditions, "include[ing]: *changes in underwriting guidelines and credit scoring models; trends in consumer payment patterns, delinquencies and personal bankruptcies . . .*"

- On page 32, Table 18 presents a quantitative analysis of FHN's allowance for loan losses, including total charge-offs associated with both its Commercial and Retail business.

- On page 33, Table 19 quantifies total commercial loans held in each of 10 assigned risk grades ranging from "Firmly established, stable companies with excellent earnings, liquidity, and capital" to "Borrowers are deemed incapable of repayment and debt is deemed uncollectible."

- On pages 35-36, FHN quantified its nonperforming loans, including a disclosure that nonperforming assets in 2005 totaled $79.7 million compared to $77.3 million in 2004. Further, FHN broke down the total amount of nonperforming assets among loan types.

- On page 36, FHN presented a table further detailing its nonperforming assets, specifically identifying and quantifying the amount of total loans that were 30-89 days past due and those that were 90+ days past due.

In the face of these detailed disclosures provided in the very SEC filings plaintiffs reference throughout their Amended Complaint, plaintiffs simply assert that the disclosures are inadequate because they do not "suggest[] cause for concern regarding liquidity." (Pls. Mem. at 51.) This plainly does not suffice to cure the deficiency in their pleadings, particularly considering the undisputed fact that FHN remained well-capitalized by bank regulators' standards throughout the class period. *See In re Huntington*, 620 F. Supp. 2d at 855-56.

Plaintiffs' hindsight argument that it "now appears" that FHN might have failed to heed regulators' "guidelines" likewise fails to make plausible their allegation that FHN's risk assessment practices were inadequate. (Pls. Mem. at 13-16.) The "guidelines" plaintiffs quote merely state that some banks "*may* not be fully recognizing risk" in their loan portfolios and urge management to "actively assess" their portfolios, including by considering borrowers' ability to pay their loans and the "underwriting standards" for different types of loans. (*Id.*) Beyond

quoting these publications, plaintiffs offer no facts to support their bald assertion that FHN "now appears" to have "flouted" the regulators' guidance. (*Id.*)  To the contrary, FHN's disclosures state that its risk management methodologies accounted for changing conditions, including: "*changes in underwriting guidelines. . .* [and] *trends in consumer payment patterns, delinquencies and personal bankruptcies. . .*" (2005 Ann. Rpt. (Doc. # 41-15) at 35 (emphasis added).)

Finally, there is no plausible basis for plaintiffs' contention that FHN failed to disclose either that its loan portfolios "were susceptible to losses" from a slowdown in the housing market (Am. Cmpl. ¶ 55), or its "involvement in subprime, Alt-A loans, and loans secured by undeveloped collateral" (*id.* at ¶ 72).  FHN made both general disclosures regarding risks associated with economic downturns, and specific disclosures regarding the housing market as events unfolded.  For example, in its 2005 10-K FHN specifically discussed "Risks From Economic Downturns." (10/21/08 Def. Mem. at 27.)  Plaintiffs acknowledge this disclosure, but criticize it for suggesting that FHN's risks "were no different from any of those faced by all other financial services companies . . ."  (Pls. Mem. at 51-52.)  The obvious problem with this argument, however, is that plaintiffs have not alleged that FHN's risks *were* any different than those faced by other financial services companies.  Moreover, plaintiffs completely ignore FHN's statements throughout the class period regarding the impact of the slowing housing market on its loan portfolios.[15]  *See In re Huntington*, 620 F. Supp. 2d at 854 (dismissing misrepresentation claim where bank disclosed "general market risks" and "market turmoil," including that "there has been a general slowdown in the housing market").

---

[15] *See, e.g.,* 4/19/06 Press Release (Doc. # 41-20) (discussing "tightening of the overall mortgage market."); Am. Cmpl. ¶ 87 (quoting August 2006 Press Release announcing expected unfavorable impact due to "further deterioration in the mortgage environment and slow down in housing market.").

Similarly, as the Amended Complaint acknowledges (Am. Cmpl. ¶ 97), in early-2007 FHN announced it was exiting its already miniscule subprime business due to "market risk," but that it would continue making Alt-A loans to borrowers with strong credit ratings.  Moreover, FHN subsequently disclosed that it had indeed eliminated its miniscule subprime business as of October 2007, that it had reduced its Alt-A loans to just 6% of mortgage originations in 2007, and that just 3% of its Homebuilder loans were backed by undeveloped collateral.  (10/21/08 Def. Mem. at 27.)  Plaintiffs offer nothing in response to these disclosures.  *See In re Huntington*, 620 F. Supp. 2d at 855-56 (dismissing imprudence claim based on undisclosed subprime risk).

> **2.    There Is No Basis For Plaintiffs' Assertion That The Fiduciaries Should Have Known That FHN's Loss Reserves Were Inadequate.**

As discussed *supra* at 15-16, plaintiffs' assertion that the FHN fiduciaries should have known that the Company's reserves for loan losses were inadequate fails to state a claim.  It is axiomatic that plaintiffs cannot establish a plausible claim by merely pointing out, with 20/20 hindsight, that FHN increased its reserves and conclusorily asserting that the fiduciaries should have known beforehand that its reserves were deficient.  *See In re Huntington*, 620 F. Supp. 2d at 853 n.11; *see also Pugh*, 521 F.3d at 700.  Because that is all plaintiffs offer to support their claim, it must be dismissed.  *Id.*

> **3.    There Is No Basis For Plaintiffs' Assertion That The Fiduciaries Should Have Concluded That FHN's Stock Price Was Inflated.**

Plaintiffs offer no factual basis for their final assertion that the FHN fiduciaries should have known that FHN stock was "artificially inflated."  This allegation is predicated on the numerous other bald assertions regarding FHN's allegedly undisclosed risks and inadequate reserves.  For the same reasons these allegations fail, so too does their contention that FHN stock was artificially inflated and that the fiduciaries should have known it was inflated.  *See In re*

*Huntington,* 620 F. Supp. 2d at 854-56 (dismissing claims that Huntington stock was "artificial[ly] inflated" as a consequence of conclusorily alleged misrepresentations).

## III.   PLAINTIFFS' FAILURE TO MONITOR AND CO-FIDUCIARY LIABILITY CLAIMS FAIL.

Plaintiffs' remaining claims are derivative of Counts I and III. The premise that FHN stock was not a prudent Plan investment underpins both Count IV, Plaintiffs' failure to monitor claim, and Count V, Plaintiffs' co-fiduciary duty claim.  Since there can be no finding of imprudence or fiduciary nondisclosure, the derivative Counts should also be dismissed. *See, e.g. Wright*, 360 F.3d at 1100 ("Plaintiffs' exclusive purpose claim is derivative of their prudence claim and fails for the reasons outlined above.").

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in defendants' opening brief (Doc. # 41-2), Count I, and Counts III, IV and V insofar as they are directed at FHN stock, should be dismissed with prejudice.

Dated:  September 8, 2009

Respectfully submitted,

First Horizon National Corporation, et al.

s/ Thomas F. Hurka
Counsel for Defendants

| | |
|---|---|
| R. Mark Glover | Charles C. Jackson (*pro hac vice*) |
| Baker Donelson | Sari M. Alamuddin (*pro hac vice*) |
| 165 Madison Avenue | Thomas F. Hurka (*pro hac vice*) |
| First Tennessee Building | Christopher J. Boran (*pro hac vice* pending) |
| Memphis, Tennessee  38103 | Morgan, Lewis & Bockius, LLP |
| Tel:  (901) 577-2222 | 77 West Wacker Drive, 5th Floor |
| Email:  mglover@bakerdonelson.com | Chicago, IL  60601 |
| | Tel:  (312) 324-1000 |
| *Local Counsel for Defendants* | Email:  salamuddin@morganlewis.com |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on September 8, 2009, a true and correct

copy of the foregoing document was served by electronic means through the Court's ECF

System to:

> Ellen M. Doyle, edoyle@stemberfeinstein.com
> William T. Payne, wpayne@stemberfeinstein.com
> John Stember, jstember@stemberfeinstein.com
> Stephen M. Pincus, spincus@stemberfeinstein.com
> Joel R. Hurt, jhurt@stemberfeinstein.com
>
> Stember Feinstein Doyle & Payne, LLC
> 1705 Allegheny Building
> 429 Forbes Avenue
> Pittsburgh, PA 15219
> *Attorneys for Plaintiff*

Signed:  /s Thomas F. Hurka