## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

| | | |
|---|---|---|
| TROY SIMS and JOHN YOST,<br>individually, and on behalf of all others<br>similarly situated, | ) <br> ) <br> ) <br> ) | |
| **Plaintiffs,** | ) <br> ) | |
| v. | ) | No. 08-2293-STA-cgc |
| | ) | |
| FIRST HORIZON NATIONAL CORP., et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO DISMISS

---

Before the Court is Defendants' Motion to Dismiss (D.E. # 41) filed on October 21, 2008. Plaintiffs filed a response (D.E. # 85) on August 18, 2009. For the reasons set forth below, the Motion is **GRANTED IN PART, DENIED IN PART**.

### BACKGROUND

On May 5, 2008, Plaintiffs brought this class action to recover losses to the First Horizon Corporation Savings Plan ("Plan") in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et. seq. First, Plaintiffs allege that Defendants unlawfully selected First Horizon National Corporation's ("First Horizon") proprietary First Funds as an investment option for the Plan without employing a prudent selection process untainted by conflict. Secondly, Plaintiffs allege that Defendants unlawfully invested Plan assets in First Horizon stock when Plan fiduciaries knew or should have known that material information about the company's financial problems had not been disclosed.

1

On September 17, 2008, Plaintiffs filed an Amended Complaint. The Amended Complaint alleges five claims for relief: (1) failure to prudently and loyally manage the Plan's investment in First Horizon stock in violation of ERISA § 404, 29 U.S.C. § 1104 (Count I); (2) breaches of the duties of loyalty and prudence by causing the Plan to invest in First Funds in violation of ERISA § 404, 29 U.S.C. § 1104 (Count II); (3) failure to provide complete and accurate information to participants and beneficiaries in violation of ERISA § 404, 29 U.S.C. § 1104 (Count III); (4) failure to monitor the Plan's fiduciaries in violation of ERISA § 404, 29 U.S.C. § 1104(a)(1) (Count IV); and, (5) breach of co-fiduciary duties in violation of ERISA § 405, 29 U.S.C. § 1105 (Count V).

Plaintiffs allege in the Amended Complaint that Plaintiffs Troy Sims and John Yost and others similarly situated were employees of Defendant First Horizon during the relevant periods and are current participants in the Plan. Am. Comp. ¶¶ 8-9. Defendants include First Horizon; members of First Horizon's Board of Directors ("the Board"); various officers of First Horizon; First Tennessee National Bank, N.A. ("First Tennessee"); Highland Capital Management, Corp. ("Highland"); Martin & Company, Inc., ("Martin & Co."); members of the Retirement Investment Committee ("Investment Committee"); and members of the Pension, Savings and Flexible Compensation Committee ("Administrative Committee"). *Id.* at ¶¶ 10-17. Plaintiffs allege that all named Defendants were plan fiduciaries. *Id.*

According to Plaintiffs, the Plan is a defined contribution plan and an individual account plan. *Id.* at ¶ 18. Under its terms, a participant may authorize payroll deductions from 1% to 100% of eligible pay (subject to certain legal limitations) as contributions, to be invested in one or more of a number of options selected by the Plan's investment fiduciaries for employee

2

contributions.  *Id*.  Until September 1, 2007, First Horizon had a pension plan as well as the Plan, but it closed its pension plan to new participants on September 1, 2007.  *Id*. at ¶ 19.  The Plan allows participants to make pre-tax contributions (from 1% to 90% of eligible pay) and after-tax contributions (from 1% to 10% of eligible pay).  *Id*. at ¶ 20.  Participants may also rollover amounts representing distributions from other defined benefit and/or defined contribution plans.  *Id*. at ¶ 21.

The Company makes two types of contributions on behalf of participants to the Plan – matching contributions and savings contributions.  *Id*. at ¶ 22.  After one year of service, all participants are eligible for matching contributions.  *Id*.  Until some recent date in 2008, all participants except First Horizon Home Loan Corporation participants were required to invest in the Company Stock Fund in order to receive matching contributions.  *Id*. at ¶ 23.  Matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund.  *Id*.  According to an April 15, 2008 Proxy Statement, that requirement was dropped in early 2008, *i.e*., only after the Plan's holdings of First Horizon stock had lost more than half of its value.  *Id*.

Matching contributions are automatically invested in the Company Stock Fund.  *Id*. at ¶ 24. Each participant's account is credited with the participant's contributions, the Company's contributions and Plan earnings, and is charged with an allocation of asset management fees, Plan losses and certain other recordkeeping expenses.  *Id*. at ¶ 25.  Such allocations are based on participant contributions or account balances.  *Id*.  Participants direct their contributions into various investment options selected by the Plan's investment fiduciaries and may change their investment authorizations at any time.  *Id*. at ¶ 26.

Part of the Plan is referred to as the Employee Stock Ownership Plan ("ESOP") and is designed to invest primarily in Company Stock.  *Id*. at ¶ 27.  According to the 2007 Plan Document, § 13.3, the trustee was authorized under the ESOP provisions of the Plan to "invest Trust assets in savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds or other investments desirable for the Trust" or in cash.  *Id*.  The 2007 Plan Document further provided that "All investments will be made by the Trustee only upon the direction of the Plan Administrator [*i.e.* Defendant Administrative Committee].  The Plan Administrator may direct that all Trust Assets be invested and held in Employer Stock."  *Id*.

As of December 31, 2005, more than 50% of the Plan's net assets available for benefits – $317,598,814 – were invested in the Company Stock Fund.  *Id*. at ¶ 28.  The Plan's investments in First Horizon stock were highly volatile.  *Id*. at ¶ 29.  At year end 2005, those investments represented approximately –115% of the Plan's investment income; at year end 2006, approximately +48% of the Plan's investment income; and at year end 2007, approximately –420% of the Plan's investment income.  *Id*.

According to the Amended Complaint, First Horizon is a bank and financial holding company which spent years touting itself as a growing and dynamic "national" company.  *Id*. at ¶ 44.  Throughout the class period, First Horizon's principal source of cash flow, including cash flow to pay dividends on its stock, has been from its principal subsidiary, First Tennessee.  *Id*. Between January 1, 2005, and April 28, 2008, First Horizon – through its subsidiaries First Tennessee and First Horizon Home Loan Corporation – provided mortgage banking services in 44 states, and promoted itself as one of the country's 20 largest mortgage loan originators.  *Id*. at ¶ 45.  During the first part of the Class Period, as part of its so called "national expansion

strategy," First Horizon and its affiliates wrote and securitized ever increasing numbers of subprime and Alt-A mortgage loans, second lien mortgage loans, home equity loans and lines of credit, and construction loans, for which reduced underwriting standards and/or non-traditional financing arrangements were used. *Id*. By doing so, First Horizon was able to build loan volume and to appear more dynamic as a financial institution. *Id*.

In particular, between 2003 and 2007, First Horizon vastly increased its exposure to three higher-risk lending products: home equity lines of credit ("HELOC"); commercial construction loans to single-family builders ("homebuilder loans"); and retail real estate construction loans to individual consumers to build homes ("one time close loans"). *Id*. at ¶ 46. According to its 2006 Annual Report at p. 30, by 2006, retail residential real estate products, primarily HELOCs and other home equity loans, constituted 40 percent of total loans, with commercial construction loans comprising 11 percent of total loans, and retail construction "one time close loans" comprising an additional 10 percent of total loans. *Id*.

First Horizon failed to disclose, or adequately disclose, that HELOCS and loans backed by undeveloped collateral ("homebuilder" and "one time close") were inherently more risky than government-sponsored entity ("GSE") conforming first-lien mortgages. *Id*. at ¶ 47. Moreover, First Horizon failed to disclose, or adequately disclose, the risks in increasing its underwriting of second-lien loans, second mortgages, and loans secured by homes to be built where borrowers already had existing mortgages on their current homes. *Id*. In its 2004 Annual Report, Introduction: Retail/Commercial Banking – Review of 2004, and its 2005 Annual Report at pp. 30-31, First Horizon continued to maintain that risk-profiles for these portfolios were "stable" and that overall asset quality was "strong" over the course of several years of rapid portfolio

5

growth in these product areas. *Id.*

First Horizon touted its growth in its drive to become a national financial institution, but it failed to adequately disclose that this growth came at the expense of sound banking practices, and, instead, was based on lax underwriting and the issuance of loans on terms which created an unacceptably high likelihood of non-payment. *Id.* at ¶ 48. While First Horizon disclosed that there was a risk that some of its customers may not repay their loans and that collateral might be insufficient to avoid a loss, it failed to disclose that this risk had materially increased because of its underwriting practices and its failure to adequately manage this enhanced risk. *Id.*

First Horizon utilized what it referred to as "Super Expanded Underwriting Guidelines" in its loan business. *Id.* at ¶ 49. These standards allowed for FICO scores, loan-to-value ratios and debt-to-income ratios that were significantly less restrictive than the Company's standard full/alternative documentation loan programs. *Id.* First Horizon did not disclose or did not adequately disclose that it had failed to make adjustments in its loss provisions and loss reserves to take into account its foray into higher risk loans and lowered underwriting standards. *Id.*

First Horizon failed to adequately disclose that a large percentage of loans, including those backed by undeveloped collateral, were concentrated in states including Florida, California, Washington and Nevada. *Id.* at ¶ 50. Moreover, First Horizon inadequately reserved for loan losses by failing to take into account that its loans were geographically concentrated in states where there were clear signs that the boom in the housing market was over by early 2006. *Id.* First Horizon also became increasingly reliant upon secondary markets to securitize and sell its loans, as a result of its decision to write loans (*e.g.*, HELOCs and Adjustable Rate Mortgages or "ARMS") that did not conform with GSE's guidelines for federally-insured mortgage loans.

6

*Id*. at ¶ 51.  In 2003, First Horizon securitized and sold $40.9 billion of conventional and federally-insured mortgage loans and had $6 billion in off-balance sheet business trusts for the purpose of securitizing and selling to secondary market investors.  *Id*.  At year end 2006, First Horizon securitized and sold only $13.8 billion of conventional and federally-insured mortgage loans and reported approximately $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales.  *Id*.

First Horizon's proprietary securitizations of nonconforming first-lien and second-lien mortgages and home equity loans did not conform to the standards for sale or securitization to government agencies and created risks that there might not be an adequate market for such securities, risks which were not adequately disclosed.  *Id*. at ¶ 52.  First Horizon also failed to disclose or adequately disclose various risks related to its changed business model including the extent to which recourse could be sought from First Horizon on securitized loans, the increasing risks associated with its shift to off-balance sheet transactions, and how it could affect the levels of Level I and II capital held.  *Id*. at ¶ 53.  While First Horizon claimed to adequately manage the risks associated with the sale and securitization of its loans, it knew, when Plan participants did not and could not know, the facts and risks associated with First Horizon's risk management.  *Id*.

First Horizon failed to adequately oversee its own risk management.  *Id*. at ¶ 54.  It failed to adequately disclose the systemic problems in its risk management and its lack of competency in assessing and managing risks related to its national expansion and reduced underwriting.  *Id*.  First Horizon also failed to adequately disclose that the sustainability of its new business model relied on continued real estate growth and appreciation of real estate values.  *Id*. at ¶ 55.  Moreover, First Horizon also failed to adequately disclose that its products– particularly its non-

mortgage homebuilder, one-time close construction, condo developer and HELOC products –were susceptible to losses due to significant downturns in the general housing market and to a credit crunch in the general economy, including a severe reduction in the availability of credit or an increase in interest rates. *Id*.

On May 16, 2005, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS"), and the National Credit Union Administration issued "Credit Risk Management Guidance for Home Equity Lending" ("Credit Risk Guidance"). *Id*. at ¶ 56. Credit Risk Guidance stated that the agencies had "found that, in many cases, (sic) institution's credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards." *Id*. Credit Risk Guidance further stated that financial institutions "may not be fully recognizing the risk embedded in these portfolios." *Id*. at ¶ 57. Credit Risk Guidance also provided that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values." *Id*. at ¶ 58. Credit Risk Guidance also found that

> prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt. Given the home equity products' long-term nature and the large credit amount typically extended to a consumer and evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score. *Id*. at ¶ 59.

The Credit Risk Guidance stated that "underwriting standards for interest-only and variable rate HELOCs should include an assessment of the borrower's ability to amortize the fully drawn line over the long term and to absorb potential increases in interest rates." *Id*. at ¶ 60. The Credit

Risk Guidance also recommended that financial institutions with home equity concentrations as well as higher risk portfolios perform sensitivity analyses on key portfolio segments.  *Id.* at ¶ 61.

In its 2005 Annual Report, First Horizon stated that it had 13,000 employees serving customers through hundreds of offices located throughout 46 states.  *Id.* at ¶ 62.  The 2005 Annual Report contained a Chairman's Message from Defendant J. Kenneth Glass ("Glass") , then First Horizon CEO, dated February 1, 2006, which stated, "Our national expansion strategy also worked well."  *Id.*  Glass also stated, "As I look at 2006, I'm encouraged about the opportunities that exist in our businesses and the progress we are making toward our commitment of $50 million in earnings enhancements."  *Id.*

In 2004, First Horizon Home Loans securitized and sold approximately $19.3 billion in mortgage loans.  *Id.* at ¶ 63.  In 2005, First Horizon Home Loans securitized and sold approximately $16.6 billion in mortgage loans.  *Id.*  In its 2005 Annual Report, First Horizon disclosed that:

> Certain of FHN's originated loans, including non-conforming first-lien mortgages, second lien mortgages and HELOC originated primarily through FTBNA, do not conform to the requirements for sale or securitization through government agencies. FHN pools and securitizes these non-conforming loans in proprietary transactions. After securitization and sale, these loans are not reflected on the Consolidated Statements of Condition [except for certain circumstances].  On December 31, 2005 and 2004, the outstanding principal amount of loans in these off-balance sheet business trusts was $20.0 billion and $11.3 billion, respectively.  Given the significance of FHN's origination of non-conforming loans, the use of single-purpose business trusts to securitize these loans is an important source of liquidity to FHN.  *Id.*

In other words, in one year, from 2004 to 2005, First Horizon almost doubled the amount of off-balance sheet loans, while simultaneously describing the loan transactions so opaquely that Plan participants could not assess the risks to the Company related to those items.  *Id.* at ¶ 64.

According to its 2005 10-K, First Horizon depended "significantly" on its "ability to sell

or securitize first and second mortgage loans and home equity lines of credit. . . ."  *Id*. at ¶ 65.  It did not disclose or did not adequately disclose the risks to its ability to continue to engage in such securitizations.  *Id*.  Moreover, while First Horizon increased its investment in securitized mortgage products, it failed to reflect this increased risk in its loan loss provisions and reserves. *Id*. at ¶ 66.  In its 2005 Annual Report, First Horizon stated that it had "a significant concentration in loans secured by real estate" but they were "geographically diversified nationwide."  *Id*. at ¶ 67.  First Horizon also represented that it "did not have any concentrations of 10 percent or more of total commercial, financial and industrial loans in any single industry." *Id*.  By that date, First Horizon knew or should have known that it was likely to experience further deterioration in its National Home Builder and commercial real estate lending through its First Horizon Lending offices.  *Id*.

In its 2005 Annual Report, First Horizon touted the 83% growth of commercial construction loans in 2005 without disclosing risks inherent to that portfolio.  *Id*. at ¶ 68.  First Horizon and its Chief Operating Officer described the Company's construction lending as operating pursuant to "a program of carefully managed growth with this business."  *Id*.  The 2005 Annual Report credited "the favorable housing environment" as a factor in that growth as well as the expansion of its sales force and its geographic reach.  *Id*.  It did not attribute the growth to its lowered underwriting standards or disclose the extent to which the growth depended on such lowered underwriting standards.  *Id*.

In its 2005 Annual Report, First Horizon represented that in providing for loan losses it used an "analytical model based on historical loss experience adjusted for current events, trends and economic conditions."  *Id*. at ¶ 69.  The 2005 Annual Report stated on page 15 that "asset

quality in general should remain relatively stable based on expected economic conditions with normal short-term fluctuations; however, asset quality performance during 2005 was relatively strong." *Id*. First Horizon's description of its model was not adequate for outsiders to assess whether its loan loss reserves and provisions were reasonable and timely updated to reflect changes in the economic conditions. *Id*. As later events revealed, the loan loss reserves and provisions were wholly inadequate. *Id*.

First Horizon showed an increase in shareholders' equity from $1.9 billion in 2004 to $2.1 billion in 2005. *Id*. at ¶ 70. First Horizon touted its "enterprise-wide approach to risk governance, measurement, management and reporting including an economic capital allocation process that is tied to risk profiles used to measure risk-adjusted returns." *Id*. at ¶ 71. It did not disclose that its risk management procedures were not adjusted to take into account the increased risks associated with its more risky loan portfolio and its reduced underwriting standards and practices. *Id*.

In its 2005 Annual Report, First Horizon reported that it had investment grade ratings from all three of the rating agencies and that it recognized the need to maintain such ratings: "Maintaining adequate credit ratings on debt issues is critical to liquidity because it affects the ability of FHN to attract funds from various sources, such as brokered deposits or wholesale borrowings of which FHN had $10.1 billion and $6.2 billion on December 31, 2005 and 2004, respectively…." *Id*. at ¶ 72. First Horizon did not disclose that the banking practices in which it was engaged, including lowered underwriting standards and involvement in subprime, Alt-A loans, and loans secured by undeveloped collateral, were likely to cause its credit ratings to be lowered in the future. *Id*.

11

According to its 2005 Annual Report, First Horizon increased its mortgage loan origination volumes in 2005 by $4.2 billion, or 17 percent, and increased its delivery of loans into the secondary market by 18 percent to $34.6 billion. *Id.* at ¶ 74. However, First Horizon failed to increase its loan loss reserves or make changes to its risk-assessment methods in light of changes to its business. *Id.* Instead, First Horizon announced in its 2005 Annual Report that its ratio for allowance for loan losses to loans, net of unearned income, was lower "primarily reflecting the stable risk profile of both the commercial and retail loan portfolios." *Id.*

First Horizon described the increase in its mortgage business as resulting from the "favorable housing environment and expansion of the sales force and geographic reach" without describing the increasing riskiness of its business model given the changing nature of its portfolio. *Id.* First Horizon described its asset quality performance during 2005 as "relatively strong." *Id.* at ¶ 75. First Horizon claimed that it "uses the best information available to establish the allowance for loan losses." *Id.* at ¶ 76. Notwithstanding the Credit Risk Guidance, First Horizon continued to use the same methodology for determining relevant considerations for loss levels as it had historically used without taking into account the far riskier nature of its portfolio. *Id.* at ¶ 77. But because First Horizon did not disclose the actual methodology used or the flaws in the methodology used, it was impossible for participants to know those flaws. *Id.*

During the class period, First Horizon continued to offer and promote its "Payment Choice" Adjustable Rate Mortgage program which offered borrowers "lower starting rates and a choice of four repayment options each month," including making fixed payments at a reduced rate for up to 60 months which could result in the accumulation of deferred interest and paying interest only. *Id.* at ¶ 78. First Horizon promoted the use of "interest only" payment programs

12

for its mortgage borrowers as allowing them to "defer payment of the principal and use the funds for other purposes such as investment or paying off high-interest credit." *Id*. at ¶ 79. First Horizon also promoted "interest only" mortgages and loans stating that "Payment Choice is especially valuable if you're managing a dynamic portfolio, earn a fluctuating income or are dealing with unplanned expenses." *Id*. Yet such "interest only" loans were highly risky and required careful risk management and accounting treatment not afforded by First Horizon. *Id*.

In October 2006, the OCC, the Fed, the FDIC, the OTS, and the National Credit Union Administration jointly issued the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("2006 OCC Guidance"). *Id*. at ¶ 80. The 2006 OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime" mortgage products by ensuring that loan terms and underwriting standards were consistent with prudent lending practices, which require a credible analysis of a borrower's repayment capacity. *Id*. The 2006 OCC Guidance provided that such loans should be underwritten based on a borrower's ability to make fully-amortizing payments at the fully-indexed interest rate. *Id*. at ¶ 81. For products like payment option ARMs that permit negative amortization, the 2006 OCC Guidance provided that a lender should base its underwriting analysis on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan. *Id*.

Even after the 2006 OCC Guidance was issued, First Horizon continued to initiate interest-only mortgages, ARMs and HELOCs and second-lien mortgages which were far more risky and did not take into account the 2006 OCC Guidance. *Id*. at ¶ 82. On December 13, 2006, the Governmental Banking Agencies including the OCC issued an Interagency Policy

Statement on the Allowance for Loan and Lease Losses ("12/13/06 Policy Statement"). *Id*. That Statement provided that "Estimated credit losses should reflect consideration of all significant factors that affect the collectability of the portfolio as of the evaluation date." *Id*. The 12/13/06 Policy Statement directed management to "consider those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience." *Id*. at ¶ 83. According to the 12/13/06 Policy Statement, "if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity." *Id*. at ¶ 84.

Plaintiffs contend that First Horizon and the Director Defendants delayed conforming their practices to the Credit Risk Guidance, the 2006 OCC Guidance, and the 12/13/06 Policy Statement, thereby delaying recognition of loan losses and increasing loan loss reserves. *Id*. at ¶ 85. This delay is reflected in the huge increases in those items reflected in its reporting. *Id*. During the class period, First Horizon touted its "courage to make decisions and take actions based on personal and professional integrity." *Id*. at ¶ 86. By December 31, 2006, First Horizon's credit ratings had begun to decline.

Late in the summer of 2006, First Horizon allowed the first bad news about the company's deteriorating financial condition to slowly dribble out. *Id*. at ¶ 87. On August 29, 2006, in a press release, First Horizon admitted that:

> First Horizon National Corporation (First Horizon) (NYSE:FHN) announced today that it expects mortgage banking earnings to be unfavorably impacted this quarter by two unrelated events. The further deterioration in the current mortgage environment is expected to reduce pre-tax operating earnings by approximately $35 million as compared to the second quarter, and the settlement of a class action lawsuit is anticipated to create an estimated $21 million pre-tax accrual.

Mortgage banking operating earnings for the first two months of this quarter have been unfavorably impacted by lower gain on sale margins, further reductions in mortgage production and increased costs to hedge the servicing risks.

The recent drop in the 10-year treasury rate and the resulting inversion of the yield curve have changed the dynamics within the mortgage secondary market.  As a result, First Horizon Home Loan's gain on sale margins fell significantly below second quarter levels, and the costs increased to hedge servicing risks.  After realizing 122 basis points in gain on sale margins in the second quarter, we currently expect margins to range between 85 basis points and 90 basis points in the third quarter based on product delivery trends.  Additionally, this environment is expected to increase net hedging costs by approximately $5 million as compared to second quarter.

Mortgage banking industry-wide production has also weakened as the housing market has continued to slow. Although third quarter originations have traditionally been higher than second quarter levels, First Horizon's recent application trends foreshadow approximately a $1 billion reduction in originations and deliveries this quarter.

These three issues could reduce third quarter pre-tax operating earnings by $35 million in comparison to the second quarter.  Although we currently expect some modest improvement in mortgage banking in the fourth quarter, the current operating environment suggests that mortgage banking operations will only be in the range of break-even in the fourth quarter while our other two businesses should continue to perform in line with expectations.  *Id*.

First Horizon blamed the "current mortgage environment" rather than its own aggressive

banking practices and the relaxation of its underwriting standards and other banking practices for

losses in its mortgage portfolio.  *Id*. at ¶ 88.  And First Horizon failed to stem the problems.  *Id*.

It continued to make subprime real estate loans, Alt-A loans and other non-conforming loans

ignoring the declining market for those loans.  *Id*.

On September 29, 2006, First Horizon announced the "transition[ing]" of its Chief

Financial Officer and the search for a successor.  *Id*. at ¶ 89.  On October 18, 2006, First Horizon

issued a press release announcing the Company's earnings for Third Quarter 2006, which stated:

"We remain confident in our core strategy which continued to show progress in the third

15

quarter," said First Horizon National Corporation Chairman and CEO, Ken Glass. "In this period, we expanded our retail/commercial banking footprint, experienced the positive impact of cross-sell penetration, and made gains in the development and distribution of capital markets products other than fixed income. We believe that our vision of organically creating a national financial services organization and recruiting high-performing, experienced talent will deliver above-industry performance and provide long term value to our shareholders."

* * *

Provision for loan losses increased to $23.6 million in third quarter 2006 from $22.4 million last year. The 2005 provision included $3.8 million of hurricane losses. Excluding this item, the provision for loan losses would have been $18.6 million. The $5.0 million increase primarily reflects an expectation of slowing economic growth and the migration of a few loans to the watch list….

* * *

"While macro environment issues will continue to impact earnings growth into next quarter, our overall strategy continues to position our business for strong sustained earnings growth," concluded Glass.  *Id*. at ¶ 90.

In a January 17, 2007 press release, Defendant Glass was quoted as stating:

2006 was a unique year for the company, as our financial performance was marked by a number of unusual and one time items such as the sale of our merchant business. We recognize that given this, it will be difficult for you to get a good fix on our 2007 earnings. Therefore, we have decided for 2007 to offer more earnings for the full year at or above the current market consensus of $2.80.  *Id*. at ¶ 91.

Yet, in the quarterly earnings call the following day, the company continued to insist that its

careful management of its portfolios, specifically the construction portfolios, had left it

positioned for growth:

We have expanded construction lending nationally, but kept our local approach. Our culture and our local support systems allow us to recruit experienced end market staff who know their markets extremely well. We specifically target home builders who have a track record of enduring through multiple cycles and whose loyalty to their financial partners is based upon relationship rather than price. We operate in geographically diverse markets. Our customer base is granular and we have managed our exposure to undeveloped land to represent only 3% of our portfolio. As a result we believe this business line is well positioned for continued growth without significant additional asset quality risk.  *Id*. at ¶ 92.

16

First Horizon's 2006 Annual Report was entitled "Positioned for Growth." *Id.* at ¶ 93. First Horizon was not positioned for growth. *Id.* It was on an unsustainable course. *Id.*

As of March 1, 2007, First Horizon and Defendant Gerald Baker ("Baker"), then president and CEO of First Horizon, were still touting First Horizon's national expansion strategy. *Id.* at ¶ 94. In a letter from Baker in the 2006 Annual Report, Baker wrote

> We are very clear about our strategic vision. Our goal is to expand our banking franchise to select markets nationwide using our targeted relationship approach. . . [W]hat we're proud to move forward with is an organization that is stronger at its foundation and better positioned to find stability amid financial market uncertainty. And it's this repositioning that we believe will offer our shareholders the confidence of a more consistent return on the investments they make. *Id.*

As of March 1, 2007, First Horizon and Baker continued to misrepresent the nature of First Horizon's underwriting practices. *Id.* at ¶ 94. In the same March 1, 2007 letter in the 2006 Annual Report, Baker stated in reference to the bank's construction lending practices: "And as always, we apply strict underwriting standards." *Id.* at ¶ 95.

On April 18, 2007, First Horizon announced first quarter 2007 earnings of $70.5 million or $0.55 per diluted share. *Id.* at ¶ 96. It was not until that date that First Horizon announced in a press release that it was finally no longer going to underwrite, process or fund subprime loans, but it was going to continue its Alt-A loans which represented 20% of new originations of first lien mortgages. *Id.* at ¶ 97. The April 18, 2007 press release quotes Baker as stating:

> We are working hard to return mortgage to historical levels of profitability through our strategy of building our prime, retail origination business. … Accordingly, we have made the decision to no longer underwrite, process and fund nonprime loans. Our nonprime business, which represents less than two percent of our mortgage loan production, has resulted in a reasonable level of repurchase activity for which we have adequate reserves to cover estimated remaining losses. However, reduced investor appetite for this product has diminished gain-on-sale margins drastically; therefore, we believe market risk no

17

longer justifies the modest potential rewards and believe it is better to service retail customer needs through broker relationships. In contrast, our Alt-A business, which represented 20 percent of our first-lien production in first quarter 2007, has prime-type credit characteristics despite the non-standard loan structures, with an average FICO of over 715 and continues to price appropriately.  The majority of our Alt-A production is securitized and to-date, no residual or credit support structures have been retained and we have not seen any material repurchase activity from these loans.  *Id.*

The Company also stated in its April 18, 2007 press release:

Provision for loan losses increased to $28.5 million in first quarter 2007 from $23.0 million in fourth quarter 2006, primarily reflecting an increase in both homebuilder and one-time-close construction loans on the watch list...The nonperforming assets ratio related to the loan portfolio decreased to 56 basis points in first quarter 2007 from 58 basis points in fourth quarter 2006 due to the resolution of these previously identified problem loans and as overall low levels in the retail and commercial loans portfolios outweighed the expected increase in construction lending. The compared to 98 basis points in fourth quarter 2006. Nonperforming assets were $135.9 million on March 31, 2007, compared to $139.0 million on December 31, 2006.  *Id.* at ¶ 98.

Baker also stated in the press release:

We are maintaining our focus on disciplined asset quality management with tightened guidelines in both retail and construction lending. We still expect asset quality to be solid for the full year of 2007 with net charge-offs averaging between 30 and 40 basis points for the year.  *Id.* at ¶ 99.

In late May and early June, First Horizon Stock closed around $40 per share.  *Id.* at ¶ 100.  On July 17, 2007, Fitch downgraded the lower tranches of two Alt-A Trusts offered and managed by First Horizon, series 2006 AA-3 and Series 2006-F-2.  *Id.* at ¶ 101.  Fitch downgraded the lowest two tranches (the BB tranche became B+, the B tranche was downgraded to CCC and assigned "distressed recovery" ratings) and put the BBB tranche on "ratings watch negative."  *Id.*

In a July 19, 2007 press release, First Horizon announced that charge-offs decreased during the second quarter of 2007:

The net charge-off ratio decreased to 41 basis points in second quarter 2007 from 48

basis points in first quarter 2007 as net charge-offs declined to $23.0 million from $26.6 million in first quarter 2007. Provision for loan losses increased to $44.4 million in second quarter 2007 from $28.5 million in first quarter 2007, with the increase split between recognition of $7.7 million of losses for a non-strategic loan portfolio that was sold during the quarter and additional provisioning. Excluding the impact of the sold loans, the provision would have been $36.7 million for second quarter 2007. The nonperforming asset ratio increased to 81 basis points in second quarter 2007 from 56 basis points in first quarter 2007. *Id*. at ¶ 102.

On July 19, 2007, First Horizon Stock closed at $37.74 per share, down 24 cents. *Id*. at ¶ 103. Over the next three months, First Horizon's share price decreased approximately 20%, reaching $29.65 on September 11, 2007. *Id*. The July 19, 2007 press release also announced that First Horizon would pursue the sale, closure or consolidation of 34 branches in its four national full-service banking markets of Atlanta, Baltimore, Dallas and Northern Virginia, while continuing to offer mortgage loans in these markets through First Horizon Home Loan Corporation. *Id*. at ¶ 104.

On September 12, 2007, Baker announced plans to cut up to 50 percent of First Horizon's mortgage sales force and shrink the real estate portfolio on its balance sheets by making further changes in its consumer and construction lending businesses. *Id*. at ¶ 105. At that time, First Horizon noted that it was not planning to grow. *Id*. Instead, it was shrinking and cutting back as well as planning to make other adjustments, including:

• Shrinking the real estate portfolios on its balance sheet by making further changes in its consumer and construction lending business. New originations are expected to decline significantly as a result of continued product and program changes and the retention of only the most productive sales people.

• Cutting back-office support in consumer and construction lending as production is

reduced.

- Exiting selected national markets for business banking.

- Transitioning the national cross-sales of deposit products to an Internet-based model,

eliminating the need for banking specialists in mortgage offices.  *Id.*

The September 12, 2007 press release quoted Baker as stating:

> "This strategic shift will reduce our real estate exposure and position us appropriately for the expected ongoing contraction of the housing market," said Baker. "As we focus our energy on continuing to build our strong banking franchise in Tennessee, we will enhance shareholder value by deemphasizing our more volatile national businesses, improving short-term profitability and increasing longer-term returns." *Id.* at ¶ 106.

On October 17, 2007, First Horizon Stock closed at $25.04 per share.  *Id.* at ¶ 107.

After the close of the market on October 17, 2007, First Horizon announced that it

experienced a loss in the third quarter of 2007 of $14.2 million, or 11 cents per share, compared

with net income of $22.1 million, or 17 cents a share, a year earlier.  *Id.* at ¶ 108.  Reflecting the

"deterioration" of credit markets, the company's mortgage banking operations posted a pre-tax

loss of $45.8 million, up from a second quarter pre-tax loss of $16.1 million.  *Id.*  In an October

17, 2007 conference call, Bryan Jordan provided an estimate of its loan losses for the rest of

2007:

> **Bob Patten - Morgan Keegan**
> Can you give us a sense of the moving parts over the next two quarters, because now we are talking about charge going into '08 in terms of gains and charges left and where they are attributed to?
>
> **Bryan Jordan**
> Yeah, Bob, this is Bryan. I think the bulk of the charges will be realized in the fourth quarter, and we are still within the original framework that we said, somewhere between $90 million and $100 million, so, probably another $20 million maybe $30 million in charges.  That will be offset by the premiums on the sale of the First Horizon branches. The bulk of that will be in the first quarter, because that's when those divestitures close. We'll have a little bit in November that offsets the charges. But we expect up to $40

million of net premium, they are offset by a little bit of severance and costs, whether we have yet to accrue it.  *Id.*

Also, in this conference call, Bryan Jordan assured investors that FHN was on-top of monitoring its problem loans:

> All right, the thing I would add is that in terms of our risk rating, we have seen a little bit pressure on downward migration. We would expect that to continue in this part of the cycle. In some sense, the depth and severity of what we are seeing in the markets will continue to pull it down, if this persists. **And so, we are very actively monitoring it. And we have got a tremendous amount of resources dedicated to managing problem assets.** *Id*. at ¶ 109.

Upon announcement of the third quarter results, First Horizon's share price dropped to $23.69 on October 18, 2007.  *Id*. at ¶ 110.

On December 21, 2007, First Horizon announced that its mortgage business expected to lose money in the fourth quarter of 2007 and that it expected to set aside an additional $150 million in anticipation of unpaid loans, over 50% higher than what Defendant Jordan had estimated two months earlier.  *Id*. at ¶ 111.  The loan loss provision for the fourth quarter exceeded First Horizon's combined provision for the first three quarters of 2007.  *Id*.  Many of these unpaid loans were a result of defaults from residential developers that borrowed money to buy properties in Florida, California, Virginia, Georgia and Nevada.  *Id*.  The December 21, 2007 press release stated:

> Additional Loan Loss Reserves
>
> First Horizon recently completed a review of its reserve for loan losses and real estate portfolios, with an emphasis on higher-risk markets. As a result of that review, First Horizon expects to increase its reserves in the fourth quarter, with an anticipated total provision of approximately $150 million that should significantly exceed net charge-offs of roughly $50 million. The additional reserves are largely attributable to inherent losses within its residential construction portfolios – One-Time Close and Homebuilder – from discontinued product structures and higher-risk national markets such as Florida,

21

California, Virginia, Georgia and Nevada….

Mortgage Segment Impacts

First Horizon expects its mortgage segment to report a fourth quarter 2007 pre-tax loss. While based on preliminary estimates and subject to changing market conditions through the end of this quarter, this anticipated loss is driven by three areas:

• Approximately $70 million of goodwill impairment resulting from updated valuation of the mortgage segment;

• Volatility of mortgage rates and intra-mortgage spread widening since the beginning of December, which has (sic)
• Potential adjustments to the carrying values of mortgage servicing and valuation of non-conforming products in light of current market conditions. *Id.*

Throughout the fourth quarter of 2007, First Horizon's stock price continued to drop, closing the year at $17.78 per share. *Id.* at ¶ 112.

On January 17, 2008, First Horizon announced a loss of $248.6 million or $1.97 per diluted share in the fourth quarter of 2007 compared to a net loss of $14.2 million or $.11 per diluted share in the third quarter of 2007 due to rising loan-loss reserves and a reduction in the value of mortgage servicing rights. *Id.* at ¶ 113. The Company also reduced its dividend by 56% to 20 cents per share. *Id.* With respect to loan losses, First Horizon stated:

The net charge-off ratio was 93 basis points in fourth quarter 2007 compared to 57 basis points in third quarter 2007 as net charge-offs increased to $50.8 million from $31.4 million in third quarter 2007. Provision for loan losses increased to $156.6 million in fourth quarter 2007 from $43.3 million in third quarter 2007. Provisioning for fourth quarter 2007 reflects recognition of inherent losses within residential construction portfolios, including One-Time Close and Homebuilder Finance, related to discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada. The nonperforming asset ratio increased to 166 basis points in fourth quarter 2007 from 113 basis points in third quarter 2007. *Id.* at ¶ 114.

An 8-K also filed on January 17, 2008 contained supplemental materials and disclosed that the consumer real estate, homebuilder, and "one time close" portfolios contained concentrations of

loans in California, Virginia and Florida.  *Id*. at ¶ 115.  Loans issued in California comprised

approximately 7.8 percent of total loans held by First Horizon.  *Id*.  In the January 17, 2008 press

release, Baker is quoted as stating:

> Current market conditions require definitive management actions to adequately address
> the operating environment and to position the company for consistent revenue growth
> and greater return for our shareholders…. As such, we have acted in several key areas by
> increasing loan loss reserves, reducing our mortgage servicing assets and national lending
> businesses, implementing productivity enhancements, and selling or reducing low
> returning operations. In combination with our dividend reduction, these changes should
> improve our capital position in 2008 and allow us to make the proper investments that
> leverage the fundamental strength of our Tennessee banking franchise. …
> We will continue to make further significant adjustments to our mortgage and related lending
> businesses, including pursuing strategic alternatives to further reduce our exposure to these
> areas.  *Id*. at ¶ 116.

During all that bad news, First Horizon continued to make matches in Company Stock.  *Id*. at ¶

117.

During a January 17, 2008 earnings conference call, First Horizon's Chief Financial

Officer Bryan Jordan stated:

> . . . As we disclosed in late December the additional reserves primarily reflect **higher
> inherent losses in segments of our national one time close and home builder
> portfolios, which together represent $4.1 billion or about 19% of our total loan
> portfolio.**
> In Home Builder Finance we continue to see the greatest problems in weak national
> housing markets such as Florida, California, Arizona, Nevada, Virginia and Georgia.
> Where falling home prices are driving entire loss severities and where a large supplies of
> unsold homes are pressuring builders and consumers. **Florida and California alone
> represent about 22% of our total $2.1 billion builder portfolio but account for over
> 50% of our non-performers in this portfolio.** Our one time close portfolio is also
> experiencing significant pressures in these national markets.  *Id*. at ¶ 118.

That conference call continued:

> **Fred Cannon – KBW**
> Good morning. I wonder if you could walk us through a bit more on the one-time flows
> product, in particular. Essentially what went wrong on that product, in terms of the
> structure of it and the loss content you are seeing? **If I remember correctly, historically**

**you have implied that you thought that was a fairly safe product and would perform like first mortgages; that isn't occurring. Now it sounds like it is performing more in line with the national homebuilder portfolio.** Also, was there any kind of breakdown in your risk management regarding that product?

**Bryan Jordan**

The one-time close is a product, just to restate, is an individual construction loan for an individual borrower to build a home. It is often made in a scenario where the homebuilder is – it also includes a take-out into a permanent structure. The average loan size is about $435,000 or so.

The issues that we are seeing in the portfolio are largely driven by a couple of major factors. **In a lot of cases, the portfolio had an Alt-A structure or an Alt-A take-out. A lot of the problems that we are seeing today are in the products that we significantly curtailed in 2006 and into 2007.** For example, stated income product and other expanded approval products. We are seeing the greatest deterioration in those products. You have got the overall slowdown in the real estate markets driving the ability of buyers to sell the home they are in, move into this one; a number of different factors from the economy affecting it. The biggest drivers in general have been the difficulties in the real estate market and the unavailability of financing and the ability to sell some of those products.

**Fred Cannon – KBW**

So just on that note, so essentially the risk characteristic that created this issue were alt-A stated income issues? Secondly, you said that essentially you would make this loan to an individual while you still had another mortgage on another property, and then therefore it was essentially a second home loan to individuals and that was another risk characteristic?

**Bryan Jordan**

It wasn't always a second home loan. It was intended to be a first and that was part of the approval where you would sell the existing home, you would move the equity over. But clearly **a [stepped] product is more susceptible to misrepresentation and fraud.**

**Dave Miller**

Fred, those expanded guideline type of products also tended to be more for some of the higher-risk markets. So with the slowdown in some of those areas that sort of exacerbated the issue.

**Fred Cannon – KBW**

You are talking about my home state of California, I bet.

**Gerald L. Baker**

That would be one, Fred. *Id*. at ¶ 119.

24

In addition to the previously announced winding down of the homebuilder and one-time close product lines, the company announced that "[o]n the origination side, we have eliminated virtually all non-GSE eligible product originations…" *Id*. at ¶ 120.  The company also noted in its supplemental 8-K filing on the same date that First Horizon had "tightened underwriting standards for one-time close and homebuilder finance products." *Id*.

On January 17, 2008, Standard & Poor's Ratings Services cut its long-term credit rating on First Horizon to "BBB+" from "A-," as well as the counter-party credit rating on its subsidiary, First Tennessee, to "A-/A-2" from "A/A-1." *Id*. at ¶ 121.  On January 28, 2008, First Horizon announced that it would pull out of national home building and commercial real estate lending everywhere except in Tennessee and a few other parts of the Southeast.  *Id*. at ¶ 122.  On January 30, 2008, at the Citigroup 2008 Financial Services Conference, First Horizon announced to investors that it was revamping its risk management and workout processes, including:

- Developing a more intensive "watch list" process;

- Enhancing risk grading protocols and training;

- Conducting comprehensive portfolio reviews;

- Deploying additional workout resources;

- Enhancing workout functions;

- Reviewing reserve models given recent history, conditions; and

- Refining certain loss probabilities and severities.  *Id*. at ¶ 123.

Within months, First Horizon substantially increased the number of employees dedicated to workouts.  *Id*. at ¶ 124.  For example, in C&I and Commercial Real Estate, First Horizon increased the number of full-time employees from 12 to 33 and the number of workout officers

from 7 to 2 (sic) With respect to "one time close" workouts, First Horizon expanded staff from 7 to 30 full-time employees.  *Id*.  On March 3, 2008, Moody's Investors Services downgraded First Horizon based on concerns about its exposure to commercial real estate.  *Id*. at ¶ 125.  On March 10, 2008, Fitch Ratings gave a negative outlook to First Horizon due to "continuing weakness in FHN's construction lending portfolio and rising non-performing assets in homebuilder finance portfolio and construction loans made directly to consumers for single family loans, which comprise approximately 20% of total loans."  *Id*. at ¶ 126.  On March 20, 2008, JP Morgan Securities Inc. downgraded First Horizon shares to "Neutral" citing rapid deterioration of home equity loans as a major short-term risk.  *Id*. at ¶ 127.  In a note to clients, analyst Steven Alexopoulos pointed to evidence that loan losses for the industry are rapidly spreading from residential construction loans to home equity loans:

> "A weakening economy and declines in home prices are the two ingredients that tend to drive mounting home equity losses," he said. "Listening to what bank managements have said during the quarter, it appears to us that all of the pieces are in place for the industry to see meaningful deterioration in home equity loans in the first quarter." …
> First Horizon is especially at risk, as 18 percent of the Memphis, Tenn.-based bank's loans are home equity products, Alexopoulos noted.  *Id*.

On April 1, 2008, Morgan Stanley initiated coverage of First Horizon with "underweight" – that it will perform below its peers in the industry over the next 12 to 19 months.  *Id*. at ¶ 128.

On April 28, 2008, First Horizon announced that it would no longer pay its dividend in cash but would make it instead in shares of common stock and that it was issuing up to $600 million in new shares priced at $10.00 per share, thereby diluting its existing shares of common stock.  *Id*. at ¶ 129.  First Horizon's allowance for loan losses more than doubled from $229,919,000 as of June 30, 2007, to $575,149,000 as of June 30, 2008.  *Id*. at ¶ 130.   First Horizon's Impaired Loans increased from $9,993,000 on December 31, 2006, to $50,761,000 on

June 30, 2007, to $372,494,000 on June 30, 2008.  *Id*. at ¶ 131.  On May 21, 2008, First

Horizon's share price declined more than 6 percent after a troubled California bank, Vineyard

National Bancorp, revealed in a regulatory filing that it owed $53.3 million on a credit line for

which First Horizon was the lead bank in the consortium that made the loan.  *Id*. at ¶ 132.  Other

non-accrual loans increased from $89,747,000 on June 30, 2007 to $397,524,000 on June 30,

2008.  *Id*. at ¶ 133.

First Horizon admits that in 2008 and fourth quarter 2007 it "conducted focused portfolio

management activities to identify problem credits and to ensure appropriate provisioning and

reserve levels."  *Id*. at ¶ 134.  Plaintiffs believe and therefore aver that such focus should have

been directed on First Horizon's provisioning and reserve levels as soon as it began its riskier

practices – including increased use of subprime, Alt-A, nontraditional mortgages, ARMS,

HELOCs, second-lien mortgages and construction loans to boost its lagging growth as mortgage

lending became more competitive during the class period.  *Id*.

On or about June 4, 2008, First Horizon announced that it had agreed to sell its mortgage

business outside of Tennessee to MetLife Bank for approximately $400 million.  *Id*. at ¶ 135.

The deal included First Horizon's 230 offices in its loan-origination business and its right to

service $20 billion in mortgages.  *Id*.  In addition, the agreement provides that MetLife will

service $65 billion of first mortgages that First Horizon is retaining for now but will try to sell

over the next few years.  *Id*.  First Horizon estimated that it would take $50 million to $70

million in pre-tax charges related to both the MetLife deal and other expenses in the mortgage

division.  *Id*. at ¶ 136.

First Horizon's sale of its national mortgage business and its January 2008 decision to

discontinue home builder and commercial real estate lending through First Horizon Construction

Lending offices were part of its decision to abandon its "Diversification Through National

Expansion" strategy. *Id*. at ¶ 137. Instead, First Horizon decided to pursue a new strategy of

"Strong Regional Financial Services Company," which included reducing its mortgage exposure

to its banking footprint and eliminating non-bank real estate lending. *Id*. at ¶ 138.

On July 14, 2008, First Horizon announced that it lost $19.1 million during the second

quarter, compared to earnings of $22.1 million during the same quarter the previous year. *Id*. at

¶ 139. The company also stated that it would set aside $220 million to cover loan losses,

compared to $44.4 million a year earlier, and net charge-offs were $127.7 million during the

second quarter. *Id*. The company also reaffirmed that charge-offs for the year would be between

$385 million and $485 million. *Id*.

Throughout the class period, although it lowered underwriting standards, First Horizon

was becoming heavily involved in high-risk mortgage and home equity lending (including

subprime and Alt-A loans) and in loans backed by undeveloped collateral (i.e., commercial

construction loans, one time close loans), and was increasing its holdings of off-balance sheet

assets, and although the housing boom was ending and the availability of credit was tightening,

First Horizon did not fully account for its credit risks in setting loan loss provisions and reserves

for the total outstanding loans reflected on its balance sheets, its off-balance sheet loan

commitments, or the off-balance sheet securitizations for which it had recourse obligations. *Id*.

at ¶ 140. It was only in mid-2008 that First Horizon began to fully account for its credit risks in

its loan reserves and charge-offs. *Id*. Also on July 14, 2008, First Horizon announced that CEO

Jerry Baker would resign from the company effective August 31 and that he would be succeeded

by CFO Bryan Jordan. *Id*. at ¶ 141.  On July 14, 2008, First Horizon's stock price hit a 12-year

low when it dropped to $4.52 before closing at $5.04 per share. *Id*. at ¶ 142.  The close of First

Horizon's stock at $5.04 meant that the stock was down over 72% for 2008, causing the Plan's

holdings to further depreciate. *Id*. at ¶ 143.

On July 31, 2008, First Horizon announced that its Emerging National Business division

would be discontinued and that it was terminating employment of the division's president,

Defendant Sarah Meyerrose. *Id*. at ¶ 144.  On September 2, 2008, First Horizon executives

announced that they expect that as a result of "persisting market weakness and their ongoing

efforts to aggressively address problem loans," First Horizon's latest projections indicate that

2008 full-year net charge offs could be approximately $100 million above the range announced

in July 2008. *Id*. at ¶ 145.  The following day Standard & Poor's cut First Horizon's long-term

counter-party ratings one notch to BBB, two notches above junk status. *Id*. at ¶ 146.  It also

reduced the counter-party credit rating on First Tennessee Bank N.A. Memphis one notch to

BBB+/A-2. *Id*.  Standard & Poor's also pointed out that First Horizon had seen credit

deterioration at its retail bank and "we expect nonperforming assets and net charge-offs to

remain high through the rest of 2008." *Id*. at ¶ 147.

Plaintiffs contend that First Horizon, First Tennessee, Director Defendants, the

Investment Committee and its members, the Administrative Committee and its members, and

other fiduciaries knew or should have known of these problems with First Horizon's failure to

manage and accurately report on its books these growing financial problems and knew or should

have known that the price of First Horizon's stock was inflated until full and complete disclosure

of the problems occurred. *Id*. at ¶ 148.

29

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the complaint as true and construe all of the allegations in the light most favorable to the non-moving party.[1] However, legal conclusions or unwarranted factual inferences need not be accepted as true.[2]  "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[3]  "The Federal Rules of Civil Procedure do not require a claimant to set out in detail all the facts upon which he bases his claim."[4]

The Supreme Court has more recently stated that the Federal Rules "do not require a heightened fact pleading of specifics, but only enough facts to state a claim that is plausible on its face."[5]  The plausibility standard ensures that "a district court... retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to

---

[1]  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).

[2]  *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[3]  *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[4]  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

[5]  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) ("retiring" the "no set of facts" standard first announced in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).  *See also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

proceed."[6]  In this way, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court."[7]

The Sixth Circuit has subsequently acknowledged "[s]ignificant uncertainty" as to the intended scope of *Twombly*.[8]  Consequently, the Sixth Circuit has articulated the following as the standard of review for 12(b)(6) motions: on a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."[9]  Thus, although the factual allegations in a complaint need not be detailed, they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief."[10]

## ANALYSIS

On October 21, 2008, Defendants filed the instant Motion to Dismiss.  Defendants' Rule 12(b)(6) Motion to Dismiss asserts that Count I and portions of Counts III, IV, and V of the

---

[6] *Twombly*, 127 S. Ct. at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528, n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

[7] *Twombly*, 127 S. Ct. at 1966 (citations omitted).

[8] *Weisbarth v. Geauga Park Dist.,* 499 F.3d 538, 541 (6th Cir.2007); *see also Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 337 (6th Cir.2007) ("We have noted some uncertainty concerning the scope of *Bell Atlantic Corp. v. Twombly,* ... in which the Supreme Court 'retired' the 'no set of facts' formulation of the Rule 12(b)(6) standard ....").

[9] *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Twombly,* 127 S.Ct. at 1974 (2007)).

[10] *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (emphasis in original) (citing *Twombly,* 127 S.Ct. at 1964-65).

Amended Complaint fail to state a claim upon which relief can be granted.  The Court will analyze Defendants' arguments as to each count separately.

## I.      *Exhibits Offered in Support of Defendants' Motion to Dismiss*

As an initial matter, Plaintiffs have argued in their Response brief that Defendants have attached exhibits which are not proper for consideration under Rule 12(b)(6).  These exhibits include articles concerning the recent crisis affecting banking institutions and speeches and statements from Ben Bernanke, the Chairman of the Federal Reserve Board.   Plaintiffs argue that periodical articles are not public records and not the type of record of which courts typically take judicial notice.  And even when a court takes notice of a document, it does so only to establish the document's existence and not for the truth of the matters asserted in the document. Thus, the Court should not consider these exhibits in ruling on the Motion before the Court. Defendants have not responded to Plaintiffs' Motion due to the fact that Plaintiffs raised the issue in their Response brief.[11]

Defendants have attached to the Motion thirty-one exhibits.  Seventeen of these exhibits appear to be referred to in the Amended Complaint, for example, various public statements and disclosures related to First Horizon's corporate performance.  Fed. R. Civ. P. 12(d) provides that

> If, on a motion under rule 12(b)(6) or 12(c), matters outside the pleadings are presented
> to and not excluded by the court, the motion must be treated as one for summary

---

[11] This issue was also raised in briefing on Defendants' Objections to Judge Cohn's Order of April 30, 2009.  *See* docket entries 77 and 78.  There Defendants argued the Motion must still be considered under Rule 12(b)(6) because the exhibits are all referred to or relied on in the Complaint and are properly considered part of the pleadings.  Additionally, Defendants argue that the Court may consider media accounts and publications as "public records."

judgment under Rule 56.[12]

The Court retains the discretion to consider or exclude such extrinsic evidence presented with a Rule 12(b)(6) to dismiss.[13]  Fed.R.Civ.P. 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."  Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based.[14]  Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claims.[15]

The Court finds that of the exhibits attached to Defendants' Motion, twenty-one are press releases, SEC filings, annual reports, and earnings statements related to First Horizon.  These exhibits, numbers 3 through 14 and 23 through 31, are referred to in the Amended Complaint and/or are central to the claims.  The Court declines to consider the other ten documents which include one affidavit and several press reports unrelated to First Horizon, its SEC filings, or annual reports.  More specifically, the Court will not consider exhibits 1 and 2 and 15 through 22.  Therefore, the Court will not convert the Motion to a motion of summary judgment.

---

[12] Fed. R. Civ. P. 12(d); *see also Jones v. City of Cincinnati*, 521 F.3d 555, 561-62 (6th Cir. 2008).

[13] *Jones*, 521 F. 3d at 561.  *See also Pueschel v. United States*, 369 F.3d 345, 353 n. 3, (4th Cir. 2004); *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003).

[14] *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327, at 762 (2d ed. 1990)).

[15] *Weiner*, 108 F.3d at 89 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

## II.   Count I:  Breach of Fiduciary Duty of Prudence and Loyalty

In Count I of the Amended Complaint, Plaintiffs allege that Defendants failed to prudently and loyally manage the Plan's investment in First Horizon stock.  According to Plaintiffs, Defendants exercised authority and control over the management of the Plan and of the assets of the Plan and thus acted as fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Am. Compl. ¶ 162.  Defendants knew or should have known by January 1, 2006, that First Horizon stock was not a suitable and appropriate investment for the Plan.  Id. at ¶ 163.  Although First Horizon had not publicly disclosed the risks which made it an unsuitable investment, Defendants had reason to know that First Horizon had exposure to losses due to the deteriorating quality of its loan portfolio; its dependence on securitization of subprime, Alt-A and other troubled loans; the problems in its residential construction and other loans; and its failure to adequately account for and report those problems including by not having adequate loan loss provisions and reserves.  Id.

Defendants breached their fiduciary duties by (1) failing to review the appropriateness of First Horizon Stock as an investment for the Plan, (2) requiring participants to invest in the Company Stock Fund in order to receive a matching contribution from the company, (3) automatically investing company matching contributions in the Company Stock Fund, (4) acquiring new shares of First Horizon Stock at artificially inflated prices, and (5) concentrating more than 50% of the Plan's assets in First Horizon stock despite the risks associated with such a concentration.  Id. at ¶ 164.  Defendants further breached their duty to avoid conflicts of interest and to promptly resolve them by, among other things: (1) failing to engage independent fiduciaries that could make independent judgments regarding the Plan's investments in First

34

Horizon Stock; (2) failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made First Horizon Stock an unsuitable investment for the Plan; (3) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and (4) in each of these failures, by otherwise placing the Company's interests above those of the participants. *Id.* at ¶ 165. As a result of these breaches, the Plan suffered losses of millions of dollars. The named Defendants are therefore liable to restore the losses under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a). *Id.* at ¶¶ 166-67.

In their Motion to Dismiss, Defendants argue first that the matching provisions of the Plan and the ESOP are matters of plan design, that is, a settlor function to which ERISA's fiduciary provisions do not apply. The matching provisions could not be ignored or adjusted by the Defendant-fiduciaries themselves. Likewise, Defendants argue that the ESOP provision is an "architectural component of the overall Plan." Thus, the matching provisions and the ESOP were "embedded" in the Plan and could not be terminated or modified short of an amendment to the Plan. Because the fiduciaries had no authority to terminate or modify the matching provision or the ESOP, Count I of Plaintiffs' Amended Complaint should be dismissed.

In the alternative, Defendants contend that Plaintiffs' allegations fail to overcome the strong presumption that investment in First Horizon stock was prudent as a matter of law. As an eligible individual account plan, an ESOP is exempt from the ERISA duty to diversify. Therefore, an ESOP fiduciary cannot be liable for failure to diversify such a plan. Defendants point to the strong public policy in favor of employee ownership, which an ESOP plan serves. For these reasons, the Sixth Circuit has applied an abuse of discretion standard to similar claims

involving ESOP fiduciaries, which presumes that the "fiduciary's decision to remain invested in employer securities was reasonable." This standard is known as the *Kuper* presumption and requires a plaintiff to make an extraordinary showing that the company's "viability as a going concern was . . . threatened,[or] that [its] stock was in danger of becoming essentially worthless." In this case the decline in the stock price of First Horizon shares and the fiduciaries' alleged knowledge of undisclosed risks to the company's fiscal health are insufficient to overcome the *Kuper* presumption. Under the circumstances, the Plan fiduciaries could not have foreseen in January 2006 the decline in First Horizon stock that took place in late 2007 and early 2008. No one in the financial industry foresaw the global financial crisis that arose in August 2007. There is no allegation in the Amended Complaint that the fiduciaries acted imprudently after August 2007 when First Horizon along with the rest of the stocks in its industry began to decline. For these reasons, Count I should be dismissed.

Plaintiffs respond that courts in the Sixth Circuit have consistently held that the issues Defendants raise as to Count I should not be resolved on a motion to dismiss but only after an opportunity for discovery. First, Count I's claims of imprudent investment do implicate the fiduciary duty to diversify plan assets and to act in the best interests of the ESOP and its participants. A fiduciary may only follow plan terms to the extent that the plan is consistent with ERISA. Under the terms of the Plan in this case, Defendants had the authority to invest ESOP assets "primarily in Employer Stock" but also in "savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds or other investment desirable for the Trust . . . or Trust Assets may be held in cash." Thus, the Court should reject Defendants' argument that the matching provisions of the Plan and the ESOP are settlor functions and not fiduciary

functions.

Second, Plaintiffs argue that courts in this Circuit have declined to consider whether the *Kuper* presumption should apply in the context of a Rule 12(b)(6) motion to dismiss. Those cases have held (1) that the *Kuper* presumption is an evidentiary, and not a pleading, standard; and (2) the notice pleading requirement of Rule 8 does not require Plaintiffs to overcome the ESOP presumption by affirmatively pleading facts such as fraud or "the impending collapse" of the company. *Kuper* itself was not a decision about the sufficiency of the plaintiffs' pleadings but a decision of the court after the parties had submitted briefs, findings of fact and conclusions of law.

Even on the merits, Plaintiffs argue that the Amended Complaint contains allegations sufficient to overcome the *Kuper* presumption. Rather than demonstrating that First Horizon's financial condition was "dire," Plaintiffs contend that they need only show that a prudent fiduciary acting under similar circumstances would have made a different investment decision in order to rebut the *Kuper*'s presumption of reasonableness. Plaintiffs argue that there is no Sixth Circuit authority for the proposition that a plaintiff must allege that a company's "financial condition is seriously deteriorating" or other "extraordinary circumstances" in order to overcome the *Kuper* presumption. Although it is true that First Horizon did not fail, Plaintiffs argue that First Horizon did receive approximately $900 million in money from the federal government and its stock price declined 88.25% during the class period. According to Plaintiffs, First Horizon declined by 20 to 30% more than the S&P Bank Index during the same period. Defendants' attempts to limit cases from other courts in the Sixth Circuit to the "unique circumstances" involved in those cases is unavailing. For these reasons, the Court should deny Defendants'

Motion to Dismiss Count I.

## A.   Plaintiff-Fiduciaries Cannot Be Liable for Settlor Functions

The Sixth Circuit has explained that ERISA's high standard of fiduciary duty encompasses three distinct duties.[16]  First, a fiduciary has a "duty of loyalty" that "all decisions regarding an ERISA plan must be made with an eye single to the interests of the participants and beneficiaries."[17]  Second, a fiduciary has "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single-minded devotion" to plan participants and beneficiaries.[18]  Third, a fiduciary must "act for the exclusive purpose" of providing benefits to plan beneficiaries.[19]  ERISA holds a fiduciary who breaches any of these duties personally liable for any losses to the plan that result from his breach of duty.[20]

A plan sponsor acts as the settlor of a trust, and not as fiduciary, when the sponsor makes a decision regarding the amendment or structure of a plan.[21]  Here Plaintiffs allege that Defendants breached their fiduciary duty by requiring participants to invest in the Company Stock Fund in order to receive a matching contribution from First Horizon and automatically

---

[16] *Kuper v. Iovenko,* 66 F.3d 1447, 1458 (6th Cir. 1995) (citing 29 U.S.C. § 1104(a)(1)).

[17] *Kuper*, 66 F.3d at 1458 (citations omitted).

[18] *Id.*

[19] *Id.*

[20] *Id.* (citing 29 U.S.C. § 1109(a)).

[21] *See Lockheed Corp. v. Spink,* 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Varity Corp. v. Howe,* 516 U.S. 489, 505, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).

investing company matching contributions in the Company Stock Fund.  It is undisputed that these provisions are part of the Plan itself.  Therefore, any change would require amendment to the structure of the Plan, a settlor function.  To the extent that Plaintiffs allege that Defendants breached their fiduciary duties by not amending the Plans to alter the matching and ESOP provisions, Plaintiffs have failed to state a claim upon which relief can be granted in Count I.


### B.   Plaintiffs Need Not Overcome the *Kuper* Presumption in Pleadings

Plaintiffs have alleged additional breaches of fiduciary duty in Count I for the Defendants' continued investment of Plan assets in First Horizon Stock.  As an initial matter, the parties do not dispute that the Plan is a specific kind of ERISA plan known as an ESOP.   ERISA provides for certain kinds of eligible individual account plans ("EIAP") including plans known as Employee Stock Ownership Plans ("ESOPs").[22]  An ESOP is an ERISA plan investing primarily in "qualifying employer securities," which is most commonly the stock of the employer creating the plan.[23]  An ESOP promotes a policy of employee ownership of a company by modifying the fiduciary duty to diversify plan investments, 29 U.S.C. § 1104 (a)(1)(C), and the prudence requirement to the extent that it requires diversification, 29 U.S.C. § 1104 (a)(1)(B).[24]  "As a general rule, ESOP fiduciaries cannot be held liable for failing to diversify investments, regardless of whether diversification would be prudent under the terms of an

---

[22] 29 U.S.C. § 1107(d).

[23] 29 U.S.C. § 1107(d)(6)(A).

[24] 29 U.S.C. § 1104 (a)(2).

ordinary non-ESOP pension plan."[25]

However, an ESOP fiduciary may be liable for failing to diversify plan assets even where the plan required that an ESOP invest primarily in company stock.[26]  The Sixth Circuit has explained that ERISA's statutory exemptions for ESOPs

> do[ ] not relieve a fiduciary ... from the general fiduciary responsibility provisions of [§ 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion ... nor does it affect the requirement ... that a plan must be operated for the exclusive benefit of employees and their beneficiaries.[27]

According to the Sixth Circuit, ESOP fiduciaries "wear two hats" as they "are expected to administer ESOP investments consistent with the provisions of both a specific employee benefits plan and ERISA."[28]  In recognition of an ESOP fiduciary's "two hats," the Sixth Circuit has adopted an abuse of discretion standard of review for an ESOP fiduciary's decision to invest in employer securities.[29]  A fiduciary's decision to remain invested in employer securities is presumed to be reasonable, the so-called *Kuper* or *Moench* presumption.[30]  Faced with this presumption, a plaintiff  "may rebut the presumption by showing that a prudent fiduciary acting

---

[25] *Kuper*, 66 F.3d at 1458.  ERISA further exempts ESOPs from "strict prohibitions against self-dealing, that is 'deal[ing] with the assets of the plan in his own interest or for his own account.'"  29 U.S.C. § 1106(b)(1).

[26] *Id*. at 1459.

[27] *Kuper*, 66 F.3d at 1458 (citations omitted).

[28] *Id*. (citing *Moench v. Robertson,* 62 F.3d 553, 569 (3d Cir. 1995).

[29] *Id*. at 1459.

[30] *Id*.

under similar circumstances would have made a different investment decision."[31]

Plaintiffs allege that beginning in 2003, First Horizon had altered its traditional business model as a regional bank to pursue national expansion and substantially riskier kinds of lending. As a result, the risk of future losses associated with First Horizon profits increased, yet First Horizon did not take steps to manage its risks by increasing reserves.  Plaintiffs allege that as officers and directors of First Horizon, Defendants were aware or should have been aware of these risks.  Defendants should have adjusted the Plan's investment in First Horizon stock accordingly.  However, Defendants continued to invest Plan assets in First Horizon stock. Eventually, First Horizon's performance suffered, the stock declined by almost 90% from July 2007 to July 2008 (the end of the class period), and the Plan lost a substantial amount of money.

Accepting Plaintiffs' well-pled allegations as true, the Court holds that Plaintiffs have stated a plausible claim that Defendants breached their fiduciary duty by continuing to invest Plan assets in First Horizon stock even after they knew that it was no longer prudent to do so. Plaintiffs have alleged that First Horizon loosened its underwriting standards in an effort to lend more aggressively at the same time that it failed to manage the risks for these practices.  It is true, as Defendants argue, that the Plan directed the trustees to invest ESOP assets "primarily in Employer Stock."  However, an ESOP fiduciary may be liable for failing to diversify plan assets even where the plan required that an ESOP invest primarily in company stock.[32]  Moreover, the Plan itself vested further discretion in Defendants to invest Plan assets in savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds, and even cash.

---

[31] *Id.*

[32] *Id.*

Plaintiffs have alleged in Count I that Defendants breached their fiduciary duty by not exercising their discretion to invest Plan assets in these other types of investments instead of company stock.  A plan does not impose on a fiduciary an unquestioning duty to follow the terms of a plan where doing so would be imprudent.[33]  Again in *Kuper*, the Sixth Circuit held that an ESOP's goal of investing primarily or even exclusively in employer securities "cannot override ERISA's goal of ensuring the proper management and soundness of employee benefit plans."[34]  Under ERISA, a plan fiduciary may only follow plan terms to the extent that they are consistent with ERISA.[35]  Therefore, the Court holds that Plaintiffs have stated a plausible claim against Defendants for their failure to diversify plan assets.

Defendants argue that Plaintiffs must plead enough facts to overcome the *Kuper* presumption and that in this case they have failed to do so.  The Court is not persuaded that the *Kuper* presumption creates a heightened pleadings standard for an ERISA plaintiff.  First, *Kuper* did not involve a dismissal on the pleadings and provides that a plaintiff  "may rebut the presumption by *showing* that a prudent fiduciary acting under similar circumstances would have made a different investment decision " (emphasis added).  The Sixth Circuit has described the rebuttal as a "showing," which suggests to the Court an evidentiary standard, that is, the plaintiff carries the burden to overcome the presumption with facts or evidence to make the "showing."  This conclusion is consistent with rulings from other courts in this Circuit which have held that

---

[33] *Id.*

[34] *Id.* at 1457.

[35] 29 U.S.C. § 1104(a)(1).

the *Kuper* presumption is an evidentiary, and not a pleading, standard.[36]  Indeed, it appears to the

Court that the majority of the courts in this Circuit to consider this issue have concluded that an

ESOP plaintiff need only satisfy Rule 8 notice pleading requirements with respect to similar

breach of fiduciary duty claims in order to survive a Rule 12(b)(6) motion to dismiss.[37]

Furthermore, *Kuper* did not require that a plaintiff plead the impending collapse of the employer

or other dire circumstances to rebut the presumption that the ESOP fiduciary acted reasonably in

investing in employer stock.[38]  On the contrary, the rebuttal standard is much broader and

requires only that "a prudent fiduciary acting under similar circumstances would have made a

different investment decision."  Therefore, the Court holds that *Kuper* does not require a

heightened pleading standard as it were.

　　Having concluded that Plaintiffs need not overcome the *Kuper* presumption as a matter of

---

[36]  *In re The Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F.Supp.2d 783, 793-94 (N.D. Ohio 2006); *In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 864 (N.D. Ohio 2006); *In re CMS Energy ERISA Litigation,* 312 F. Supp. 2d 898, 914 (E.D. Mich. 2004); *Rankin v. Rots,* 278 F. Supp. 2d 853 (E.D. Mich. 2003).  *Accord Tullis v. UMB Bank, N.A.*, 515 F.3d 673, 681 (6th Cir. 2008) (rejecting heightened pleadings requirements in ERISA cases that "would elevate form over substance").  The Court notes that in many of these cases, there was a more fundamental dispute about whether the plans in question were ESOPs at all.  It is undisputed in the case at bar that this plan is an ESOP.  As a result, neither party disputes that the *Kuper* presumption will apply in this case or that Plaintiffs will bear the burden in this case to show that "a prudent fiduciary acting under similar circumstances would have made a different investment decision."

[37]  *In re Ford Motor Co. ERISA Litigation*, 590 F. Supp. 2d 883, 915-16 (E.D. Mich. 2008); *Shirk v. Fifth Third Bancorp*, 2007 WL 1100429 (S.D. Ohio Apr.10, 2007); *Goodyear*, 438 F. Supp. 2d at 783; *In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006); *Ferro*, 422 F. Supp. 2d at 850; *In re General Motors ERISA Litig.*, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006); *CMS*, 312 F. Supp. 2d at 898; *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812 (S.D. Ohio 2004); *Rankin*, 278 F. Supp. 2d at 853.

[38] *See also Goodyear*, 438 F. Supp. 2d at 794.

pleading, the Court holds that Plaintiffs have stated a claim for breach of fiduciary duty by

continuing to invest Plan assets in First Horizon stock.


III.      **Count III:  Breach of Fiduciary Duty for Failure To Provide Complete and Accurate**

          **Information to Participants and Beneficiaries**

          In Count III of the Amended Complaint, Plaintiffs allege that Defendants failed to

provide complete and accurate information to Plaintiffs as Plan participants and beneficiaries.

Plaintiffs contend that Defendants had a heightened duty to provide this information due to the

Plan's investment in the Company Stock Fund and resulting lack of diversification.  The

Amended Complaint asserts that Defendants failed to provide accurate information regarding (1)

First Horizon Stock, (2) the extent of the Company's exposure to losses in connection with the

deteriorating quality of its residential construction loans and mortgages, (3) the Company's

artificial inflation of the value of the stock, and, generally, (4) by conveying incomplete and

inaccurate information about the soundness of First Horizon Stock and the Company Stock Fund

as retirement investments.  Am. Compl. ¶ 175.  Defendants further breached their duty to inform

by failing to provide complete and accurate information regarding the financial benefits that First

Horizon and its affiliates were receiving in connection with investing Plan assets in the First

Funds, and the fact that the First Funds were selected by Plan fiduciaries because of the fees

generated to First Horizon and its affiliates rather than through a prudent selection process.  *Id*.

at ¶ 176.  By their actions, Defendants caused Plaintiffs to make and maintain substantial

investments in First Horizon stock, in the Company Stock Fund and in the First Funds at a time

when Defendants knew or should have known that First Horizon stock and the First Funds were

44

not prudent investment options for the Plan or Plan participants.  *Id*. at ¶ 177.  As a result, the

Plan lost millions of dollars for which Defendants are liable for breach of fiduciary duty pursuant

to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a).  *Id*. at ¶¶ 177-78.

In their Motion to Dismiss, Defendants argue that Plaintiffs have failed to state a claim in

Count III.  First, Defendants made the disclosures Plaintiffs cite in their corporate capacities, and

not as the Plan fiduciaries.  Thus, the disclosures cannot create a cause of action for breach of

fiduciary duty.  None of the SEC filings, press releases, or analyst calls were addressed to the

Plan or its participants.  None of these statements concerned the Plan or ERISA benefits.  Even

though the communications may have affected the value of First Horizon stock and so indirectly

the Plan, the communications do not thereby take on a fiduciary nature.  Second, fiduciaries are

not required to disclose information ERISA does not require to be disclosed.  ERISA requires the

disclosure of a summary plan description and an annual report with the government.  ERISA

does not, however, require the disclosure of general information of business risks.  Third,

Defendants argue that Plaintiffs have not sufficiently alleged that Defendants had knowledge of

any allegedly inadequate disclosures.  Defendants detail the disclosures included in First

Horizon's public SEC filings about risks associated with its lending practices.  Finally, as to this

issue, Defendants argue that Defendants were prohibited under federal law from using material,

non-public information to make decisions about Plan assets.  Thus, they could not have traded

First Horizon stock held by the Plan based on material, nonpublic information on which

plaintiffs allege defendants should have acted.

Plaintiffs have responded that fiduciaries have an affirmative duty to inform plan

beneficiaries whether it is a "negative duty not to misinform" or "an affirmative duty to inform

when the trustee knows that silence might be harmful."  Because the matching provisions of the

Plan required investment in First Horizon, Defendants had a duty to inform beneficiaries like

Plaintiffs of all information material to the decision to invest.  Plaintiffs counter that Defendants'

interpretation of the duty to inform under ERISA is too narrow.  Plaintiffs attack the adequacy of

the disclosures of risk associated with First Horizon stock in public filings and statements

including First Horizon's annual reports.  In particular, Plaintiffs argue that the disclosures

concerning geographic risk and general risk management were incomplete or understated.

Plaintiffs also argue that Defendants cannot hide behind securities laws to avoid their duty to

disclose.

ERISA imposes upon a fiduciary the duty to convey complete and accurate information

to its beneficiaries.[39]  This duty to disclose "entails not only a negative duty not to misinform,

but also an affirmative duty to inform when ... silence might be harmful."[40]  With respect to a

fiduciary's affirmative duty to disclose, the Sixth Circuit has held that the duty to disclose is

limited to only those disclosures required under ERISA.[41]  For example, ERISA, 29 U.S.C. §§

1021 *et seq*., mandates the following types of fiduciary disclosures: a summary plan description

(§ 1022); a plan description (§ 1022); an annual report (§ 1023); various notices to participants

---

[39] *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 452 (6th Cir. 2002).

[40] *Id.* (quoting *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir. 1993)).

[41] *Sprague v. General Motors Corp.,* 133 F.3d 388, 405 (6th Cir. 1998) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed.").

and beneficiaries (§ 1021); and a pension benefit statement (§ 1025).[42]  The *Sprague* Court

opined, "when Congress and the Department of Labor have carefully prescribed a detailed list of

matters that must be disclosed to plan participants and beneficiaries, it ill-behooves federal

judges to add to that list."[43]  Other courts in the Sixth Circuit have applied *Sprague* and the

affirmative duty to inform under facts similar to those presented in the case at bar.  For example,

a fiduciary does not have an affirmative duty under ERISA to provide participants with non-

public information regarding a company's financial condition.[44]  On the other hand, a fiduciary

does have a duty to inform participants of the general risks of investing in company stock

through the plan documents mandated by ERISA.[45]  In either case, any cause of action for a

fiduciary's failure to disclose is limited to failures to make such disclosures required under

ERISA.[46]

       In their Amended Complaint, Plaintiffs allege a series of disclosures which First Horizon

failed to make: (1) that certain loans in First Horizon's portfolio were inherently more risky than

conforming first-lien mortgages (¶ 47); (2) First Horizon had altered its underwriting practices

---

[42] 29 U.S.C. §§ 1021-1026.

[43] *Id*. at 405 n. 15.

[44] *In re Ferro*, 422 F. Supp. 2d at 864 (N.D. Ohio 2006) ("Although the individual Defendants had an obligation to protect the Plans under these circumstances because of their duties of prudence and loyalty, they did not have a duty to disclose non-public information to plan participants about the accounting irregularities.").  *See also Banks v. Healthways, Inc.*, 2009 WL 211137, *3 (M.D. Tenn. Jan. 28, 2009); *In re The Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F.Supp.2d 783, 794-95 (N.D. Ohio 2006).

[45] *In re Ferro*, 422 F. Supp. 2d at 864 (citing *Stahl v. Tony's Bldg. Materials, Inc.*, 875 F.2d 1404 (9th Cir. 1989).

[46] *Id.*

resulting in a larger number of these riskier loans (¶ 48); (3) that a large percentage of riskier loans were concentrated in certain states including Florida, California, Washington and Nevada (¶ 50); (4) First Horizon failed to adjust its loss provisions and loss reserves at the same time it increased higher risk loans and lowered underwriting standards (¶¶ 49, 71); (5) First Horizon's methodology for determining loss levels did not take into account the riskier nature of its portfolio (¶ 77); (6) First Horizon had systemic problems in its risk management related to its national expansion and reduced underwriting (¶ 54); (7) First Horizon's new business model relied on the continued appreciation of real estate values (¶ 55); (8) that certain loan products were susceptible to losses due to significant downturns in the general housing market and to a credit crunch in the general economy (¶ 55); (9) First Horizon's proprietary securitizations of nonconforming mortgages and home equity loans did not conform to the standards for sale or securitization to government agencies (¶ 52)[47]; (10) First Horizon's continued ability to sell or securitize first and second mortgage loans and home equity lines of credit (¶ 65); (11) risks to First Horizon's credit ratings due to its lowered underwriting standards and involvement in riskier loans (¶ 72); and (12) the extent to which recourse could be sought from First Horizon on securitized loans, the increasing risks associated with its shift to off-balance sheet transactions, and how it could affect the levels of Level I and II capital held (¶ 53).

The Court holds that as Plan fiduciaries Defendants did not have an affirmative duty to disclose any of the information cited by Plaintiffs. Contrary to Plaintiffs' argument, there is no authority for the proposition that the duty to disclose is as broad and absolute as Plaintiffs have

---

[47] This contention appears to be at odds with ¶ 63 of the Amended Complaint where Plaintiffs cite the 2005 Annual Report specifically disclosing this risk.

characterized it.  Plaintiffs have pointed to no provision in ERISA requiring a fiduciary to disclose the specific kinds of risks and factors detailed in the pleadings.  Indeed, the matters addressed in the Amended Complaint are the kind of non-public disclosures relating to First Horizon's business practices and internal decision-making, which ERISA does not require a fiduciary to disclose.  Additionally, Plaintiffs have failed to allege that the plan documents, which must be disclosed under ERISA, themselves failed to disclose the general risk of loss of the investment in company stock.  For these reasons, Plaintiffs have failed to state a claim that Defendants breached their affirmative fiduciary duty to disclose certain matters required by ERISA.

With respect to the negative duty not to misinform, courts in this Circuit have applied a different analysis.[48]  In order to establish a claim that the fiduciary supplied the participant with inaccurate or misleading information, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that the misrepresentations were material; and (3) that the plaintiff relied on the misrepresentations to his detriment.[49]  "[A] fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally."[50]  Furthermore, corporate officers who also act as plan fiduciaries are said to wear "two hats."[51]  Thus, there is a

---

[48] *Id.*

[49] *Pirelli,* 305 F.3d at 449.

[50] *Krohn v. Huron Mem. Hosp.,* 173 F.3d 542, 548 (6th Cir. 1999) (*citing Berlin v. Michigan Bell Telephone Co.,* 858 F.2d 1154, 1163-64 (6th Cir. 1988)).

[51] *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998).

distinction "between employer actions that constitute managing or administering a plan and those that are said to constitute merely business decisions that have an effect on an ERISA plan."[52]

Under this analysis, where a defendant makes statements to the general public in the form of SEC filings, press releases, conference calls with analysts and investors, and newspaper articles during the regular course of business, such statements are not made in the defendant's fiduciary capacity.[53]  In short, "a fiduciary is not liable under ERISA simply because he made public statements concerning a company's financial condition."[54]  The Supreme Court considered this issue and held that public statements implicate the fiduciary duty to inform only where the statements concern plan benefits.[55]  Nevertheless, a plaintiff may state a claim for breach of the duty to inform where public communications are incorporated into plan documents or directed to plan participants by the Plan.[56]  For example, a cause of action may lie where a defendant fiduciary incorporated false SEC filings into plan documents.[57]

---

[52] *Id.*

[53] *In re Ferro*, 422 F. Supp. 2d at 865.  *See also Healthways*, 2009 WL at 211137 at *3

[54] *Id.*

[55] *Varity Corp. v. Howe,* 516 U.S. 489, 505, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

[56] *In re Ferro*, 422 F. Supp. 2d at 865.  *See also In re Diebold ERISA Litig.*, 2008 WL 2225712, *5 (N.D. Ohio May 28, 2008); *In re General Motors Erisa Litigation*, 2007 WL 2463233, *6 (E.D. Mich. Aug. 28, 2007) ("GM II"); *Shirk v. Fifth Third Bancorp*, 2007 WL 1100249 (S.D. Ohio Apr. 10, 2007); *Goodyear,* 438 F. Supp. 2d at 795 (N.D. Ohio 2006); *Gee v. UnumProvident Corp.,* 2005 WL 534873, at *16 (E.D. Tenn. Jan 13, 2005)

[57] *In re Ferro*, 422 F. Supp. 2d at 865 (citing *In re Worldcom Inc.,* 263 F.Supp.2d 745, 766-67 (S.D.N.Y. 2003); *In re Sprint Corp. ERISA Litig.,* 388 F.Supp.2d 1207, 1226 (D. Kan. 2004); *In re CMS Energy ERISA Litig.,* 312 F.Supp.2d 898, 915-16 (E.D. Mich. 2004); *In re Reliant Energy ERISA Litig.,* 336 F.Supp.2d 646, 671 (S.D. Tex. 2004).

The Court holds that Plaintiffs have failed to state a claim for breach of the negative duty not to misinform as to any of the public comments or statements of the corporate officers cited in the Amended Complaint.  More specifically, Plaintiffs cannot satisfy the first of the *Pirelli* factors, that the named Defendants made the public statements in their fiduciary capacity.  As a matter of law, the press releases, conference calls, media accounts, and SEC filings Plaintiffs cite were all made during the regular course of First Horizon's business, not as matters of plan administration.  None of the statements addressed Plan benefits or other specific issues concerning the Plan or its management.  The statements all pertain to First Horizon and its corporate governance.  Although the statements did impact First Horizon stock, which was a Plan asset, the statements related to the kind of business conduct that merely had an effect on the ERISA Plan at issue.  It is clear then that the statements were made in the Defendants' corporate capacities and not as Plan fiduciaries.  Plaintiffs have also failed to allege that any of the statements from First Horizon's SEC filings or Annual Reports were incorporated by reference into plan documents, which were then communicated to Plaintiffs.  Plaintiffs have not alleged any instance where these documents were incorporated in any Plan document.  Plaintiffs do not even allege that they ever received the Annual Reports or SEC filings, read them, or relied on them in any way.  Therefore, Plaintiffs have failed to state a claim as to any of these statements.

Finally, the Court finds that the cases cited in support by Plaintiffs are not inconsistent with the result in this case.  The Court has relied on *Pirelli* in reaching its decision as discussed above.  Nevertheless, Plaintiffs rely primarily on *Pirelli* and a Third Circuit case, *In re Unisys Sav. Plan Litig.,* 74 F.3d 420 (3d Cir.1996), for their expansive interpretation of the fiduciary duty to disclose.  In both *Pirelli* and *Unisys*, the Circuit Courts considered a fiduciary's negative

duty not to misinform under ERISA.  Both cases involved plaintiff-employees who had made

inquiries about plan benefits and received materially misleading or inaccurate information from

plan fiduciaries.  As a result, *Pirelli*, for instance, specifically required that the misleading

communication relate to "plan administration" such as eligibility under a plan or the extent of

benefits.[58]  The alleged misrepresentations or failed disclosures in this case did not relate

specifically to Plan benefits and were not made by fiduciaries responding in their fiduciary

capacity to direct inquiries from participants or beneficiaries.  Thus, the Court finds its decision

consistent with *Pirelli* and *Unisys*.[59]

Having concluded that Plaintiffs have not pled that the alleged disclosures were required

under ERISA or that Defendants made the misleading disclosures in their fiduciary capacity, the

Court holds that Plaintiffs have failed to state a claim for breach of the fiduciary duty to disclose.

## IV.    *Count IV (Failure to Monitor and Count V (Co-Fiduciary Duties)*

In Count IV of the Amended Complaint, Plaintiffs allege that Defendants failed to

---

[58] *Pirelli*, 305 F.3d at 449.

[59] Plaintiffs have also cited for support two cases from this Circuit, *In re Diebold*, 2008 WL 2225712 (N.D. Ohio May 28, 2008) and *In re General Motors ERISA Litigation*, 2006 WL 897444 (E.D. Mich. 2006).  In both cases, the District Court denied motions to dismiss similar claims by ESOP participants arguing that fiduciaries failed to disclose risks to the future value of company stock.  Concerning a cause of action for misleading public statements, the *Diebold* court concluded that whether the defendants made their public statements in their fiduciary capacity was a question of fact.  The Court disagrees with this analysis and finds the *Ferro* line of cases more persuasive on this point.  As for *General Motors*, that court never addressed the issue of whether the defendants' public statements were made in their fiduciary capacity.  However, unlike the case at bar, the *General Motors* plaintiffs had pled that misleading SEC filings and reports were incorporated in plan documents.  *See In re General Motors ERISA Litig.*, 2007 WL 2463233 (E.D. Mich. Aug. 28, 2007).  Therefore, the Court finds these two decisions distinguishable.

monitor the Plan's fiduciaries.  Specifically, First Horizon, First Tennessee, and the Director

Defendants were all Plan fiduciaries.  First Horizon and the Director Defendants breached their

fiduciary duties by failing to adequately monitor the trustees, plan administrators, and other

persons, if any, to whom management of Plan assets was delegated.  Am. Compl. ¶ 182.

According to Plaintiffs, these Defendants failed to monitor other fiduciaries in that they knew or

should have known that the other fiduciaries were allowing the Plan to offer First Horizon Stock

and First Funds and investing the Plan's assets in them when it was not prudent to do so.  *Id*.

Furthermore, these Defendants failed to disclose accurate information to other fiduciaries about

the financial condition and practices of First Horizon.  *Id*. at ¶ 183.  First Horizon is also liable

for the acts of breaches of duty by the Director Defendants, the Committee Defendants, and other

agents and employees including John Does for the losses caused by them, under the law of

agency.  *Id*. at ¶ 185.  As a result, the Plan lost millions of dollars for which Defendants are

liable for breach of fiduciary duty pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§

1132(a)(2) and 1109(a).  *Id*. at ¶¶ 186-87.

In Count V of the Amended Complaint, Plaintiffs allege that Defendants are liable for the

breaches of fiduciary duty of their co-fiduciaries under the circumstances.  Defendants enabled

their co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed

to make reasonable efforts to remedy the breaches.  *Id*. at ¶ 190.  First Horizon, First Tennessee,

Highland Capital and Martin & Co. are liable because they knowingly participated in and/or

concealed the breaches by the Investment Committee and its members of their duty of loyalty by

investing Plan assets in the First Funds in order to generate financial benefits for themselves

rather than because such funds were prudent retirement investments for Plan participants.  *Id*. at

¶ 191.  By their failure to monitor, First Horizon and the Director Defendants enabled appointed fiduciaries such as the Committee Defendants to breach their duties by selecting the Company Stock Fund and the First Funds as investment options for the Plan when it was imprudent or disloyal to do so.  *Id*. at ¶ 192.  Plaintiffs allege that all Defendants knew that the other Defendants had breached their duties by continuing to offer the Company Stock Fund and/or the First Funds as investment options and to direct and approve investment of matching contributions in First Horizon stock, even though it was imprudent, disloyal and contrary to ERISA to do so.

As to Counts IV and V, the parties agree that these claims are derivative of Counts I and III and are premised on the assertion that First Horizon Stock was not a prudent investment for the Plan.  Thus, as Defendants assert that there can be no finding of imprudence or fiduciary non-disclosure, Counts IV and V should be dismissed on this basis.  Plaintiffs simply respond that because Plaintiffs have stated claims in Counts I and III, Counts IV and V likewise state a claim.

The Court holds that Plaintiffs have stated their claims for failure to monitor (Count IV) and for the breaches of co-fiduciaries (Count V) in part.  The Court has previously ruled in this Order that in Count I Plaintiffs stated a claim for breach of the fiduciary duty of prudence by continuing to invest in First Horizon when they knew or should have known that it was no longer prudent to do so.  To the extent that Plaintiffs stated this predicate claim in Count I, their claims in Counts IV and V will survive.  However, the Court has dismissed portions of Plaintiffs' claims in Count I, specifically Plaintiffs' allegation that Defendants breached their fiduciary duties by following the matching and ESOP provisions of the Plan.  Likewise, the Court dismissed Plaintiffs' claims in Count III that Defendants breached their fiduciary duty to inform.

To the extent then that Plaintiffs have failed to state the predicate claims in Counts I and III, their claims in Counts IV and V are dismissed.

## CONCLUSION

The Court holds that Plaintiffs' Amended Complaint has stated some of the claims at issue but failed to state others. Plaintiffs properly stated a claim in Count I that Defendants breached their fiduciary duty by continuing to invest Plan assets in First Horizon stock when it was no longer prudent to do so. However, Plaintiffs failed to state a claim upon which relief can be granted in Count I where Plaintiffs alleged that Defendants breached their fiduciary duties by not amending the Plans to alter the matching and ESOP provisions. Furthermore, Plaintiffs' claim in Count III that Defendant failed to make disclosures as required under ERISA or that Defendants made misleading disclosures in their fiduciary capacity is dismissed. Plaintiffs have stated their derivative claims for failure to monitor (Count IV) and for breaches of co-fiduciaries (Count V) with respect to Count I. To the extent that Plaintiffs have failed to state the predicate claims in the Counts I and III, their claims in Counts IV and V deriving from Counts I and III are dismissed. Therefore, Defendants' Motion is **GRANTED IN PART, DENIED IN PART**.

Pursuant to the Court's Order of June 23, 2009, the parties are hereby directed to submit a revised discovery plan to the Court within ten (10) days of the entry of this Order.[60]

**IT IS SO ORDERED**.

s/ S. Thomas Anderson

---

[60] Order Overruling in Part, Sustaining in Part Defendants' Objections to the Magistrate Judge's Order and Order Denying Defendants' Motion for Summary Judgment, June 23, 2009.

S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 30th, 2009.