**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

TROY SIMS and JOHN YOST, individually,
and on behalf of all others similarly situated,

        Plaintiffs,

       v.                      No.  2:08-CV-02293

FIRST HORIZON NATIONAL          Judge S. Thomas Anderson
CORPORATION, et al.,

        Defendants.

**DEFENDANTS' ANSWER AND DEFENSES TO
PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

Defendants First Horizon National Corporation, et al., ("defendants") by their attorneys and pursuant to Fed. R. Civ. P. 7, 8 and 12, respectfully submit the following answer and defenses to the Amended Complaint filed by plaintiffs Troy Sims and John Yost.

## I.      INTRODUCTION

Plaintiffs Troy Sims and John Yost bring this action, individually and on behalf of all others similarly situated, to recover losses to the First Horizon National Corporation Savings Plan ("Plan") from May 1, 2002 to July 14, 2008 (the "Class Period"). Class Members work or worked for First Horizon National Corporation ("First Horizon" or the "Company") and are Plan participants (and their beneficiaries) for whose account Plan fiduciaries acquired or held shares of First Horizon common stock ("First Horizon Stock"), First Horizon's proprietary mutual funds ("First Funds"), or both, during the Class Period.

From May 1, 2002 through a date early in 2006, the Plan's fiduciaries maintained investment offerings in the First Funds for which a division of Defendant First Tennessee Bank, N.A. was the investment advisor, even though most of those funds under-performed their peers. Plan fiduciaries did not select the First Funds because they were prudent retirement investments, but rather because offering the funds generated fees to First Horizon and its affiliates, and helped maintain the viability of the funds.

In addition, the Plan's largest investment at all times has been in the First Horizon Common Stock Fund ("Company Stock Fund"). As of December 31, 2005, more than 50% of the Plan's net assets available for benefits – $317,598,814 – was invested in First Horizon Stock. Such a large percentage of Plan assets were concentrated in First Horizon Stock because not only did the Company invest matching contributions in the Company Stock Fund – it **required** participants to invest in the Company Stock Fund and First Horizon Stock in order to receive the match.

The Company Stock Fund was an imprudent retirement investment from at least January 1, 2006 because First Horizon was not fairly and accurately disclosing the risks and likely consequences of its banking practices such that the Plan was purchasing shares of First Horizon Stock at an inflated price. Among items that were not disclosed to participants were the risks related to the lowering of its underwriting standards; the scope and circumstances of its involvement with subprime, Alt-A, second-lien loans (*i.e.*, home equity loans), and "One Time Close" home building loans; its growing dependence on real estate construction loans fueled by the increase in subprime mortgages; problems with its accounting for loan losses and loan reserves which did not reflect its higher risk business plan; and its increasing use of off-balance sheet transactions and proprietary securitizations of loans which did not comply with government-sponsored entity ("GSE") conforming mortgage guidelines. Whereas shares of First Horizon Stock traded at $38.44 per share on December 30, 2005, shares closed at $10.99 on April 28, 2008, when First Horizon announced that it was ending its cash dividend and issuing new shares to raise $600 million of capital. On July 14, 2008, First Horizon stock hit a 12-year low when it dropped to $4.52 before closing at $5.04 per share.

Thus, as a result of Defendants' fiduciary breaches, the Plan suffered huge losses on its investment in First Horizon Stock.

**ANSWER:**

The "Introduction" to plaintiffs' Amended Complaint contains general background information and conclusions of law and purports to characterize the Amended Complaint, the allegations of which speak for themselves. Therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations in the "Introduction" and refer to defendants' answers to the numbered allegations contained in plaintiffs' Amended Complaint.

## II.    NATURE OF ACTION

1.    This class action asserts claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), to recover losses to the Plan arising from (i) the selection of First Horizon's proprietary First Funds as investment options for the Plan without employing a prudent selection process untainted by conflict, and (ii) the investment of Plan assets in First Horizon Stock when

Plan fiduciaries knew or should have known that material information about the Company's financial problems had not been disclosed or had been inadequately disclosed. Plaintiffs further seek additional equitable relief to the extent that it is needed to protect the interests of Plan participants and beneficiaries. Once these losses are restored to the Plan, Plaintiffs request that the amounts restored be distributed among the class members' current and prior accounts to remedy the harms alleged, in a manner that the Court deems proper and equitable.

**ANSWER:**

Defendants admit that plaintiffs purport to bring this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, but deny that defendants breached any duties under ERISA or any other statute or law, or that plaintiffs are entitled to any relief whatsoever. Defendants deny the remaining allegations contained in Paragraph 1 of the Amended Complaint.

2.     Defendants were or are ERISA fiduciaries of the Plan during the Class Period, whose responsibilities included, *inter alia*, selecting and monitoring the investments offered to participants, prudent investment of Plan assets, and/or providing participants with complete and accurate information as to the risks of each investment. As more fully described below, Defendants were obligated to comply with ERISA-imposed fiduciary duties to act prudently and in the sole interest of the Plan and its participants and beneficiaries.

**ANSWER:**

Paragraph 2 contains conclusions of law and purports to characterize the Amended Complaint, the allegations of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations contained in Paragraph 2 of the Amended Complaint.

3.     Defendants breached their fiduciary duties: (i) by causing participants' retirement savings to be invested in First Horizon Stock when doing so was imprudent because of the Company's increased exposure to losses from subprime and Alt-A mortgages, residential construction loans, residential retail loans, and other problem lending, and its incomplete and inaccurate public disclosures of these and other exposures; (ii) by, until early in 2006, selecting and investing in First Funds because these funds generated fees for First Horizon and its affiliates, rather than as a result of a prudent selection process; and (iii) by failing to provide complete and accurate information to participants regarding the Company Stock Fund and the First Funds as investment options for participants' retirement savings.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 3 of the Amended Complaint.

4.      This action is brought to recover millions of dollars in losses to the Plan which Plaintiffs allege were caused by Defendants' fiduciary breaches.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 4 of the Amended Complaint.

### III.      JURISDICTION AND VENUE

5.      This action is brought pursuant to the civil enforcement provisions of ERISA § 502, 29 U.S.C § 1132. The Court has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1) as well as 28 U.S.C § 1331.

**ANSWER:**

Paragraph 5 contains conclusions of law and, therefore, no response is required.  To the extent a response is required, defendants admit that plaintiffs purport to bring this action under the civil enforcement provisions of ERISA, § 502, 29 U.S.C. § 1132, and that the Court has subject matter jurisdiction over this action.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 5 of the Amended Complaint.

6.      ERISA § 502(e)(2), 29 U.S.C § 1132(e)(2), provides for nationwide service of process. As all Defendants are residents of the United States, this Court has personal jurisdiction over them.

**ANSWER:**

Paragraph 6 contains conclusions of law as to which no response is required.  To the extent a response is required, defendants admit that the Court has personal jurisdiction over defendants.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 6 of the Amended Complaint.

7.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C § 1132(e)(2), since Defendant First Horizon has its headquarters in Memphis, Tennessee; and since many of the fiduciary breaches for which relief is sought are believed to have occurred in this District. Venue is also proper in this District under 28 U.S.C. §1391(b) & (c) because some

Defendants reside in, have principal executive offices in, and/or regularly do business in, this District.

**ANSWER:**

Paragraph 7 contains conclusions of law as to which no response is required. To the extent a response is required, defendants admit that venue of this action is proper, that First Horizon's headquarters are located in Memphis, Tennessee, and that one or more defendants have contacts in the District. Defendants deny the remaining allegations contained in Paragraph 7 of the Amended Complaint.

## IV.   PARTIES

8.    **Plaintiff Troy Sims.** Troy Sims is a resident of Spokane, Washington. Mr. Sims was an employee of First Horizon from 2003 through October 2007 and is a participant in the Plan. His account was invested in the Company Stock Fund and in First Funds during the relevant periods.

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the current residence of plaintiff Troy Sims. Defendants admit that plaintiff Sims was employed by First Horizon from 2003 through October 2007, that plaintiff Sims is a participant in the Plan, and that plaintiff Sims is invested in the Company Stock Fund and in the First Funds.

9.    **Plaintiff John Yost.** John Yost is a resident of Rosenberg, Texas. Mr. Yost was an employee of First Horizon from April 2006 through April 2008 and is a participant in the Plan. His account was invested in the Company Stock Fund during the relevant periods.

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the current residence of plaintiff John Yost. Defendants admit that plaintiff Yost was employed by First Horizon from April 2006 through April 2008, that plaintiff Yost is a participant in the Plan, and that plaintiff Yost's account is invested in the Company Stock Fund.

10.     **Defendant First Horizon National Corporation.** First Horizon is a national financial services institution with more than 13,000 employees. First Horizon is a Tennessee corporation headquartered in Memphis. First Horizon is a fiduciary of the Plan because it exercised authority or control over the assets of the Plan and exercised discretionary authority with respect to the management and administration of the Plan.

**ANSWER:**

Defendants admit that First Horizon is a national financial services institution, that it is a Tennessee corporation, and that its headquarters are located in Memphis, Tennessee. The allegations in the third sentence of Paragraph 10 contain legal conclusions to which no response is required. To the extent a response is required, defendants deny the allegations contained in the third sentence of Paragraph 10. Defendants deny the remaining allegations contained in Paragraph 10 of the Amended Complaint.

11.     **Defendant Members of First Horizon Board of Directors.** The members of First Horizon's Board of Directors (the "Board") are fiduciaries because they exercised discretionary authority with respect to the management and administration of the Plan. The Director Defendants (named below) are persons who serve or served on the Board during the Class Period, and who knew or should have known about the facts and circumstances that rendered First Horizon Stock an imprudent retirement investment for Plan assets. On information and belief, the Director Defendants appointed – and therefore had a fiduciary duty to monitor – the members of both the Retirement Investment Committee ("Investment Committee") and the members of the Pension, Savings and Flexible Plan Committee ("Administrative Committee"). Moreover, the Director Defendants who were members of the Board's Compensation Committee specifically assumed the responsibility "to review the appropriateness of the issuance of Corporation common stock under the terms of the Savings Plan as required by resolutions of the Board as adopted from time to time." Specifically, the Director Defendants are:

a.      **Defendant Gerald L. Baker** became President and Chief Executive Officer and a director of First Horizon and Defendant First Tennessee Bank National Association ("First Tennessee") on January 29, 2007. From November 2005 to January 29, 2007, Mr. Baker was Chief Operating Officer of First Horizon and First Tennessee. Prior to November 2005, Mr. Baker was Executive Vice President of First Horizon and First Tennessee and President – Mortgage Banking and President and Chief Executive Officer of First Horizon Home Loan Corporation. He served on the Credit Policy and Executive Committee of the Board until April 9, 2007. He is a fiduciary of the Plan because he serves on the Board.

b.      **Defendant J. Kenneth Glass** was the Chief Executive Officer of First Horizon until January 29, 2007 and served on the Board until April 2007. He was the Chair of the Credit Policy and Executive Committee. He was a fiduciary of the Plan during the Class Period because he served on the Board.

c.      **Defendant Simon F. Cooper** has been a director of First Horizon since 2005. He serves on the Audit Committee. He is a fiduciary of the Plan because he serves on the Board.

d.      **Defendant James A. Haslam, III** has been a director since 1996. Mr. Haslam currently serves on the Compensation Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

e.      **Defendant Colin V. Reed** has been a director since April 2006. He serves on the Audit Committee and the Nominating and Corporate Governance Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

f.      **Defendant Mary F. Sammons** has been a director since 2003. Ms. Sammons currently serves on the Compensation Committee and the Nominating and Corporate Governance Committee of the Board. She served on the Audit Committee of the Board until January 29, 2007. She is a fiduciary of the Plan because she serves on the Board.

g.      **Defendant Robert B. Carter** was elected as a director of First Horizon in July 2007. He serves on the Audit Committee and the Nominating and Corporate Governance Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

h.      **Defendant R. Brad Martin** has been a director since 1994. Mr. Martin is the Chair of the Compensation Committee and he also serves on the Credit Policy and Executive Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

i.      **Defendant Vicki R. Palmer** has been a director since 1993. She serves as Chair of the Audit Committee. She is a fiduciary of the Plan because she serves on the Board.

j.      **Defendant William B. Sansom** has been a director since 1984. He serves on the Credit Policy and Executive Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

k.      **Defendant Robert C. Blattberg** has been a director since 1984. He serves as a member of the Compensation Committee and as Chairman of the Nominating and Corporate Governance Committee. He is a fiduciary of the Plan because he serves on the Board of First Horizon.

l.      **Defendant Michael D. Rose** has been a director since 1984. He serves as Chairman of the Credit Policy and Executive Committee of the Board; he also served on the Nominating and Corporate Governance Committee of the Board until January 29, 2007. He is a fiduciary of the Plan because he serves on the Board of First Horizon.

m.      **Defendant Luke Yancy III** has been a director since 2001. He serves on the Audit Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

n.      **Defendant Jonathan P. Ward** served on the Board from 2003-2007. Defendant Ward served on the Compensation Committee and the Nominating and Corporate

Governance Committee. He is a fiduciary of the Plan because he served on the Board during the Class Period.

o.     **Defendant George E. Cates** served on the Board from 1996 until 2005. He is a fiduciary of the Plan because he served on the Board during the Class Period.

**ANSWER:**

Defendants admit that the alleged "Director Defendants" served on the First Horizon Board of Directors during the purported class period; that the Director Defendants appointed members of the Investment Committee and the Administrative Committee during the purported class period; and that the Director Defendants who served on the Compensation Committee were responsible, under the terms of the Compensation Committee Charter "to review the appropriateness of the issuance of Corporation common stock under the terms of the Savings Plan as required by resolutions of the Board as adopted from time to time." Defendants deny the remaining allegations contained in Paragraph 11 of the Amended Complaint.

(a)     Defendants admit that Mr. Baker became President, Chief Executive Officer and a director of First Horizon and First Tennessee on January 29, 2007; that Mr. Baker was Chief Operating Officer of First Horizon and First Tennessee from November 2005 to January 29, 2007; that Mr. Baker was Executive Vice President of First Horizon and First Tennessee prior to November 2005; that Mr. Baker was President – Mortgage Banking and President and Chief Executive Officer of First Horizon Home Loan Corporation prior to January 2006; and that Mr. Baker served on the Credit Policy and Executive Committee of the First Horizon Board until April 9, 2007.  By way of further answer, defendants affirmatively state that Mr. Baker resigned as Chief Executive Officer of First Horizon and First Tennessee on August 31, 2008.  The remaining allegations contained in Paragraph 11(a) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(a) of the Amended Complaint.

(b)      Defendants admit that Mr. Glass was the Chief Executive Officer of First Horizon until January 29, 2007; that Mr. Glass served on the First Horizon Board until April 2007; and that Mr. Glass served as the Chair of the Credit Policy and Executive Committee.  The remaining allegations in Paragraph 11(b) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(b) of the Amended Complaint.

(c)      Defendants admit that Mr. Cooper has served on the First Horizon Board since 2005 and that Mr. Cooper serves on the Audit Committee.  The remaining allegations in Paragraph 11(c) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(c) of the Amended Complaint.

(d)      Defendants admit that Mr. Haslam has served on the First Horizon Board since 1996 and that he currently serves on the Compensation Committee.  The remaining allegations in Paragraph 11(d) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(d) of the Amended Complaint.

(e)      Defendants admit that Mr. Reed has served on the First Horizon Board since April 2006 and that he currently serves on the Nominating and Corporate Governance Committee. Defendants deny the remaining allegations contained in the first sentence of Paragraph 11(e) of the Amended Complaint.  The remaining allegations in Paragraph 11(e) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(e) of the Amended Complaint.

(f)      Defendants admit that Ms. Sammons served on the First Horizon Board from 2003 until November 21, 2008 and that she served on the Compensation Committee, Nominating and Corporate Governance Committee and Audit Committee during her tenure on the Board. The allegations in the fourth sentence of Paragraph 11(f) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the allegations contained in the fourth sentence of Paragraph 11(f) of the Amended Complaint.   Defendants deny the remaining allegations contained in Paragraph 11(f) of the Amended Complaint.

(g)      Defendants admit that Mr. Carter has served on the First Horizon Board since July 2007 and that he currently serves on the Audit Committee and the Nominating and Corporate Governance Committee.   The remaining allegations in Paragraph 11(g) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(g) of the Amended Complaint.

(h)      Defendants admit that Mr. Martin has served on the First Horizon Board since 1994 and that he currently serves on the Compensation Committee and the Credit Policy and Executive Committee.    Defendants deny that Mr. Martin is the current Chair of the Compensation Committee.   The remaining allegations in Paragraph 11(h) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(h) of the Amended Complaint.

(i)      Defendants admit that Ms. Palmer has served on the First Horizon Board since 1993 and that she currently serves as the Chair of the Audit Committee.   The remaining allegations in Paragraph 11(i) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the allegations contained in Paragraph 11(i) of the Amended Complaint.

(j)    Defendants admit that Mr. Sansom has served on the First Horizon Board since 1984 and that he currently serves on the Credit Policy and Executive Committee.  The remaining allegations in Paragraph 11(j) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(j) of the Amended Complaint.

(k)    Defendants admit that Mr. Blattberg served on the First Horizon Board from 1984 until November 21, 2008 and that he served on the Compensation Committee and as Chair of the Nominating and Corporate Governance Committee during his tenure on the Board.  The allegations in the third sentence of Paragraph 11(k) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in the third sentence of Paragraph 11(k) of the Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 11(k) of the Amended Complaint.

(l)    Defendants admit that Mr. Rose has served on the First Horizon Board since 1984; that he currently serves on the Credit Policy and Executive Committee; and that he formerly served on the Nominating and Corporate Governance Committee.  Defendants deny that Mr. Rose is the current Chair of the Credit Policy and Executive Committee.  The remaining allegations in Paragraph 11(l) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(l) of the Amended Complaint.

(m)    Defendants admit that Mr. Yancy has served on the First Horizon Board since 2001 and that he currently serves on the Audit Committee.  The remaining allegations in Paragraph 11(m) contain conclusions of law, to which no response is required.  To the extent a

response is required, defendants deny the remaining allegations in Paragraph 11(m) of the Amended Complaint.

(n)      Defendants admit that Mr. Ward served on the First Horizon Board from 2003 to 2007 and that he served on the Compensation Committee and the Nominating and Corporate Governance Committee.  The remaining allegations in Paragraph 11(n) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(n) of the Amended Complaint.

(o)      Defendants admit that Mr. Cates served on the First Horizon Board from 1996 to 2005.  The remaining allegations in Paragraph 11(o) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 11(o) of the Amended Complaint.

12.      **Defendant First Tennessee Bank, N.A.** is the primary banking operating subsidiary of First Horizon. It was or is a fiduciary of the Plan during the Class Period because its division, First Tennessee Advisory Services, with offices at 530 Oak Court Drive, Memphis, TN 38117, served as an investment adviser to the First Funds in which the Plan invested.

**ANSWER:**

Defendants admit that First Tennessee Bank National Association is a banking operating subsidiary of First Horizon, that its offices are located in Memphis, Tennessee, and that it served as an investment adviser to the First Funds.  The remaining allegations in Paragraph 12 contain conclusions of law to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12 of the Amended Complaint.

13.      **Defendant Highland Capital Management Corporation ("Highland Capital"),** with offices at 6077 Primacy Parkway, Memphis, TN 38119, was a fiduciary of the Plan during the Class Period because it managed certain of the First Funds held by the Plan through early 2006. Highland Capital is a wholly-owned subsidiary of First Horizon until early 2006.

**ANSWER:**

Defendants admit that Highland Capital is a wholly-owned subsidiary of First Horizon, that its offices are located in Memphis, Tennessee, and that it assisted in the management of the First Funds.  The remaining allegations in Paragraph 13 contain conclusions of law to which no response is required.   To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 13 of the Amended Complaint.

14.     **Defendant Martin & Company, Inc. ("Martin & Company"),** with offices at 165 Madison Avenue, Third Floor, Memphis, TN 38103, was a fiduciary of the Plan during the Class Period because it managed certain of the First Funds held by the Plan through early 2006. Martin & Company is a wholly-owned subsidiary of First Horizon.

**ANSWER:**

Defendants admit that Martin & Company is a wholly-owned subsidiary of First Horizon, that its offices are located in Memphis, Tennessee, and that it assisted in the management of the First Funds.  The remaining allegations in Paragraph 14 contain conclusions of law to which no response is required.   To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 14 of the Amended Complaint.

15.     **Defendant Retirement Investment Committee ("Investment Committee")** is a committee appointed by the Board with responsibility for the establishment of an investment policy for the Plan as well as the selection of funds and the securities or classes of securities in any particular fund. According to Section 7.5 of the First Tennessee National Corporation Savings Plan and Trust, amended and restated effective September 1, 2003 ("2003 Plan Document") the Investment Committee was to review the investments of the trust on a regular basis no less often than annually, develop and communicate to the trustee an investment strategy appropriate to the purposes of the Plan; determine the strategic array of asset classes available under the trust; establish appropriate benchmarks for each asset class and at appropriate intervals evaluate the performance of the trustee and any investment managers against those benchmarks; and take other actions. During the Class Period, the Investment Committee was comprised of the following members:

a.      **Defendant Thomas C. Adams, Jr.,** is the Executive Vice President, Chief Investment Office and Treasurer of First Horizon. He has served as a member of the Investment Committee since 2006 and is a fiduciary of the Plan by reason of his membership on the Investment Committee.

b.      **Defendant Rhomes Aur** is Executive Vice President, Wealth Management Services, of First Horizon. He has been a member of the Investment Committee from 2007 to the present and is a fiduciary of the Plan by reason of his membership on the Investment Committee. Defendant Aur also served on the Administrative Committee from 2002 to the present and was a fiduciary of the Plan because of his membership on the Administrative Committee during that time.

c.      **Defendant Kenneth R. Bottoms** is the Senior Vice President and Manager – Total Rewards of First Horizon. He has been a member of the Investment Committee from some time in 2008 to the present and is a fiduciary of the Plan by reason of his membership on the Investment Committee. He is also a fiduciary of the Plan because he has served on the Administrative Committee from 2004 to present.

d.      **Defendant Charles G. Burkett** is the President for Tennessee and National Banking of First Horizon. He was a member of the Investment Committee from 2003 to 2004 and thereby was a fiduciary of the Plan.

e.      **Defendant John M. Daniel** is the Executive Vice President of Human Resources of First Horizon. He is a fiduciary of the Plan because he has been a member of the Investment Committee from 2007 to the present and has also been a member of the Administrative Committee from 2007 to the present.

f.      **Defendant Ann Fite** is the Senior Vice President, Division Controller of First Horizon. She is a fiduciary of the Plan by reason of having been a member of the Investment Committee from some time in 2008 to the present.

g.      **Defendant James F. Keen** is the Executive Vice President, Chief Accounting Officer of First Horizon who was a member of the Investment Committee in 2003 and was a fiduciary of the Plan because of his membership on the Investment Committee.

h.      **Defendant Gerald Laurain** is the Senior Vice President, Chief Investment Officer of First Horizon. He is a fiduciary of the Plan because he has been a member of the Investment Committee from some time in 2008 to the present.

i.      **Defendant Pete Makowiecki** is the President, Mortgage Banking for First Horizon Home Loan Corporation. He was a fiduciary of the Plan because he served as a member of the Investment Committee from 2004 to 2007.

j.      **Defendant Larry B. Martin,** is the former Chief Operating Officer, First Tennessee Bank Financial Services Group, of First Horizon. He was a fiduciary of the Plan during the Class Period because he served on the Investment Committee from 2003 to 2006.

k.      **Defendant Sarah Meyerrose** is President, Emerging National Businesses, and former Executive Vice President, Operations and Technology, of First Horizon. She has been a member of the Investment Committee from 2003 to the present.

l.       **Defendant Marlin L. Mosby, III,** is the former Executive Vice President and Chief Financial Officer of First Horizon. He was a fiduciary of the Plan during the Class period because he was a member of the Investment Committee from 2003 to 2007.

m.      **Defendant Elbert L. Thomas, Jr.,** is the former Executive Vice President and Chief Financial Officer of First Horizon. He was a fiduciary of the Plan because he was a member of the Investment Committee from 2005 to 2008.

n.      **Defendant William E. Weaver, Jr.,** is the Senior Executive Vice President, Chief Financial Official of First Horizon. He is a fiduciary of the Plan because he has been a member of the Investment Committee from 2007 to the present.

**<u>ANSWER:</u>**

Defendants admit that, under the terms of the Plan, the Investment Committee "is granted full and unrestricted discretion in the selection of Funds as well as the particular securities, classes of securities, and levels of investment in any particular securities or classes of securities in any particular Fund."  The allegations in the second sentence of Paragraph 15 of the Amended Complaint purport to characterize the terms of a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations in the second sentence of Paragraph 15 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 15 of the Amended Complaint.

(a)      Defendants admit that Mr. Adams is the Executive Vice President, Chief Investment Officer and Treasurer of First Horizon, and that Mr. Adams has served on the Investment Committee since 2006.  The remaining allegations in Paragraph 15(a) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(a).

(b)      Defendants admit that Mr. Aur is the Executive Vice President, Wealth Management Services of First Horizon, that he has served on the Investment Committee since

2007, and that he has served on the Administrative Committee since 2002.  The remaining allegations in Paragraph 15(b) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(b).

(c)      Defendants admit that Mr. Bottoms is the Senior Vice President and Manager of Total Rewards of First Horizon, that he has served on the Investment Committee since 2008 and that he has served on the Administrative Committee since 2004.  The remaining allegations in Paragraph 15(c) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(c).

(d)      Defendants admit that Mr. Burkett is the President of Tennessee and National Banking of First Horizon, and that he served on the Investment Committee from 2003 to 2004. The remaining allegations in Paragraph 15(d) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(d).

(e)      Defendants admit that Mr. Daniel is the Executive Vice President of Human Resources of First Horizon, and that he has served on the Investment Committee and the Administrative Committee since 2007. The remaining allegations in Paragraph 15(e) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(e).

(f)      Defendants admit that Ms. Fite is the Senior Vice President, Division Controller of First Horizon, and that she has served on the Investment Committee since 2008.    The remaining allegations in Paragraph 15(f) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(f).

(g)     Defendants admit that Mr. Keen is the Executive Vice President, Chief Accounting Officer of First Horizon, and that he served on the Investment Committee in 2003. The remaining allegations in Paragraph 15(g) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(g).

(h)     Defendants admit that Mr. Laurain is the Senior Vice President, Chief Investment Officer of First Horizon, and that he has served on the Investment Committee since 2008.  The remaining allegations in Paragraph 15(h) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(h).

(i)     Defendants admit that Mr. Makowiecki is the President, Mortgage Banking for First Horizon Home Loan Corporation, and that he served on the Investment Committee from 2003 to 2006.  The remaining allegations in Paragraph 15(i) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(i).

(j)     Defendants admit that Mr. Martin is the former Chief Operating Officer, First Tennessee Bank Financial Services Group, of First Horizon, and that he served on the Investment Committee from 2003 to 2006.  The remaining allegations in Paragraph 15(j) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(j).

(k)     Defendants admit that Ms. Meyerrose is the former President, Emerging National Businesses and former Executive Vice President, Operations and Technology of First Horizon,

and that she served on the Investment Committee from 2003 until 2008.  Defendants deny the remaining allegations contained in Paragraph 15(k) of the Amended Complaint.

(l)      Defendants admit that Mr. Mosby is the former Executive Vice President  and Chief Financial Officer of First Horizon, and that he served on the Investment Committee from 2003 to 2007.  The remaining allegations in Paragraph 15(l) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(l).

(m)      Defendants admit that Mr. Thomas is the former Senior Executive Vice President and Chief Financial Officer of First Horizon, and that he served on the Investment Committee from 2005 to 2008.  The remaining allegations in Paragraph 15(m) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(m).

(n)      Defendants admit that Mr. Weaver is the Senior Executive Vice President, Chief Financial Officer of First Horizon, and that he has served on the Investment Committee since 2007.  The remaining allegations in Paragraph 15(n) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 15(n).

16.      **Defendant Pension, Savings and Flexible Compensation Committee** ("Administrative Committee") is the administrator of the Plan according to the Plan's SEC Form 11-K for the fiscal year ending December 31, 2006, dated June 29, 2007. In their Initial Disclosures, the defendants named in the original complaint referred to that Committee as the "Administrative Committee." The Administrative Committee is a fiduciary of the Plan with responsibility for the operation and administration of the Plan, and for communications with the participants. It is established under the Plan and appointed by First Horizon to administer the Plan. According to Section 13.3 of the First Horizon National Corporation Savings Plan and Trust, as restated in 2007 (the "2007 Plan Document"), the Administrative Committee also had responsibility for giving directions to the trustee with respect to the investments within the ESOP portion of the Plan. "All investments will be made by the Trustee only upon the direction of the Plan Administrator [*i.e.*, the Administrative Committee]. The Plan Administrator may direct that

all Trust assets be invested and held in Employer Stock." In addition to Defendants Aur, Bottoms and Daniels, the following individuals were members of the Administrative Committee during the Class Period:

a.    **Defendant Robert E. Ellis** is Senior Vice President – Manager Financial Operations of First Horizon. He was a fiduciary of the Plan because he was a member of the Administrative Committee between 2002 and 2007.

b.    **Defendant Alvenia Cunningham** is the Senior Vice President, Regional Sales, of First Horizon National Corporation. She is a fiduciary of the Plan because she has been a member of the Administrative Committee from 2002 to present.

c.    **Defendant Bruce Hopkins** is the Executive Vice President, Memphis Banking Group of First Horizon. He is a fiduciary of the Plan because he has been a member of the Administrative Committee from 2002 to the present.

d.    **Defendant Karen Kruse** is the Senior Vice President Wealth Management, Product Development and Support for First Horizon. She is a fiduciary of the Plan because she has been a member of the Administrative Committee from some time in 2008 to the present.

e.    **Defendant Deborah McDonald** is the Senior Vice President and Manager of Wealth Management Services, of First Horizon. She was a fiduciary of the Plan during the Class period she was a member of the Administrative Committee between 2002 and 2007.

f.    **Defendant Sandy Ragland** is the Vice President, Trust, of First Horizon. She is a fiduciary of the Plan because she has served on the Administrative Committee from 2008 to the present.

g.    **Defendant Karen Sones** is the Senior Vice President, Manager, Operations & Systems of First Horizon. She is a fiduciary of the Plan because she has been a member of the Administrative Committee from 2002 to the present.

h.    **Defendant Will Taylor** works for First Horizon Insurance Group, Inc. He is a fiduciary of the Plan because he has served from 2004 to the present on the Administrative Committee.

i.    **Defendant Bonnie Zoccola** is the former Vice President, Accounting, of First Horizon. She was a fiduciary of the Plan because she served as a member of the Administrative Committee between 2002 and 2003.

**<u>ANSWER</u>:**

Defendants admit that, under the Plan, the Pension, Savings and Flexible Compensation

Committee's responsibilities include "interpret[ing] and constru[ing] the provisions of the Plan . .

19

. and, in general, to direct the administration of the Plan." Defendants further admit that their Initial Disclosures refer to the Pension, Savings and Flexible Compensation Committee as the "Administrative Committee." The third sentence in Paragraph 16 of the Amended Complaint contains conclusions of law, to which no response is required. To the extent a response is required, defendants deny the allegations in Paragraph 16 of the Amended Complaint. The remaining allegations in Paragraph 16 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required to the remaining allegations in Paragraph 16. To the extent a response is required, defendants deny the remaining allegations and characterizations in Paragraph 16 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

(a)     Defendants admit that Mr. Ellis is Senior Vice President, Manager of Financial Operations of First Horizon, and that he served on the Administrative Committee between 2002 and 2007. The remaining allegations in Paragraph 16(a) contain conclusions of law, to which no response is required. To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(a).

(b)     Defendants admit that Ms. Cunningham is Senior Vice President, Regional Sales, of First Horizon, and that she has served on the Administrative Committee since 2002. The remaining allegations in Paragraph 16(b) contain conclusions of law, to which no response is required. To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(b).

(c)     Defendants admit that Mr. Hopkins is the Executive Vice President, Memphis Banking Group of First Horizon, and that he has served on the Administrative Committee since 2002. The remaining allegations in Paragraph 16(c) contain conclusions of law, to which no

response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(c).

(d)     Defendants admit that Ms. Kruse is the Senior Vice President Wealth Management, Product Development and Support of First Horizon, and that she has served on the Administrative Committee since 2008.   The remaining allegations in Paragraph 16(d) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(d).

(e)     Defendants admit that Ms. McDonald is the Senior Vice President and Manager of Wealth Management Services of First Horizon, and that she served on the Administrative Committee between 2002 and 2007.   The remaining allegations in Paragraph 16(e) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(e).

(f)     Defendants admit that Ms. Ragland is the Vice President, Trust, of First Horizon, and that she has served on the Administrative Committee since 2008.   The remaining allegations in Paragraph 16(f) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(f).

(g)     Defendants admit that Ms. Sones has served on the Administrative Committee since 2002.  The allegations in the second sentence of Paragraph 16(g) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations in the second sentence of Paragraph 16(g).   Defendants deny the remaining allegations contained in Paragraph 16(g) of the Amended Complaint.

(h)     Defendants admit that Mr. Taylor works for First Horizon Insurance Group, Inc. and that he has served on the Administrative Committee since 2004.   The remaining allegations

in Paragraph 16(h) contain conclusions of law, to which no response is required.  To the extent a

response is required, defendants deny the remaining allegations in Paragraph 16(h).

(i)      Defendants admit that Mr. Zoccola is the former Vice President, Accounting, of

First Horizon, and that he served on the Administrative Committee between 2002 and 2003.  The

remaining allegations in Paragraph 16(i) contain conclusions of law, to which no response is

required.  To the extent a response is required, defendants deny the remaining allegations in

Paragraph 16(i).

17.     **Defendants DOES 1-100** are additional Plan fiduciaries whose exact identities
and fiduciary functions will be ascertained through discovery. The information and documents
on which Plaintiffs' claims are based are, very likely, solely within Defendants' possession and
control. Therefore, to the extent necessary and appropriate in light of discovery, Plaintiffs will
amend their Complaint or seek leave to amend to add such other fiduciaries as defendants.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 17 of the Amended Complaint.

## V.      FACTUAL ALLEGATIONS

**A.      The Plan**

18.     The Plan is a defined contribution plan and an individual account plan. Under its
terms, a participant may authorize payroll deductions from 1% to 100% of eligible pay (subject
to certain legal limitations) as contributions, to be invested in one or more of a number of options
selected by the Plan's investment fiduciaries for employee contributions.

**ANSWER:**

Defendants admit that the Plan is a directed defined contribution plan within the meaning

of ERISA Section 3(34), 29 U.S.C. § 1002(34), that provides for individual accounts for each

participant, and that participants may authorize payroll deductions from 1% to 100% of eligible

earnings subject to legal limitations.  Defendants deny the remaining allegations contained in

Paragraph 18 of the Amended Complaint.

19.     Until September 1, 2007, First Horizon had a pension plan as well as the Plan, but
it closed its Pension Plan to new participants on September 1, 2007.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 19 of the Amended Complaint.

20.    The Plan allows participants to make pre-tax contributions (from 1% to 90% of eligible pay) and after-tax contributions (from 1% to 10% of eligible pay).

**ANSWER:**

Defendants admit that the Plan allows active employee participants to make pre-tax contributions to their individual accounts from 1% to 90% of their eligible earnings and after-tax contributions to their individual accounts from 1% to 10% of their eligible earnings, subject to certain restrictions imposed by federal law.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 20 of the Amended Complaint.

21.    Participants may also rollover amounts representing distributions from other defined benefit and/or defined contribution plans.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 21 of the Amended Complaint.

22.    The Company makes two types of contributions on behalf of participants to the Plan – matching contributions and savings contributions. After one year of service, all participants are eligible for matching contributions.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 22 of the Amended Complaint.

23.    Until some recent date in 2008, all participants except First Horizon Home Loan Corporation participants were required to invest in the Company Stock Fund in order to receive matching contributions. Matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund. According to an April 15, 2008 Proxy Statement, that requirement was dropped in early 2008, *i.e.*, only after the Plan's holdings of First Horizon Stock had lost more than half of its value.

**ANSWER:**

Defendants admit that prior to January 1, 2008, participants were required by the plan document to invest in the Company Stock Fund in order to receive matching contributions and

that matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund.  The third sentence of Paragraph 23 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 23 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 23 of the Amended Complaint.

24.     Matching contributions are automatically invested in the Company Stock Fund.

**ANSWER:**

Defendants admit that the plan document required that matching contributions be initially invested in the Company Stock Fund, but deny the remaining allegations contained in Paragraph 24 of the Amended Complaint.

25.     Each participant's account is credited with the participant's contributions, the Company's contributions and Plan earnings, and is charged with an allocation of asset management fees, Plan losses and certain other recordkeeping expenses. Such allocations are based on participant contributions or account balances.

**ANSWER:**

Defendants admit that participants' accounts are credited with each participant's contributions, any matching contributions from the Company and the Plan's earnings, and further admit that participant accounts are charged with an allocation of asset management fees, Plan losses and other recordkeeping expenses, which are based on participant contributions or account balances.  Defendants deny the remaining allegations contained in Paragraph 25 of the Amended Complaint.

26.     Participants direct their contributions into various investment options selected by the Plan's investment fiduciaries, and may change their investment authorizations at any time.

**ANSWER:**

Defendants admit that participants direct their contributions in investment options of their choosing available under the Plan and that participants may change their investment authorizations on a daily basis. Defendants deny the remaining allegations contained in Paragraph 26 of the Amended Complaint.

27. Part of the Plan is referred to as the Employee Stock Ownership Plan ("ESOP") and is designed to invest primarily in Company Stock. The trustee was authorized under the ESOP provisions of the Plan to "invest Trust assets in savings accounts, certificates of deposit, high-grade short-term securities, equity stocks, bonds or other investments desirable for the Trust" or in cash. (2007 Plan Document § 13.3) "All investments will be made by the Trustee only upon the direction of the Plan Administrator [*i.e.* Defendant Administrative Committee]. The Plan Administrator may direct that all Trust Assets be invested and held in Employer Stock." Id.

**ANSWER:**

Defendants admit that the Plan incorporates an Employee Stock Ownership Plan ("ESOP") for investment in First Horizon stock and that the ESOP is comprised solely of the First Horizon National Corporation Stock Fund. The remaining allegations contained in Paragraph 27 of the Amended Complaint purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations in Paragraph 27 and refer to the documents cited therein for the full contents and context thereof.

28. As of December 31, 2005, more than 50% of the Plan's net assets available for benefits – $317,598,814 – were invested in the Company Stock Fund.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 28 of the Amended Complaint. By way of further answer, defendants affirmatively state that as of December 31, 2005, the Company Stock Fund comprised 49.9% of the Plan's assets, with a fund balance of $317,599,085.

29.     The Plan's investments in First Horizon Stock were highly volatile. At year end 2005, those investments represented approximately –115% of the Plan's investment income; at year end 2006, approximately +48% of the Plan's investment income; and at year end 2007, approximately –420% of the Plan's investment income.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 29 of the Amended Complaint.

30.     Until approximately March, 2006, the funds offered to Plan participants included several proprietary mutual and money market funds of First Horizon, the "First Funds." The "First Funds" offered included "First Funds US Governmental Portfolio," "First Funds Capital Appreciation I, " "First Funds Core Equity," "First Funds Intermediate Bond I."

**ANSWER:**

Defendants admit that, from February 2004 until June 5, 2006, the Plan's investment options included four proprietary funds managed by First Horizon affiliates and known as the "First Funds" and that the First Funds included the First Funds U.S. Government Money Market fund, the First Funds Capital Appreciation fund, the First Funds Core Equity Fund and the First Funds Intermediate Bond Fund.   Defendants deny the remaining allegations contained in Paragraph 30 of the Amended Complaint.

31.     The First Funds were managed by Highland Capital and Martin & Company, wholly-owned subsidiaries of First Horizon. Transactions related to these mutual funds, as well as transactions related to First Horizon Stock, qualify as party-in-interest transactions under ERISA.

**ANSWER:**

Defendants admit that the First Funds were managed by Highland Capital and Martin & Company, which were wholly-owned subsidiaries of First Horizon during the period in which the First Funds were offered as investment options under the Plan.   The remaining allegations contained in Paragraph 31 are conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 31 and refer to the statute cited therein for the full contents and context thereof.

32.     The Plan did not offer non-proprietary funds as an alternative to the types of First Funds offered. For example, the only bond fund offered in the Plan was the First Fund Intermediate Bond I.

**ANSWER:**

Defendants admit that during the period of time in which the First Funds Intermediate

Bond Fund was offered under the Plan that it was the only bond fund offered.  Defendants deny

the remaining allegations contained in Paragraph 32 of the Amended Complaint.

33.     As of December 31, 2004, the Plan held assets of some $61,659,809 in Core Equity I and $40,488,692 in US Government Portfolio. Form 11-K filed on June 28, 2005.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 33 of the Amended Complaint.

34.     As of December 31, 2005, the Plan held some $8,449,747 in the Capital Appreciation I Fund; $44,939,572 in the Core Equity I Mutual Fund; $35,694,744 in US Governmental Portfolio; and $17,777,946 in the Intermediate Bond I Fund. Form 11-K filed on June 29, 2006. Those Plan holdings represented 6.7%, 12.8% and 5.5% of those mutual funds, respectively, and 7.1%, 16.8% and 6.0% of the Class I shares in those funds.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 34 of the Amended Complaint.

35.     The First Funds were not selected by a prudent selection process. Rather, they were selected because of the fees generated for First Horizon and its affiliates and because the investment of Plan assets in the First Funds supported the viability of the funds. A prudent process is one which considers exclusively the best interests of the Plan's participants and beneficiaries with respect to the funds to be offered for their retirement savings. Here, the First Funds were offered because of the benefits to First Horizon and its affiliates. Defendants, as fiduciaries of an ERISA Plan with over $600 million dollars in assets, knew or should have known that the evaluation of relative fees and investment returns are a necessary component of fulfilling their fiduciary responsibilities. As the United States Department of Labor ("DOL") has stated:

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated

with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

In recent years, there has been a dramatic increase in the number of investment options, as well as level and types of services, offered to and by plans in which participants have individual accounts. In determining the number of investment options and the level and type of services for your plan, it is important to understand the fees and expenses for the services you decide to offer. The cumulative effect of fees and expenses on retirement savings can be substantial.

*Understanding Retirement Plan Fees And Expenses*, U. S. Department of Labor, May 2004 (available at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html).

**ANSWER:**

The allegations summarizing the Department of Labor's publication referenced in Paragraph 35 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 35 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 35 of the Amended Complaint.

36.     The DOL also has informed employers that the level of fees may vary substantially, depending upon the nature of the product and the investment style of a particular product. Id. When investments are "passively managed," such as index funds, "little research" is required, and thus, the fees of these funds should be much lower:

Funds that are "actively managed" (*i.e.*, funds with an investment adviser who actively researches, monitors, and trades the holdings of the fund to seek a higher return than the market as a whole) generally have higher fees than funds that are "passively managed" (see below). The higher fees are associated with the more active management provided and increased sales charges from the higher level of trading activity. While actively managed funds seek to

> provide higher returns than the market, neither active management nor higher fees necessarily guarantee higher returns.
>
> Funds that are "passively managed" generally have lower management fees. Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index. Thus, passively managed funds require little research and less trading activity.

Id.

**ANSWER:**

The allegations summarizing the Department of Labor's publication in Paragraph 36 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations in Paragraph 36 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 36 of the Amended Complaint.

37.    Accordingly, if actively managed funds are offered in an ERISA-protected retirement plan, the fiduciaries must ensure that the performance of those investments options justifies the increased expense of the investment. Paying high fees for a fund that underperforms the applicable index, as a matter of basic prudence, is financially unsound. For this reason, a fiduciary has an ongoing duty to "monitor investment returns and service provider performance and, if necessary, make changes." Id.

**ANSWER:**

Paragraph 37 contains conclusions of law and purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 37 of the Amended Complaint.

38.    The DOL has also pointed out that [sic] detrimental impact excessive fees have on retirement savings is substantial. Over the course of an individual's participation in a defined

contribution plan, excessive fees can result in a loss of tens of thousands of dollars, if not more, in retirement savings.

**ANSWER:**

Paragraph 38 purports to characterize the position of Department of Labor without providing a supporting citation and, therefore, defendants lack information or knowledge sufficient to form a belief as to the accuracy of the allegations contained in Paragraph 38.  To the extent a response is required, defendants deny the allegations contained in Paragraph 38 of the Amended Complaint.

39.     *For example*: Assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000. If returns on investments in his or her account over the next 35 years average 7 percent, and fees and expenses reduce these average returns by 0.5 percent, the employee's account balance would grow to $227,000 at retirement, even if there were no further contributions to the account. However, if fees and expenses being withheld are 1.5 percent, the employee's account balance would grow to only $163,000 at retirement. The 1 percent difference in fees and expenses reduces the employee's account balance at retirement by an appalling 28 percent. See Department of Labor Publication: *A Look at 401(k) Plan Fees* (available at http://www.dol.gov/ebsa/publications/401k employee.html).

**ANSWER:**

Paragraph 39 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 39 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

40.     Because of the enormous impact that excessive fees and expenses have on participants' retirement savings, plan fiduciaries are required to carefully monitor fees and expenses and ensure that amounts charged against plan accounts are reasonable.

**ANSWER:**

Defendants admit that plan fiduciaries are required to comply with certain obligations under ERISA, *see, e.g.*, ERISA Section 404, but deny that defendants failed to comply with any

such obligations.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 40 of the Amended Complaint.

41.     Defendant First Tennessee served as the sub-manager for the First Funds, and as such was acutely aware of the substantial underperformance of the First Funds. Yet despite substantial underperformance of the First Funds, it was only after February 2006, when Karen Kruse, First Tennessee's Senior Vice President of Wealth Management, admitted that First Tennessee was reconsidering whether the mutual fund management business "was a core competency for us, " that the First Funds were removed from the Plan and other funds were offered to the Plan's participants. Before that, the continued offering of the First Funds was a representation that the Funds were prudently selected and monitored by the Plan's investment fiduciaries based on the exclusive interests of the participants in the Plan.

**ANSWER:**

Defendants admit that First Tennessee assisted in the management of the First Funds and further admit that the First Funds were no longer offered as Plan investment options as of June 5, 2006.  Defendants deny the remaining allegations contained in Paragraph 41 of the Amended Complaint.

42.     First Horizon sold its interest in the "First Funds" in a merger with Goldman Sachs Asset Management funds in early 2006.

**ANSWER:**

Defendants admit that the First Funds were reorganized into comparable funds managed by Goldman Sachs Asset Management in 2006.  Defendants deny the remaining allegations contained in Paragraph 42 of the Amended Complaint.

43.     The selection of the First Funds mutual funds by the Plan's investment fiduciaries was only changed when First Horizon decided to exit the mutual fund business.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 43 of the Amended Complaint.

**B.     First Horizon's Financial Condition and Problems During the Class Period**

44.     First Horizon is a bank and financial holding company which spent years touting itself as a growing and dynamic "national" company. Throughout the Class Period, First

Horizon's principal source of cash flow, including cash flow to pay dividends on its stock, has been from its principal subsidiary, First Tennessee.

**ANSWER:**

Defendants admit that First Horizon is a nationwide financial services corporation and admit that First Horizon's subsidiary, First Tennessee, was a major business segment of First Horizon during the purported class period. Defendants deny the remaining allegations contained in Paragraph 44 of the Amended Complaint.

45.     Between January 1, 2005 and April 28, 2008, First Horizon – through its subsidiaries First Tennessee and First Horizon Home Loan Corporation – provided mortgage banking services in 44 states, and promoted itself as one of the country's 20 largest mortgage loan originators. During the first part of the Class Period, as part of its so called "national expansion strategy," First Horizon and its affiliates wrote and securitized ever increasing numbers of subprime and Alt-A mortgage loans, second lien mortgage loans, home equity loans and lines or credit, and construction loans, for which reduced underwriting standards and/or non-traditional financing arrangements were used. By doing so, First Horizon was able to build loan volume and to appear more dynamic as a financial institution.

**ANSWER:**

Defendants admit that, at various times between the dates identified in Paragraph 45, First Horizon and its affiliates provided mortgage banking services in 44 states, and wrote and securitized subprime and Alt-A mortgage loans, second lien mortgage loans, home equity loans and lines of credit, and construction loans. Defendants deny the remaining allegations contained in Paragraph 45 of the Amended Complaint.

46.     In particular, between 2003 and 2007, First Horizon vastly increased its exposure to three higher-risk lending products: home equity lines of credit ("HELOC"); commercial construction loans to single-family builders ("Homebuilder" loans); and retail real estate construction loans to individual consumers to build homes ("One Time Close" loans). By 2006, retail residential real estate products, primarily HELOCs and other home equity loans, constituted 40 percent of total loans, with commercial construction loans comprising 11 percent of total loans, and retail construction "One Time Close" loans comprising an additional 10 percent of total loans. 2006 Annual Report, p. 30.

**ANSWER:**

Defendants deny the allegations contained in the first sentence of Paragraph 46 of the Amended Complaint.   The remaining allegations contained in Paragraph 46 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 46 and refer to the document cited therein for the full contents and context thereof.

47.    First Horizon failed to disclose, or adequately disclose, that HELOCS and loans backed by undeveloped collateral ("Homebuilder " and "One Time Close") were inherently more risky than government-sponsored entity ("GSE") conforming first-lien mortgages. Moreover, First Horizon failed to disclose, or adequately disclose, the risks in increasing its underwriting of second-lien loans, second mortgages, and loans secured by homes to be built where borrowers already had existing mortgages on their current homes. Instead, over the course of several years of rapid portfolio growth in these product areas, First Horizon continued to maintain that risk-profiles for these portfolios were "stable," and that overall asset quality was "strong." (2004 Annual Report, Introduction: Retail/Commercial Banking – Review of 2004; 2005 Annual Report, p. 30-31).

**ANSWER:**

The last sentence of Paragraph 47 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the last sentence of Paragraph 47 and refer to the document cited therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 47 of the Amended Complaint.

48.    First Horizon touted its growth in its drive to become a national financial institution, but it failed to adequately disclose that this growth came at the expense of sound banking practices, and, instead, was based on lax underwriting, and the issuance of loans on terms which created an unacceptably high likelihood of non-payment. While First Horizon disclosed that there was a risk that some of its customers may not repay their loans and that collateral might be insufficient to avoid a loss, it failed to disclose that this risk had materially increased because of its underwriting practices and its failure to adequately manage this enhanced risk.

**ANSWER:**

Defendants admit that First Horizon disclosed the risk that some customers may not repay their loans and that collateral might be insufficient to avoid losses.  Defendants deny the remaining allegations contained in Paragraph 48 of the Amended Complaint.

49.     First Horizon utilized what it referred to as "Super Expanded Underwriting Guidelines," in its loan business. These standards allowed for FICO scores, loan-to-value ratios and debt-to-income ratios that were significantly less restrictive than the Company's standard full/alternative documentation loan programs. First Horizon did not disclose or did not adequately disclose that it had failed to make adjustments in its loss provisions and loss reserves to take into account its foray into higher risks loans and lowered underwriting standards.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 49 of the Amended Complaint.

50.     First Horizon failed to adequately disclose that it [sic] a large percentage of loans, including those backed by undeveloped collateral, were concentrated in states including Florida, California, Washington and Nevada. Moreover, First Horizon inadequately reserved for loan losses by failing to take into account that its loans were geographically concentrated in states where there were clear signs that the boom in housing market was over by early 2006.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 50 of the Amended Complaint.

51.     First Horizon also became increasingly reliant upon secondary markets to sell securitize and sell its loans, as a result of its decision to write loans (*e.g*., HELOCs and Adjustable Rate Mortgages or "ARMS") that did not conform with GSE's guidelines for federally insured mortgage loans. In 2003, First Horizon securitized and sold $40.9 billion of conventional and federally insured mortgage loans, and had $6 billion in off-balance sheet business trusts for the purpose of securitizing and selling to secondary market investors. At year end 2006, First Horizon securitized and sold only $13.8 billion of conventional and federally insured mortgage loans, and reported approximately $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales.

**ANSWER:**

Defendants admit that in 2003, First Horizon securitized and sold $40.9 billion of conventional and federally insured mortgage loans and reported $6 billion in off-balance sheet business trusts related to secondary market securitizations and sales. Defendants further admit

that in 2006, First Horizon securitized and sold $13.8 billion of conventional and federally insured mortgage loans and reported $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales.  Defendants deny the remaining allegations contained in Paragraph 51 of the Amended Complaint.

52.     First Horizon's proprietary securitizations of nonconforming first-lien and second-lien mortgages and home equity loans did not conform to the standards for sale or securitization to government agencies and created risks that there might not be an adequate market for such securities, which risks were not adequately disclosed.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 52 of the Amended Complaint.

53.     First Horizon also failed to disclose or adequately disclose various risks related to its changed business model including the extent to which recourse could be sought from it on securitized loans, the increasing risks associated with its shift to off-balance sheet transactions, and how it could affect the levels of Level I and II capital held. While First Horizon claimed to adequately manage the risks associated with the sale and securitization of its loans, it knew, when Plan participants did not and could not know, the facts and risks associated with First Horizon's risk management.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 53 of the Amended Complaint.

54.     First Horizon failed to adequately oversee its own risk management. It failed to adequately disclose the systemic problems in its risk management and its lack of competency in assessing and managing risks related to its national expansion and reduced underwriting.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 54 of the Amended Complaint.

55.     First Horizon also failed to adequately disclose that the sustainability of its new business model relied on continued real estate growth and appreciation of real estate values. Moreover, First Horizon also failed to adequately disclose that its products– particularly its non-mortgage Homebuilder, One-Time Close construction, condo developer and HELOC products – were susceptible to losses due to significant downturn in the general housing market and to a credit crunch in the general economy, including a severe reduction in the availability of credit or an increase in interest rates.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 55 of the Amended Complaint.

56.     On May 16, 2005, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC") the Office of Thrift Supervision ("OTS") and the National Credit Union Administration issued "Credit Risk Management Guidance for Home Equity Lending" ("Credit Risk Guidance"). That Credit Risk Guidance stated that the agencies had "found that, in many cases, institution's credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards."

**ANSWER:**

Defendants admit the allegations contained in the first sentence of Paragraph 56 of the

Amended Complaint.  The remaining allegations in Paragraph 56 purport to characterize a

written document, the terms of which speak for themselves and, therefore, no response is

required.  To the extent a response is required, defendants deny the allegations and

characterizations contained in Paragraph 56 of the Amended Complaint and refer to the

document referenced therein for the full contents and context thereof.

57.     That Credit Risk Guidance stated that financial institutions "may not be fully recognizing the risk embedded in these portfolios."

**ANSWER:**

Paragraph 57 purports to characterize a written document, the terms of which speak for

themselves and, therefore, no response is required.  To the extent a response is required,

defendants deny the allegations and characterizations contained in Paragraph 57 of the Amended

Complaint and refer to the document referenced therein for the full contents and context thereof.

58.     That Credit Risk Guidance also provided that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values."

**ANSWER:**

Paragraph 58 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 58 of the Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

59.    The Credit Risk Guidance also found that "prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt. Given the home equity products' long-term nature and the large credit amount typically extended to a consumer and evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score."

**ANSWER:**

Paragraph 59 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 59 of the Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

60.    The Credit Risk Guidance stated that "underwriting standards for interest-only and variable rate HELOCs should include an assessment of the borrower's ability to amortize the fully drawn line over the long term and to absorb potential increases in interest rates."

**ANSWER:**

Paragraph 60 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 60 of the Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

61.    The Credit Risk Guidance also recommended that financial institutions with home equity concentrations as well as higher risk portfolios perform sensitivity analyses on key portfolio segments.

**ANSWER:**

Paragraph 61 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 61 of the Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

62.    In its 2005 Annual Report, First Horizon stated that it had 13,000 employees serving customers through hundreds of offices located throughout 46 states. The 2005 Annual Report contained a Chairman's Message from Defendant Glass dated February 1, 2006, which stated, "Our national expansion strategy also worked well." Glass also stated, "As I look at 2006, I'm encouraged about the opportunities that exist in our businesses and the progress we are making toward our commitment of $50 million in earnings enhancements."

**ANSWER:**

Paragraph 62 purports to characterize a written document and statements from Mr. Glass, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 62 and refer to the document and statements referenced therein for the full contents and context thereof.

63.    In 2004, First Horizon Home Loans securitized and sold approximately $19.3 billion in mortgage loans. In 2005, First Horizon Home Loans securitized and sold approximately $16.6 billion in mortgage loans. In its 2005 Annual Report, First Horizon disclosed that:

> Certain of FHN's originated loans, including non-conforming first-lien mortgages, second lien mortgages and HELOC originated primarily through FTBNA, do not conform to the requirements for sale or securitization through government agencies. FHN pools and securitizes these non-conforming loans in proprietary transactions. After securitization and sale, these loans are not reflected on the Consolidated Statements of Condition [except for certain circumstances]. On December 31, 2005 and 2004, the outstanding principal amount of loans in these off-balance sheet business trusts was $20.0 billion and $11.3 billion, respectively. Given the significance of FHN's origination of non-conforming loans, the use of single-purpose business trusts to securitize these loans is an important source of liquidity to FHN.

**ANSWER:**

Defendants admit the allegations in the first two sentences of Paragraph 63 of the Amended Complaint. The remaining allegations contained in Paragraph 63 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 63 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

64.    In other words, in one year, from 2004 to 2005, First Horizon almost doubled the amounts of off-balance sheet loans, while simultaneously describing the loan transactions so opaquely that Plan participants could not assess the risks to the Company related to those items.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 64 of the Amended Complaint.

65.    First Horizon depended "significantly" on its "ability to sell or securitize first and second mortgage loans and home equity lines of credit…." 2005 10-K. It did not disclose or did not adequately disclose the risks to its ability to continue to engage in such securitizations.

**ANSWER:**

The first sentence in Paragraph 65 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations in the first sentence of Paragraph 65 and refer to the cited document for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 65 of the Amended Complaint.

66.    Moreover, while First Horizon increased its investment in securitized mortgage products, it failed to reflect this increased risk in its loan loss provisions and reserves.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 66 of the Amended Complaint.

67.     In its 2005 Annual Report, First Horizon stated that it had "a significant concentration in loans secured by real estate" but they were "geographically diversified nationwide." First Horizon also represented that it "did not have any concentrations of 10 percent or more of total commercial, financial and industrial loans in any single industry." By that date, First Horizon knew or should have known that it was likely to experience further deterioration in its National Home Builder, and commercial real estate lending through its First Horizon Lending offices.

**ANSWER:**

 The first two sentences of Paragraph 67 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first two sentences of Paragraph 67 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 67 of the Amended Complaint.

68.     In its 2005 Annual Report, First Horizon touted the 83% growth of commercial construction loans in 2005 without disclosing risks inherent to that portfolio. First Horizon and Defendant Baker – then First Horizon's Chief Operating Officer – described the Company's construction lending as operating pursuant to "a program of carefully managed growth with this business." The 2005 Annual Report credited "the favorable housing environment" as a factor in that growth as well as the expansion of its sales force and its geographic reach. It did not attribute the growth to its lowered underwriting standards, or disclose the extent to which the growth depended on such lowered underwriting standards. 2005 Annual Report, p. 17.

**ANSWER:**

 Paragraph 68 purports to characterize a written document and the statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 68 of the Amended Complaint and refer to the document and statements cited therein for the full contents and context thereof.

69.     In its 2005 Annual Report, First Horizon represented that in providing for loan losses it used an "analytical model based on historical loss experience adjusted for current events, trends and economic conditions." "[A]sset quality in general should remain relatively stable based on expected economic conditions with normal short-term fluctuations; however,

asset quality performance during 2005 was relatively strong." (2005 Annual Report, p. 15). First Horizon's description of its model was not adequate for outsiders to assess whether its loan loss reserves and provisions were reasonable and timely updated to reflect changes in the economic conditions. As later events revealed, the loan loss reserves and provisions were wholly inadequate.

**ANSWER:**

The first two sentences of Paragraph 69 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations of the first two sentences of Paragraph 69 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 69 of the Amended Complaint.

70.     First Horizon showed an increase in shareholders' equity from $1.9 billion in 2004 to $2.1 billion in 2005. 2005 Annual Report.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 70 of the Amended Complaint.

71.     First Horizon touted its "enterprise-wide approach to risk governance, measurement, management and reporting including an economic capital allocation process that is tied to risk profiles used to measure risk-adjusted returns." 2005 Annual Report. It did not disclose that its risk management procedures were not adjusted to take into account the increased risks associated with its more risky loan portfolio and its reduced underwriting standards and practices.

**ANSWER:**

The first sentence of Paragraph 71 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 71 and refer to the document cited therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 71 of the Amended Complaint.

72.     In its 2005 Annual Report, First Horizon reported that it had investment grade ratings from all three of the rating agencies and that it recognized the need to maintain such ratings: "Maintaining adequate credit ratings on debt issues is critical to liquidity because it affects the ability of FHN to attract funds from various sources, such as brokered deposits or wholesale borrowings of which FHN had $10.1 billion and $6.2 billion on December 31, 2005 and 2004, respectively...." First Horizon did not disclose that the banking practices in which it was engaged, including lowered underwriting standards, and involvement in subprime, Alt-A loans, and loans secured by undeveloped collateral, were likely to cause its credit ratings to be lowered in the future.

**ANSWER:**

The first sentence of Paragraph 72 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 72 and refer to the document cited therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 72 of the Amended Complaint.

73.     According to its 2005 Annual Report, in 2005 First Horizon increased its mortgage loan origination volumes by $4.2 billion or 17 percent and increased its delivery of loans into the secondary market by 18 percent to $34.6 billion. However, First Horizon failed to increase its loan losses reserves or make changes to its risk-assessment methods in light of changes to its business. Instead, First Horizon announced that its ratio for allowance for loan losses to loans, net of unearned income, was lower "primarily reflecting the stable risk profile of both the commercial and retail loan portfolios." (2005 Annual Report, pp. 6, 30-31).

**ANSWER:**

Defendants deny the allegations contained in the second sentence of Paragraph 73 of the Amended Complaint.  The remaining allegations in Paragraph 73 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 73 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

74.     First Horizon described the increase in its mortgage business as resulting from the "favorable housing environment and expansion of the sales force and geographic reach" (2005 Annual Report p. 17) without describing the increasing riskiness of its business model given the changing nature of its portfolio.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 74 of the Amended Complaint.

75.     First Horizon described its asset quality performance during 2005 as "relatively strong." (2005 Annual Report p. 15)

**ANSWER:**

Paragraph 75 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 75 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

76.     First Horizon claimed that it "uses the best information available to establish the allowance for loan losses." (2005 Annual Report p. 45)

**ANSWER:**

Paragraph 76 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 76 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

77.     Notwithstanding the Credit Risk Guidance, First Horizon continued to use the same methodology for determining relevant considerations for loss levels as it had historically used without taking into account the far riskier nature of its portfolio. (See 2005 Annual Report p. 45). But because First Horizon did not disclose the actual methodology used or the flaws in the methodology used, it was impossible for participants to know those flaws.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 77 of the Amended Complaint.

78.     During the Class Period, First Horizon continued to offer and promote its "Payment Choice" Adjustable Rate Mortgage program which offered borrowers "lower starting

rates and a choice of four repayment options each month," including making fixed payments at a reduced rate for up to 60 months which could result in the accumulation of deferred interest and paying interest only. See First Horizon National archived website.

**ANSWER:**

Paragraph 78 purports to characterize an archived writing from First Horizon's website, the content of which speaks for itself and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 78 of the Amended Complaint and refer to the website cited therein for the full contents and context thereof.

79.     First Horizon promoted the use of "interest only" payment programs for its mortgage borrowers as allowing them to "defer payment of the principal and use the funds for other purposes such as investment or paying off high-interest credit." Id. First Horizon also promoted "interest only" mortgages and loans stating that "Payment Choice is especially valuable if you're managing a dynamic portfolio, earn a fluctuating income or are dealing with unplanned expenses." Id. Yet such "interest only" loans were highly risky and required careful risk management and accounting treatment not afforded by First Horizon.

**ANSWER:**

The first two sentences of Paragraph 79 purport to characterize an archived writing from First Horizon's website, the content of which speaks for itself and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 79 and refer to the website cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 79.

80.     In October 2006, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration all jointly issued the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("2006 OCC Guidance"). The OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime " mortgage products by ensuring that loan terms and underwriting standards were consistent with prudent lending practices, which require a credible analysis of a borrower's repayment capacity.

**ANSWER:**

Defendants admit the allegations contained in the first sentence of Paragraph 80 of the Amended Complaint.   The remaining allegations contained in Paragraph 80 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 80 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

81.   The 2006 OCC Guidance provided that such loans should be underwritten based on a borrower's ability to make fully-amortizing payments at the fully-indexed interest rate. For products like payment option ARMs that permit negative amortization, the 2006 OCC Guidance provided that a lenders should base its underwriting analysis on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan.

**ANSWER:**

Paragraph 81 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 81 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

82.   Even after this 2006 OCC Guidance was issued, First Horizon continued to initiate interest-only mortgages, ARMs and HELOCs and second-lien mortgages which were far more risky and did not take into account the 2006 OCC's Guidance. See www.firsthorizon.com and www.fthomeloans.com (last visited on 9/15/08). [On December 13, 2006, the Governmental Banking Agencies including the OCC issued an Interagency Policy Statement on the Allowance for Loan and Lease Losses ("12/13/06 Policy Statement"). That Statement provided that "Estimated credit losses should reflect consideration of all significant factors that affect the collectability of the portfolio as of the evaluation date."

**ANSWER:**

Paragraph 82 purports to characterize a written document and an archived writing on First Horizon's website, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and

characterizations contained in Paragraph 82 of the Amended Complaint and refer to the documents cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 82 of the Amended Complaint.

83.   The 12/13/06 Policy Statement directed management to "consider those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience."

**ANSWER:**

Paragraph 83 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 83 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

84.   According to the 12/13/06 Policy Statement "if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity."

**ANSWER:**

Paragraph 84 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 84 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

85.   Plaintiffs contend that First Horizon and the Director Defendants delayed conforming their practices to the Credit Risk Guidance, the 2006 OCC Guidance, and the 12/13/06 Policy Statement, thereby delaying recognition of loan losses and increasing loan loss reserves. This delay is reflected in the huge increases in those items reflected in its reporting.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 85 of the Amended Complaint.

86.   During the Class Period First Horizon has touted its "courage to make decisions and take actions based on personal and professional integrity." (2005 Annual Report, Introduction). By December 31, 2006, First Horizon's credit ratings had begun to decline.

**ANSWER:**

Defendants admit the second sentence contained in Paragraph 86 of the Amended Complaint.  The remaining allegations contained in Paragraph 86 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 86.

## C.    The Truth Delayed

87.    Late in the summer of 2006, First Horizon allowed the first bad news about the Company's deteriorating financial condition to slowly dribble out. On August 29, 2006, in a press release, First Horizon admitted that:

> First Horizon National Corporation (First Horizon) (NYSE:FHN) announced today that it expects mortgage banking earnings to be unfavorably impacted this quarter by two unrelated events. The further deterioration in the current mortgage environment is expected to reduce pre-tax operating earnings by approximately $35 million as compared to the second quarter, and the settlement of a class action lawsuit is anticipated to create an estimated $21 million pre-tax accrual.

> Mortgage banking operating earnings for the first two months of this quarter have been unfavorably impacted by lower gain on sale margins, further reductions in mortgage production and increased costs to hedge the servicing risks.

> The recent drop in the 10-year treasury rate and the resulting inversion of the yield curve have changed the dynamics within the mortgage secondary market. As a result, First Horizon Home Loan's gain on sale margins fell significantly below second quarter levels, and the costs increased to hedge servicing risks. After realizing 122 basis points in gain on sale margins in the second quarter, we currently expect margins to range between 85 basis points and 90 basis points in the third quarter based on product delivery trends. Additionally, this environment is expected to increase net hedging costs by approximately $5 million as compared to second quarter.

Mortgage banking industry-wide production has also weakened as the housing market has continued to slow. Although third quarter originations have traditionally been higher than second quarter levels, First Horizon's recent application trends foreshadow approximately a $1 billion reduction in originations and deliveries this quarter.

These three issues could reduce third quarter pre-tax operating earnings by $35 million in comparison to the second quarter. Although we currently expect some modest improvement in mortgage banking in the fourth quarter, the current operating environment suggests that mortgage banking operations will only be in the range of break-even in the fourth quarter while our other two businesses should continue to perform in line with expectations.

**ANSWER:**

Defendants deny the allegations contained in the first sentence of Paragraph 87 of the Amended Complaint. The remaining allegations in Paragraph 87 contain an incomplete quotation from the referenced document and purport to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 87 of the Amended Complaint and refer to the complete document referenced therein for the full contents and contexts thereof.

88. First Horizon blamed the "current mortgage environment" rather than its own aggressive banking practices and the relaxation of its underwriting standards and other banking practices for losses in its mortgage portfolio. And First Horizon failed to stem the problems. It continued to make subprime real estate loans, Alt-A loans and other non-conforming loans ignoring the declining market for those loans.

**ANSWER:**

The first sentence of Paragraph 88 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence

of Paragraph 88 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 88 of the Amended Complaint.

89.    On September 29, 2006, First Horizon announced the "transition[ing]" of its Chief Financial Officer and the search for a successor.

**ANSWER:**

Defendants admit that First Horizon announced on September 29, 2006 that Chief Financial Officer Marlin L. Mosby III would be assuming a new position at the end of 2006 and that First Horizon would begin searching for his successor.  Defendants deny the remaining allegations contained in Paragraph 89 of the Amended Complaint.

90.    On October 18, 2006 First Horizon issued a press release announcing the Company's earnings for Third Quarter 2006, which stated:

> "We remain confident in our core strategy which continued to show progress in the third quarter," said First Horizon National Corporation Chairman and CEO, Ken Glass. "In this period, we expanded our retail/commercial banking footprint, experienced the positive impact of cross-sell penetration, and made gains in the development and distribution of capital markets products other than fixed income. We believe that our vision of organically creating a national financial services organization and recruiting high-performing, experienced talent will deliver above-industry performance and provide long term value to our shareholders."
>
> *      *      *
>
> Provision for loan losses increased to $23.6 million in third quarter 2006 from $22.4 million last year. The 2005 provision included $3.8 million of hurricane losses. Excluding this item, the provision for loan losses would have been $18.6 million. The $5.0 million increase primarily reflects an expectation of slowing economic growth and the migration of a few loans to the watch list....
>
> *      *      *

> "While macro environment issues will continue to impact earnings growth into next quarter, our overall strategy continues to position our business for strong sustained earnings growth," concluded Glass.

**ANSWER:**

Paragraph 90 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document and statements by Mr. Glass, which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 90 of the Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

91. In a January 17, 2007 press release, Defendant Glass was quoted as stating:

> 2006 was a unique year for the company, as our financial performance was marked by a number of unusual and one time items such as the sale of our merchant business. We recognize that given this, it will be difficult for you to get a good fix on our 2007 earnings. Therefore, we have decided for 2007 to offer more specific guidance. For 2007, we expect the company to produce earnings for the full year at or above the current market consensus of $2.80.

**ANSWER:**

Paragraph 91 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document and statements of Mr. Glass, which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 91 of the Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

92.     Yet, in the quarterly earnings call the following day, the company continued to insist that its careful management of its portfolios, specifically the construction portfolios, had left it positioned for growth:

> We have expanded construction lending nationally, but kept our local approach. Our culture and our local support systems allow us to recruit experienced end market staff who know their markets extremely well. We specifically target home builders who have a track record of enduring through multiple cycles and whose loyalty to their financial partners is based upon relationship rather than price. We operate in geographically diverse markets. Our customer base is granular and we have managed our exposure to undeveloped land to represent only 3% of our portfolio. As a result we believe this business line is well positioned for continued growth without significant additional asset quality risk.

(Q4 2006 Earnings Call, 1-18-2007)

**ANSWER:**

Paragraph 92 contains an incomplete quotation from the cited document and purports to characterize the cited written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 92 of the Amended Complaint and refer to the complete document cited therein for the full contents and context thereof.

93.     First Horizon's 2006 Annual Report was entitled "Positioned for Growth." First Horizon was not positioned for growth. It was on an unsustainable course.

**ANSWER:**

Defendants admit that the cover page of First Horizon's 2006 Annual Report contained the language quoted in Paragraph 93.  Defendants deny the remaining allegations contained in Paragraph 93 of the Amended Complaint.

94.     As of March 1, 2007, First Horizon and Defendant Baker were still touting First Horizon's national expansion strategy:

51

> We are very clear about our strategic vision. Our goal is to expand our banking franchise to select markets nationwide using our targeted relationship approach..
>
> [W]hat we're proud to move forward with is an organization that is stronger at its foundation and better positioned to find stability amid financial market uncertainty. And it's this repositioning that we believe will offer our shareholders the confidence of a more consistent return on the investments they make.

March 1, 2007 letter from Defendant Baker in 2006 Annual Report.

**<u>ANSWER</u>:**

Paragraph 94 contains an incomplete quotation from the cited document and purports to characterize the cited written document and statements of Mr. Baker, which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 94 of the Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

95. As of March 1, 2007, First Horizon and Defendant Baker continued to misrepresent the nature of First Horizon's underwriting practices. In his March 1, 2007 letter in the 2006 Annual Report, Defendant Baker stated in reference to the bank's construction lending practices: "And as always, we apply strict underwriting standards." (<u>Id</u>.)

**<u>ANSWER</u>:**

The second sentence of Paragraph 95 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 95 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 95 of the Amended Complaint.

96. On April 18, 2007, First Horizon announced first quarter 2007 earnings of $70.5 million or $0.55 per diluted share.

**ANSWER:**

Defendants admit that in April 2007, First Horizon announced first quarter 2007 earnings

of $70.5 million, equaling $0.55 per share.  Defendants deny the remaining allegations contained

in Paragraph 96 of the Amended Complaint.

97.     It was not until that date that First Horizon announced in a press release that it was finally no longer going to underwrite, process or fund subprime loans, but it was going to continue its Alt-A loans which represented 20% of new originations of first lien mortgages. The April 18, 2007 press release quotes Defendant Baker as stating:

> We are working hard to return mortgage to historical levels of profitability through our strategy of building our prime, retail origination business. ... Accordingly, we have made the decision to no longer underwrite, process and fund nonprime loans. Our nonprime business, which represents less than two percent of our mortgage loan production, has resulted in a reasonable level of repurchase activity for which we have adequate reserves to cover estimated remaining losses. However, reduced investor appetite for this product has diminished gain-on-sale margins drastically; therefore, we believe market risk no longer justifies the modest potential rewards and believe it is better to service retail customer needs through broker relationships. In contrast, our Alt-A business, which represented 20 percent of our first-lien production in first quarter 2007, has prime-type credit characteristics despite the non-standard loan structures, with an average FICO of over 715 and continues to price appropriately. The majority of our Alt-A production is securitized and to-date, no residual or credit support structures have been retained and we have not seen any material repurchase activity from these loans.

**ANSWER:**

Defendants deny the allegations contained in the first sentence of Paragraph 97 of the

Amended Complaint.   The remaining allegations in Paragraph 97 contain an incomplete

quotation from the cited document and purport to characterize the written document and the

statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To

the extent a response is required, defendants deny the remaining allegations and characterizations

contained in Paragraph 97 of the Amended Complaint and refer to the complete document cited therein for the full contents and context thereof.

98.     The Company also stated in its April 18, 2007 press release:

> Provision for loan losses increased to $28.5 million in first quarter 2007 from $23.0 million in fourth quarter 2006, primarily reflecting an increase in both homebuilder and one-time-close construction loans on the watch list ... The nonperforming assets ratio related to the loan portfolio decreased to 56 basis points in first quarter 2007 from 58 basis points in fourth quarter 2006 due to the resolution of these previously identified problem loans and as overall low levels in the retail and commercial loans portfolios outweighed the expected increase in construction lending. The allowance to loans ratio was 99 basis points in first quarter 2007 compared to 98 basis points in fourth quarter 2006. Nonperforming assets were $135.9 million on March 31, 2007, compared to $139.0 million on December 31, 2006.

**ANSWER:**

Paragraph 98 contains an incomplete quotation from the cited document and purports to characterize the cited written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 98 of the Amended Complaint and refer to the complete document cited therein for the full contents and context thereof.

99.     Baker also stated in the press release:

> We are maintaining our focus on disciplined asset quality management with tightened guidelines in both retail and construction lending. We still expect asset quality to be solid for the full year of 2007 with net charge-offs averaging between 30 and 40 basis points for the year.

**ANSWER:**

Paragraph 99 contains an incomplete quotation from the cited document and purports to characterize the cited written document and statements by Mr. Baker, which speak for

themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 99 of the Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

100.   In late May and early June, First Horizon Stock closed around $40 per share.

**ANSWER:**

Defendants admit that First Horizon stock closed around $40 per share in late May and early June 2007, as from May 21, 2007 through June 11, 2007, First Horizon stock's daily closing price ranged from $38.43 per share to $40.52 per share.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 100 of the Amended Complaint.

101.   On July 17, 2007, Fitch downgraded the lower tranches of two Alt-A Trusts offered and managed by First Horizon, series 2006 AA-3 and Series 2006-F-2. Fitch downgraded the lowest two tranches (the BB tranche became B+, the B tranche was downgraded to CCC and assigned "distressed recovery" ratings) and put the BBB tranche on "ratings watch negative."

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 101 of the Amended Complaint.

102.   In a July 19, 2007 press release, First Horizon announced that charge-offs decreased during the second quarter of 2007:

> The net charge-off ratio decreased to 41 basis points in second quarter 2007 from 48 basis points in first quarter 2007 as net charge-offs declined to $23.0 million from $26.6 million in first quarter 2007. Provision for loan losses increased to $44.4 million in second quarter 2007 from $28.5 million in first quarter 2007, with the increase split between recognition of $7.7 million of losses for a non-strategic loan portfolio that was sold during the quarter and additional provisioning. Excluding the impact of the sold loans, the provision would have been $36.7 million for second quarter 2007. The nonperforming asset ratio increased to 81 basis points in second quarter 2007 from 56 basis points in first quarter 2007.

**ANSWER:**

Paragraph 102 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 102 of the Amended Complaint and refer to the complete document referenced therein for the full contents and context thereof.

103.    On July 19, 2007, First Horizon Stock closed at $37.74 per share, down 24 cents. Over the next three months, First Horizon's share price decreased approximately 20%, reaching $29.65 on September 11, 2007.

**ANSWER:**

Defendants admit that on July 19, 2007, First Horizon stock closed at $37.50 per share. Defendants further admit that First Horizon stock closed at $29.65 per share on September 11, 2007.  Defendants deny the remaining allegations contained in Paragraph 103 of the Amended Complaint.

104.    The July 19, 2007 press release also announced that First Horizon would pursue the sale, closure or consolidation of 34 branches in its four national full-service banking markets of Atlanta, Baltimore, Dallas and Northern Virginia, while continuing to offer mortgage loans in these markets through First Horizon Home Loan Corporation.

**ANSWER:**

Paragraph 104 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 104 of the Amended Complaint and refer to the document cited therein for the full contents and contexts thereof.

105.    On September 12, 2007, First Horizon CEO Jerry Baker announced plans to cut up to 50 percent of its mortgage sales force and shrink the real estate portfolio on its balance

sheets by making further changes in its consumer and construction lending businesses. At that time, First Horizon noted that it was not planning to grow. Instead, it was shrinking and cutting back as well as planning to make other adjustments, including:

- Shrinking the real estate portfolios on its balance sheet by making further changes in its consumer and construction lending business. New originations are expected to decline significantly as a result of continued product and program changes and the retention of only the most productive sales people.

- Cutting back-office support in consumer and construction lending as production is reduced.

- Exiting selected national markets for business banking.

- Transitioning the national cross-sales of deposit products to an Internet-based model, eliminating the need for banking specialists in mortgage offices.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 105 of the Amended Complaint.

106.   The September 12, 2007 press release quoted Defendant Baker as stating:

> "This strategic shift will reduce our real estate exposure and position us appropriately for the expected ongoing contraction of the housing market," said Baker. "As we focus our energy on continuing to build our strong banking franchise in Tennessee, we will enhance shareholder value by deemphasizing our more volatile national businesses, improving short-term profitability and increasing longer-term returns."

**ANSWER:**

Paragraph 106 contains an incomplete quotation from the cited document and purports to characterize the cited written document and statements by Mr. Baker, which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 106 of the Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

107.   On October 17, 2007, First Horizon Stock closed at $25.04 per share.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 107 of the Amended Complaint.

108.    After the close of the market on October 17, 2007, First Horizon announced that it experienced a loss in the third quarter of 2007 of $14.2 million, or 11 cents per share, compared with net income of $22.1 million, or 17 cents a share, a year earlier. Reflecting the "deterioration" of credit markets, the company's mortgage banking operations posted a pre-tax loss of $45.8 million, up from a second quarter pre-tax loss of $16.1 million. In an October 17, 2007 conference call, Bryan Jordan provided an estimate of its loan losses for the rest of 2007:

> **Bob Patten – Morgan Keegan**
>
> Can you give us a sense of the moving parts over the next two quarters, because now we are talking about charge going into '08 in terms of gains and charges left and where they are attributed to?
>
> **Bryan Jordan**
>
> Yeah, Bob, this is Bryan. I think the bulk of the charges will be realized in the fourth quarter, and we are still within the original framework that we said, somewhere between $90 million and $100 million, so, probably another $20 million maybe $30 million in charges. That will be offset by the premiums on the sale of the First Horizon branches. The bulk of that will be in the first quarter, because that's when those divestitures close. We'll have a little bit in November that offsets the charges. But we expect up to $40 million of net premium, they are offset by a little bit of severance and costs, whether we have yet to accrue it.

October 17, 2007 Conference Call Transcript.

**ANSWER:**

Paragraph 108 contains an incomplete quotation from the cited document and purports to characterize the cited written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 108 of the

Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

109.    Also, in this conference call, Bryan Jordan assured investors that FHN was on-top of monitoring its problem loans:

> All right, the thing I would add is that in terms of our risk rating, we have seen a little bit pressure on downward migration. We would expect that to continue in this part of the cycle. In some sense, the depth and severity of what we are seeing in the markets will continue to pull it down, if this persists. **And so, we are very actively monitoring it. And we have got a tremendous amount of resources dedicated to managing problem assets.**

Id. (emphasis added).

**ANSWER:**

Paragraph 109 contains an incomplete quotation from the cited document and purports to characterize the cited written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 109 of the Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

110.    Upon announcement of the third quarter results, First Horizon's share price dropped to $23.69 on October 18, 2007.

**ANSWER:**

Defendants admit that First Horizon stock closed at $23.69 per share on October 18, 2007.  Defendants deny the remaining allegations contained in Paragraph 110 of the Amended Complaint.

111.    On December 21, 2007, First Horizon announced that its mortgage business expected to lose money in the fourth quarter of 2007 and that it expected to set aside an additional $150 million in anticipation of unpaid loans, over 50% higher than what Defendant Jordan had estimated two months earlier. The loan loss provision for the fourth quarter exceeded

First Horizon's combined provision for the first three quarters of 2007. Many of these unpaid loans were a result of defaults from residential developers that borrowed money to buy properties in Florida, California, Virginia, Georgia and Nevada. The December 21, 2007 press release stated:

> Additional Loan Loss Reserves
>
> First Horizon recently completed a review of its reserve for loan losses and real estate portfolios, with an emphasis on higher-risk markets. As a result of that review, First Horizon expects to increase its reserves in the fourth quarter, with an anticipated total provision of approximately $150 million that should significantly exceed net charge-offs of roughly $50 million. The additional reserves are largely attributable to inherent losses within its residential construction portfolios – One-Time Close and Homebuilder – from discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada....
>
> Mortgage Segment Impacts
>
> First Horizon expects its mortgage segment to report a fourth quarter 2007 pre-tax loss. While based on preliminary estimates and subject to changing market conditions through the end of this quarter, this anticipated loss is driven by three areas:
>
> - Approximately $70 million of goodwill impairment resulting from updated valuation of the mortgage segment;
>
> - Volatility of mortgage rates and intra-mortgage spread widening since the beginning of December, which has
>
> - Potential adjustments to the carrying values of mortgage servicing and valuation of non-conforming products in light of current market conditions.

**ANSWER:**

Defendants admit that, on December 21, 2007, First Horizon announced that it expected its mortgage business to report a loss for the fourth quarter; that it anticipated an increase in its

reserves of approximately $150 million; and that it attributed the increase in reserves to inherent

losses in markets such as Florida, California, Virginia, Georgia and Nevada.  The remaining

allegations in Paragraph 111 of the Amended Complaint contain an incomplete quotation from

the cited document and purport to characterize the written document, the terms of which speak

for themselves and, therefore, no response is required.  To the extent a response is required,

defendants deny the allegations and characterizations contained in Paragraph 111 of the

Amended Complaint and refer to the complete document cited therein for the full contents and

context thereof.

112.    Throughout the fourth quarter of 2007, First Horizon's stock price continued to
drop, closing the year at $17.78 per share.

**ANSWER:**

Defendants admit that First Horizon's stock price declined in 2007.  Defendants deny the

remaining allegations contained in Paragraph 112 of the Amended Complaint.  By way of further

answer, defendants affirmatively state that on December 31, 2007, First Horizon stock closed at

$18.15 per share.

113.    On January 17, 2008, First Horizon announced a loss of $248.6 million or $1.97
per diluted share in the fourth quarter of 2007 compared to a net loss of $14.2 million or .11 per
diluted share in the third quarter of 2007 due to rising loan-loss reserves and a reduction in the
value of mortgage servicing rights. The Company also reduced its dividend by 56% to 20 cents
per share.

**ANSWER:**

Defendants admit that, on January 17, 2008, First Horizon announced a loss of $248.6

million ($1.97 per diluted share) in the fourth quarter of 2007, compared to a net loss of $14.2

million ($0.11 per diluted share) in the third quarter of 2007.  Defendants further admit that First

Horizon announced payment of a quarterly dividend of $0.20 per share.  Defendants deny the

remaining allegations contained in Paragraph 113 of the Amended Complaint.

114.    With respect to loan losses, First Horizon stated:

> The net charge-off ratio was 93 basis points in fourth quarter 2007 compared to 57 basis points in third quarter 2007 as net charge-offs increased to $50.8 million from $31.4 million in third quarter 2007. Provision for loan losses increased to $156.6 million in fourth quarter 2007 from $43.3 million in third quarter 2007. Provisioning for fourth quarter 2007 reflects recognition of inherent losses within residential construction portfolios, including One-Time Close and Homebuilder Finance, related to discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada. The nonperforming asset ratio increased to 166 basis points in fourth quarter 2007 from 113 basis points in third quarter 2007.

**ANSWER:**

Paragraph 114 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 114 of the Amended Complaint and refer to the complete document referenced therein for the full contents and context thereof.

115.    Supplemental materials contained in an 8-K filed the same day disclosed that the consumer real estate, homebuilder, and "One Time Close" portfolios contained concentrations of loans in California, Virginia and Florida. Loans issued in California comprised approximately 7.8 percent of total loans held by First Horizon. See 8-K filed January 17, 2008, p. 17.

**ANSWER:**

Paragraph 115 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 115 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

116.    In the January 17, 2008 press release, Defendant Baker is quoted as stating:

> Current market conditions require definitive management actions to adequately address the operating environment and to position the company for consistent revenue growth and greater return for our shareholders.... As such, we have acted in several key areas by increasing loan loss reserves, reducing our mortgage servicing assets and national lending businesses, implementing productivity enhancements, and selling or reducing low returning operations. In combination with our dividend reduction, these changes should improve our capital position in 2008 and allow us to make the proper investments that leverage the fundamental strength of our Tennessee banking franchise. ...
>
> We will continue to make further significant adjustments to our mortgage and related lending businesses, including pursuing strategic alternatives to further reduce our exposure to these areas.

**ANSWER:**

Paragraph 116 purports to characterize a written document and the statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 116 of the Amended Complaint and refer to the document and statements referenced therein for the full contents and context thereof.

117.    During all that bad news, First Horizon continued to make matches in Company Stock.

**ANSWER:**

Defendants admit that First Horizon made matching contributions to the Company Stock Fund in 2007 and 2008.  Defendants deny the remaining allegations contained in Paragraph 117 of the Amended Complaint.

118.    During a January 17, 2008 earnings conference call, First Horizon's Chief Financial Officer Bryan Jordan stated:

. . . As we disclosed in late December the additional reserves primarily reflect **higher inherent losses in segments of our national one time close and home builder portfolios, which together represent $4.1 billion or about 19% of our total loan portfolio.**

In Home Builder Finance we continue to see the greatest problems in weak national housing markets such as Florida, California, Arizona, Nevada, Virginia and Georgia. Where falling home prices are driving entire loss severities and where a large supplies of unsold homes are pressuring builders and consumers. **Florida and California alone represent about 22% of our total $2.1 billion builder portfolio but account for over 50% of our non-performers in this portfolio. Our one time close portfolio is also experiencing significant pressures in these national markets.**

4Q 2007 Investors Conference Call (emphasis added).

**ANSWER:**

Paragraph 118 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 118 of the Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

119.   That conference call continued:

**Fred Cannon – KBW**

Good morning. I wonder if you could walk us through a bit more on the one-time flows product, in particular. Essentially what went wrong on that product, in terms of the structure of it and the loss content you are seeing? **If I remember correctly, historically you have implied that you thought that was a fairly safe product and would perform like first mortgages; that isn't occurring. Now it sounds like it is performing more in line with the national homebuilder portfolio.**

Also, was there any kind of breakdown in your risk management regarding that product?

**Bryan Jordan**

The one-time close is a product, just to restate, is an individual construction loan for an individual borrower to build a home. It is often made in a scenario where the homebuilder is – it also includes a take-out into a permanent structure. The average loan size is about $435,000 or so.

The issues that we are seeing in the portfolio are largely driven by a couple of major factors. **In a lot of cases, the portfolio had an Alt-A structure or an Alt-A take-out. A lot of the problems that we are seeing today are in the products that we significantly curtailed in 2006 and into 2007.** For example, stated income product and other expanded approval products. We are seeing the greatest deterioration in those products. You have got the overall slowdown in the real estate markets driving the ability of buyers to sell the home they are in, move into this one; a number of different factors from the economy affecting it. The biggest drivers in general have been the difficulties in the real estate market and the unavailability of financing and the ability to sell some of those products.

**Fred Cannon – KBW**

So just on that note, so essentially the risk characteristic that created this issue were alt-A stated income issues? Secondly, you said that essentially you would make this loan to an individual while you still had another mortgage on another property, and then therefore it was essentially a second home loan to individuals and that was another risk characteristic?

**Bryan Jordan**

It wasn't always a second home loan. It was intended to be a first and that was part of the approval where you would sell the existing home, you would move the equity over. But clearly **a [stepped] product is more susceptible to misrepresentation and fraud.**

**Dave Miller**

Fred, those expanded guideline type of products also tended to be more for some of the higher-risk markets. So with the slowdown in some of those areas that sort of exacerbated the issue.

**Fred Cannon – KBW**

You are talking about my home state of California, I bet.

**Gerald L. Baker**

That would be one, Fred.

Id. (emphasis added).

**ANSWER:**

Paragraph 119 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 119 of the Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

120.    In addition to the previously announced winding down of the Homebuilder and One-Time Close product lines, the company announced that "[o]n the origination side, we have eliminated virtually all non-GSE eligible product originations..." Id. The company also noted in its supplemental 8-K filing on the same date that First Horizon had "tightened underwriting standards for one-time close and homebuilder finance products." 8-K, filed 1/17/2008, p. 4.

**ANSWER:**

Paragraph 120 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 120 of the

Amended Complaint and refer to the documents cited therein for the full contents and context thereof.

121.    On January 17, 2008, Standard & Poor's Ratings Services cut its long-term credit rating on First Horizon to "BBB+ " from "A-, " as well as the counterparty credit rating on its subsidiary, First Tennessee, to "A-/A-2 " from "A/A-1."

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 121 of the Amended Complaint.

122.    On January 28, 2008, First Horizon announced that it would pull out of national home building and commercial real estate lending everywhere except in Tennessee and a few other parts of the Southeast. David Flaum, "First Horizon Cuts Back Lending," Memphis Commercial Appeal (January 29, 2008).

**ANSWER:**

Paragraph 122 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 122 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

123.    Also in January 2008, First Horizon announced to investors that it was revamping its risk management and workout processes, including:

- Developing a more intensive "watch list" process;

- Enhancing risk grading protocols and training;

- Conducting comprehensive portfolio reviews;

- Deploying additional workout resources;

- Enhancing workout functions;

- Reviewing reserve models given recent history, conditions; and

- Refining certain loss probabilities and severities.

January 30, 2008 Citigroup 2008 Financial Services Conference, p. 17 (emphasis added).

**ANSWER:**

Paragraph 123 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 123 of the Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

124. Within months, First Horizon substantially increased the number of employees dedicated to workouts. For example, in C&I and Commercial Real Estate, First Horizon increased the number of full-time employees from 12 to 33 and the number of workout officers from 7 to 2 With respect to "One Time Close" workouts, First Horizon expanded staff from 7 to 30 full-time employees. First Horizon Analyst Packet, Third Quarter 2008.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 124 of the Amended Complaint.

125. On March 3, 2008, Moody's Investors Services downgraded First Horizon based on concerns about its exposure to commercial real estate.

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 125 of the Amended Complaint.

126. On March 10, 2008, Fitch Ratings gave a negative outlook to First Horizon due to "continuing weakness in FHN's construction lending portfolio and rising non-performing assets in homebuilder finance portfolio and construction loans made directly to consumers for single family loans, which comprise approximately 20% of total loans."

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 126 of the Amended Complaint.

127. On March 20, 2008 JPMorgan Securities Inc. downgraded First Horizon shares to "Neutral" citing rapid deterioration of home equity loans as a major short-term risk. In a note to

clients, analyst Steven Alexopoulos pointed to evidence that loan losses for the industry are rapidly spreading from residential construction loans to home equity loans:

> "A weakening economy and declines in home prices are the two ingredients that tend to drive mounting home equity losses," he said. "Listening to what bank managements have said during the quarter, it appears to us that all of the pieces are in place for the industry to see meaningful deterioration in home equity loans in the first quarter." ...

> First Horizon is especially at risk, as 18 percent of the Memphis, Tenn.-based bank's loans are home equity products, Alexopoulos noted.

"JPMorgan downgrades First Horizon," Associated Press, March 20, 2008

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 127 of the Amended Complaint.

128.   On April 1, 2008, Morgan Stanley initiated coverage of First Horizon with "underweight" – that it will perform below its peers in the industry over the next 12 to 19 months.

**ANSWER:**

Defendants admit that Morgan Stanley rated First Horizon stock as "underweight" on April 1, 2008.  Defendants deny the remaining allegations contained in Paragraph 128 of the Amended Complaint.

129.   On April 28, 2008, First Horizon announced that it would no longer pay its dividend in cash, but would make it instead in shares of common stock, and that it was issuing up to $600 million in new shares priced at $10.00 per share, thereby diluting its existing shares of common stock. April 28, 2008 Press Release; April 29, 2008 Press Release.

**ANSWER:**

Paragraph 129 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required,

defendants deny the allegations and characterizations contained in Paragraph 129 of the Amended Complaint and refer to the documents cited therein for the full contents and context thereof.

130.    First Horizon's Allowance for Loan Losses more than doubled from $229,919,000 as of June 30, 2007 to $575,149,000 as of June 30, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 130 of the Amended Complaint.

131.    First Horizon's Impaired Loans increased from $9,993,000 on December 31, 2006 to $50,761,000 on June 30, 2007 to $372,494,000 on June 30, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 131 of the Amended Complaint.

132.    On May 21, 2008, First Horizon's share price declined more than 6 percent after a troubled California bank, Vineyard National Bancorp, revealed in a regulatory filing that it owed $53.3 million on a credit line for which First Horizon was the lead bank in the consortium that made the loan.

**ANSWER:**

Defendants admit that First Horizon's stock price declined and closed at $ 9.26 per share on May 21, 2008.  Defendants deny the remaining allegations contained in Paragraph 132 of the Amended Complaint.

133.    Other non-accrual loans increased from $89,747,000 on June 30, 2007 to $397,524,000 on June 30, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 133 of the Amended Complaint.

134.    First Horizon admits that in 2008 and fourth quarter 2007 it "conducted focused portfolio management activities to identify problem credits and to ensure appropriate provisioning and reserve levels." Plaintiffs believe and therefore aver that such focus should have been directed on First Horizon's provisioning and reserve levels as soon as it began its riskier practices – including increased use of subprime, Alt-A, nontraditional mortgages, ARMS, HELOCs, second-lien mortgages and construction loans to boost its lagging growth as mortgage lending became more competitive during the Class Period.

**ANSWER:**

Defendants admit that beginning in 2007, First Horizon "conducted focused portfolio management activities to identify problem credits and to reach appropriate provisioning and reserve levels." Defendants deny the remaining allegations contained in Paragraph 134 of the Amended Complaint.

135.    On or about June 4, 2008, First Horizon announced that it had agreed to sell its mortgage business outside of Tennessee to MetLife Bank for approximately $400 million. The deal includes First Horizon's 230 offices in its loan-origination business and its right to service $20 billion in mortgages. In addition, the agreement provides that MetLife will service $65 billion of first mortgages that First Horizon is retaining for now but will try to sell over the next few years. David Flaum, "First Horizon to Focus on State Business," Memphis Commercial Appeal, June 5, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 135 of the Amended Complaint.

136.    First Horizon estimated that it would take $50 million to $70 million in pre-tax charges related to both the MetLife deal and other expenses in the mortgage division. Id.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 136 of the Amended Complaint.

137.    First Horizon's sale of its national mortgage business and its January 2008 decision to discontinue home builder and commercial real estate lending through First Horizon Construction Lending offices were part of its decision to abandon its "Diversification Through National Expansion" strategy.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 137 of the Amended Complaint.

138.    Instead, First Horizon decided to pursue a new strategy of "Strong Regional Financial Services Company," which included reducing its mortgage exposure to its banking footprint and eliminating non-bank real estate lending. First Horizon Analyst Packet – Third Quarter 2008 (August 5, 2008), pp. 5-6.

**ANSWER:**

Paragraph 138 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 138 of the Amended Complaint and refer to the document cited therein for the full contents and context thereof.

139.    On July 14, 2008, First Horizon announced that it lost $19.1 million during the second quarter, compared to earnings of $22.1 million during the same quarter the previous year. The company also stated that it would set aside $220 million to cover loan losses, compared to $44.4 million a year earlier, and net charge-offs were $127.7 million during the second quarter. The company also reaffirmed that charge-offs for the year would be between $385 million and $485 million. "First "Horizon Swings to $19.1M Loss, CEO Plans to Retire," Associated Press, July 15, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 139 of the Amended Complaint.

140.    Throughout the class period, although it lowered underwriting standards, was becoming heavily involved in high-risk mortgage and home equity lending (including subprime and Alt-A loans) and in loans backed by undeveloped collateral (i.e., commercial construction loans, One Time Close loans), and was increasing its holdings of off-balance sheet assets, and although the housing boom was ending and the availability of credit was tightening, First Horizon did not fully account for its credit risks in setting loan loss provisions and reserves for the total outstanding loans reflected on its balance sheets, its off-balance sheet loan commitments, or the off-balance sheet securitizations for which it had recourse obligations. It was only until mid-2008 that First Horizon began to fully account for its credit risks in its loan reserves and charge-offs:

|  | 12/31/03 | 12/31/04 | 12/31/05 | 12/31/06 | 06/30/07 | 12/31/07 | 06/30/08 |
|---|---|---|---|---|---|---|---|
| **Allowance to total outstanding loans** | 1.15% | .96% | .92% | .98% | 1.03% | 1.55% | 2.59% |
| **Net charge-offs to average loans** | .54 | .27% | .20% | .26% | .41% | .60% | 2.35% |
| **Nonperforming assets to loans, foreclosed real estate** | .42% | .37% | .29% | .52% | .81% | 1.57% | 3.88% |

**ANSWER:**

Defendants admit the allegations contained in the table in Paragraph 140 of the Amended Complaint.   Defendants deny the remaining allegations contained in Paragraph 140 of the Amended Complaint.

141.    Also on July 14, 2008, First Horizon announced that CEO Jerry Baker would resign from the company effective August 31 and that he would be succeeded by CFO Bryan Jordan. David Flaum, "First Horizon Chief to Step Down," Memphis Commercial Appeal, July 15, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 141 of the Amended Complaint.

142.    On July 14, 2008, First Horizon's stock price hit a 12-year low when it dropped to $4.52 before closing at $5.04 per share.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 142 of the Amended Complaint.

143.    The close of First Horizon's stock at $5.04 meant that the stock was down over 72% for 2008, causing the Plan's holdings to further depreciate.

**ANSWER:**

Defendants admit that First Horizon's stock price closed at $5.04 per share on July 14, 2008.  Defendants deny the remaining allegations contained in Paragraph 143 of the Amended Complaint.

144.    On July 31, 2008, First Horizon announced that its Emerging National Business division would be discontinued and that it was terminating employment of the division's president, Defendant Sarah Meyerrose. David Flaum, "Veteran Exec Departs at FHN," Memphis Commercial Appeal, August 1, 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 144 of the Amended Complaint.

145.    On September 2, 2008, First Horizon executives announced that they expect that as a result of "persisting market weakness and their ongoing efforts to aggressively address

problem loans", First Horizon's latest projections indicate that 2008 full-year net charge offs could be approximately $100 million above the range announced in July 2008.

**ANSWER:**

Defendants admit the allegations contained in Paragraph 145 of the Amended Complaint.

146.   The following day Standard & Poor's cut First Horizon's long-term counterparty ratings one notch to BBB, two notches above junk status. It also reduced the counterparty credit rating on First Tennessee Bank N.A. Memphis one notch to BBB+/A-2. "S&P Cuts Ratings on National City, First Horizon National," wsj.com (September 3, 2008).

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the

allegations contained in Paragraph 146 of the Amended Complaint.

147.   Standard & Poor's also pointed out that First Horizon has seen credit deterioration at its retail bank and "we expect nonperforming assets and net charge-offs to remain high through the rest of 2008. " Id.

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to the truth of the

allegations contained in Paragraph 147 of the Amended Complaint.

148.   Plaintiffs contend that First Horizon, First Tennessee, Director Defendants, the Investment Committee, and members of the Investment Committee, the Administrative Committee and its members, and other fiduciaries knew or should have known of these problems with First Horizon's failure to manage and accurately report on its books these growing financial problems and knew or should have known that the price of First Horizon's stock was inflated until full and complete disclosure of the problems occurred.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 148 of the Amended Complaint.

## VI.   THE LAW UNDER ERISA

149.   **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and ... for the

exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; ... and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

**ANSWER:**

Paragraph 149 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 149 of the Amended Complaint and refer to the statute cited therein for the full contents and context thereof.

150.   **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries...."

**ANSWER:**

Paragraph 150 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 150 of the Amended Complaint and refer to the statute cited therein for the full contents and context thereof.

151.   The duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly if they occur. A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the fiduciaries themselves or plan sponsor.

**ANSWER:**

Paragraph 151 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 151 of the Amended Complaint.

152.   **The Duty of Prudence.** ERISA imposes on a plan fiduciary the duty of prudence, that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...." .

**ANSWER:**

Paragraph 152 contains conclusions of law, to which no response is required.  To the

extent a response is required, defendants deny the allegations contained in Paragraph 152 of the

Amended Complaint and refer to the statute cited therein for the full contents and context

thereof.

153.   **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (1) a duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. The duties to disclose and inform recognize that a disparity may exist -- and in this case did exist -- between the training and knowledge of fiduciaries, on the one hand, and of participants, on the other.

**ANSWER:**

Paragraph 153 contains conclusions of law, to which no response is required.  To the

extent a response is required, defendants deny the allegations contained in Paragraph 153 of the

Amended Complaint.

154.   **The Duty to Investigate and Monitor Investment Alternatives**. For pension plans such as this one, the duties of loyalty and prudence entail a duty to independently investigate and continually monitor the merits of the investments offered by or in which Plan assets are invested, including the merits of offering and investing in employer securities, to ensure that each investment is a suitable investment for the plan.

**ANSWER:**

Paragraph 154 contains conclusions of law, to which no response is required.  To the

extent a response is required, defendants deny the allegations contained in Paragraph 154 of the

Amended Complaint.

155.    **The Duty to Monitor Appointed Fiduciaries.** Fiduciaries who have the responsibility for appointing other fiduciaries have a concomitant duty to monitor the fiduciaries they appoint. The duty to monitor entails giving information to, and reviewing the performance of, the appointed fiduciaries. For defined contribution plans such as the Plan, monitoring fiduciaries must ensure that appointed fiduciaries:

a.    Possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

b.    Are knowledgeable about Plan operations and goals, and the behavior and characteristics of Plan participants;

c.    Select investment options for the Plan based on the prudence of the options for the Participants and not the fees to be generated by affiliates of the Plan's sponsor;

d.    Review the reasonableness of the fees charged to the Plan in relation to the services performed;

e.    Are provided with adequate financial resources to discharge their duties;

f.    Have adequate information to perform their duty of overseeing plan investments in employer stock;

g.    Have access to outside, impartial advisors when needed;

h.    Maintain adequate records which document information on which they based decisions and analysis of plan investment options; and

i.    Report regularly to monitoring fiduciaries.

Monitoring fiduciaries must then review, comprehend and approve the conduct of the hands-on fiduciaries they appointed.

**ANSWER:**

Paragraph 155 and its subparts (a) through (i) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 155 of the Amended Complaint and its subparts (a) through (i).

156.    **The Duty to Follow Plan Documents with Prudence.** A fiduciary may not avoid liability by rote reliance on the language of plan documents without considering its impact on his fiduciary duties. While the plan sponsor may specify the basic structure of a plan, within limits, the fiduciary may not blindly follow plan documents if it would lead to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

**ANSWER:**

Paragraph 156 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 156 of the Amended Complaint and refer to the statute cited therein for the full contents and context thereof.

157.    **404(c) Defense Inapplicable.** ERISA § 404(c), 29 U.S.C. § 1104(c), provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for the selection of imprudent investments for the plan. Before § 404(c) will apply, it must be shown that participants in fact exercised "independent control" over investment decisions within the meaning of 29 C.F.R. § 2550.404c-1.

**ANSWER:**

Paragraph 157 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 157 of the Amended Complaint and refer to the statute cited therein for the full contents and context thereof.  Defendants further deny that ERISA Section 404(c) is inapplicable in this case.

158.    As alleged, Defendants failed to provide participants with complete and accurate information regarding First Horizon Stock in the Plan; the financial condition of the Company; the facts surrounding the selection of the funds offered to participants; and the comparison of those funds to other funds that an independent fiduciary would have selected. The Department of Labor's § 404(c) regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant." Accordingly, § 404(c) does not apply here, and the Defendants remain liable for losses suffered by participants during the Class Period.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 158 of the Amended Complaint.

159.    In addition, § 404(c) does not apply to any losses resulting from any matching contributions which were automatically invested by the Defendants in the First Horizon Stock, since participants did not exercise independent or any control over those investments.

**ANSWER:**

Paragraph 159 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 159 of the Amended Complaint.

160.    Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely within Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief. After Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will to the extent necessary and appropriate amend their Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that support each of the following counts below.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 160 of the Amended Complaint.

## CLAIMS FOR RELIEF

## COUNT I

**Failure to Prudently and Loyally Manage The Plan's Investment in First Horizon Stock**

**(Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C. § 1104 by First Horizon, Director Defendants, the Investment Committee and its members, the Administrative Committee and its members, and other John Doe Defendants)**

161.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of the Complaint as if fully contained herein.

**ANSWER:**

Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 160 of the Amended Complaint as if contained herein in their entirety.

162.    At all relevant times, Defendants named in this Count acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and of the assets of the Plan.

**ANSWER:**

Paragraph 162 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 162 of the Amended Complaint.

163.   By at least January 1, 2006, First Horizon, the Director Defendants, the Investment Committee, the members of the Investment Committee, the Administrative Committee and members of the Administrative Committee, and others including John Does, knew or should have known that First Horizon Stock was not a suitable and appropriate investment for the Plan due to the Company's undisclosed exposure to losses due to the deteriorating quality of its loan portfolio, its dependence on securitization of subprime, Alt-A and other troubled loans, the problems in its residential construction and other loans, and its failure to adequately account for and report those problems including by not having adequate loan loss provisions and reserves.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 163 of the Amended Complaint.

164.   Notwithstanding this knowledge, Defendants named in this Count breached their fiduciary duties by, among other things, failing to review the appropriateness of First Horizon Stock as an investment fund for the Plan, requiring participants to invest in the Company Stock Fund in order to receive a matching contribution from the Company, automatically investing Company matching contributions in the Company Stock Fund, acquiring new shares of First Horizon Stock at artificially inflated prices, and concentrating more than 50% of the Plan's assets in First Horizon Stock despite the risks associated with such a concentration.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 164 of the Amended Complaint.

165.   Upon information and belief, Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, among other things: failing to engage independent fiduciaries that could make independent judgments regarding the Plan's investments in First Horizon Stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made First Horizon Stock an unsuitable investments for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and in each of these failures, by otherwise placing the Company's interests above those of the participants.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 165 of the Amended Complaint.

166.    As a direct and proximate result of these breaches of fiduciary obligations as alleged, the Plan, and indirectly Plaintiffs and other Plan participants and beneficiaries, have lost millions of dollars.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 166 of the Amended Complaint.

167.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 167 of the Amended Complaint.

## COUNT II

**Breach of Duties of Loyalty and Prudence by Causing the Plan to Invest in First Funds**

**(Violation of ERISA § 404, 29 U.S.C. § 1104 by Defendants First Horizon, First Tennessee, Director Defendants, the Investment Committee and its members, Highland Capital; Martin & Company, and John Doe Defendants)**

168.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully contained herein.

**ANSWER:**

Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 168 of the Amended Complaint as if contained herein in their entirety.

169.    At all relevant times, these Count II Defendants named herein acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

**ANSWER:**

Paragraph 169 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 169 of the Amended Complaint.

170.    These Count II Defendants, by their actions and omissions in authorizing or causing the Plan to invest in First Funds, to purchase products and services from First Horizon

subsidiaries and affiliates, and to pay investment management and other fees in connection therewith to First Horizon subsidiaries and affiliates, put First Horizon's financial interests ahead of the Plan's interests. In doing so, Count II Defendants breached their duties of prudence and loyalty to the Plan under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

**ANSWER:**

Defendants deny the allegations contained in Paragraph 170 of the Amended Complaint.

171.   As a direct and proximate result of these breaches of duty, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost millions of dollars. Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a), Count II Defendants are liable to restore all losses suffered by the Plan caused by their breaches of fiduciary duty in the selection of funds for the Plan and investment of Plan assets.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 171 of the Amended Complaint.

## COUNT III

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C. § 1104 by all Defendants)

172.   Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully contained herein.

**ANSWER:**

Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 171 of the Amended Complaint as if contained herein in their entirety.

173.   At all relevant times, Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control in the management of the Plan and of Plan assets.

**ANSWER:**

Paragraph 173 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 173 of the Amended Complaint.

174.   Because investment in the Company Stock Fund was, by definition, not diversified, it carried an inherently high degree of risk. This risk made Defendants' duty to provide complete and accurate information particularly important for the Company Stock Fund and investments of Plan assets in First Horizon Stock.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 174 of the Amended Complaint.

175.   Defendants breached their duty to inform by failing to provide complete and accurate information regarding First Horizon Stock, the extent of the Company's exposure to losses in connection with the deteriorating quality of its residential construction loans and mortgages, the Company's artificial inflation of the value of the stock, and, generally, by conveying incomplete and inaccurate information about the soundness of First Horizon Stock and the Company Stock Fund as a retirement investment.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 175 of the Amended Complaint.

176.   All Defendants breached their duty to inform by failing to provide complete and accurate information regarding the financial benefits that First Horizon and its affiliates were receiving in connection with investing Plan assets in the First Funds, and the fact that the First Funds were selected by Plan fiduciaries because of the fees generated to First Horizon and its affiliates rather than through a prudent selection process.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 176 of the Amended Complaint.

177.   These actions and failures caused Plan participants and beneficiaries to make and maintain substantial investments in First Horizon Stock in the Company Stock Fund and in the First Funds at a time when Defendants knew or should have known that First Horizon Stock and the First Funds were not prudent investment options for the Plan or Plan participants.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 177 of the Amended Complaint.

178.   As a direct and proximate result of these breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and other participants and beneficiaries, have lost millions of dollars.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 178 of the Amended Complaint.

179.     Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of their fiduciary duties.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 179 of the Amended Complaint.

<u>COUNT IV</u>

**Failure to Monitor the Plan's Fiduciaries**

**(Breach of Fiduciary Duties in Violation of ERISA, 29 U.S.C. § 1104(a)(1) by First Horizon, First Tennessee, and the Director Defendants, and Against First Horizon Under Agency Principles)**

180.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully contained herein.

**ANSWER:**

Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 179 of the Amended Complaint as if contained herein in their entirety.

181.     At all relevant times, First Horizon, First Tennessee, and the Director Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), for the Plan because they were charged with, responsible for, and otherwise assumed the duty of, appointing, monitoring, and, when necessary, removing Plan fiduciaries, including but not limited to trustees, plan administrators, investment advisors, investment managers, and any other as yet unidentified First Horizon employees or agents to whom such duties were delegated.

**ANSWER:**

Paragraph 181 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 181 of the Amended Complaint.

182.     First Horizon and the Director Defendants breached their fiduciary duties by failing to adequately monitor the trustees, plan administrators, and other persons, if any, to whom management of Plan assets was delegated. These Defendants knew or should have known that the other fiduciaries were imprudently allowing the Plan to offer First Horizon Stock and the First Funds and investing plan assets in them when it was not prudent to do so. Despite this, they failed to take action to protect Plan participants from the failures of these other fiduciaries.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 182 of the Amended Complaint.

183.    The Defendant fiduciaries named in this Count, in discharging their monitoring and oversight duties, were required to disclose to other fiduciaries directly involved in investment of Plan assets accurate information about the financial condition and practices of the Company. By remaining silent and failing to provide such information to the other fiduciaries, these Defendants breached their monitoring duties under ERISA.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 183 of the Amended Complaint.

184.    In summary, Defendants named in this Count breached their monitoring duties by:

a.    failing to adequately monitor the investing fiduciaries' investment of Plan assets;

b.    failing to adequately monitor the Plan's other fiduciaries' implementation of Plan terms, including but not limited to investment of plan assets in First Horizon Stock and the First Funds;

c.    failing to disclose to the investing fiduciaries material facts about the financial condition and practices of the Company that Defendants named in this Count knew or should have known were material to loyal and prudent investment decisions about the Plan's acquisition and retention of First Horizon Stock in the Company Stock Fund and of the First Funds, and with respect to implementation of Plan terms; and

d.    failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 184 of the Amended Complaint.

185.    First Horizon is also liable for breaches of duty by the Director Defendants, the Committee Defendants, and other agents and employees including John Does for the losses caused by them, under the law of agency, including principles of vicarious liability and *respondeat superior*; and First Horizon is liable as indemnitor of these Defendants under corporate law and First Horizon's articles of incorporation and other documents of corporate governance.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 185 of the Amended Complaint.

186.    As a direct and proximate result of these breaches of fiduciary duties alleged, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, have suffered losses of millions of dollars.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 186 of the Amended Complaint.

187.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by the breaches of fiduciary duties by Defendants named in this Count.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 187 of the Amended Complaint.

## COUNT V

### Breach of Co-Fiduciary Duties

### (Breach of Co-Fiduciary Duties in Violation of ERISA § 405, 29 U.S.C. § 1105, by All Defendants)

188.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully contained herein.

**ANSWER:**

Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 187 of the Amended Complaint as if contained herein in their entirety.

189.    A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**ANSWER:**

Paragraph 189 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations in Paragraph 189 and refer to the statute cited therein for the full contents and context thereof..

190.   By virtue of all facts and events alleged herein, and at all relevant times, all Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a), 29 U.S.C. §1 104(a), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the breaches. Accordingly, Defendants are each liable for the others' violations pursuant to ERISA § 405(a)(2) and (3), 29 U.S.C. § 1105(a)(2) and (3).

**ANSWER:**

Defendants deny the allegations contained in Paragraph 190 of the Amended Complaint.

191.   First Horizon, First Tennessee, Highland Capital and Martin & Company are liable under Section 405 because, among other things, they knowingly participated in and/or concealed the breaches by the Investment Committee and its members of their duty of loyalty by investing Plan assets in the First Funds in order to generate financial benefits for themselves, rather than because such funds were prudent retirement investments for Plan participants.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 191 of the Amended Complaint.

192.   First Horizon and the Director Defendants are liable under Section 405 because their own fiduciary breaches in failing to appropriately monitor the fiduciaries they appointed, enabled appointed fiduciaries such as the Committee Defendants to breach their duties under ERISA by, among other things, continually selecting the Company Stock Fund and the First Funds as investment options for the Plan when it was imprudent or disloyal to do so.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 192 of the Amended Complaint.

193.    Further, all Defendants knew that the other Defendants had breached their duties under Section 404 by continuing to offer the Company Stock Fund and/or the First Funds as investment options, and to direct and approve investment of matching contributions in First Horizon Stock, when it was imprudent, disloyal and contrary to ERISA to do so, yet they failed to make reasonable efforts to remedy the situation.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 193 of the Amended Complaint.

194.    As a result of their breaches of Section 405 of ERISA, Defendants have caused the Plan to suffer financial losses for which they are jointly and severally liable, pursuant to Section 409 of ERISA.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 194 of the Amended Complaint.

## VII.    CLASS ACTION ALLEGATIONS

195.    Plaintiffs brings this class action on behalf of a Class defined as:

> Participants in and beneficiaries of the First Horizon National Corporation Savings Plan ("Plan"), excluding Defendants, whose accounts in the Plan were invested in First Horizon Stock between January 1, 2006 and July 14, 2008, and/or the First Funds on or after the date six years prior to the filing of the Complaint.

**ANSWER:**

Defendants admit that plaintiffs purport to bring this lawsuit as a class action, but deny

that class action treatment is appropriate for this lawsuit.

196.    Class certification is appropriate under Rule 23(b)(1)(A) & (B), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 196 of the Amended Complaint.

197.    The Class consists of more than 15,000 individuals and is so numerous that joinder of all members is impracticable.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 197 of the Amended Complaint.

198.    There are questions of law and fact common to the Class, which include:

a.    Whether all or some of Defendants are fiduciaries;

b.    Whether various of the Defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to offer the Company Stock Fund as an investment option given that Defendants knew or should have known that, because of First Horizon's undisclosed financial problems, purchases of the Stock were being made at inflated prices;

c.    Whether various of the Defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to make and maintain investments in First Horizon Stock at a time as it was not prudent to do so;

d.    Whether various of the Defendants failed to conduct a prudent investment selection process with respect to the First Funds to be offered by the Plan and instead selected First Funds because of their benefits to First Horizon and its affiliates;

e.    Whether various of the Defendants breached their fiduciary obligations to the Plan and participants by providing incomplete and inaccurate information to participants, and by preventing participants from exercising "independent control" over investments in the Company Stock Fund as a result;

f.    Whether the Company and the Director Defendants breached their fiduciary obligations to the Plan and participants by failing to prudently monitor the investment selection procedures and other activities of the Plan's other fiduciaries, including the administration of the Plan, such that the interests of the Plan and Plan participants were not adequately protected and served;

g.    Whether all of the Defendants, by failing to comply with their specific fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled and/or caused their co-fiduciaries to violate of ERISA and, despite knowledge of such breaches, failed to make reasonable efforts to remedy them, and are each liable for the others' violations pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a).

h.    Whether as a result of fiduciary breaches by the Defendants, the Plan, participants and beneficiaries have suffered losses.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 198 of the Amended Complaint.

199.    Plaintiffs' claims are typical of the Class.

**ANSWER:**

Defendants deny the allegations contained in Paragraph 199 of the Amended Complaint.

200.    Plaintiffs will fairly and adequately protect the interests of the Class. They have no interest that is antagonistic to or in conflict with the interest of the Class as a whole, and they have engaged competent counsel experienced in class actions and ERISA actions of this nature.

**ANSWER:**

Defendants lack information or knowledge sufficient to form a belief as to plaintiffs'

counsel's qualifications, experience or knowledge.  Defendants deny the remaining allegations

contained in Paragraph 200 of the Amended Complaint.

201.    This action is properly maintainable as a class action for the following independent reasons and under these portions of Rule 23:

a.    Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications which would establish incompatible standards of conduct for Defendants with respect to their obligations under the Plan. Fed. R. Civ. P. 23(b)(1)(A).

b.    The prosecution of separate actions by members of the Class would create a risk of adjudications for individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Fed.R.Civ.P. 23(b)(2).

d.    Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3).

**ANSWER:**

Defendants deny the allegations contained in Paragraph 201 of the Amended Complaint.

## PRAYER FOR RELIEF

Defendants deny that this case is properly certifiable as a class action and deny that plaintiffs are entitled to any of the relief contained in the Amended Complaint or its Prayer for Relief.

## DEFENDANTS' SPECIFIC DEFENSES

### FIRST DEFENSE

Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

### THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent they seek monetary damages.

### FOURTH DEFENSE

Plaintiffs' claims are barred because the plaintiffs exercised independent control over their plan accounts.

### FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by application of ERISA § 404(c), 29 U.S.C. § 1104(c).

### SIXTH DEFENSE

Neither plaintiffs or the Plan, nor anyone else suffered a loss as a result of the actions or inactions of the defendants.

## SEVENTH DEFENSE

One or more of the defendants are not fiduciaries within the meaning of ERISA § 3(21)(A).  Therefore, to the extent that plaintiffs' claims are premised on the fiduciary status of the defendants, these claims are barred against all defendants who are not fiduciaries of the Plans.

## EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole are in part, by the principle of laches.

## NINTH DEFENSE

The claims of any plaintiff or putative class member who has executed a waiver or release of claims against any or all of the defendants are barred.

## TENTH DEFENSE

The fees associated with the Plan are not excessive or unreasonable and have been properly disclosed.

## ELEVENTH DEFENSE

Plaintiffs are not entitled to a jury trial.

## TWELFTH DEFENSE

All disclosures provided to plaintiffs are fully compliant with applicable law and plaintiffs have not relied to their detriment on any such disclosures.

## THIRTEENTH DEFENSE

Plaintiffs cannot meet the requirements of Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure.

## FOURTEENTH DEFENSE

At all relevant times, the Plan's investments in the Company Stock Fund and the First Funds, and defendants' conduct, have been substantively and procedurally prudent.

WHEREFORE, defendants respectfully request that judgment be entered in their favor, that plaintiffs' Amended Complaint be dismissed with prejudice, that plaintiffs be denied any remedy or relief, and that defendants be awarded any costs of this action, their attorneys' fees, and such other relief as the Court deems appropriate

Respectfully submitted,

First Horizon National Corporation, et al.

s/ Charles C. Jackson
Counsel for Defendants

R. Mark Glover
Baker Donelson
165 Madison Avenue
First Tennessee Building
Memphis, Tennessee  38103
Tel:  (901) 577-2222
Email:  mglover@bakerdonelson.com

*Local Counsel for Defendants*

Charles C. Jackson (*pro hac vice*)
Sari M. Alamuddin (*pro hac vice*)
Thomas F. Hurka (*pro hac vice*)
Christopher J. Boran (*pro hac vice*)
John W. Drury (*pro hac vice*)
Morgan, Lewis & Bockius, LLP
77 West Wacker Drive, 5th Floor
Chicago, IL  60601
Tel:  (312) 324-1000
Email:  charles.jackson@morganlewis.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on November 16, 2009, a true and correct copy of the foregoing document was served by electronic means through the Court's ECF System to:

Ellen M. Doyle, edoyle@stemberfeinstein.com
William T. Payne, wpayne@stemberfeinstein.com
John Stember, jstember@stemberfeinstein.com
Stephen M. Pincus, spincus@stemberfeinstein.com
Joel R. Hurt, jhurt@stemberfeinstein.com

Stember Feinstein Doyle & Payne, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
*Attorneys for Plaintiff*

Signed:  <u>/s Thomas F. Hurka</u>