**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| JOHN YOST, KATHLEEN A. BRENNAN, and GERALD L. SANDERS, individually, and on behalf of all others similarly situated, | No.  2:08-CV-02293 |
| Plaintiffs | Judge S. Thomas Anderson |
| v. | |
| FIRST HORIZON NATIONAL CORPORATION, et al., | |
| Defendants | |

**DEFENDANTS' ANSWER AND DEFENSES TO
PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

## I.   INTRODUCTION

Plaintiffs John Yost, Kathleen A. Brennan, and Gerald L. Sanders bring this action, individually and on behalf of all others similarly situated, to recover losses to the First Horizon National Corporation Savings Plan ("Plan").  Class Members work or worked for First Horizon National Corporation ("First Horizon" or the "Company") or affiliated companies and are Plan participants (and their beneficiaries) for whose account Plan fiduciaries acquired or held shares of First Horizon common stock ("First Horizon Stock") from January 1, 2006 to July 14, 2008 ("First Horizon Stock Claims Period"), and/or for whose account Plan fiduciaries acquired or held First Horizon's proprietary mutual funds ("First Funds") between May 9, 2002 through June 5, 2006 ("First Funds Claims Period").

From May 9, 2002 through June 5, 2006, the Plan's fiduciaries maintained investment offerings in the First Funds for which a division of Defendant First Tennessee Bank, N.A. was the investment advisor, even though most of those funds under-performed their peers.  Plan fiduciaries did not select the First Funds because they were prudent retirement investments, but rather because offering such funds generated fees to First Horizon and its affiliates, and helped maintain the viability of the funds.

In addition, the Plan's largest investment at all times has been in the First Horizon Common Stock Fund ("Company Stock Fund").  As of December 31, 2005, more than 50% of the Plan's net assets available for benefits – $317,598,814 – was invested in First Horizon Stock. Such a large percentage of Plan assets were concentrated in First Horizon Stock because not only did the Company invest matching contributions in the Company Stock Fund – it **required** participants to invest in the Company Stock Fund and First Horizon Stock in order to receive the match.

The Company Stock Fund was an imprudent retirement investment from at least January 1, 2006 through July 14, 2008 because First Horizon had assumed massive new risks of default and loss through its banking practices in an effort to fuel national growth, because the Company lacked the credit review, audit, or accounting infrastructure to adequately identify and manage those risks, and because First Horizon was not fairly and accurately disclosing the risks and likely consequences of a number of its banking practices, such that the Plan was purchasing shares of First Horizon Stock at an inflated price.  Among items that were not disclosed to participants were the risks related to the lowering of its underwriting standards; the scope and circumstances of its involvement with subprime, Alt-A, second-lien loans (*i.e.*, home equity loans), and "One Time Close" home building loans; its growing dependence on real estate construction loans fueled by the increase in subprime mortgages; problems with its accounting for loan losses and loan reserves which did not reflect its higher risk business plan; and its increasing use of off-balance sheet transactions and proprietary securitizations of loans which did not comply with government-sponsored entity ("GSE") conforming mortgage guidelines.  Whereas shares of First Horizon Stock traded at $38.44 per share on December 30, 2005, shares closed at $10.99 on April 28, 2008, when First Horizon announced that it was ending its cash dividend and issuing new shares to raise $600 million of capital.  On July 14, 2008, First Horizon stock hit a 12-year low when it dropped to $4.52 before closing at $5.04 per share.

Thus, as a result of Defendants' fiduciary breaches, the Plan suffered enormous losses on its investment in First Horizon Stock.

**ANSWER:** The "Introduction" to plaintiffs' Second Amended Complaint contains general background information and conclusions of law and purports to characterize the Second Amended Complaint, the allegations of which speak for themselves.  Therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations in the "Introduction" and refer to defendants' answers to the numbered allegations contained in plaintiffs' Second Amended Complaint.

## II.   NATURE OF ACTION

1.      This class action asserts claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), to recover losses to the Plan arising from (i) the selection of First Horizon's proprietary First Funds as investment options for the Plan without employing a prudent selection process untainted by conflict, and (ii) the acquisition and continued investment of Plan assets in First Horizon Stock when Plan fiduciaries knew or should have known that material information about the Company's financial problems had not been disclosed or had been inadequately disclosed.  Plaintiffs further seek additional equitable relief to the extent that it is needed to protect the interests of Plan participants and beneficiaries.  Once these losses are restored to the Plan, Plaintiffs request that the amounts restored be distributed among the class members'

current and prior accounts to remedy the harms alleged, in a manner that the Court deems proper and equitable.

ANSWER:   Defendants admit that plaintiffs purport to bring this action under the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, but deny that

defendants breached any duties under ERISA or any other statute or law, or that plaintiffs are

entitled to any relief whatsoever.   Defendants deny the remaining allegations contained in

Paragraph 1 of the Second Amended Complaint.

2.      Defendants were or are ERISA fiduciaries of the Plan during the two Claims Periods, whose responsibilities included, inter alia, selecting and monitoring the investments offered to participants, prudent investment of Plan assets, and/or providing participants with complete and accurate information as to the risks of each investment.  As more fully described below, Defendants were obligated to comply with ERISA-imposed fiduciary duties to act prudently and in the sole interest of the Plan and its participants and beneficiaries.

ANSWER:   Paragraph 2 contains conclusions of law and purports to characterize the

Second Amended Complaint, the allegations of which speak for themselves and, therefore, no

response is required.   To the extent a response is required, defendants deny the allegations

contained in Paragraph 2 of the Second Amended Complaint.

3.      Defendants breached their fiduciary duties: (i) by causing participants' retirement savings to be invested in First Horizon Stock when doing so was imprudent because of the Company's increased exposure to losses from subprime and Alt-A mortgages, adjusted rate and interest only loans, residential construction loans, residential retail loans, and other problem lending, and its grossly inadequate credit risk, audit, and accounting infrastructure that rendered it unable to adequately manage risk to the business or comply with regulatory guidance; (ii) by, until early in 2006, selecting and investing in First Funds because these funds generated fees for First Horizon and its affiliates, rather than as a result of a prudent selection process; and (iii) by failing to provide complete and accurate information to participants regarding the Company Stock Fund and the First Funds as investment options for participants' retirement savings.[1]

ANSWER:   Defendants deny the allegations contained in Paragraph 3 of the Second

Amended Complaint.

---

[1]      In an abundance of caution to ensure that they do not lose any appeal rights, Plaintiffs retain Count III and associated allegations in this Proposed Second Amended Complaint.  The Court previously dismissed Count III, Plaintiffs' claim that Defendants breached their fiduciary duties by failing to provide complete and accurate information to participants and beneficiaries.

4.     This action is brought to recover millions of dollars in losses to the Plan which Plaintiffs allege were caused by Defendants' fiduciary breaches.

ANSWER:  Defendants deny the allegations contained in Paragraph 4 of the Second Amended Complaint.

### III.     JURISDICTION AND VENUE

5.     This action is brought pursuant to the civil enforcement provisions of ERISA § 502, 29 U.S.C. § 1132.  The Court has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) as well as 28 U.S.C. § 1331.

ANSWER:  Paragraph 5 contains conclusions of law and, therefore, no response is required.  To the extent a response is required, defendants admit that plaintiffs purport to bring this action under the civil enforcement provisions of ERISA, § 502, 29 U.S.C. § 1132, and that the Court has subject matter jurisdiction over this action.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 5 of the Second Amended Complaint.

6.     ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process.  As all Defendants are residents of the United States, this Court has personal jurisdiction over them.

ANSWER:  Paragraph 6 contains conclusions of law as to which no response is required.  To the extent a response is required, defendants admit that the Court has personal jurisdiction over defendants.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 6 of the Second Amended Complaint.

7.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1 132(e)(2), since Defendant First Horizon has its headquarters in Memphis, Tennessee; and since many of the fiduciary breaches for which relief is sought are believed to have occurred in this District.  Venue is also proper in this District under 28 U.S.C. § 1391(b) & (c) because some Defendants reside in, have principal executive offices in, and/or regularly do business in, this District.

ANSWER:  Paragraph 7 contains conclusions of law as to which no response is required.  To the extent a response is required, defendants admit that venue of this action is proper, that First Horizon's headquarters are located in Memphis, Tennessee, and that one or more

defendants have contacts in the District.  Defendants deny the remaining allegations contained in Paragraph 7 of the Second Amended Complaint.

## IV.   PARTIES

8.   **Plaintiff John Yost.**  John Yost is a resident of Rosenberg, Texas.  Mr. Yost was an employee of First Horizon from April 2006 through April 2008 and is a participant in the Plan.  His account was invested in the Company Stock Fund during the relevant periods.

<u>ANSWER</u>:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations as to the current residence of plaintiff John Yost.  Defendants admit that plaintiff Yost was employed by First Horizon from April 2006 through April 2008, that plaintiff Yost is a participant in the Plan, and that plaintiff Yost's account is invested in the Company Stock Fund.  Defendants deny the remaining allegations contained in Paragraph 8 of the Second Amended Complaint.

9.   **Plaintiff Kathleen A. Brennan.**   Kathleen A. Brennan is a resident of Millersville, Maryland.  She was an employee of First Horizon and its predecessors from 1982 through 2008, with a six month break in service, and is a participant in the Plan within the meaning of ERISA, including during the relevant periods.  Her account was invested in both the Company Stock Fund and in First Funds.

<u>ANSWER</u>:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations as to the current residence of plaintiff Kathleen A. Brennan.  Defendants admit that plaintiff Brennan was an employee of First Horizon, is a participant in the Plan, and that plaintiff Brennan's account was invested in the Company Stock Fund.  Defendants deny the remaining allegations contained in Paragraph 9 of the Second Amended Complaint.

10.   **Plaintiff Gerald L. Sanders.**  Gerald L. Sanders is a resident of Olive Branch, Mississippi.  He was an employee of First Horizon and its predecessors from 2001 through 2008 and is a participant in the Plan within the meaning of ERISA, including during the relevant periods.  His account was invested in both the Company Stock Fund and First Funds.

<u>ANSWER</u>:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations as to the current residence of plaintiff Gerald L. Sanders.  Defendants

admit that plaintiff Sanders was an employee of First Horizon, and that at various points during

the purported class period plaintiff Sanders' account was invested in the Company Stock Fund,

the First Funds Growth and Income Fund (later called the First Funds Core Equity Fund), the

First Funds Intermediate Bond Fund, the First Funds Capital Appreciation Fund, and the First

Fund U.S. Government Fund.  Defendants deny the remaining allegations contained in Paragraph

10 of the Second Amended Complaint.

11.     **Defendant First Horizon National Corporation.**  First Horizon is a national
financial services institution which at the time of the publication of its 2005 Annual Report had
13,000 employees; as of the publication of its 10-Q on May 6, 2010, it had only 5,500
employees.  First Horizon is a Tennessee corporation headquartered in Memphis.  First Horizon
is a fiduciary of the Plan because it exercised authority or control over the assets of the Plan and
exercised discretionary authority with respect to the management and administration of the Plan.

ANSWER:   Defendants admit that First Horizon is a national financial services

institution, that it is a Tennessee corporation, and that its headquarters are located in Memphis,

Tennessee.  The allegations in Paragraph 11 summarizing the 2005 Annual Report and May 6,

2010 10-Q purport to characterize a written document, the terms of which speak for themselves

and, therefore, no response is required.  To the extent a response is required, defendants deny the

characterizations contained second sentence of Paragraph 11.   The allegations in the third

sentence of Paragraph 11 contain legal conclusions to which no response is required.   To the

extent a response is required, defendants deny the allegations contained in the third sentence of

Paragraph 11.  Except as expressly admitted herein, Defendants deny the allegations contained in

Paragraph 11 of the Second Amended Complaint.

12.     **Defendant Members of First Horizon Board of Directors.**  The members of
First Horizon's Board of Directors (the "Board") are fiduciaries because they exercised
discretionary authority with respect to the management and administration of the Plan.   The
Director Defendants (named below) are persons who serve or served on the Board during the two
Claims Periods, and who knew or should have known about the facts and circumstances that
rendered First Horizon Stock an imprudent retirement investment for Plan assets.  The Director
Defendants appointed – and therefore had a fiduciary duty to monitor – the trustee for the Plan,
and the members of both the Retirement Investment Committee ("Investment Committee") and

the members of the Pension, Savings and Flexible Plan Committee ("Administrative Committee"). Moreover, the Director Defendants who were members of the Board's Compensation Committee specifically assumed the responsibility "to review the appropriateness of the issuance of Corporation common stock under the terms of the Savings Plan as required by resolutions of the Board as adopted from time to time." Specifically, the Director Defendants are:

a. **Defendant Gerald L. Baker** became President and Chief Executive Officer and a director of First Horizon and Defendant First Tennessee Bank, N.A. ("First Tennessee") on January 29, 2007. From November 2005 to January 29, 2007, Mr. Baker was Chief Operating Officer of First Horizon and First Tennessee. Prior to November 2005, Mr. Baker was Executive Vice President of First Horizon and First Tennessee, and served on the Credit Policy and Executive Committee of the Board until April 9, 2007. He also served as President – Mortgage Banking and President and Chief Executive Officer of First Horizon Home Loan Corporation ("FHHLC"), and was one of the architects and promoters of the FHHLC national strategy. He accordingly knew or should have known of the substantial problems within that portion of First Horizon's business. Mr. Baker also served on the Enterprise-wide Risk/Return Management Committee from 2004 until his resignation. Mr. Baker resigned as Chief Executive Officer of First Horizon and First Tennessee on August 31, 2008. Mr. Baker had a personal stake in inflating First Horizon's revenues in order to receive additional executive compensation. He was a Plan fiduciary during the Claims Period because he served on the Board.

b. **Defendant J. Kenneth Glass** was the President and Chief Executive Officer of First Horizon until January 29, 2007, and served on the Board from 1996 until April 2007. He was the Chair of the Credit Policy and Executive Committee. He also was a member of the Enterprise-wide Risk Return Management Committee during the period from 2004 until early 2007. Glass was the promoter of First Horizon's national strategy and had a personal stake in inflating First Horizon's revenues in order to receive additional executive compensation. He was a fiduciary of the Plan because he served on the Board.

c. **Defendant Simon F. Cooper** has been a director of First Horizon since 2005 but has recently resigned from the Board effective at the end of 2010. He serves on the Audit Committee. He is a fiduciary of the Plan because he serves on the Board.

d. **Defendant James A. Haslam, III** has been a director since 1996. Mr. Haslam currently serves on the Compensation Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

e. **Defendant Colin V. Reed** has been a director since April 2006. He serves on the Compensation Committee of the Board. He is a fiduciary of the Plan because he serves on the Board.

f. **Defendant Mary F. Sammons** was a director from 2003 through 2008. Ms. Sammons served on the Compensation Committee and the Nominating and Corporate Governance Committee of the Board, and she served on the Audit Committee of the Board until January 29, 2007. She was a fiduciary of the Plan because she served on the Board.

g.     **Defendant Robert B.Carter** was elected as a director of First Horizon in July 2007.  He serves on the Audit Committee and the Nominating and Corporate Governance Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

h.     **Defendant R. Brad Martin** has been a director since 1994.  Mr. Martin now chairs both the Executive Committee and Nominating and Corporate Governance Committee.  He also serves on the Compensation Committee and on the Board.  He is a fiduciary of the Plan because he serves on the Board.

i.     **Defendant Vicki R. Palmer** has been a director since 1993.  She serves as Chair of the Audit Committee and serves on the Executive Committee.  She is a fiduciary of the Plan because she serves on the Board.

j.     **Defendant William B. Sansom** has been a director since 1984.  He serves on the Credit Policy and Executive Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

k.     **Defendant Robert C. Blattberg** was a director from 1984 through November 2008.  He served as a member of the Compensation Committee and as Chairman of the Nominating and Corporate Governance Committee.  He was a fiduciary of the Plan because he served on the Board of First Horizon.

l.     **Defendant Michael D. Rose** has been a director since 1984.  He now serves as Chairman of the Board and of the Board of Directors of First Tennessee, and also serves on the Executive Committee; he also served on the Nominating and Corporate Governance Committee of the Board until January 29, 2007.  He is a fiduciary of the Plan because he serves on the Board of First Horizon.

m.     **Defendant Luke Yancy III** has been a director since 2001.  He serves on the Audit Committee of the Board.  He is a fiduciary of the Plan because he serves on the Board.

n.     **Defendant Jonathan P. Ward** served on the Board from 2003-2007. Defendant Ward served on the Compensation Committee and the Nominating and Corporate Governance Committee.  He is a fiduciary of the Plan because he served on the Board.

o.     **Defendant George E. Cates** served on the Board from 1996 until 2005. He is a fiduciary of the Plan because he served on the Board.

ANSWER:  Defendants admit that the alleged "Director Defendants" served on the First Horizon Board of Directors during the purported class period; that the Director Defendants appointed members of the Investment Committee and the Administrative Committee during the purported class period; and that the Director Defendants who served on the Compensation Committee were responsible, under the terms of the Compensation Committee Charter "to

8

review the appropriateness of the issuance of Corporation common stock under the terms of the Savings Plan as required by resolutions of the Board as adopted from time to time." Defendants deny the remaining allegations contained in Paragraph 12 of the Second Amended Complaint.

(a)     Defendants admit that Mr. Baker became President, Chief Executive Officer and a director of First Horizon and First Tennessee on January 29, 2007; that Mr. Baker was Chief Operating Officer of First Horizon and First Tennessee from November 2005 to January 29, 2007; that Mr. Baker was Executive Vice President of First Horizon and First Tennessee prior to November 2005; that Mr. Baker was President – Mortgage Banking and President and Chief Executive Officer of First Horizon Home Loan Corporation prior to January 2006; that Mr. Baker served on the Credit Policy and Executive Committee of the First Horizon Board until April 9, 2007; that Mr. Baker served on the Enterprise-wide Risk/Return management Committee from 2004 until his resignation; and that Mr. Baker resigned as Chief Executive Officer of First Horizon and First Tennessee on August 31, 2008.  The remaining allegations contained in Paragraph 12(a) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(a) of the Second Amended Complaint.

(b)     Defendants admit that Mr. Glass was the President and Chief Executive Officer of First Horizon from July 2002 until January 29, 2007; that Mr. Glass served on the First Horizon Board prior to the start of the purported class period until April 2007; that Mr. Glass served as the Chair of the Credit Policy and Executive Committee; and that Mr. Glass was a member of the Enterprise-wide Risk/Return Management Committee from 2004 until 2007.  The fifth sentence in Paragraph 12(b) contains conclusions of law, to which no response is required.  To the extent

a response is required, defendants deny the fifth sentence of Paragraph 12(b) of the Second Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 12(b).

(c)      Defendants admit that Mr. Cooper has served on the First Horizon Board since 2005; that Mr. Cooper serves on the Audit Committee; and that the Board of Directors has accepted Mr. Cooper's resignation from the Board effective December 31, 2010.  The remaining allegations in Paragraph 12(c) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(c) of the Second Amended Complaint.

(d)      Defendants admit that Mr. Haslam has served on the First Horizon Board since 1996, and that he currently serves on the Compensation Committee.  The remaining allegations in Paragraph 12(d) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(d) of the Second Amended Complaint.

(e)      Defendants admit that Mr. Reed has served on the First Horizon Board since April 2006, and that he currently serves on the Compensation Committee.  Defendants deny the remaining allegations contained in the first sentence of Paragraph 12(e) of the Second Amended Complaint.  The remaining allegations in Paragraph 12(e) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(e) of the Second Amended Complaint.

(f)      Defendants admit that Ms. Sammons served on the First Horizon Board from 2003 until November 21, 2008; that she served on the Compensation and Nominating and Corporate Governance Committees of the Board; and that she resigned from the Audit Committee of the Board on January 16, 2007.   The allegations in the fourth sentence of

Paragraph 12(f) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in the fourth sentence of Paragraph 12(f) of the Second Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 12(f) of the Second Amended Complaint.

(g)    Defendants admit that Mr. Carter has served on the First Horizon Board since July 2007, and that he currently serves on the Audit Committee and the Nominating and Corporate Governance Committee.  The remaining allegations in Paragraph 12(g) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(g) of the Second Amended Complaint.

(h)    Defendants admit that Mr. Martin has served on the First Horizon Board since 1994; that he currently chairs both the Executive & Risk Committee and the Nominating and Corporate Governance Committee of the Board; and that he is a member of the Compensation Committee of the Board.  The remaining allegations in Paragraph 12(h) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(h) of the Second Amended Complaint.

(i)    Defendants admit that Ms. Palmer has served on the First Horizon Board since 1993; that she serves as the Chair of the Audit Committee; and that she serves on the Executive & Risk Committee.  The remaining allegations in Paragraph 12(i) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 12(i) of the Second Amended Complaint.

(j)    Defendants admit that Mr. Sansom has served on the First Horizon Board since 1984.  Defendants deny that Mr. Sansom currently serves on the Credit Policy and Executive Committee.  Defendants affirmatively state that Mr. Sansom serves as a member of the

Executive & Risk Committee of the Board.  The remaining allegations in Paragraph 12(j) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(j) of the Second Amended Complaint.

(k)      Defendants admit that Mr. Blattberg served on the First Horizon Board from 1984 until November 21, 2008, and that he served on the Compensation Committee and as Chair of the Nominating and Corporate Governance Committee during his tenure on the Board.  The allegations in the third sentence of Paragraph 12(k) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in the third sentence of Paragraph 12(k) of the Second Amended Complaint. Defendants deny the remaining allegations contained in Paragraph 12(k) of the Second Amended Complaint.

(l)      Defendants admit that Mr. Rose has served on the First Horizon Board since 1984; that he currently serves of Chairman of the Board and of the Board of Directors of First Tennessee Bank; that he serves on the Executive & Risk Committee; and that he served on the Nominating and Corporate Governance Committee until 2007.  The remaining allegations in Paragraph 12(l) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(l) of the Second Amended Complaint.

(m)      Defendants admit that Mr. Yancy has served on the First Horizon Board since 2001, and that he currently serves on the Audit Committee.  The remaining allegations in Paragraph 12(m) contain conclusions of law, to which no response is required.  To the extent a

response is required, defendants deny the remaining allegations in Paragraph 12(m) of the Second Amended Complaint.

(n)     Defendants admit that Mr. Ward served on the First Horizon Board from 2003 to 2007, and that he served on the Compensation Committee and the Nominating and Corporate Governance Committee.  The remaining allegations in Paragraph 12(n) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(n) of the Second Amended Complaint.

(o)     Defendants admit that Mr. Cates served on the First Horizon Board from 1996 to 2005.  The remaining allegations in Paragraph 12(o) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 12(o) of the Second Amended Complaint.

13.     **Defendant First Tennessee Bank, N.A.** is the primary banking operating subsidiary of First Horizon.  It was or is a fiduciary of the Plan during the First Funds Claims Period because its division, First Tennessee Advisory Services, with offices at 530 Oak Court Drive, Memphis, TN 38117, served as an investment adviser to the First Funds in which the Plan invested.

ANSWER:  Defendants admit that First Tennessee Bank National Association is a banking operating subsidiary of First Horizon, that its offices are located in Memphis, Tennessee, and that it served as an investment adviser to the First Funds.  The remaining allegations in Paragraph 13 contain conclusions of law to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 13 of the Second Amended Complaint.

14.     **Defendant Highland Capital Management Corporation** ("Highland Capital"), with offices at 6077 Primacy Parkway, Memphis, TN 38119, was a fiduciary of the Plan during the First Funds Claims Period because it managed certain of the First Funds held by the Plan through early 2006.  Highland Capital was a wholly-owned subsidiary of First Horizon until early 2006.

ANSWER:  Defendants admit that Highland Capital is a wholly-owned subsidiary of First Horizon, that its offices are located in Memphis, Tennessee, and that it assisted in the management of the First Funds.  The remaining allegations in Paragraph 14 contain conclusions of law to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 14 of the Second Amended Complaint.

15.    **Defendant Martin & Company, Inc.** ("Martin & Company"), with offices at 165 Madison Avenue, Third Floor, Memphis, TN 38103, was a fiduciary of the Plan during the First Funds Claims Period because it managed certain of the First Funds held by the Plan through early 2006.  Martin & Company is a wholly-owned subsidiary of First Horizon.

ANSWER:  Defendants admit that Martin & Company is a wholly-owned subsidiary of First Horizon, that its offices are located in Memphis, Tennessee, and that it assisted in the management of the First Funds.  The remaining allegations in Paragraph 15 contain conclusions of law to which no response is required.  To the extent a response is required, defendants deny the remaining allegations contained in paragraph 15 of the Second Amended Complaint.

16.    **Defendant Retirement Investment Committee** ("Investment Committee") is a committee appointed by the Board with responsibility for the establishment of an investment policy for the Plan as well as the selection of funds and/or the securities or classes of securities in any particular fund.  According to Section 7.5 of the First Tennessee National Corporation Savings Plan and Trust, amended and restated effective September 1, 2003 ("2003 Plan ") the Investment Committee was to review the investments of the trust on a regular basis and no less often than annually; develop and communicate to the trustee an investment strategy appropriate to the purposes of the Plan; determine the strategic array of asset classes available under the trust; establish appropriate benchmarks for each asset class and at appropriate intervals evaluate the performance of the trustee and any investment managers against those benchmarks; and take other actions.  During the Claims Periods, the Investment Committee was comprised of the following members:

a.    **Defendant Thomas C. Adams, Jr.**, is the Executive Vice President, Chief Investment Office and Treasurer of First Horizon and First Tennessee.  He has served as a member of the Investment Committee since 2006 and is a fiduciary of the Plan by reason of his membership on the Investment Committee.

b.    **Defendant Rhomes Aur** is Executive Vice President, Wealth Management Services, of First Horizon and First Tennessee.  He has been a member of the Investment Committee from 2007 to the present and is a fiduciary of the Plan by reason of his membership on the Investment Committee.  Defendant Aur also served on the Administrative

Committee from 2002 to the present and was a fiduciary of the Plan because of his membership on the Administrative Committee during that time.

        c.      **Defendant Kenneth R. Bottoms** is the Senior Vice President and Manager –Total Rewards of First Horizon and First Tennessee.  He has been a member of the Investment Committee from some time in 2008 to the present and is a fiduciary of the Plan by reason of his membership on the Investment Committee.  He is also a fiduciary of the Plan because he has served on the Administrative Committee from 2004 to present.

        d.      **Defendant Charles G. Burkett** is the President for Tennessee and National Banking of First Horizon.  He served on the Enterprise-wide Risk/Return Management Committee in 2004.  He also serves on the Board of Highland Capital.  He was a member of the Investment Committee from 2003 to 2004 and thereby was a fiduciary of the Plan.

        e.      **Defendant John M. Daniel** is the Executive Vice President of Human Resources of First Horizon and First Tennessee.  He is a fiduciary of the Plan because he has been a member of the Investment Committee from 2007 to the present and has also been a member of the Administrative Committee from 2007 to the present.

        f.      **Defendant Ann Fite** is the Senior Vice President, Division Controller of First Horizon and First Tennessee.  She is a fiduciary of the Plan by reason of having been a member of the Investment Committee from some time in 2008 to the present.

        g.      **Defendant James F. Keen** is the Executive Vice President, Chief Accounting Officer of First Horizon who was a member of the Investment Committee in 2003 and was a fiduciary of the Plan because of his membership on the Investment Committee.

        h.      **Defendant Gerald Laurain** is the Senior Vice President, Chief Investment Officer of First Horizon and First Tennessee.  He is a fiduciary of the Plan because he has been a member of the Investment Committee from some time in 2008 to the present.

        i.      **Defendant Pete Makowiecki** was the President, Mortgage Banking for First Horizon Home Loan Corporation.  He served on the Enterprise-wide Risk/Return Management Committee in 2005-2008.  He was a fiduciary of the Plan because he served as a member of the Investment Committee from 2004 to 2007.

        j.      **Defendant Larry B. Martin** is the former Chief Operating Officer, First Tennessee Bank Financial Services Group, of First Horizon.  He served on the Enterprise-wide Risk Return Management Committee in 2004-2006.  He was a fiduciary of the Plan because he served on the Investment Committee from 2003 to 2006.

        k.      **Defendant Sarah Meyerrose** was President, Emerging National Businesses, and former Executive Vice President, Operations and Technology, of First Horizon and First Tennessee.  Ms. Meyerrose served on the Enterprise-wide Risk/Return Management Committee from 2004-2008.  She was a member of the Investment Committee from 2003 through 2008.  She was also a member of the Administrative Committee from 2002 until sometime in 2007.  She was a fiduciary of the Plan because she served on the Investment Committee and the Administrative Committee.

l.      **Defendant Marlin L. Mosby, III** is the former Executive Vice President and Chief Financial Officer of First Horizon and First Tennessee.  He served on the Enterprise-wide Risk/Return Management Committee from 2004-2007.  He was a fiduciary of the Plan because he was a member of the Investment Committee from 2003 to 2007.

m.      **Defendant Elbert L. Thomas, Jr.** is the former Executive Vice President and Chief Financial Officer of First Horizon.  He served on the Enterprise-wide Risk/Return Management Committee from 2004-2007.  He was a fiduciary of the Plan because he was a member of the Investment Committee from 2003 to 2008.

n.      **Defendant William E. Weaver, Jr.** was the Senior Executive Vice President, Chief Financial Official of First Horizon.  He was a fiduciary of the Plan because he was a member of the Investment Committee from 2007 until 2008.

ANSWER:   Defendants admit that, under the terms of the Plan, the Retirement Investment Committee ("RIC") "is granted full and unrestricted discretion in the selection of Funds as well as the particular securities, classes of securities, and levels of investment in any particular securities or classes of securities in any particular Fund."  The allegations in the second sentence of Paragraph 16 of the Second Amended Complaint purport to characterize the terms of a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations in the second sentence of Paragraph 16 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 16 of the Second Amended Complaint.

(a)      Defendants admit that Mr. Adams is the Executive Vice President, Chief Investment Officer and Treasurer of First Horizon, and that Mr. Adams has served on the Investment Committee since 2006.   The remaining allegations in Paragraph 16(a) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(a) of the Second Amended Complaint.

(b)      Defendants admit that Mr. Aur is the Executive Vice President, Wealth Management Services of First Horizon; that he has served on the Investment Committee since 2007; and that he has served on the Administrative Committee since 2002.  The remaining allegations in Paragraph 16(b) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(b) of the Second Amended Complaint.

(c)      Defendants admit that Mr. Bottoms is the Senior Vice President and Manager of Total Rewards of First Horizon; that he has served on the Investment Committee since 2008; and that he has served on the Administrative Committee since 2004.  The remaining allegations in Paragraph 16(c) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(c) of the Second Amended Complaint.

(d)      Defendants admit that Mr. Burkett is the President of Tennessee and National Banking of First Horizon; that he serves on the Board of Directors of Highland Capital; that he served on the Investment Committee from 2003 to 2004; and that he served on the Enterprise-wide Risk/Return Management Committee in 2004.  The remaining allegations in Paragraph 16(d) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(d) of the Second Amended Complaint.

(e)      Defendants admit that Mr. Daniel is the Executive Vice President of Human Resources of First Horizon, and that he has served on the Investment Committee and the Administrative Committee since 2007.  The remaining allegations in Paragraph 16(e) contain conclusions of law, to which no response is required.  To the extent a response is required,

defendants deny the remaining allegations in Paragraph 16(e) of the Second Amended Complaint.

(f)     Defendants admit that Ms. Fite is the Senior Vice President, Division Controller of First Horizon, and that she has served on the Investment Committee since 2008.  The remaining allegations in Paragraph 16(f) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(f) of the Second Amended Complaint.

(g)     Defendants admit that Mr. Keen is the Executive Vice President, Chief Accounting Officer of First Horizon, and that he served on the Investment Committee in 2003. The remaining allegations in Paragraph 16(g) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(g) of the Second Amended Complaint.

(h)     Defendants admit that Mr. Laurain is the Senior Vice President, Chief Investment Officer of First Horizon, and that he has served on the Investment Committee since 2008.  The remaining allegations in Paragraph 16(h) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(h) of the Second Amended Complaint.

(i)     Defendants admit that Mr. Makowiecki is the former President, Mortgage Banking for First Horizon Home Loan Corporation; that he served on the Enterprise-wide Risk/Return Management Committee from 2005 to 2008; and that he served on the Investment Committee from 2003 to 2006.   The remaining allegations in Paragraph 16(i) contain conclusions of law, to which no response is required.  To the extent a response is required,

defendants deny the remaining allegations in Paragraph 16(i) of the Second Amended Complaint.

(j)       Defendants admit that Mr. Martin is the former Chief Operating Officer, First Tennessee Bank Financial Services Group, of First Horizon; that he served on the Enterprise-wide Risk/Return Management Committee from 2004 to 2006; and that he served on the Investment Committee from 2003 to 2006.  The remaining allegations in Paragraph 16(j) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(j) of the Second Amended Complaint.

(k)       Defendants admit that Ms. Meyerrose is the former President, Emerging National Businesses and former Executive Vice President, Operations and Technology of First Horizon; that she served on the Enterprise-wide Risk/Return Management Committee from 2004 to 2008; that she was a member of the Administrative Committee from 2002 through February 2007, and that she served on the Investment Committee from 2003 until 2008.  To the extent a response is required, Defendants deny the remaining allegations contained in Paragraph 16(k) of the Second Amended Complaint.

(l)       Defendants admit that Mr. Mosby is the former Executive Vice President and Chief Financial Officer of First Horizon; that he served on the Enterprise-wide Risk/Return Management Committee from 2004 through 2007; and that he served on the Investment Committee from 2003 to 2007.   The remaining allegations in Paragraph 16(l) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(l) of the Second Amended Complaint.

(m)     Defendants admit that Mr. Thomas is the former Senior Executive Vice President and Chief Financial Officer of First Horizon; that he served on the Enterprise-wide Risk/Return Management Committee from 2004 to 2007; and that he served on the Investment Committee from 2003 to 2008.  The remaining allegations in Paragraph 16(m) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(m) of the Second Amended Complaint.

(n)     Defendants admit that Mr. Weaver is the former Senior Executive Vice President, Chief Financial Officer of First Horizon, and that he has served on the Investment Committee from 2007 to 2008.  The remaining allegations in Paragraph 16(n) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations in Paragraph 16(n) of the Second Amended Complaint.

17.     **Defendant Pension, Savings and Flexible Compensation Committee** ("Administrative Committee") is the administrator of the Plan according to the Plan's SEC Form 11-K for the fiscal year ending December 31, 2006, dated June 29, 2007.  In their Initial Disclosures, the defendants named in the original complaint referred to that Committee as the "Administrative Committee."  The Administrative Committee is a fiduciary of the Plan with responsibility for the operation and administration of the Plan, and for communications with the participants.  It is established under the Plan and appointed by First Horizon to administer the Plan.  According to Section 13.3 of the First Horizon National Corporation Savings Plan and Trust, as restated in 2007 (the "2007 Plan "), the Administrative Committee also had responsibility for giving directions to the trustee with respect to the investments within the ESOP portion of the Plan.  "All investments will be made by the Trustee only upon the direction of the Plan Administrator [*i.e.*, the Administrative Committee].  The Plan Administrator may direct that all Trust assets be invested and held in Employer Stock."   In addition to Defendants Aur, Bottoms and Daniels, the following individuals were members of the Administrative Committee during the Claims periods:

a.     **Defendant Robert E. Ellis** was Senior Vice President – Manager Financial Operations of First Horizon.  He was a fiduciary of the Plan because he was a member of the Administrative Committee between 2002 and 2007.

b.     **Defendant Alvenia Cunningham** is the Senior Vice President, Regional Sales, of First Horizon and First Tennessee.  She is a fiduciary of the Plan because she has been a member of the Administrative Committee from 2002 to present.

        c.     **Defendant Bruce Hopkins** is the Executive Vice President, Memphis Banking Group of First Horizon and First Tennessee.  He is a fiduciary of the Plan because he has been a member of the Administrative Committee from 2002 to the present.

        d.     **Defendant Karen Kruse** is the Senior Vice President Wealth Management, Product Development and Support for First Horizon and First Tennessee.  She is a fiduciary of the Plan because she has been a member of the Administrative Committee since some time in 2008.

        e.     **Defendant Deborah McDonald** was the Senior Vice President and Manager of Wealth Management Services, of First Horizon and First Tennessee.  She was a fiduciary of the Plan because she was a member of the Administrative Committee between 2002 and 2007.

        f.     **Defendant Sandy Ragland** is the Vice President, Trust, of First Horizon and First Tennessee.  She is a fiduciary of the Plan because she has served on the Administrative Committee from 2008 to the present.

        g.     **Defendant Karen Sones** is the Senior Vice President, Manager, Operations & Systems of First Horizon and First Tennessee.  She is a fiduciary of the Plan because she has been a member of the Administrative Committee from 2002 to the present.

        h.     **Defendant Will Taylor** works for First Horizon Insurance Group, Inc.  He is a fiduciary of the Plan because he has served from 2004 to the present on the Administrative Committee.

        i.     **Defendant Bonnie Zoccola** is the former Vice President, Accounting, of First Horizon.  He was a fiduciary of the Plan because he served as a member of the Administrative Committee between 2002 and 2003.

ANSWER:  Defendants admit that, under the Plan, the Pension, Savings and Flexible Compensation Committee's responsibilities include "interpret[ing] and constru[ing] the provisions of the Plan . . . and, in general, to direct the administration of the Plan."  Defendants further admit that their Initial Disclosures refer to the Pension, Savings and Flexible Compensation Committee as the "Administrative Committee."   The third sentence in Paragraph 17 of the Second Amended Complaint contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations in Paragraph 17 of the Second Amended Complaint.  The remaining allegations in Paragraph 17 purport to characterize a written document, the terms of which speak for themselves and, therefore, no

response is required to the remaining allegations in Paragraph 17.  To the extent a response is required, defendants deny the remaining allegations and characterizations in Paragraph 17 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

(a)     Defendants admit that Mr. Ellis is the former Senior Vice President, Manager of Financial Operations of First Horizon, and that he served on the Administrative Committee between 2002 and 2007.  The remaining allegations in Paragraph 17(a) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(a) of the Second Amended Complaint.

(b)     Defendants admit that Ms. Cunningham is Senior Vice President, Regional Sales, of First Horizon, and that she has served on the Administrative Committee since 2002.  The remaining allegations in Paragraph 17(b) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(b) of the Second Amended Complaint.

(c)     Defendants admit that Mr. Hopkins is the Executive Vice President, Memphis Banking Group of First Horizon, and that he has served on the Administrative Committee since 2002.  The remaining allegations in Paragraph 17(c) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(c) of the Second Amended Complaint.

(d)     Defendants admit that Ms. Kruse is the Senior Vice President Wealth Management, Product Development and Support of First Horizon, and that she has served on the Administrative Committee since 2008.  The remaining allegations in Paragraph 17(d) contain conclusions of law, to which no response is required.  To the extent a response is required,

defendants deny the remaining allegations in Paragraph 17(d) of the Second Amended Complaint.

(e)      Defendants admit that Ms. McDonald is the Senior Vice President and Manager of Wealth Management Services of First Horizon, and that she served on the Administrative Committee between 2002 and 2007.   The remaining allegations in Paragraph 17(e) contain conclusions of law, to which no response is required.   To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(e) of the Second Amended Complaint.

(f)      Defendants admit that Ms. Ragland is the Vice President, Trust, of First Horizon, and that she has served on the Administrative Committee since 2008.  The remaining allegations in Paragraph 17(f) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(f) of the Second Amended Complaint.

(g)      Defendants admit that Ms. Sones has served on the Administrative Committee since 2002.  The allegations in the second sentence of Paragraph 17(g) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations in the second sentence of Paragraph 17(g).   Defendants deny the remaining allegations contained in Paragraph 17(g) of the Second Amended Complaint.

(h)      Defendants admit that Mr. Taylor works for First Horizon Insurance Group, Inc., and that he has served on the Administrative Committee since 2004.  The remaining allegations in Paragraph 17(h) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(h) of the Second Amended Complaint.

(i)      Defendants admit that Mr. Zoccola is the former Vice President, Accounting, of First Horizon, and that he served on the Administrative Committee between 2002 and 2003.  The remaining allegations in Paragraph 17(i) contain conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the remaining allegations in Paragraph 17(i) of the Second Amended Complaint.

18.      **Defendants DOES 1-100** are additional Plan fiduciaries whose exact identities and fiduciary functions will be ascertained through discovery.  The information and documents on which Plaintiffs' claims are based are, very likely, solely within Defendants' possession and control.  Therefore, to the extent necessary and appropriate in light of discovery, Plaintiffs will amend their Complaint or seek leave to amend to add such other fiduciaries as defendants.

ANSWER:  Defendants deny the allegations contained in Paragraph 18 of the Second Amended Complaint.

## V.      FACTUAL ALLEGATIONS

### A.      The Plan

19.      The Plan is a defined contribution plan and an individual account plan.  Under its terms, a participant may authorize payroll deductions from 1% to 100% of eligible pay (subject to certain legal limitations) as contributions, to be invested in one or more of a number of options selected by the Plan's investment fiduciaries for employee contributions.

ANSWER:  Defendants admit that the Plan is a directed defined contribution plan within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), that provides for individual accounts for each participant, and that participants may authorize payroll deductions from 1% to 100% of eligible earnings subject to legal limitations.  Defendants deny the remaining allegations contained in Paragraph 19 of the Second Amended Complaint.

20.      Before September 1, 2007, First Horizon had a pension plan as well as the Plan, but it closed its Pension Plan to new participants on September 1, 2007.

ANSWER:  Defendants admit the allegations contained in Paragraph 20 of the Second Amended Complaint.

21.     The Plan allows participants to make pre-tax contributions (from 1% to 90% of eligible pay) and after-tax contributions (from 1% to 10% of eligible pay).

ANSWER:  Defendants admit that the Plan allows active employee participants to make pre-tax contributions to their individual accounts from 1% to 90% of their eligible earnings and after-tax contributions to their individual accounts from 1% to 10% of their eligible earnings, subject to certain restrictions imposed by federal law.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 21 of the Second Amended Complaint.

22.     Participants may also rollover amounts representing distributions from other defined benefit and/or defined contribution plans.

ANSWER:  Defendants admit the allegations contained in Paragraph 22 of the Second Amended Complaint.

23.     The Company makes two types of contributions on behalf of participants to the Plan – matching contributions and savings contributions.   After one year of service, all participants are eligible for matching contributions.

ANSWER:  Defendants admit the allegations contained in Paragraph 23 of the Second Amended Complaint.

24.     Until January 1, 2008, all participants except First Horizon Home Loan Corporation participants were required to invest in the Company Stock Fund in order to receive matching contributions.   Matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund.  According to an April 15, 2008 Proxy Statement, that requirement was dropped in early 2008, *i.e.*, only after the Plan's holdings of First Horizon Stock had lost more than half of its value.

ANSWER:  Defendants admit that prior to January 1, 2008, all participants – except First Horizon Home Loan Corporation participants – were required by the plan document to invest in the Company Stock Fund in order to receive matching contributions and that matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund.  The third sentence of Paragraph 24 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To

the extent a response is required, defendants deny the allegations and characterizations contained in the third sentence of Paragraph 24 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 24 of the Second Amended Complaint.

25.     Matching contributions are automatically invested in the Company Stock Fund.

ANSWER:     Defendants admit that the plan document required that matching contributions be initially invested in the Company Stock Fund, but deny the remaining allegations contained in Paragraph 25 of the Second Amended Complaint.

26.     Each participant's account is credited with the participant's contributions, the Company's contributions and Plan earnings, and is charged with an allocation of asset management fees, Plan losses and certain other recordkeeping expenses.  Such allocations are based on participant contributions or account balances.

ANSWER:     Defendants admit that participants' accounts are credited with each participant's contributions, any matching contributions from the Company and the Plan's earnings, and further admit that participant accounts are charged with an allocation of asset management fees, Plan losses and other recordkeeping expenses, which are based on participant contributions or account balances.  Defendants deny the remaining allegations contained in Paragraph 26 of the Second Amended Complaint.

27.     Participants direct their contributions into various investment options selected by the Plan's investment fiduciaries, and may change their investment authorizations at any time.

ANSWER:  Defendants admit that participants direct their contributions in investment options of their choosing available under the Plan, and that participants may change their investment authorizations on a daily basis.  Defendants deny the remaining allegations contained in Paragraph 27 of the Second Amended Complaint.

28.     Part of the Plan is referred to as the Employee Stock Ownership Plan ("ESOP") and is designed to invest primarily in First Horizon Stock.  The trustee was authorized under the ESOP provisions of the Plan to "invest Trust assets in savings accounts, certificates of deposit,

high-grade short-term securities, equity stocks, bonds or other investments desirable for the Trust" or in cash.  (2007 Plan § 13.3) "All investments will be made by the Trustee only upon the direction of the Plan Administrator [*i.e.* Defendant Administrative Committee].  The Plan Administrator may direct that all Trust Assets be invested and held in Employer Stock."  Id.

ANSWER:  Defendants admit that the Plan incorporates an Employee Stock Ownership Plan ("ESOP") for investment in First Horizon stock and that the ESOP is comprised solely of the First Horizon National Corporation Stock Fund.  The remaining allegations contained in Paragraph 28 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations in Paragraph 28 and refer to the documents cited therein for the full contents and context thereof.

29.    From at least the mid-1990s until 2003, First Tennessee served as Trustee for the Plan.  Under the Plan as amended effective July 1, 1997, the "Trustee" had "full and unrestricted discretion in the selection of particular securities" (within the descriptions specified in Section 7.1 of the Plan) for Funds A, B, C, D, E and F.

ANSWER:  Defendants admit that First Tennessee served as Trustee for the Plan from prior to the start of the purported class period until 2003.  The second sentence of Paragraph 29 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the second sentence of Paragraph 29 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 29 of the Second Amended Complaint.

30.    In 2003, the Company reorganized the structure of Plan administration by creating the Retirement Investment Committee, or "Investment Committee," which, as alleged above, was responsible for review of Plan investments.  Specifically, the Plan was amended effective January 1, 2003 to create the Investment Committee for the purpose of "directing the Trustee regarding asset strategy" and establishing "standards for the best performance of Trust assets." The Investment Committee became responsible for review of Plan assets and investments, as well as the Company's pension plan, which both held large amounts of First Funds and First Horizon stock.  As set forth in the June 2004 Investment Policy Statement for the Plan:

The Company, through action of its Board of Directors pursuant to the Plan, has delegated to the First Horizon National Corporation Retirement Investment Committee ("Committee") the following authority:

•   Selecting investment options that are appropriate for the purposes of the Plan;

•   Selecting qualified investment managers and/or investment vehicles that fulfill the purposes of the Plan investment options;

•   Monitoring Plan investment performance by means of regular reviews and analyses to determine whether those responsible for investment results are meeting the guidelines and criteria identified in this Policy and taking appropriate action if such standards are not being met; and

•   In collaboration with the Plan administrative committee, overseeing compliance with the rules and regulations issued by the Department of Labor pursuant to Section 404(c) of ERISA.

ANSWER:   Defendants admit that the Plan was amended effective January 1, 2003 and that those amendments included the creation of the RIC.  Defendants further admit that, under the terms of the Plan, the RIC "is granted full and unrestricted discretion in the selection of Funds as well as the particular securities, classes of securities, and levels of investment in any particular securities or classes of securities in any particular Fund" and is responsible for, among other things, selecting investment alternatives to be offered under the Plan (with the exception of the ESOP), determining the strategic array of asset classes available under the Plan, conducting a regular review of the performance of those investments, establishing appropriate performance benchmarks for each asset class under the Plan, developing and communicating to the Trustee an investment strategy for the Plan, and evaluating the performance of the Trustee and fund managers.  Defendants further admit that prior to May 1, 2002 until June 5, 2006, the Plan investment options available to participants included the First Funds and, as a matter of Plan design, Article 13 of the Plan provides for an ESOP comprised solely of First Horizon Stock Fund, through which participants can invest in First Horizon stock.  The remaining allegations in

Paragraph 30 contain an incomplete quotation from the referenced document and purport to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 31 and refer to the document referenced therein for the full contents and context thereof.

31.     Under the amended Plan, the Investment Committee was responsible for entering into the Trust Agreement, and had authority to "vest in the Trustee and/or in one or more investment managers appointed under the Trust Agreement responsibility for the management and control of the Retirement Fund pursuant to this funding policy."

ANSWER:   See defendants' answer to Paragraph 16.   Paragraph 31 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 31 and refer to the document referenced therein for the full contents and context thereof.

32.     With regard to investment managers, the June 2004 Investment Policy Statement stated in pertinent part as follows:

The duties and responsibilities of the Plan's investment managers include:

•     Accepting the Plan's assets as directed by the Trustee of the Plan and investing according to the stated investment philosophy and strategy dictated in each fund's prospectus or investment guidelines;

•     Issuing prospectuses, annual reports and other pertinent information on a timely basis to the Committee and/or its designees and any other parties directly responsible for the investment of the Plan's assets;

•     Meeting as required with the Committee and/or its designees to review portfolio and investment results;

•     Notifying the Committee and/or its designees in advance of potential changes in fund operation under consideration or about to be implemented, including organizational or strategy changes that impact asset management;

•       Issuing a periodic report to the Committee and/or its designees which includes the following information:

- The market value of fund assets,

- The portion of fund assets allocated to each asset class (as applicable),

- Time-weighted rates of return measured net of investment management fees and all expenses for the current quarter, year-to-date and historical time periods, - Average fund characteristics and number of holdings at quarter-end, - Expenses,

- Current investment strategy,

- Changes implemented over the prior quarter;

•       Providing the Committee with monthly and quarterly statements detailing Plan assets and transactions;

•       Providing Plan participants with copies of prospectuses, written confirmations, and other information materials as required and maintaining compliance with the rules and regulations issued by the Department of Labor pursuant to Section 404(c) of ERISA; and

•       Other duties and services as shall be agreed to by the investment manager and the Committee.

<u>ANSWER</u>:  Paragraph 32 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 32 and refer to the document referenced therein for the full contents and context thereof.

33.    With regard to Investment Objectives, the June 2004 Investment Policy Statement stated in pertinent part as follows:

The primary investment objectives of the Plan are to offer a range of investment options such that:

•       Sufficient options are provided to offer Plan participants a reasonable range of investment risk/return characteristics;

•       Each option is adequately diversified;

•       Each option has a risk profile consistent with its position in the overall structure of Plan investment options; and

•    Each option is managed to implement the desired risk profile and other investment characteristics.

**Supporting Analysis Behind Investment Option Structure**

The Committee, in seeking to achieve diversity in the investment options offered, established certain criteria to determine the material difference between and among potential investment options.   The historical and prospective investment characteristics associated with various asset classes were examined in order to determine the criteria.   The following technical factors were used to classify and define potential investment options:

•    A distinct, definable market and the availability of a widely used and understood benchmark;

•    A distinct risk and return profile as exhibited by historical return analysis; and

•    Use of a distinct management style that is definable in terms of the investment strategies/methodologies utilized (e.g., passive (Index) versus active management).

ANSWER:  Paragraph 33 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 33 and refer to the document referenced therein for the full contents and context thereof.

34.    The Investment Committee also had responsibility to "review the investments of the Trust on a regular basis no less often than annually," "establish appropriate benchmarks," and "recommend to the Company and other appropriate fiduciaries any action indicated as a result of the Retirement Investment Committee's review of the performance of the Trustee and any such investment manager."

ANSWER:    See defendants' answer to Paragraph 16.    Paragraph 34 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 34 and refer to the document referenced therein for the full contents and context thereof.

35.    In an April 30, 2002, First Horizon consultant Mercer Human Resource Consulting ("Mercer") advised the Investment Committee as to, inter alia, fiduciary responsibilities in general.  Mercer explained that these duties include the following:

> Exclusive Benefit Rule - requiring fiduciaries to act solely in the interest of the plan's participants and beneficiaries for the exclusive purpose of providing plan benefits or defraying the reasonable administrative expenses of the plan.  This standard should be understood as imposing on the fiduciary a strict duty of loyalty to plan participants and beneficiaries.

> Prudent Expert Rule - requiring fiduciaries to make decisions with the level of care a prudent person knowledgeable and experienced in the management of pension assets would use under like circumstances.

> Diversification Rule - requiring fiduciaries to diversify plan investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. " Some elements to consider regarding diversification include the nature and purposes of the plan, the amount of plan assets, general economic conditions and the particular characteristics of the type of investment.

> Plan  Rule - requiring fiduciaries to operate the plan according to the plan's written s insofar as the s are consistent with the prudence and other provisions of ERISA.

ANSWER:  Defendants admit that to assist the Retirement Investment Committee in fulfilling its duties under the Plan, Mercer has provided investment consulting services to the Retirement Investment Committee in connection with the Plan since 2002.  The remainder of Paragraph 35 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 35 and refer to the document referenced therein for the full contents and context thereof.

36.    Mercer also advised the Investment Committee in its April 30, 2002  as to the Committee's responsibilities in particular, explaining that these included:

**Planning**

- Establish and  Plan funding and investment policies and objectives in accordance with applicable state and federal laws

- In defined contribution plans, establish participant investment options sufficient to provide a broad risk/return spectrum

- Select investment managers appropriate to fund objectives

- Select a trustee to hold custody of Plan assets

- Select consultants to assist the Committee, as appropriate

- Establish and  performance standards for trustee, investment managers and other service providers

- Establish and  policy and process for voting Plan sponsor stock held by the fund, if any

- Negotiate fees and service agreements with Plan service providers within the Committee's purview.

**Operations**

- Ensure Committee decisions, policies and procedures are implemented and maintained, whether directly or appropriate delegation

- Review fees of Plan service providers and approve for payment by the Plan sponsor or trust, as appropriate

**Control**

- Review and evaluate on a regular basis the performance of investment managers, trustee and other Plan service providers against established performance standards

- Take whatever corrective action is deemed prudent and appropriate on behalf of the Plan when a service provider fails to meet established performance standards

ANSWER:  Defendants admit that Mercer provides education to the RIC regarding their fiduciary duties under ERISA.  Defendant further admits that when the RIC was created in 2002, Mercer prepared a May 30, 2002 memorandum on fiduciary responsibilities under ERISA, the specific duties of the Retirement Investment Committee, and a suggested process for Retirement Investment Committee meetings.  The remainder of Paragraph 36 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is

required.   Except as expressly admitted herein, defendants deny the remaining allegations and characterizations contained in Paragraph 36 and refer to the document referenced therein for the full contents and context thereof.

37.   As alleged, before January 1, 2008, most participants were required to invest in the Company Stock Fund in order to receive matching contributions, and throughout the First Horizon Stock Claims Period, matching contributions were automatically invested in the Company Stock Fund.  First Horizon Defendants were aware or should have been aware that once First Horizon Stock was acquired, Plan participants did not have the knowledge, time or expertise to regularly monitor their investments because, *inter alia*, an article to that effect appeared in a January 2007 Company newsletter, "Working Together."

ANSWER:  Defendants admit that prior to January 1, 2008, participants – except First Horizon Home Loan Corporation employees – were required by the plan document to invest in the Company Stock Fund in order to receive matching contributions and that matching contributions equaled 50% of the first 1% to 6% of participant pre-tax contributions invested in the Company Stock Fund.   The second sentence of Paragraph 37 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in the second sentence of Paragraph 37 and refer to the document referenced therein for the full contents and context thereof.  Except as expressly admitted herein, defendants deny the remaining allegations contained in Paragraph 37 of the Second Amended Complaint.

38.   Defendants also knew or should have known that participants did not regularly transfer shares out of the Company Stock Fund so as to diversify their retirement accounts. According to statistics gathered in February 2005, the average number of exchanges for all participants in and out of any investment fund selection for the prior year was 0.5.  Further, in a study performed in 2007, First Horizon found that the main financial goal for some 56.2% of its employees was to get out of debt.  Finally, a June 2005 report from First Horizon consultant Hewitt Associates advised that a number of company stock ERISA class actions had been , and further explained as follows with regard to participants' understanding of the risks of owning large amounts of company stock:

> Despite the cautionary tales of investing too much in company stock emanating from this spate of ERISA lawsuits-and ample media attention to this issue-research from Hewitt Associates indicates that, overall, participants still show either little appreciation for the risk of owning large amounts of company stock in their defined contribution plans or a great deal of confidence in their employer's financial health.

ANSWER:  Defendants deny the allegations contained in the first sentence of Paragraph 38 of the Second Amended Complaint.  The remaining allegations of Paragraph 38 purport to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 38 and refer to the documents referenced therein for the full contents and context thereof.

**B.**     **Defendant Fiduciaries Did Not Select The First Funds As A Plan Investment Option Because They Were Prudent Retirement Investments, But Because Offering The Funds Generated Fees To First Horizon And Its Affiliates, And Helped Maintain The Viability Of The Funds.**

39.     The First Funds were a family of proprietary mutual and money market funds under the management of First Horizon's wholly-owned subsidiaries.

ANSWER:  Defendants admit the allegations contained in Paragraph 39 of the Second Amended Complaint.

40.     First Tennessee served as "co-administrator" to the First Funds during the First Funds Claims Period, and also served as "investment advisor" to First Funds Intermediate Bond Portfolio and the First Funds Capital Appreciation Fund.  Highland Capital and Martin & Company, both wholly-owned subsidiaries of First Horizon, were retained by First Tennessee to serve as "sub-advisors" to the First Funds Growth and Income Portfolio and the First Funds Bond Portfolio, respectively.

ANSWER:  Defendants admit the allegations contained in Paragraph 40 of the Second Amended Complaint.

41.     First Horizon and its subsidiaries earned numerous and substantial fees for administration, advisory, and investment services provided to the First Funds.  The First Funds were selected and retained as investments in the Plan during the First Funds Claims Period, at class members' expense, because this benefited First Horizon and its affiliates, both through fees and because this helped maintain the viability of the funds.

ANSWER:   Defendants admit that First Tennessee Bank was compensated for the administrative, advisory, and investment services provided to the First Funds.  Defendants deny the remaining allegations in Paragraph 41 of the Second Amended Complaint.

42.     The "First Funds" offered to Plan participants during the First Funds Claims Period included "First Funds US Governmental Portfolio," "First Funds Capital Appreciation I, " "First Funds Core Equity," (referred to as the "First Funds Growth and Income Fund" until 2003) and "First Funds Intermediate Bond I."

ANSWER:  Defendants admit that the First Funds US Government Portfolio (also known as the First Funds Money Market Fund) was offered as an investment option to Plan participants from February 24, 2004 until June 5, 2006; that the First Funds Capital Appreciation Fund was offered as an investment option to Plan participants from September 1, 2003 until June 5, 2006; and that the First Funds Core Equity Fund (referred to as the First Funds Growth and Income Fund until 2003) and the First Funds Intermediate Bond Fund were offered as an investment options to Plan participants from before the purported class period until June 5, 2006.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 42 of the Second Amended Complaint.

43.     The Plan did not offer non-proprietary funds as an alternative to the types of First Funds offered.   For example, the only bond fund offered in the Plan was the First Fund Intermediate Bond I.

ANSWER:  Defendants admit that during the period of time in which the First Funds Intermediate Bond Fund was offered under the Plan that it was the only bond fund offered.  Defendants deny the remaining allegations contained in Paragraph 43 of the Second Amended Complaint.

44.     Between 2001 and mid-2003, two of the proprietary First Funds were included among the Plan's six offerings: the First Funds Growth & Income Fund as Fund A and the First Funds Intermediate Bond Portfolio as Fund B.

ANSWER:  Defendants admit the allegations contained in Paragraph 44 of the Second Amended Complaint.

45.     Meeting minutes from an Investment Committee meeting held on February 13, 2003 reflect that committee members were well aware of performance problems with the Bond Fund because it "lagged the benchmark for all annualized time periods measured," and because "[a] plan to change the manager of this fund was put into place at the end of 2002 before this committee was established."

ANSWER:  Paragraph 45 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 45 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

46.     The February 13, 2003 meeting minutes also reflect that the Investment Committee determined to add additional fund offerings to the Plan, but voted that First Tennessee, rather than its outside counsel, should select the fund managers for the new funds to be added to the Plan.

ANSWER:  Paragraph 46 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 46 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

47.     The Investment Committee met again on May 15, 2003.  Those in attendance included Defendants Marty Mosby, Charles Burkett, Jim Keen, Sarah Meyerrose, and Larry Martin, as well as Bob Ellis and Karen Kruse from First Horizon, and consultants from Mercer.  At this meeting, Defendant Kruse, Senior Vice President, Wealth Management Product Development and Support for First Tennessee, made recommendations regarding Plan investments, including retaining First Funds Bond Portfolio and First Funds Growth & Income Funds (which were already in the Plan), retaining First Horizon Stock, and adding the First Funds Capital Appreciation Fund as the small cap growth fund.

ANSWER:  Defendants admit the first two sentences contained in Paragraph 47 of the Second Amended Complaint.  The remainder of paragraph 47 purports to characterize a written

document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 47 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

48.   In response to those recommendations, the Investment Committee (then comprised of Defendants Mosby, Burkett, Keen, Meyerrose and Martin) approved replacement of the non-proprietary "Managed Capital Appreciation Fund" and "Managed International Fund." However, the First Funds Bonds Portfolio, which substantially lagged both the LB Aggregate Index and the Mercer Core Bond Fund Mutual Fund Universe over the preceding one-, three-, and five-year periods, was continued as a Plan offering.  On behalf of the Investment Committee, Defendants Mosby, Burkett, Keen, Meyerrose and Martin also approved the addition of the First Funds Capital Appreciation Fund, and approved removal of the Fidelity Money Market and replacement with the First Funds U.S. Government money market fund.

ANSWER:  Paragraph 48 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 48 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

49.   In addition to generating fees for First Horizon's affiliates, use of Plan assets to invest in the First Funds assisted in maintaining the viability of the First Funds by spreading the First Funds' fixed expenses across a larger pool of assets and causing the funds to appear more attractive to investors.

ANSWER:  Defendants deny the allegations contained in Paragraph 49 of the Second Amended Complaint.

50.   At around the time that Ms. Kruse recommended the addition of the First Funds Capital Appreciation Fund to the Plan, the Capital Appreciation Fund held only approximately $50 million in assets under management, most of which was the result of the Investment Committee's decision to invest assets of the First Tennessee Pension Plan ("Pension Plan") in the fund, rather than a reflection of the First Funds Capital Appreciation Fund's ability to capture independent investors.  By contrast, each of the five non-proprietary funds recommended by Kruse all held assets under management of at least a billion dollars, and most held considerably more.

ANSWER:  Defendants admit that the First Funds Capital Appreciation fund – at the time

of its selection – returned in top 16th percentile of its benchmark, Lipper Small Cap Institutional

funds, for the past three years and the top 38th percentile since its inception.  Defendants further

admit that as of May 31, 2003, the First Funds Capital Appreciation Fund held $48.6 million in

net assets, and that as of May 31, 2003, the five non-proprietary funds considered for inclusion in

the Plan at the May 15, 2003 Investment Committee meeting - the Invesco Stable Value Fund,

Dodge & Cox Balanced Fund, Vanguard 500 Index Fund, Royce Premier Fund, and Harbor

Funds International Fund - all had net assets of at least one billion dollars.  Defendants deny the

remaining allegations and characterizations contained in Paragraph 50 of the Second Amended

Complaint and refer to the document referenced therein for the full contents and context thereof.

51.     In early 2004, the Plan's assets in the multi-billion dollar Fidelity money market
were transferred to the First Funds Government Money Market.  After the transfer of Plan assets
to the First Funds Government Money Market occurred, Plan assets comprised 89% of the assets
in the First Fund Government Money Market fund.

ANSWER:  Defendants admit that the First Funds US Government Money Market Fund

was added as an investment option under the Plan effective February 9, 2004; that the Fidelity

Institute Money Market Fund was removed as a Plan investment option effective February 23,

2004; and that any remaining assets in, or future deferral options directed to, the Fidelity Institute

Money Market Fund on February 23, 2004 were transferred to the First Funds US Government

Money Market Fund on that date.  Defendants deny the remaining allegations contained in

Paragraph 51 of the Second Amended Complaint.

52.     Review of the concentrations of holdings of the First Funds suggests that few
individuals with access to other investments chose to invest in the First Funds.  During the First
Funds Claims Period, the majority of assets under management in the First Funds Intermediate
Bond Fund, Core Equity Fund, Capital Appreciation Fund and Government Money Market
belonged to the Plan or the Pension Plan.  Notably, as of March 31, 2006, 34.68% of the
Government Money Market Fund, 48.50% of the Intermediate Bond Fund, 56.2% of the Core
Equity Fund, and 79.81% of the Capital Appreciation Fund represent investments by the Plan
and Pension Plan.

ANSWER:  Defendants deny the allegations contained in Paragraph 52 of the Second Amended Complaint.

53.    As of December 31, 2004, the Plan held assets of some $61,659,809 in Core Equity I and $40,488,692 in US Government Portfolio.  (Form 11-K  on June 28, 2005)  As of December 31, 2005, the Plan held some $8,449,747 in the Capital Appreciation I Fund; $44,939,572 in the Core Equity I Mutual Fund; $35,694,744 in US Governmental Portfolio; and $17,777,946 in the Intermediate Bond I Fund.  (Form 11-K  on June 29, 2006)

ANSWER:  Defendants admit the allegations contained in Paragraph 53 of the Second Amended Complaint.

54.    On or around July 10, 2003, the Company again amended and restated the Plan, effective September 1, 2003.  Under the September 2003 Plan, the Investment Committee had sole discretion to determine which Funds would be offered by the Plan, which "securities, classes of securities, and levels of investment" would be held within each Fund, and the "investment objectives and parameters" for each Fund.  The Plan further provided that "[t]he available Funds at any time may be changed in writing by the Retirement Investment Committee without the necessity of amendment to the Plan or its associated Trust."

ANSWER:  Defendants admit the allegations contained in the first sentence of Paragraph 54 of the Second Amended Complaint.  The remainder of purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 54 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

55.    On July 20, 2003, First Horizon and Nationwide Trust Co. entered into a "Directed Trust Agreement" effective September 1, 2003.  Defendant Meyerrose signed the Directed Trust Agreement on behalf of the Investment Committee.

ANSWER:  Defendants admit the allegations contained in Paragraph 55 of the Second Amended Complaint.

56.    Under the July 2003 Directed Trust Agreement, the Investment Committee was defined as the "Plan Representative."  Under the Directed Trust Agreement, the Trustee had no investment management responsibility with respect to the Trust or assets held under the Plan. Instead, "the Plan Representative shall have all power over and responsibility for the selection of investment vehicles and the management, disposition, and investment of assets of the Trust,

including, but not limited to, the selection of the Funding Vehicle(s), and the purchase, sale or exchange of assets included in the Trust Fund, unless such power is delegated by the Plan to a fiduciary other than the Plan Representative and notification of such delegation is supplied to the Trustee in Written Instructions." Further, the Plan Representative is empowered under the Directed Trust Agreement to appoint Investment Managers: "The Plan Representative, from time to time in accordance with the provisions of the Plan may appoint one or more independent Investment Managers to direct the investment of all or a portion of the Trust Fund."

ANSWER:  Paragraph 56 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 56 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

57.    Effective September 1, 2003, the Company contracted with 401k Company to service the Plan.

ANSWER:  Defendants admit that the 401(k) Company became the Plan administrator and service provider effective September 1, 2003.

58.    Several of the First Funds underperformed significantly.

ANSWER:  Defendants deny the allegations contained in Paragraph 58 of the Second Amended Complaint.

59.    Near the time that the Investment Committee first began reviewing investments in February 2003, it was noted that the First Funds Intermediate Bond Fund "lagged the benchmark for all annualized time periods measured."

ANSWER:  Paragraph 59 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 59 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

60.    More than a year later, on August 5, 2004, the Investment Committee approved its Investment Policy Statement, which set forth the Investment Committee's expectation that the

fixed income "fund should be expected to outperform its benchmark by 25 basis points net of fees over rolling three and five year periods with risk levels not exceeding the benchmark." The Investment Committee apparently changed the benchmark between 2003 and 2004.

ANSWER:  Defendants admit that the RIC approved its Investment Policy Statement, on

August 5, 2004.  Defendants deny the last sentence contained in Paragraph 60 of the Second

Amended Complaint.  The remainder of Paragraph 60 purports to characterize a written

document, the terms of which speak for themselves and, therefore, no response is required.  To

the extent a response is required, defendants deny the remaining allegations and characterizations

contained in Paragraph 60 of the Second Amended Complaint and refer to the document

referenced therein for the full contents and context thereof.

61.     Although the First Funds Intermediate Bond Fund continued to have substantial problems, and in fact continued to lag behind the benchmarks for the one-, three-, and five-year time periods as of June 30, 2004, it was not removed from Plan offerings pursuant to the Investment Policy Statement.

ANSWER:  Defendants admit that the First Funds Intermediate Bond Fund was removed

from the Plan offerings effective June 5, 2006. Defendants deny the remaining allegations in

Paragraph 61 of the Second Amended Complaint.

62.     The First Funds Core Equity Fund and Capital Appreciation Fund also had significant problems.  At an Investment Committee meeting on February 3, 2005, the Committee asked Mercer to calculate how much money the First Funds Core Equity Fund's underperformance was costing **the Pension Plan**.  However, the Investment Committee evidently was not concerned about the same underperformance of the First Fund Core Equity Fund in **the Plan**, where the Company was not responsible for paying a defined benefit and therefore did not bear the investment risk if the Core Equity Fund underperformed.

ANSWER:   The second sentence of Paragraph 62 purports to characterize a written

document, the terms of which speak for themselves and, therefore, no response is required.  To

the extent a response is required, defendants deny the allegations and characterizations contained

in the second sentence of  Paragraph 62 of the Second Amended Complaint and refer to the

document referenced therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 62 of the Second Amended Complaint.

63.     The May 5, 2005 Investment Committee minutes reflect that the First Funds Intermediate Bond Fund "continues to struggle" and also noted continuing problems with the First Funds Core Equity and Capital Appreciation Funds.  Yet the Investment Committee did not decide to remove any of these underperforming funds from the Plan.

ANSWER:   The first sentence of Paragraph 63 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 63 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.  Defendants admit the First Funds Intermediate Bond Fund, First Funds Core Equity Fund and First Funds Capital Appreciation Funds remained investment options under the Plan until June 5, 2006. Defendants deny the remaining allegations contained in Paragraph 63 of the Second Amended Complaint.

64.     By 2004, First Horizon had decided to try to sell the First Funds family due to performance problems.

ANSWER:  Defendants deny the allegations contained in Paragraph 64 of the Second Amended Complaint.

65.     In November 2004, Kruse (who in May 2003 had recommended to the Investment Committee that the Plan include and retain First Funds) advised the media that First Horizon might shed the proprietary funds.  She later explained that, after the funds faltered, First Horizon had assessed whether mutual funds were "a core competency for us."

ANSWER:  Paragraph 65 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 65 of the Second Amended Complaint and refer to the documents referenced therein for the full contents and context thereof.

66.     Although the First Funds struggled, and although Plan fiduciaries knew or should have known that First Horizon was trying to sell the faltering First Funds from at least some time in 2004, Plan fiduciaries retained these funds in the Plan until June 5, 2006.  They did so even though the First Funds under-performed and carried higher than average fees.  At an August 17, 2005 Investment Committee meeting, a representative from Mercer advised the Investment Committee that "the First Funds Board is considering major changes to the funds."  The Investment Committee meeting minutes reflect the Investment Committee's determination that "[o]nce those changes are announced, the Committee will review the actions and determine what is appropriate for the pension and savings plans."

ANSWER:  Defendants admit the First Fund Intermediate Bond Fund, First Fund Core

Equity Fund, and the First Fund Capital Appreciation Fund were retained as investment options

under the Plan effective June 5, 2006.  Defendants deny the remaining allegations contained in

the first sentence and the allegations contained in the second sentence of Paragraph 66.  The

remainder of Paragraph 66 purport to characterize a written document, the terms of which speak

for themselves and, therefore, no response is required.  To the extent a response is required,

defendants deny the remaining allegations and characterizations contained in the third and fourth

sentences of Paragraph 66 of the Second Amended Complaint and refer to the document

referenced therein for the full contents and context thereof.

67.     Meeting minutes from November 3, 2005 reflect that "the Committee has been concerned about the investment results of the First Funds."  All four First Funds were doing poorly.  Yet the Committee decided to wait until after the First Funds news was announced before making any decisions.

ANSWER:   The first sentence of Paragraph 67 purports to characterize a written

document, the terms of which speak for themselves and, therefore, no response is required.  To

the extent a response is required, defendants deny the allegations and characterizations contained

in the first sentence of Paragraph 67 of the Second Amended Complaint and refer to the

document referenced therein for the full contents and context thereof.  Defendants deny the

remaining allegations contained in Paragraph 67 of the Second Amended Complaint.

68.     At a February 13, 2006 meeting, the Committee continued to recognize problems with the First Funds, but made no changes because the Funds were going to be sold.

ANSWER:  Paragraph 68 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 68 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

69.     First Horizon sold its interest in the First Funds in a merger with Goldman Sachs Asset Management funds in early 2006.  On May 26, 2006, the 401k Company issued a notice advising: "Upon shareholder approval, First Funds, First Tennessee's proprietary mutual fund family, will be reorganized into selected mutual funds managed by Goldman Sachs Asset Management ("GSAM"), the asset management arm of The Goldman Sachs Group, Inc.  (NYSE: GS).  The target date for shareholder approval is June 2, 2006."  Participants were advised that any assets in the First Funds after the close of business on June 2, 2006 would be automatically transferred into Goldman Sachs funds.

ANSWER:  Defendants admit the last two sentences contained in Paragraph 69 of the Second Amended Complaint.   Defendants further admit that on May 25, 2006, the 401k Company issued a notice advising: "Upon shareholder approval, First Funds, First Tennessee's proprietary mutual fund family, will be reorganized into selected mutual funds managed by Goldman Sachs Asset Management ("GSAM"), the asset management arm of The Goldman Sachs Group, Inc.  (NYSE: GS).  Defendants also admit that the First Funds were reorganized into comparable funds managed by Goldman Sachs Asset Management on June 5, 2006. Defendants deny the remaining allegations and characterizations contained in Paragraph 69 of the Second Amended Complaint.

70.     After the sale/merger, First Horizon initiated a more vigorous process to select the funds offered under the Plan, and it was only after the First Funds were sold to Goldman Sachs that the First Funds were removed from the Plan.

ANSWER:  Defendants admit that the First Fund Intermediate Bond was mapped into the Goldman Sachs Core Fixed Income; the First Fund Core Equity was mapped into the Goldman Sachs CORE U.S. Equity; and the First Fund Capital Appreciation was mapped into the

Goldman Sachs CORE Small Cap Equity Fund effective June 5, 2006.  Defendants deny the remaining allegations in Paragraph 70 of the Second Amended Complaint.

71.     Although Plan fiduciaries had been fully aware of the underperformance of the First Funds, they kept them in the Plan and Pension Plan rather than jeopardize the sale to Goldman.  The August 2006 meeting minutes state with respect to the Pension Plan: "Now that the First Funds have been moved to Gold funds, Mr. Schutes [of Mercer] indicated that the Committee should explore the possibly of moving out of mutual funds into commingled funds or separate accounts to achieve lower expenses."

ANSWER:   .  The second sentence of Paragraph 71 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the second sentence of Paragraph 71 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations in Paragraph 71 of the Second Amended Complaint.

72.     After the sale was completed, Plan fiduciaries initiated a fund search to identify and select new funds to replace one of the Goldman Sachs funds.  In contrast to their retention of the First Funds despite worse manager performance and violations of the Investment Policy Statement, the Plan fiduciaries sought to replace the "Goldman Sachs Structured Small Cap Equity fund" that was "in compliance with the investment guidelines" and although manager performance "is more favorable since the Goldman funds have been introduced."

ANSWER:  Paragraph 72 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 72 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

73.     In addition to their underperformance, the First Funds also carried high expenses.  The First Funds were not selected by a prudent selection process but were selected because of the fees generated for First Horizon and its affiliates and because the investment of Plan assets in the First Funds supported the viability of the funds.  A prudent process is one which considers exclusively the best interests of the Plan's participants and beneficiaries with respect to the funds to be offered for their retirement savings.  Here, the First Funds were offered because of the benefits to First Horizon and its affiliates.

ANSWER:  Defendants deny the allegations contained in Paragraph 73 of the Second

Amended Complaint.

74.     Defendants, as fiduciaries of an ERISA Plan with over $600 million dollars in assets, knew or should have known that the evaluation of relative fees and investment returns are a necessary component of fulfilling their fiduciary responsibilities.   As the United States Department of Labor ("DOL") has stated:

> Plan fees and expenses are important considerations for all types of retirement plans.  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan.  Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing.  After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> In recent years, there has been a dramatic increase in the number of investment options, as well as level and types of services, offered to and by plans in which participants have individual accounts.  In determining the number of investment options and the level and type of services for your plan, it is important to understand the fees and expenses for the services you decide to offer.  The cumulative effect of fees and expenses on retirement savings can be substantial.

Understanding Retirement Plan Fees And Expenses, U.S. Department of Labor, May 2004

(available at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html).

ANSWER:    The allegations in the first sentence of Paragraph 74 contain legal

conclusions to which no response is required.  To the extent a response is required, defendants

deny the allegations contained in the first sentence of Paragraph 74.    The allegations

summarizing the Department of Labor's publication in Paragraph 74 purport to characterize a

written document, the terms of which speak for themselves and, therefore, no response is

required.   To the extent a response is required, defendants deny the allegations and

characterizations in Paragraph 74 and refer to the document cited therein for the full contents and

context thereof.   Defendants deny the remaining allegations contained in Paragraph 74 of the Second Amended Complaint.

75.     The DOL also has informed employers that the level of fees may vary substantially, depending upon the nature of the product and the investment style of a particular product.  Id.  When investments such as index funds are "passively managed," "little research" is required, and thus, the fees of these funds should be much lower:

> Funds that are "actively managed" (i.e., funds with an investment adviser who actively researches, monitors, and trades the holdings of the fund to seek a higher return than the market as a whole) generally have higher fees than funds that are "passively managed" (see below).  The higher fees are associated with the more active management provided and increased sales charges from the higher level of trading activity.  While actively managed funds seek to provide higher returns than the market, neither active management nor higher fees necessarily guarantee higher returns.

> Funds that are "passively managed" generally have lower management fees.  Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index.  Thus, passively managed funds require little research and less trading activity.

Id.  Accordingly, if actively managed funds are offered in an ERISA-protected retirement plan, the fiduciaries must ensure that the performance of those investments options justifies the increased expense of the investment.   Paying high fees for a fund that underperforms the applicable index, as a matter of basic prudence, is financially unsound.   For this reason, a fiduciary has an ongoing duty to "monitor investment returns and service provider performance and, if necessary, make changes." Id.

ANSWER:  The allegations summarizing the Department of Labor's publication in Paragraph 75 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations in Paragraph 75 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 75 of the Second Amended Complaint.

76.     The DOL has also recognized the substantial, detrimental impact that excessive fees have on retirement savings.  Over the course of an individual's participation in a defined contribution plan, excessive fees can result in a loss of tens of thousands of dollars, if not more, in retirement savings.

ANSWER:  Paragraph 76 purports to characterize the position of Department of Labor without providing a supporting citation and, therefore, defendants lack information or knowledge sufficient to form a belief as to the accuracy of the allegations contained in Paragraph 76.  To the extent a response is required, defendants deny the allegations contained in Paragraph 76 of the Second Amended Complaint.

77.    For example: Assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000.  If returns on investments in his or her account over the next 35 years average 7 percent, and fees and expenses reduce these average returns by 0.5 percent, the employee's account balance would grow to $227,000 at retirement, even if there were no further contributions to the account.  However, if fees and expenses being withheld are 1.5 percent, the employee's account balance would grow to only $163,000 at retirement.  The 1 percent difference in fees and expenses reduces the employee's account balance at retirement by an appalling 28 percent.  See Department of Labor Publication: A Look at 401(k) Plan Fees (available at http://www.dol.gov/ebsa/publications/401k_employee.html).

ANSWER:  Paragraph 77 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 77 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

78.    Because of the enormous impact that excessive fees and expenses have on participants' retirement savings, plan fiduciaries are required to carefully monitor fees and expenses and ensure that amounts charged against plan accounts are reasonable.

ANSWER:  Defendants admit that plan fiduciaries are required to comply with certain obligations under ERISA, *see, e.g.*, ERISA Section 404, but deny that defendants failed to comply with any such obligations.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 78 of the Second Amended Complaint.

79.    Here, Plan fiduciaries looked at overall Plan expenses and literature on Plan costs in June 2004.  The Investment Committee was aware that at least some First Funds had higher than average expenses as of at least November 4, 2004.  At the November 4, 2004 meeting, the Investment Committee discussed concerns regarding the long term rate of return for the Pension Plan based, in part, on recognition that certain First Funds had higher than average expenses.

ANSWER:

Defendants admit that the RIC monitored and continually evaluated First Funds' management fees and that Mercer's Quarterly Performance Evaluations included review of the expenses associated with each fund.  The remainder of Paragraph 79 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 79 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

80.    At that meeting, a Mercer consultant advised the Investment Committee that "some large 401(k) plans are moving from mutual funds into comingled type funds to reduce plan expenses" and also told them that "a trend is developing for funds much larger than the FHN fund."

ANSWER:  Paragraph 80 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 80 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

81.    The Investment Committee determined at the November 4, 2004 meeting that Mercer should explore options to reduce plan expenses for **the Pension Plan**, but did not determine that any action was necessary with respect to the Plan, even though both plans held the same First Funds products with excessive fees.

ANSWER:  Paragraph 81 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 81 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

82.     Mercer also began tracking expenses of the various funds for both the Plan and the Pension Plan.  These demonstrate that the First Funds had higher than average expenses, in addition to poor performance.

ANSWER:  Defendants admit that the RIC monitored and continually evaluated First

Funds' management fees and that Mercer's Quarterly Performance Evaluations included review

of the expenses associated with each fund.  Defendants deny the remaining allegations in

Paragraph 82 of the Second Amended Complaint.

83.     Yet it was only after the First Funds had been sold to Goldman Sachs that the Plan fiduciaries began to express concern about fund expenses.  At the March 23, 2007 Investment Committee meeting, the Investment Committee acknowledged "the importance of its responsibilities related to savings plan fees" and asked Mercer to discuss the issue with the committee.  Mercer presented a report on "401(k) Fees and Fiduciary Responsibilities."

ANSWER:  The second and third sentences of Paragraph 83 purports to characterize a

written document, the terms of which speak for themselves and, therefore, no response is

required.   To the extent a response is required, defendants deny the allegations and

characterizations contained in the second and third sentences of Paragraph 83 of the Second

Amended Complaint and refer to the document referenced therein for the full contents and

context thereof.  Defendants deny the remaining allegations contained in Paragraph 78 of the

Second Amended Complaint.

**C.     Because Of First Horizon's Ever-Riskier Practices And Failure To Properly Adjust For This Greater Risk, The Company Stock Fund -- The Plan's Largest Investment -- Was An Imprudent Retirement Investment.**

84.     First Horizon is a bank and financial holding company which spent years touting itself as a growing and dynamic "national" company.  Throughout the Claims Periods, First Horizon's principal source of cash flow, including cash flow to pay dividends on its stock, has been from its principal subsidiary, First Tennessee.

ANSWER:  Defendants admit that First Horizon is a nationwide financial services

corporation and admit that First Horizon's subsidiary, First Tennessee, was a major business

segment of First Horizon during the purported class period.  Defendants deny the remaining allegations contained in Paragraph 84 of the Second Amended Complaint.

85.    First Horizon was managed, in part, by the use and operation of management committees.  The Enterprise-wide Risk/Return Management Committee ("EWRRMC") was responsible for overseeing management of First Horizon's enterprise-wide risk.  The EWRRMC was not a Plan fiduciary and never discussed as a Committee whether it was prudent for the Plan to continue to acquire and invest in First Horizon stock during the period from January 1, 2006 through July 14, 2008.  Many of the members of the EWRRMC were not involved in fiduciary management of the Plan, but Defendants Baker, Glass, Makowiecki, Martin, Meyerrose and Mosby were all both members of the EWRRMC and fiduciaries of the Plan.

ANSWER:  Defendants admit that First Horizon has various management committees, one of which is the Enterprise-wide Risk/Return Management Committee, and that the EWRRMC was "created to focus on a cross-functional view of risks and returns; approval of guidelines and recommendation of policies for Board approval; assessment of risk; and development of corporate-wide strategies for measuring and mitigating risk."  Defendants further admit that Defendants Baker, Glass, Makowieck, Martin, Meyerrose and Mosby all served as members of the EWRRMC.  The allegations in the third and fourth sentences of Paragraph 85 contain legal conclusions to which no response is required.  To the extent a response is required, except as expressly admitted herein, defendants deny the allegations contained in the third and fourth sentence of Paragraph 85.  Defendants deny the remaining allegations contained in Paragraph 85 of the Second Amended Complaint.

86.    The EWRRMC received reports from other management committees concerning activities and problems within First Horizon, including from the Asset and Liabilities Committee ("ALCO"), the Operational Risk Committee, the Capital Management Committee, the Operational Risk Committee, and the Senior Credit Policy Committee.

ANSWER:  Defendants admit the EWRRMC received reports from other committees, including the Asset Liability Committee, the Operational Risk Management Committee, the Capital Management Committee, the Operational Risk Management Committee, and the Senior

Credit Policy Committee.  Except as expressly admitted herein, defendants deny the allegations

contained in Paragraph 86 of the Second Amended Complaint.

87.     Between January 1, 2005 and April 28, 2008, First Horizon – through its
subsidiaries First Tennessee and First Horizon Home Loan Corporation – provided mortgage
banking services in 44 states, and promoted itself as one of the country's 20 largest mortgage
loan originators.  During the first part of the First Horizon Stock Claims Period, as part of its so
called "national expansion strategy," First Horizon and its affiliates wrote and securitized ever
increasing numbers of subprime and Alt-A mortgage loans, second lien mortgage loans, home
equity loans and lines or credit, and construction loans, for which reduced underwriting
standards and/or non-traditional financing arrangements were used.  By doing so, First Horizon
was able to build loan volume and to appear more successful as a financial institution than it
actually was.

ANSWER:  Defendants admit that between January 1, 2005 and September 30, 2007,

First Horizon Home Loans, a division of First Tennessee, provided mortgage banking services in

44 states.  Defendants deny the remaining allegations in Paragraph 87 of the Second Amended

Complaint.

88.     In particular, between 2003 and 2007, First Horizon vastly increased its exposure
to three higher-risk lending products: home equity lines of credit ("HELOC"), including
particularly risky HELOCs that initially required only payments of interest; commercial
construction loans to single-family builders ("Homebuilder" loans); and retail real estate
construction loans to individual consumers to build homes ("One Time Close" loans).  By 2006,
retail residential real estate products, primarily HELOCs and other home equity loans,
constituted 40 percent of total loans, with commercial construction loans comprising 11 percent
of total loans, and retail construction "One Time Close" loans comprising an additional 10
percent of total loans.  (2006 Annual Report, p. 30)

ANSWER:  Defendants admit that in 2006 retail residential real estate comprised 40

percent of total loans, commercial construction loans comprised 11 percent of total loans, and the

One Time Close product comprised 10 percent of total loans.  Defendants deny the remaining

allegations in Paragraph 88 of the Second Amended Complaint.

89.     First Horizon did not adjust for the explosive growth of its riskier loan products.
It failed to adopt appropriate models, processes, staffing, and compensation to assure adequate
risk management in light of the Company's enormous growth and assumption of far greater risk.
First Horizon's credit culture and processes were inadequate for the prudent management of the
Company, particularly given the rapid increase in its level of risk.

ANSWER:  Defendants deny the allegations contained in Paragraph 89 of the Second

Amended Complaint.

**Use of Models**

90.    First Horizon relied extensively on models in projecting important aspects of its financial condition and prospects.  A model is a method for estimating risk exposure, analyzing business strategies, and estimating fair values of financial instruments.  If a model does not take into account real life experience, assets may be overvalued, risks may be understated, and other serious problems may arise.

ANSWER:  Defendants admit that it used models to project aspects of its financial

condition and prospects.  Defendants deny the remaining allegations of Paragraph 90 of the

Second Amended Complaint.

91.    The Office of the Comptroller of the Currency ("OCC") has long recognized and provided guidance to financial institutions to assure that they use models in their decision-making which are validated and appropriately and independently reviewed.  The OCC considers the use of not yet validated models to be potentially an unsafe and unsound practice.  Financial models must be independently reviewed for logical and conceptual soundness and compared against other models.  Model predictions also need to be compared against real-world events.  As discussed more fully below, First Horizon in several material instances used models which were not properly validated or reviewed, with the result that its portfolio appeared considerably more valuable than it actually was.

ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations regarding the OCC contained in Paragraph 91 of the Second Amended

Complaint, and therefore, deny those allegations.  Defendants deny the remaining allegations

contained in Paragraph 91 of the Second Amended Complaint.

92.    In OCC 2000-16, an OCC Bulletin addressing risk modeling, the OCC provided guidance to help financial institutions mitigate potential risks arising from reliance on computer-based financial models that are improperly validated or tested.  The OCC described model development as "a complex and error prone process."  The OCC generally requires a bank to have a sound validation policy, which includes independent review, defined responsibility, model documentation, ongoing validation, and audit oversight.  The assumptions used are critical to the validity of the projections made by the models, and require ongoing comparison to actual behavior.

ANSWER:  The first two sentences of Paragraph 92 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first two sentences of Paragraph 92 and refer to the document referenced therein for the full contents and context thereof. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 92 of the Second Amended Complaint and, therefore, deny those allegations.

93.     As of the beginning of 2006, First Horizon's real estate valuation processes did not comply with regulatory guidance.  While this significant problem was the subject of numerous regulatory examinations and communications, the flaws in First Horizon's processes were so serious that the Company failed to attain compliance with applicable regulatory guidance during 2006 into 2007.  While Plaintiffs do not know at this time all of the problems associated with these processes, internal reporting cited the fact that First Horizon did not have accurate locations recorded for all real estate collateral, and was unable to keep up with the identification of problem assets in the residential commercial real estate portfolio, which delayed timely recognition of losses and appropriate provisioning.  The appraisal processes also had serious flaws which caused significant problems in the valuation of real estate.

ANSWER:  Defendants deny the allegations contained in Paragraph 93 of the Second Amended Complaint.

94.     At an April 4, 2006 meeting of the EWRRM Committee, there was an update on the need "to ensure model risk validation programs are understood and enforced."  The Committee approved proposed revisions to the Company's management guideline regarding model risk.

ANSWER:  Paragraph 94 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 94 and refer to the document referenced therein for the full contents and context thereof.

95.     As reported to the Audit Committee at its July 16, 2007 meeting, First Horizon's accounting function was "highly decentralized."  This means that for most of the First Horizon Stock Claims Period, it did not have a standardized platform for accounting and reporting or a standardized chart of accounts.

ANSWER:   The first sentence of Paragraph 95 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 95 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 95 of the Second Amended Complaint.

96.      First Horizon did not have the internal commitment or expertise to properly assess the many problems with its models.  One example involves First Horizon's forecasting tools for its HELOC portfolio.  As late as early 2008, First Horizon was using forecasting tools for this portfolio that were backwards-looking and not sensitive to recent market changes.  As a result, the value of that portfolio was over-inflated.

ANSWER:   Defendants deny the allegations contained in Paragraph 96 of the Second Amended Complaint.

**Back Testing**

97.      Similarly, back testing of the Mortgage Company's interest rate sensitivity model began only in the fourth quarter of 2006.  Back testing showed overestimated production volume for three consecutive quarters.   It was not until approximately October 31, 2007 that the Mortgage Company changed this model to mimic the forecast model used by the Financial Planning group.

ANSWER:   Defendants deny the allegations contained in Paragraph 97 of the Second Amended Complaint.

98.      As late as February 2008, appraisal ordering and review processes from the FHCL portfolio were not compliant with First Horizon's revised corporate standards.

ANSWER:   Defendants deny the allegations contained in Paragraph 98 of the Second Amended Complaint.

99.      First Horizon's back testing for credit scorecards in its Business Lending Center was flawed.

ANSWER:   Defendants deny the allegations contained in Paragraph 99 of the Second Amended Complaint.

100.    First Horizon's compensation practices and staffing favored short-term product growth over proper risk management.  As of January 1, 2006, compensation was not aligned with the prudent management of the institution and its risks.  Product sales staff were hired without regard to whether First Horizon had sufficient management to oversee, account and reserve for the risks of such sales.

ANSWER:  Defendants deny the allegations contained in Paragraph 100 of the Second Amended Complaint.

101.    The Credit Division's infrastructure was so inadequate that it was unable to timely respond to credit risk management issues.

ANSWER:  Defendants deny the allegations contained in Paragraph 101 of the Second Amended Complaint.

**Audit Function**

102.    First Horizon's practices and failures in credit management were sufficiently severe that in late 2006 or early 2007, it formed a Regulatory Compliance Committee to address its regulatory problems. The Regulatory Compliance Committee reported to the EWRRMC.

ANSWER:  Defendants admit that the Regulatory Compliance Committee reported to the EWRRMC.   Defendants deny the remaining allegations of Paragraph 102 of the Second Amended Complaint.

103.    As of January 1, 2006, First Horizon's internal audit function was inadequate for the work that it needed to perform.  It lacked the technical expertise to even address a number of the specialty products and services in which First Horizon was engaged.  The deficiencies in First Horizon's internal audit required a revised audit methodology which was not implemented until late 2007.

ANSWER:  Defendants deny the allegations contained in Paragraph 103 of the Second Amended Complaint.

104.    Once First Horizon began to use more appropriate methodologies and data analytics in internal audit, internal audit found significant problems and issued unsatisfactory ratings, including in the processes, procedures and controls used in Veteran Affairs ("VA") loan originations, and compliance with VA lending requirements, consumer appraisal ordering, compliance with loan collateral requirements, customer/credit risk due diligence for treasury management products and other matters.

ANSWER:  Defendants deny the allegations in Paragraph 104 of the Second Amended Complaint.

105.    Internal audit also found significant problems with regard to First Horizon's determination of Allowance for Loan and Lease Losses ("ALLL").  ALLL is a valuation reserve established and maintained by charges against a bank's operating income.  As a valuation reserve, it is an estimate of uncollectible amounts that is used to reduce the book value of loans and leases to the amount that is expected to be collected.

ANSWER:  Defendants admit that the provision for loan losses is the charge to earning that management determines to be necessary to maintain the allowance for loan and lease losses at a sufficient level reflecting management's estimate of probable incurred losses in the loan portfolio.  Defendants deny the remaining allegations in Paragraph 105 of the Second Amended Complaint.

106.    First Horizon's underwriting of second-lien loans, second mortgages, and loans secured by homes to be built where borrowers already had existing mortgages on their current homes was inadequate and was not disclosed or adequately disclosed.  Instead, over the course of several years of rapid portfolio growth in these product areas, First Horizon continued to maintain that risk-profiles for these portfolios were "stable," and that overall asset quality was "strong." (2004 Annual Report, Introduction: Retail/Commercial Banking – Review of 2004; 2005 Annual Report, p. 30-31).  In fact, it had been involved in production of very risky, poorly underwritten, and inadequately reserved loans.

ANSWER:  The allegations contained in the second sentence of Paragraph 106 purport to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the second sentence of Paragraph 106 and refer to the documents referenced therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 106 of the Second Amended Complaint.

**Mortgage and Home Equity Loan Practices**

107.    First Horizon substantially increased its sales of inadequately underwritten loans that did not conform to government sponsored entity ("GSE") requirements and which could only be sold on the secondary market.  These non-conforming loans, including First Horizon's HELOCs and loans backed by undeveloped collateral ("Homebuilder " and "One Time Close"),

were inherently more risky than GSE conforming first-lien mortgages.  Yet First Horizon failed to disclose, or failed to adequately disclose, these increased risks.  Many of First Horizon's HELOCs were even more risky because they were sold as interest-only HELOCs, with the obligation to repay principal kicking in only after a certain amount of time.

ANSWER:   Defendants deny the allegations contained in Paragraph 107 of the Second

Amended Complaint.

108.    First Horizon knew that many of the HELOCs that it sold prior to and during the first part of the First Horizon Stock Claims Period were interest-only loans which were scheduled to reset at higher rates after a certain period of time, often five years.  First Horizon Defendants knew that when the interest-only period expired, many if not most borrowers would face monthly payments that they could not afford unless they were able to refinance their homes.  First Horizon Defendants also knew that such refinancing could not occur unless the homes increased in value, but home prices were already stagnating in many of the areas where First Horizon had substantial originations.  Proper reserves were not taken in light of these substantial risks.

ANSWER:  Defendants deny the allegations contained in Paragraph 108 of the Second

Amended Complaint.

109.    First Horizon's HELOC portfolio was sufficiently problematic that it sought to sell some $800 million of the loans in September of 2007, but could not do so.  Instead, it was forced to shift the loans from "held for sale" to "held to maturity."

ANSWER:  Defendants deny the allegations contained in Paragraph 109 of the Second

Amended Complaint.

110.    First Horizon's forecasting tools and/or the models that it used in valuing its loan portfolio, including its HELOC portfolio, were inadequate.  The HELOC forecasting tools or models in use in 2006 and 2007 were backward-looking and failed to properly take into account recent deterioration in the real estate market generally as well as the particular deterioration in the specific markets where the HELOCS were sold.  When improved forecasting tools or models were initiated in 2008, the HELOC portfolio was recognized as having performed materially worse than had been indicated under the prior inadequate model.

ANSWER:  Defendants deny the allegations contained in Paragraph 110 of the Second

Amended Complaint.

111.    First Horizon's Asset Liability Committee ("ALCO") at its November 27, 2006 meeting concluded that the only economic factors considered in the model used for Enterprise Wide Rate Scenarios were interest rates, and that the model assumed the same product mix,

channel mix and loan size in all scenarios.  Assuming the same product mix, channel mix and loan size in light of the changing financial environment was unreasonable.

ANSWER:  Paragraph 111 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 111 and refer to the document referenced therein for the full contents and context thereof.

112.   First Horizon's risk grading for One Time Close loans was inadequately performed as of the beginning of 2006 and was not improved until at least the end of 2007, after tens of millions of dollars of such loans were sold.  Shortly after First Horizon started using appropriate risk grading, it shut down new production of such loans.

ANSWER:  Defendants deny the allegations contained in Paragraph 112 of the Second Amended Complaint.

113.   First Horizon utilized what it referred to as "Super Expanded Underwriting Guidelines" in its loan business.  These standards allowed for lower FICO scores[2], and for loan-to-value ratios and debt-to-income ratios that were higher than those used in the Company's traditional and standard full/alternative documentation loan programs. First Horizon failed to make appropriate adjustments in its loss provisions and loss reserves to take into account its foray into higher risks loans and lowered underwriting standards.  First Horizon also had deficiencies in its accounting methodologies.

ANSWER:  Defendants admit that First Horizon utilized what it referred to as "Super Expanded Underwriting Guidelines" in its loan business. Defendants deny the remaining allegations contained in Paragraph 113 of the Second Amended Complaint.

114.   A 2005 Credit Risk Management Guidance For Home Equity Lending issued by the OCC and other federal regulators explained that many institutions credit risk management practices for home equity lending had not kept pace with the product's rapid growth and easing of underwriting standards.  The Guidance further explained:

> Sound practices call for fully articulated policies that address marketing, underwriting standards, collateral valuation management, individual account and portfolio management, and servicing.

---

[2]    A FICO score is a credit score derived from a particular credit model, and is the best-known credit score in the United States.  A higher FICO score indicates better credit; a lower score indicates poorer credit.

Financial institutions should ensure that risk management practices keep pace with the growth and changing risk profile of home equity portfolios. Management should actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values. Active portfolio management is especially important for financial institutions that project or have already experienced significant growth or concentrations, particularly in higher risk products such as high-LTV, "low doc" or "no doc," interest-only, or third-party generated loans.

This guidance describes sound credit risk management systems for:

- Product Development and Marketing
- Origination and Underwriting
- Third-Party Originations
- Collateral Valuation Management
- Account Management
- Portfolio Management
- Operations, Servicing, and Collections
- Secondary Market Activities
- Portfolio Classifications, Allowance for Loan and Lease Losses (ALLL), and Capital

***

The agencies' real estate lending standards regulations require that an institution's real estate lending policies be consistent with safe and sound banking practices and that an institution's board of directors review and approve these policies at least annually. Before implementing any changes to policies or underwriting standards, management should assess the potential effect on the institution's overall risk profile, which would include the effect on concentrations, profitability, and delinquency and loss rates. The accuracy of these estimates should be tested by comparing them with actual experience.

***

For institutions with significant concentrations of HELs or HELOCs, [management information systems] should include, at a minimum, reports and analysis of the following:

- Production and portfolio trends by product, loan structure, originator channel, credit score, LTV, DTI, lien position, documentation type, market, and property type;

- Delinquency and loss distribution trends by product and originator channel with some accompanying analysis of significant underwriting characteristics (such as credit score, LTV, DTI);

•      Vintage tracking;

•      The performance of third-party originators (brokers and correspondents); and

•      Market trends by geographic area and property type to identify areas of rapidly appreciating or depreciating housing values.

ANSWER:  The allegations contained in Paragraph 114 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 114 and refer to the document referenced therein for the full contents and context thereof.

115.    On information and belief, First Horizon failed in material respects to comply with this Guidance.

ANSWER:  Defendants deny the allegations contained in Paragraph 115 of the Second Amended Complaint.

116.    First Horizon greatly expanded its production of High Loan To Value ("HLTV") loans and continued to originate such loans until 2007, despite the fact that it was over concentrated in these loans well before 2007.  During the First Horizon Stock Claims Period, First Horizon's HLTV loans represented more than 100% of regulatory capital and were the subject of a risk management plan.

ANSWER:  Defendants admit that it originated HLTV loans until 2007.  Defendants deny the remaining allegations of Paragraph 116 of the Second Amended Complaint.

117.    By December 13, 2006, First Horizon had a revised "strategy" for managing HLTV regulatory limits that it presented to the OCC, which had concerns regarding First Horizon's ratio of HLTV loans to regulatory capital.  Nevertheless, HLTV loans continued to be above 100% of regulatory capital throughout 2007 and into 2008.

ANSWER:  Defendants deny the allegations contained in Paragraph 117 of the Second Amended Complaint.

118.    First Horizon developed high concentrations of loans, including those backed by undeveloped collateral, in states that included Florida, California, Washington and Nevada – States where by early 2006, there were clear signs that the housing market boom was over.  First

Horizon inadequately reserved for loan losses by failing to take into account that its loans were geographically concentrated in these states.  First Horizon also failed to adequately disclose its over-concentration in these markets.

ANSWER:  Defendants deny the allegations contained in Paragraph 118 of the Second Amended Complaint.

119.    First Horizon also became increasingly reliant upon secondary markets to sell and securitize its loans, as a result of its decision to write loans (*e.g.*, HELOCs and Adjustable Rate Mortgages or "ARMS"), including HELOCs and ARMs that began as interest-only, that did not conform to GSE's guidelines for federally insured mortgage loans.  In 2003, First Horizon securitized and sold $40.9 billion in conventional and federally insured mortgage loans, and had $6 billion in off-balance sheet business trusts for the purpose of securitizing and selling to secondary market investors.  At year end 2006, First Horizon securitized and sold only $13.8 billion of conventional and federally insured mortgage loans, while reporting approximately $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales.

ANSWER:   Defendants admit the allegations contained in the second sentence of Paragraph 119 of the Second Amended Complaint.  Defendants further admit that at year end 2006, First Horizon securitized and sold $13.8 billion of conventional and federally insured mortgage loans and reported approximately $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales.  Defendants deny the remaining allegations contained in Paragraph 119 of the Second Amended Complaint.

120.    First Horizon's proprietary securitizations of nonconforming first-lien and second-lien mortgages and home equity loans did not conform to the standards for sale or securitization to government agencies, and created the risk that there would not be an adequate market for such securities, which risk was not adequately disclosed.

ANSWER:  Defendants deny the allegations contained in Paragraph 120 of the Second Amended Complaint.

121.    First Horizon issued excessive loans that were exceptions to its own credit policies.

ANSWER:  Defendants deny the allegations contained in Paragraph 121 of the Second Amended Complaint.

**New Business Model**

122.    First Horizon also failed to disclose or adequately disclose various risks related to its changed business model, including the extent to which recourse could be sought from it on securitized loans, the increasing risks associated with its shift to off-balance sheet transactions, and how it could affect the levels of Level I and II capital held.  While First Horizon claimed to adequately manage the risks associated with the sale and securitization of its loans, it knew, when Plan participants did not and could not know, the facts and risks associated with First Horizon's risk management, including the risks to its liquidity.

ANSWER:  Defendants deny the allegations contained in Paragraph 122 of the Second Amended Complaint.

123.    First Horizon failed to adequately oversee its own risk management.  It failed to adequately disclose the systemic problems in its risk management and its lack of competency in assessing and managing risks related to its national expansion and reduced underwriting.

ANSWER:  Defendants deny the allegations contained in Paragraph 123 of the Second Amended Complaint.

124.    Although First Horizon's new business model relied on continued real estate growth and appreciation in real estate values, the Company failed to adequately disclose the existence of such reliance.  Moreover, although First Horizon's products – particularly its non-mortgage Homebuilder, One-Time Close construction, condo developer and HELOC products – were susceptible to losses due to significant downturn in the general housing market and to a credit crunch in the general economy, including a severe reduction in the availability of credit or an increase in interest rates, First Horizon failed to disclose the increased likelihood of losses associated with these products.

ANSWER:  Defendants deny the allegations contained in Paragraph 124 of the Second Amended Complaint.

**Guidance from Regulators**

125.    On January 1, 2005, the Federal Reserve's new rating system for bank holding companies and financial holding companies became effective.  Rather than simply evaluating the legal banking entity under a more traditional approach, as before, the new rating system takes into account risk management across the entire holding company.  As explained by Scott Alvarez, General Counsel of the Federal Reserve, in a 2005 speech:

> ...the Federal Reserve, as umbrella supervisor of banking organizations, has a special responsibility to determine whether bank holding companies are operated in a safe and sound manner that does not threaten the viability of affiliated depository institutions.  Consolidated oversight of bank

holding companies, and in particular the subset of bank holding companies that have elected financial holding company status in order to engage in a broader range of activities, is important because the risks associated with a bank holding company's activities can transcend legal entities and business lines.  That is, risks in one entity can have an impact on another entity or functional area--and ultimately on the enterprise as a whole.

Organizations that address risk management and compliance by business line can miss inherent conflicts of interest between lines of business.  And individuals focused only on individual business lines can be motivated to support their line of business without due regard for the increased risk or potential for compliance failure that their actions create in other parts of the organization.

To better reflect this supervisory approach, the Board recently changed its examination rating system.  We replaced the [former] bank holding company rating system, with a new rating system comprised of ratings for risk management, financial strength, and the impact of non-depository legal entities on affiliated depository institutions; the system also includes a composite rating; and a depository institution rating ...  the new rating system will better emphasize risk management and the importance of the control environment.

ANSWER:  The allegations contained in Paragraph 125 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 125 and refer to the document referenced therein for the full contents and context thereof.

126.    On May 16, 2005, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC") the Office of Thrift Supervision ("OTS") and the National Credit Union Administration issued "Credit Risk Management Guidance for Home Equity Lending" ("Credit Risk Guidance").  The Credit Risk Guidance stated that the agencies had "found that, in many cases, institution's credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards."

ANSWER:  Defendants admit the allegations contained in the first sentence of Paragraph 126 of the Second Amended Complaint.  The remaining allegations in Paragraph 126 purport to characterize a written document, the terms of which speak for themselves and, therefore, no

response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 126 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

127.    The Credit Risk Guidance stated that financial institutions "may not be fully recognizing the risk embedded in these portfolios."

ANSWER:  Paragraph 127 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 127 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

128.    The Credit Risk Guidance also provided that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values."

ANSWER:  Paragraph 128 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 128 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

129.    The Credit Risk Guidance also found that "prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt. Given the home equity products' long-term nature and the large credit amount typically extended to a consumer and evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score."

ANSWER:  Paragraph 129 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 129 of the

Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

130.    The Credit Risk Guidance stated that "underwriting standards for interest-only and variable rate HELOCs should include an assessment of the borrower's ability to amortize the fully drawn line over the long term and to absorb potential increases in interest rates."

ANSWER:  Paragraph 130 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 130 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

131.    The Credit Risk Guidance also recommended that financial institutions with home equity concentrations as well as higher risk portfolios perform sensitivity analyses on key portfolio segments.

ANSWER:  Paragraph 131 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 131 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

132.    Notwithstanding the Credit Risk Guidance, First Horizon continued to use the same methodology for determining relevant considerations for loss levels as it had historically used without taking into account the far riskier nature of its portfolio.  (See 2005 Annual Report p. 45).  But because First Horizon did not disclose the actual methodology used or the flaws in the methodology used, it was impossible for participants to know that such flaws existed.

ANSWER:  Defendants deny the allegations contained in Paragraph 132 of the Second Amended Complaint.

133.    In October 2006, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration all jointly issued the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("2006 OCC Guidance").  The 2006 OCC Guidance directed financial institutions to address and mitigate the risks inherent

in nontraditional or "subprime " mortgage products by ensuring that loan terms and underwriting standards were consistent with prudent lending practices, which require a credible analysis of a borrower's repayment capacity.

ANSWER:  Defendants admit the allegations contained in the first sentence of Paragraph 133 of the Second Amended Complaint.  The remaining allegations contained in Paragraph 133 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 133 and refer to the document referenced therein for the full contents and context thereof.

134.    The 2006 OCC Guidance provided that such loans should be underwritten based on a borrower's ability to make fully-amortizing payments at the fully-indexed interest rate.  For products like payment option ARMs that permit negative amortization, the 2006 OCC Guidance provided that a lenders should base its underwriting analysis on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan.

ANSWER:  Paragraph 134 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 134 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

135.    Even after this 2006 OCC Guidance was issued, First Horizon continued to initiate interest-only mortgages, ARMs and HELOCs and second-lien mortgages which were far more risky and did not take into account the 2006 OCC Guidance.  On December 13, 2006, the Governmental Banking Agencies including the OCC issued an Interagency Policy Statement on the Allowance for Loan and Lease Losses ("12/13/06 Policy Statement").  That Statement provided that "Estimated credit losses should reflect consideration of all significant factors that affect the collectability of the portfolio as of the evaluation date."

ANSWER:  Defendants admit the allegations contained in the second sentence of Paragraph 135 of the Second Amended Complaint.  The last sentence of Paragraph 135 purports to characterize a written document, the terms of which speak for themselves and, therefore, no

response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the last sentence of Paragraph 135 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof. Defendants deny the remaining allegations contained in Paragraph 135 of the Second Amended Complaint.

136.   The 12/13/06 Policy Statement directed management to "consider those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience."

ANSWER:  Paragraph 136 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 136 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

137.   According to the 12/13/06 Policy Statement "if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity."

ANSWER:  Paragraph 137 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 137 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

138.   First Horizon and the Director Defendants delayed in conforming their practices to the Credit Risk Guidance, the 2006 OCC Guidance, and the 12/13/06 Policy Statement, thereby delaying recognition of loan losses and increasing loan loss reserves.  This delay is reflected in the huge increases in those items reflected in its reporting.

ANSWER:  Defendants deny the allegations contained in Paragraph 138 of the Second Amended Complaint.

**Growth at any price**

139.    First Horizon touted its growth in its drive to become a national financial institution, but it failed to adequately disclose that this growth came at the expense of sound banking practices, and, instead, was based on lax underwriting, and the issuance of loans on terms which created an unacceptably high likelihood of non-payment.  Much of First Horizon's expansion was in metropolitan statistical areas ("MSAs") that had the greatest price inflation for real estate related economic activity, and accordingly were subject to the largest risks and ultimately suffered accelerated deflation.

ANSWER:  Defendants deny the allegations contained in Paragraph 139 of the Second

Amended Complaint.

140.    In order to generate large and increasing loan volume, First Horizon relaxed its underwriting standards, including its standards for risky and exotic products where the possibility of default by borrowers was inherently higher.  While First Horizon disclosed that there was a risk that some of its customers might not repay their loans and that collateral might be insufficient to avoid a loss, it failed to disclose that this risk had materially increased because of its underwriting practices and its failure to staff and adequately manage this enhanced risk. First Horizon also failed to disclose information as to why its risks had increased, and why it had problems in its portfolio.

ANSWER:  Defendants deny the allegations contained in Paragraph 140 of the Second

Amended Complaint.

141.    In its 2005 Annual Report, First Horizon stated that it had 13,000 employees serving customers throughout hundreds of offices located in 46 states.  The 2005 Annual Report contained a Chairman's Message from Defendant Glass dated February 1, 2006, which stated: "Our national expansion strategy also worked well."  Glass also stated: "As I look at 2006, I'm encouraged about the opportunities that exist in our businesses and the progress we are making toward our commitment of $50 million in earnings enhancements."

ANSWER:  Paragraph 141 purports to characterize a written document and statements

from Mr. Glass, which speak for themselves and, therefore, no response is required.  To the

extent a response is required, defendants deny the allegations and characterizations contained in

Paragraph 141 and refer to the document and statements referenced therein for the full contents

and context thereof.

142.    In 2004, First Horizon Home Loans securitized and sold approximately $19.3 billion in mortgage loans.   In 2005, First Horizon Home Loans securitized and sold

approximately $16.6 billion in mortgage loans.  In its 2005 Annual Report, First Horizon disclosed that:

> Certain of FHN's originated loans, including non-conforming first-lien mortgages, second lien mortgages and HELOC originated primarily through FTB NA, do not conform to the requirements for sale or securitization through government agencies.  FHN pools and securitizes these non-conforming loans in proprietary transactions.   After securitization and sale, these loans are not reflected on the Consolidated Statements of Condition [except for certain circumstances].  On December 31, 2005 and 2004, the outstanding principal amount of loans in these off-balance sheet business trusts was $20.0 billion and $11.3 billion, respectively.   Given the significance of FHN's origination of non-conforming loans, the use of single-purpose business trusts to securitize these loans is an important source of liquidity to FHN.

ANSWER:  Defendants admit the allegations in the first two sentences of Paragraph 142 of the Second Amended Complaint. The remaining allegations contained in Paragraph 142 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 142 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

143.    In other words, in one year, from 2004 to 2005, First Horizon almost doubled the amount of non-conforming loans held in off-balance sheet trusts, while simultaneously describing the loan transactions so opaquely that Plan participants could not assess the risks associated with these loans.

ANSWER:  Defendants deny the allegations contained in Paragraph 143 of the Second Amended Complaint.

144.    First Horizon depended "significantly" on its "ability to sell or securitize first and second mortgage loans and home equity lines of credit...." (2005 10-K).  It did not disclose or did not adequately disclose the risks associated with its ability to continue to engage in such securitizations, or the risk that it stood to suffer a high rate of defaults.  First Horizon did in fact suffer a high rate of defaults, because, *inter alia*, its loans did not comply with the standards set forth in the investor prospectuses, another matter that First Horizon either failed to disclose or failed to adequately disclose.

ANSWER:   The first sentence of Paragraph 144 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 144 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 144 of the Second Amended Complaint.

145.   Moreover, while First Horizon increased its investment in securitized mortgage products, it failed to reflect this increased risk in its loan loss provisions and reserves.

ANSWER:  Defendants deny the allegations contained in Paragraph 145 of the Second Amended Complaint.

146.   In its 2005 Annual Report, First Horizon stated that it had "a significant concentration in loans secured by real estate" but they were "geographically diversified nationwide." First Horizon also represented that it "did not have any concentrations of 10 percent or more of total commercial, financial and industrial loans in any single industry." By that date, First Horizon knew or should have known that it was likely to experience further deterioration in its National Home Builder and commercial real estate lending through its First Horizon Lending offices.

ANSWER:   The first two sentences of Paragraph 146 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first two sentences of Paragraph 146 and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 146 of the Second Amended Complaint.

**Commercial Construction Loans**

147.   In its 2005 Annual Report, First Horizon touted the 83% growth of commercial construction loans in 2005 without disclosing risks inherent to that portfolio.  First Horizon and Defendant Baker – then First Horizon's Chief Operating Officer – described the Company's construction lending as operating pursuant to "a program of carefully managed growth with this business." The 2005 Annual Report credited "the favorable housing environment" as a factor in that growth as well as the expansion of its sales force and its geographic reach.  It did not

attribute the growth to its lowered underwriting standards, or disclose the extent to which the growth depended on such lowered underwriting standards.  (2005 Annual Report, p. 17).

ANSWER:   Paragraph 147 purports to characterize a written document and the statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 147 of the Second Amended Complaint and refer to the document and statements cited therein for the full contents and context thereof.

148.   In its 2005 Annual Report, First Horizon represented that in providing for loan losses it used an "analytical model based on historical loss experience adjusted for current events, trends and economic conditions." "[A]sset quality in general should remain relatively stable based on expected economic conditions with normal short-term fluctuations; however, asset quality performance during 2005 was relatively strong." (2005 Annual Report, p. 15). First Horizon's description of its model was not adequate for outsiders to assess whether its loan loss reserves and provisions were reasonable and timely updated to reflect changes in the economic conditions.  As later events revealed, the loan loss reserves and provisions were wholly inadequate.

ANSWER:  The first two sentences of Paragraph 148 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations of the first two sentences of Paragraph 148 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 148 of the Second Amended Complaint.

**Allowance for Loan and Lease Losses**

149.   Banks must establish an allowance for loan and lease losses because there is credit risk in their loan and lease portfolios.  The allowance, which is a valuation reserve, exists to cover the loan losses that occur in banks loan portfolios.  As such, adequate management of the allowance is an integral part of a bank's credit risk management process.  First Horizon's methodology for determining ALLL was inadequate.  Defendant Glass chaired the Executive Committee which approved reserve level and related changes to provisions under First Horizon's ALLL adequacy test and reported it to the Board from January 1, 2006 through early 2007, when he left the Company.  First Horizon's Senior Credit Policy Committee was warned that regulators were going to focus on compliance with ALLL methodology guidance in 2007.

ANSWER:  Defendants admit that the Allowance for Loan Losses is a valuation reserve representing the amount considered by management to be adequate to cover estimated probable incurred losses in the loan portfolio, and that the methodology for estimating the allowance for loan losses is critical to First Horizon's credit risk management function.  Defendants further admit that from January 1, 2006 until his retirement effective January 29, 2007, Defendant Glass once chaired the Credit Policy and Executive Committee (previously called the Executive Committee) of First Horizon's board of directors, which approved the allowance for loan losses, and that at times during this period, as Chairman of the Credit Policy and Executive Committee, Defendant Glass reported to the Board of Directors information regarding the allowance for loan losses. Defendants deny the remaining allegations contained in Paragraph 149 of the Second Amended Complaint.

150.    First Horizon showed an increase in shareholders' equity from $1.9 billion in 2004 to $2.1 billion in 2005.  (2005 Annual Report).

ANSWER:  Defendants admit the allegations contained in Paragraph 150 of the Second Amended Complaint.

151.    First Horizon touted its "enterprise-wide approach to risk governance, measurement, management and reporting including an economic capital allocation process that is tied to risk profiles used to measure risk-adjusted returns." (2005 Annual Report).  It did not disclose that its risk management procedures were not adjusted to take into account the increased risks associated with its more risky loan portfolio and its reduced underwriting standards and practices.

ANSWER:   The first sentence of Paragraph 151 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 151 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 151 of the Second Amended Complaint.

152.    In its 2005 Annual Report, First Horizon reported that it had investment grade ratings from all three of the rating agencies and that it recognized the need to maintain such ratings: "Maintaining adequate credit ratings on debt issues is critical to liquidity because it affects the ability of FHN to attract funds from various sources, such as brokered deposits or wholesale borrowings of which FHN had $10.1 billion and $6.2 billion on December 31, 2005 and 2004, respectively...." First Horizon did not disclose that the banking practices in which it was engaged, including lowered underwriting standards, and involvement in subprime, Alt-A loans, and loans secured by undeveloped collateral, were likely to cause its credit ratings to be lowered in the future.

ANSWER:   The first sentence of Paragraph 152 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 152 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 152 of the Second Amended Complaint.

153.    According to its 2005 Annual Report, in 2005 First Horizon increased its mortgage loan origination volumes by $4.2 billion or 17 percent and increased its delivery of loans into the secondary market by 18 percent to $34.6 billion.  However, First Horizon failed to increase its loan losses reserves or make changes to its risk-assessment methods in light of changes to its business.  Instead, First Horizon announced that its ratio for allowance for loan losses to loans, net of unearned income, was lower "primarily reflecting the stable risk profile of both the commercial and retail loan portfolios." (2005 Annual Report, pp. 6, 30-31).

ANSWER:   Defendants deny the allegations contained in the second sentence of Paragraph 153 of the Second Amended Complaint.  The remaining allegations in Paragraph 153 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 153 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

154.    First Horizon described the increase in its mortgage business as resulting from the "favorable housing environment and expansion of the sales force and geographic reach," (2005 Annual Report p. 17) without describing the increasing riskiness of its business model given the changing nature of its portfolio.

ANSWER:  Defendants deny the allegations contained in Paragraph 154 of the Second Amended Complaint.

155.    First Horizon described its asset quality performance during 2005 as "relatively strong."  (2005 Annual Report p. 15).

ANSWER:  Paragraph 155 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 155 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

156.    First Horizon claimed that it "uses the best information available to establish the allowance for loan losses." (2005 Annual Report p. 45).

ANSWER:  Paragraph 156 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 156 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

157.    During the First Horizon Stock Claims Period, First Horizon continued to offer and promote its "Payment Choice" Adjustable Rate Mortgage program which offered borrowers "lower starting rates and a choice of four repayment options each month," including making fixed payments at a reduced rate for up to 60 months which could result in the accumulation of deferred interest and paying interest only.  (See First Horizon National archived website).

ANSWER:  Paragraph 157 purports to characterize an archived writing from First Horizon's website, the content of which speaks for itself and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 157 and refer to the website cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 157.

158.   As late as October 2006, Defendant Glass advised First Horizon's Board that nonprime lending was one of the eight key drivers for achieving the Company's goals for growth.

ANSWER:  Paragraph 158 purports to characterize a written document and statements from Mr. Glass, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 158 and refer to the document and statements referenced therein for the full contents and context thereof.

159.   First Horizon promoted the use of "interest only" payment programs for its mortgage borrowers as allowing them to "defer payment of the principal and use the funds for other purposes such as investment or paying off high-interest credit."  Id.  First Horizon also promoted "interest only" mortgages and loans stating that "Payment Choice is especially valuable if you're managing a dynamic portfolio, earn a fluctuating income or are dealing with unplanned expenses."  Id.  Yet such "interest only" loans were highly risky and required careful risk management and accounting treatment not afforded by First Horizon.

ANSWER:  The first two sentences of Paragraph 159 purport to characterize an archived writing from First Horizon's website, the content of which speaks for itself and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first two sentences of Paragraph 159 and refer to the website cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 159 of the Second Amended Complaint.

**Internal Audit Department**

160.   Another significant problem is that as of January 1, 2006, First Horizon did not have an adequate, functioning internal audit department.  Management had such influence over the internal audit function that at an April 18, 2006 meeting of the Audit Committee, the Committee directed Internal Audit not to "negotiate" with management.  Internal audit continued to be inadequate through 2007.  Only as a result of regulatory findings did First Horizon act to revise its audit methodology and provide automated work papers, data analytical tools, co-sourcing, and to right-size the staff.

ANSWER:  Defendants deny the allegations contained in Paragraph 160 of the Second Amended Complaint.

161.    As reported to the Audit Committee at its July 16, 2007 meeting, First Horizon's accounting function was "highly decentralized." This means that for most of the First Horizon Stock Claims Period it did not have a standardized platform for accounting and reporting or a standardized chart of accounts.

ANSWER:   The first sentence of paragraph 161 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 161 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 161 of the Second Amended Complaint.

162.    In early 2008, First Horizon finally recognized that its internal audit personnel lacked the specific technical skills needed to review a number of the financial institution's risks.

ANSWER:  Defendants deny the allegations contained in Paragraph 162 of the Second Amended Complaint.

163.    By the time of the April 14-15, 2008 meeting of the Board, there was a report on "the use of PriceWaterhouse Coopers to examine reserve methodology." At a May 19, 2008 Board meeting, there was a report on discussions concerning consumer loss recognition methodologies.

ANSWER:   Paragraph 163 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 163 of the Second Amended Complaint and refer to the documents referenced therein for the full contents and context thereof.

164.    In the spring of 2008, First Horizon retained PricewaterhouseCoopers ("PwC") to conduct a review of First Horizon's ALLL process, as reported at the May 8, 2008 meeting of the Audit Committee.  As of the July 14, 2008 Audit Committee meeting, PwC was still being used to "assist management with ALLL processes."

ANSWER:  Defendants admit that in the spring of 2008, PricewaterhouseCoopers was conducting a review of First Horizon's ALL process, as reported at the May 8, 2008 meeting of

the Audit Committee.   The remainder of Paragraph 164 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 164 of the Second Amended Complaint and refer to the documents referenced therein for the full contents and context thereof.

165.    During this period, First Horizon paid its officers and directors at exorbitant levels.  As an example, Vicki Palmer, a financial expert on the Audit Committee who retired in 2004 as Treasurer of Coca Cola Enterprises, received director fees in 2006 of $110,000 and stock awards valued at $128,924.  In 2008, she received director fees of $170,260 and stock awards valued at $34,703.

ANSWER:   Defendants admit that Vicki Palmer, a financial expert on the Audit Committee who retired in 2004 as Treasurer of Coca Cola Enterprises, received director fees in 2006 of $110,000 and stock awards valued at $128,924.  Defendants further admit that in 2008, she received director fees of $170,260 and stock awards valued at $34,703.  Defendants deny the remaining allegations contained in Paragraph 165 of the Second Amended Complaint.

**D.     First Horizon Was Deeply Involved With Many Of The Most Risky Practices In The Financial Industry.**

166.    First Horizon's engagement in risky financial practices and its failure to make appropriate allowances for these risks did not occur in a vacuum.  Rather, First Horizon acted and failed to act in the context of certain trends within the broader financial industry.

ANSWER:  Defendants deny the allegations contained in Paragraph 166 of the Second Amended Complaint.

167.    While securitizations of loans and mortgages into mortgage bonds ballooned in the decade before 2006, the quality of the securitized mortgages decreased substantially over time.

ANSWER:   The allegations contained in Paragraph 167 purport to characterize the growth and quality of securitized loans and mortgages over time, without specifying the loans and mortgages referenced.  Therefore, defendants lack information or knowledge sufficient to

form a belief as to the accuracy of the allegations contained in Paragraph 167, and therefore, no

response is required.   To the extent a response is required, defendants deny the allegations

contained in Paragraph 167 of the Second Amended Complaint.

168.     The ability to securitize loans and mortgages and thereby keep them off of lenders' books prompted lenders to originate non-standard loans that did not qualify for purchase by Fannie Mae, Freddie Mac, or other government entities.  First Horizon was at the forefront of this practice, making increasingly non-traditional mortgages and loans which could not be securitized to the government agencies, and so had to be securitized through other transactions.

ANSWER:  Defendants deny the allegations contained in Paragraph 168 of the Second

Amended Complaint.

169.     First Horizon also made many loans that supposedly complied with the government entities' requirements, but were so poorly underwritten that the government entities asked First Horizon to repurchase them due to noncompliance.  For example, an October 15, 2007 Audit Committee meeting addressed a subpoena issued to First Horizon regarding VA loans.

ANSWER:  Defendants deny the allegations contained in the first sentence of Paragraph

169 of the Second Amended Complaint.   The remainder of Paragraph 169 purports to

characterize a written document, the terms of which speak for themselves and, therefore, no

response is required.   To the extent a response is required, defendants deny the remaining

allegations and characterizations contained in remainder of Paragraph 169 of the Second

Amended Complaint and refer to the document referenced therein for the full contents and

context thereof.

170.     First Horizon has had one of the largest push-back rates of any regional bank on government guaranteed mortgages.   Push-backs occur when the government guaranteed mortgages are pushed back to the originators as not conforming to the government supported entities ("GSE") requirements.

ANSWER:  Defendants deny the allegations contained in Paragraph 170 of the Second

Amended Complaint.

171.     As First Horizon stated in an exhibit to its 2009 10-K: "[I]ncreased repurchase and make-whole claims from agency and private purchasers of loans originated and subsequently

sold by FHN hampered earnings as FHN recorded $148.5 million in charges for its obligations related to these assets." As of December 31, 2009, First Horizon had loss severities ranging between 50 percent and 60 percent of the principal balance of repurchased loans, and rescission rates between 30 percent and 40 percent of the repurchase and make-whole requests. As of December 31, 2009, the pipeline was $256.0 million, with over half of such claims submitted by Fannie Mae. First Horizon received the greatest amount of repurchase or make-whole claims, and associated losses, related to loans that were sold during 2007. These 2007 loans were approximately 60 percent of the pipeline as of December 31, 2009.

ANSWER: Paragraph 171 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 171 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

172. First Horizon's "national strategy" consisted primarily of opening production origination offices around the country, while failing to create an appropriate credit review structure, audit and accounting infrastructure to provide adequate oversight for the greatly increased production. First Horizon placed insufficient emphasis on such functions as internal audit and accounting and governmental compliance, while the Company poured its resources into production.

ANSWER: Defendants deny the allegations contained in Paragraph 172 of the Second Amended Complaint.

173. First Horizon Defendants knew, or, in the exercise of due diligence, should have known, that the real estate market was changing, and that its models for growth were unsustainable in light of those changes. As early as January 20, 2004, Glass reported to the First Horizon and First Tennessee Boards on the transition from a high mortgage refinance market. Thus, First Horizon Defendants knew that the mortgage refinancing which had been driving the mortgage market, including the securitization and issuance of mortgage bonds, could not be sustained at then-current levels.

ANSWER: The second sentence of Paragraph 173 purports to characterize a written document and statements from Mr. Glass, which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in the second sentence of Paragraph 173 and refer to the document

and statements referenced therein for the full contents and context thereof.  Defendants deny the

remaining allegations contained in Paragraph 173 of the Second Amended Complaint.

174.    To continue production, First Horizon lowered its underwriting standards by, among other things, using "super expanded underwriting guidelines" which were far less stringent than its general underwriting guidelines, and originating loans which could include limited documentation, higher HLTV ratios, less restrictive debt-to-income ratios, and lower FICO scores.

ANSWER:    Defendants deny the allegations contained in Paragraph 174 of the Second

Amended Complaint.

175.    First Horizon knew, or in the exercise of due diligence, should have known, that loans underwritten pursuant to the super expanded underwriting guidelines, and loans issued without consideration of borrowers' ability to pay, could and were likely to experience higher rates of default and losses than loans underwritten using First Horizon's general underwriting guidelines.  The likelihood of higher rates of default and loss from these loans were also further increased when those loans were structured so that the interest rates reset after a certain period of time.  Nevertheless, First Horizon failed to concomitantly increase its loan loss reserves and provisions to account for the greater likelihood of default and loss inherent in its loan portfolio.

ANSWER:    Defendants deny the allegations contained in Paragraph 175 of the Second

Amended Complaint.

176.    Although First Horizon later disavowed any significant involvement in the subprime mortgage market, Defendant Baker was quoted in an article dated June 1, 2004 as stating that First Horizon made nonprime loans in every mortgage branch office.  Similarly, First Horizon's 4th Quarter 2004 Analyst Packets also described "Nonprime Lending" as one of First Horizon's strategic growth initiatives.

ANSWER:    Paragraph 176 purports to characterize written documents and statements

from Mr. Baker, which speak for themselves and, therefore, no response is required.  To the

extent a response is required, defendants deny the allegations and characterizations contained in

Paragraph 176 and refer to the document and statements referenced therein for the full contents

and context thereof.

177.    At the January 30, 2006 meeting of First Horizon's Asset Liability Committee ("ALCO"), Defendant Thomas C. Adams, Jr., Executive Vice President, Chief Investment Office and Treasurer of First Horizon, described the weakness in the housing market and concerns for the financial industry, specifically referencing 1) the dollar amount of hybrid/teaser rate ARMS

scheduled to re-price in the following three years (which if refinancing was unavailable, would mean that borrowers could not pay the higher monthly payments); and 2) the potential for a slowdown in mortgage equity withdrawal.  Either of these events could cause a sharp decline in mortgage equity withdrawal, a slowdown in consumer spending, and a decline in growth of GDP.

ANSWER:  The first two sentences of Paragraph 177 purport to characterize a written document and statements from Mr. Adams, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first two sentences of Paragraph 177 and refer to the document and statements referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 177 of the Second Amended Complaint.

178.    In mid-2006, First Horizon initiated a new automated loan underwriting engine, First Horizon Automated Mortgage Underwriting System designed specifically for mortgage brokers originating nonprime loans.

ANSWER:  Defendants deny the allegations contained in Paragraph 178 of the Second Amended Complaint.

179.    In its April 19, 2006 press release, First Horizon claimed that "[g]oing forward, profitability of the nonprime origination business is expected to return to normal levels..."

ANSWER:  Paragraph 179 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 179 and refer to the document and statements referenced therein for the full contents and context thereof.

180.    Despite First Horizon's recognition in-house that the financial industry's dependence on refinancing mortgages and allowing mortgagors to withdraw equity to fuel consumer spending was unsustainable, as late as October 2006, Defendant Glass's business strategy for First Horizon to achieve growth included as one of eight key drivers "success ...in nonprime lending."

ANSWER:  Defendants admit that at the October 17, 2006 First Horizon Board of Directors meeting, Defendant Glass discussed eight key drivers to achieve growth, including

"success, but at a lower level, in nonprime lending."  Defendants deny the remaining allegations contained in Paragraph 180 of the Second Amended Complaint.

181.    First Horizon was heavily involved in lower documentation Alt-A mortgages.  In the first quarter of 2006, Alt-A mortgages were 32 percent of First Horizon's first lien production.  In first quarter of 2007, they were 20 percent of First Horizon's first lien production. Approximately 60% of the Alt-A products were completed with low documentation.

ANSWER:  Defendants admit the second sentence of Paragraph 181 of the Second Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 181 of the Second Amended Complaint.

182.    First Horizon Defendants knew or should have known that First Horizon was lending to many people who were at high risk of not paying back their mortgages and loans.  On information and belief, First Horizon's internal models assumed that borrowers' homes would go up in value, even though home prices had stopped rising at predicted rates by 2005.  At the same time, First Horizon knew that borrowers' repayment rates would necessarily become substantially lower because many borrowers had teaser rates or interest only adjustable rate mortgages or loans, and would have a harder time paying the higher rates once interest rates were adjusted.  In fact, First Horizon Defendants knew or should have known that once rates were adjusted or re-set, many borrowers would be unable to make their monthly payments without refinancing, and that unless housing prices rose, those borrowers would be unable to refinance.

ANSWER:  Defendants deny the allegations contained in Paragraph 182 of the Second Amended Complaint.

183.    This is precisely what occurred.  As home prices did not rise, and in many instances decreased, numerous First Horizon borrowers could not make their payments when their rates increased, and could not refinance.  First Horizon's default and delinquency rates escalated.  Because it had failed to make adequate loan provisioning and reserves, First Horizon then delayed recognition of losses which it should have recognized earlier.

ANSWER:  Defendants deny the allegations contained in Paragraph 183 of the Second Amended Complaint.

184.    First Horizon Defendants knew that First Horizon was originating these highly risky loans at the same time that First Horizon was failing to increase loan loss provisions, ALLL, and reserves consistent with the increasingly risky loan portfolio it was originating.

ANSWER:  Defendants deny the allegations contained in Paragraph 184 of the Second Amended Complaint.

185.    As alleged, First Horizon wrote ever increasing numbers of loans to persons without the ability to pay for them absent refinancing, but failed to account for this fact with adequate loan loss provisions and reserves.  On information and belief, First Horizon failed to provide adequate reserves because doing so would have reduced First Horizon's income, and executive management's compensation was based on First Horizon's income.

ANSWER:  Defendants deny the allegations contained in Paragraph 185 of the Second Amended Complaint.

186.    First Horizon used credit default swaps to supposedly hedge its potential losses on securitization transactions.  A credit default swap is, in essence, insurance against a position held by the person who purchases the swap. Unlike insurance, however, credit default swaps were not subject to insurance regulation, including insurance requirements for adequate reserves.  In addition, credit default swaps could not be issued by banks, which also had reserve and capital requirements.  Nor did credit default swaps have an exchange on which they traded, with the result that there was no transparent market for determining their value or safety.  Indeed, the market for credit default swaps was almost completely unregulated.

ANSWER: Defendants admit that the allegations contained in Paragraph 186 of the Second Amended complaint describe credit default swaps in general terms, but deny that the purported definition fully and accurately describes a credit default swap.  Defendants deny the remaining allegations contained in Paragraph 180 of the Second Amended Complaint.  .

187.    Most credit default swaps in the 1980s and 1990s were used for corporate bonds. Eventually, they were used to "insure" much more complicated transactions, including financial institution's issuance of mortgage bonds, asset backed securities ("ABS"), Residential mortgage-backed securities ("RMBS"), HELOCs, and Collateral Debt Obligations ("CDO"), which contained pieces of other mortgage bonds or even repackaged tranches of other CDOs.

ANSWER:  Paragraph 187 purports to define and characterize the history of credit default swaps without providing a supporting citation, thus defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 187, and therefore, deny those allegations. .

188.    There is a moral hazard to originating loans that a lender does not expect to keep on its books.  This gives the lender an incentive to make loans that it would not have made if it

were obliged to hold the loan.  First Horizon succumbed to that moral hazard, but then was unable to sell a portion of its portfolio of HELOCs, obliging it to keep the portfolio on its own books.

ANSWER:  Defendants deny the allegations contained in Paragraph 188 of the Second Amended Complaint.

189.    This kind of inter-relatedness between and among players in the financial services industry through credit default swaps and other exotic products made the entire industry vulnerable to contagion nationally and internationally in ways unaccounted for by First Horizon's models and strategies.

ANSWER:  Defendants deny the allegations contained in Paragraph 189 of the Second Amended Complaint.

190.    For example, on June 14, 2007, Bear Stearns Asset Management announced that it lost money on bets on subprime mortgage securities and that it was being forced to assume some $3.2 billion of loans to two hedge funds that it sponsored.  At that time, Bear Stearns was a credit default counter-party of First Horizon, essentially insuring more than $800 million of securitized debt issued by First Horizon.  Bear Stearns was a highly leveraged trading institution with nowhere near the capital to cover substantial losses in its unreserved-for credit default swaps.

ANSWER:  Defendants admit that on June 14, 2007, Bear Stearns was a credit default counter-party of First Horizon.  Defendants deny that at that time, Bear Stearns "essentially insur[ed] more than $800 million of securitized debt issued by First Horizon."  Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 190, and therefore, deny those allegations.

## E.    First Horizon Did Not Have An Adequate Infrastructure Or Procedures To Address The Complexities And Risks Of Its Business Activities.

191.    As First Horizon rapidly expanded its business and the complexity of its business, always emphasizing production of new loans, it failed to concomitantly develop and expand critical functions it needed to perform as a prudent financial institution, particularly in the area of risk management.

ANSWER:  Defendants deny the allegations contained in Paragraph 191 of the Second Amended Complaint.

192.    First Horizon was aware for some time of various weaknesses in its risk management system in connection with its commercial real estate evaluation processes.    It delayed the implementation of an updated system even though its existing real estate valuation processes were not adequate to comply with regulatory guidance.

ANSWER:  Defendants deny the allegations contained in Paragraph 192 of the Second Amended Complaint.

193.    First Horizon had a massive real estate secured loan business.  Real estate loans are supposed to be more secure than unsecured loans.  It is fundamental to lending with real estate collateral that the collateral must be identified and that liens must be recorded against the collateral.  Yet, as of October 4, 2006, there continued to be "delays in getting accurate locations recorded for all real estate collateral."

ANSWER: Defendants deny the allegations contained in Paragraph 193 of the Second Amended Complaint.

194.    First Horizon's underwriting was flawed.  But it did not (or perhaps could not) timely implement its new underwriting system.

ANSWER:  Defendants deny the allegations contained in Paragraph 194 of the Second Amended Complaint.

195.    First Horizon had inadequate processes in effect to promptly identify problem assets in its residential commercial real estate portfolio.  This meant that First Horizon could not timely recognize losses attributable to deterioration in those assets from January 1, 2006 until sometime in 2008.

ANSWER:  Defendants deny the allegations contained in Paragraph 195 of the Second Amended Complaint.

196.    First Horizon's credit review function was inadequate because, *inter alia*, it failed to provide sufficient means for locating collateral or for recognizing loss.

ANSWER:  Defendants deny the allegations contained in Paragraph 196 of the Second Amended Complaint.

## F.    The Truth Delayed

197.    During the First Horizon Stock Claims Period, First Horizon touted its "courage to make decisions and take actions based on personal and professional integrity." (2005 Annual

Report, Introduction).   By December 31, 2006, First Horizon's credit ratings had begun to decline.

ANSWER:   Defendants admit the second sentence contained in Paragraph 197 of the Second Amended Complaint.   The remaining allegations contained in Paragraph 197 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the remaining allegations contained in Paragraph 197.

198.   Late in the summer of 2006, First Horizon allowed the first bad news about the Company's deteriorating financial condition to slowly dribble out.   On August 29, 2006, in a press release, First Horizon admitted:

> First Horizon National Corporation (First Horizon) (NYSE:FHN) announced today that it expects mortgage banking earnings to be unfavorably impacted this quarter by two unrelated events.   The further deterioration in the current mortgage environment is expected to reduce pre-tax operating earnings by approximately $35 million as compared to the second quarter, and the settlement of a class action lawsuit is anticipated to create an estimated $21 million pre-tax accrual.
>
> Mortgage banking operating earnings for the first two months of this quarter have been unfavorably impacted by lower gain on sale margins, further reductions in mortgage production and increased costs to hedge the servicing risks.
>
> The recent drop in the 10-year treasury rate and the resulting inversion of the yield curve have changed the dynamics within the mortgage secondary market.   As a result, First Horizon Home Loan's gain on sale margins fell significantly below second quarter levels, and the costs increased to hedge servicing risks.   After realizing 122 basis points in gain on sale margins in the second quarter, we currently expect margins to range between 85 basis points and 90 basis points in the third quarter based on product delivery trends.   Additionally, this environment is expected to increase net hedging costs by approximately $5 million as compared to second quarter.
>
> Mortgage banking industry-wide production has also weakened as the housing market has continued to slow.   Although third quarter originations have traditionally been higher than second quarter levels, First Horizon's recent application trends foreshadow approximately a $1 billion reduction in originations and deliveries this quarter.

These three issues could reduce third quarter pre-tax operating earnings by $35 million in comparison to the second quarter.  Although we currently expect some modest improvement in mortgage banking in the fourth quarter, the current operating environment suggests that mortgage banking operations will only be in the range of break-even in the fourth quarter while our other two businesses should continue to perform in line with expectations.

ANSWER:  Defendants deny the allegations contained in the first sentence of Paragraph 198 of the Second Amended Complaint.  The remaining allegations in Paragraph 198 contain an incomplete quotation from the referenced document and purport to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 198 of the Second Amended Complaint and refer to the complete document referenced therein for the full contents and contexts thereof.

199.  First Horizon blamed the "current mortgage environment" – rather than its own aggressive banking practices and the relaxation of its underwriting standards and other banking practices – for losses in its mortgage portfolio.  At the time, First Horizon did not have adequate models and processes in place to timely identify and report losses in several of its portfolios.  And First Horizon failed to stem the problems. It continued to make subprime real estate loans, Alt-A loans and other non-conforming loans ignoring the declining market for those loans.  On September 29, 2006, First Horizon announced the "transition[ing] " of its Chief Financial Officer and the search for a successor.

ANSWER:  Defendants admit the last sentence contained in Paragraph 199 of the Second Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 199 of the Second Amended Complaint.

200.  On October 18, 2006 First Horizon issued a press release announcing the Company's earnings for Third Quarter 2006, which stated:

"We remain confident in our core strategy which continued to show progress in the third quarter," said First Horizon National Corporation Chairman and CEO, Ken Glass.  "In this period, we expanded our retail/commercial banking footprint, experienced the positive impact of cross-sell penetration, and made gains in the development and distribution of capital markets products other than fixed income.  We believe that our vision of organically creating a national financial services organization

and recruiting high-performing, experienced talent will deliver above-industry performance and provide long term value to our shareholders."

\*     \*     \*

Provision for loan losses increased to $23.6 million in third quarter 2006 from $22.4 million last year.  The 2005 provision included $3.8 million of hurricane losses.  Excluding this item, the provision for loan losses would have been $18.6 million.  The $5.0 million increase primarily reflects an expectation of slowing economic growth and the migration of a few loans to the watch list....

\*     \*     \*

"While macro environment issues will continue to impact earnings growth into next quarter, our overall strategy continues to position our business for strong sustained earnings growth," concluded Glass.

ANSWER:   Paragraph 200 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document and statements by Mr. Glass, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 200 of the Second Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

201.   In a January 17, 2007 press release, Defendant Glass was quoted as stating:

2006 was a unique year for the company, as our financial performance was marked by a number of unusual and one time items such as the sale of our merchant business.  We recognize that given this, it will be difficult for you to get a good fix on our 2007 earnings.  Therefore, we have decided for 2007 to offer more specific guidance.  For 2007, we expect the company to produce earnings for the full year at or above the current market consensus of $2.80.

ANSWER:   Paragraph 201 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document and statements of Mr. Glass, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in

Paragraph 201 of the Second Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

202.     Yet, in the quarterly earnings call the following day, the company continued to insist that its careful management of its portfolios, specifically the construction portfolios, had left it positioned for growth:

> We have expanded construction lending nationally, but kept our local approach.  Our culture and our local support systems allow us to recruit experienced end market staff who know their markets extremely well.  We specifically target home builders who have a track record of enduring through multiple cycles and whose loyalty to their financial partners is based upon relationship rather than price.  We operate in geographically diverse markets.  Our customer base is granular and we have managed our exposure to undeveloped land to represent only 3% of our portfolio.  As a result we believe this business line is well positioned for continued growth without significant additional asset quality risk.

(Q4 2006 Earnings Call, 1-18-2007).

ANSWER:  Paragraph 202 contains an incomplete quotation from the cited document and purports to characterize the cited written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 202 of the Second Amended Complaint and refer to the complete document cited therein for the full contents and context thereof.

203.     First Horizon's 2006 Annual Report was entitled "Positioned for Growth."  First Horizon was not positioned for growth.  It was on an unsustainable course.

ANSWER:  Defendants admit that the cover page of First Horizon's 2006 Annual Report contained the language quoted in Paragraph 203.  Defendants deny the remaining allegations contained in Paragraph 203 of the Second Amended Complaint.

204.     Punk Zeigel & Company stated in March 2007 that First Horizon "is Facing Major Problems."

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 204 of the Second Amended Complaint, and therefore, deny those allegations.

205.    As of March 1, 2007, First Horizon and Defendant Baker were still touting First Horizon's national expansion strategy:

> We are very clear about our strategic vision.  Our goal is to expand our banking franchise to select markets nationwide using our targeted relationship approach. . .
>
> [W]hat we're proud to move forward with is an organization that is stronger at its foundation and better positioned to find stability amid financial market uncertainty.  And it's this repositioning that we believe will offer our shareholders the confidence of a more consistent return on the investments they make.

(March 1, 2007 letter from Defendant Baker in 2006 Annual Report).

ANSWER:  Paragraph 205 contains an incomplete quotation from the cited document and purports to characterize the cited written document and statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 205 of the Second Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

206.    As of March 1, 2007, First Horizon and Defendant Baker continued to misrepresent the nature of First Horizon's underwriting practices.  In his March 1, 2007 letter in the 2006 Annual Report, Defendant Baker stated in reference to the bank's construction lending practices: "And as always, we apply strict underwriting standards." (Id.)

ANSWER:  The second sentence of Paragraph 206 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the second sentence of Paragraph 206 of the Second Amended Complaint and refer to the

document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 206 of the Second Amended Complaint.

207.    On April 18, 2007, First Horizon announced first quarter 2007 earnings of $70.5 million or $0.55 per diluted share.

ANSWER:  Defendants admit that in April 2007, First Horizon announced first quarter 2007 earnings of $70.5 million, equaling $0.55 per share.   Defendants deny the remaining allegations contained in Paragraph 207 of the Second Amended Complaint.

208.    It was not until that date that First Horizon announced in a press release that it was finally no longer going to underwrite, process or fund subprime loans, but it was going to continue its Alt-A loans which represented 20% of new originations of first lien mortgages.  The April 18, 2007 press release quotes Defendant Baker as stating:

> We are working hard to return mortgage to historical levels of profitability through our strategy of building our prime, retail origination business.  ... Accordingly, we have made the decision to no longer underwrite, process and fund nonprime loans.  Our nonprime business, which represents less than two percent of our mortgage loan production, has resulted in a reasonable level of repurchase activity for which we have adequate reserves to cover estimated remaining losses.  However, reduced investor appetite for this product has diminished gain-on-sale margins drastically; therefore, we believe market risk no longer justifies the modest potential rewards and believe it is better to service retail customer needs through broker relationships.  In contrast, our Alt-A business, which represented 20 percent of our first-lien production in first quarter 2007, has prime-type credit characteristics despite the non-standard loan structures, with an average FICO of over 715 and continues to price appropriately.  The majority of our Alt-A production is securitized and to-date, no residual or credit support structures have been retained and we have not seen any material repurchase activity from these loans.

ANSWER:  Defendants deny the allegations contained in the first sentence of Paragraph 208 of the Second Amended Complaint.  The remaining allegations in Paragraph 208 contain an incomplete quotation from the cited document and purport to characterize the written document and the statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and

characterizations contained in Paragraph 208 of the Second Amended Complaint and refer to the

complete document cited therein for the full contents and context thereof.

209.    The Company also stated in its April 18, 2007 press release:

> Provision for loan losses increased to $28.5 million in first quarter 2007
> from $23.0 million in fourth quarter 2006, primarily reflecting an increase
> in both homebuilder and one-time-close construction loans on the watch
> list ...   The nonperforming assets ratio related to the loan portfolio
> decreased to 56 basis points in first quarter 2007 from 58 basis points in
> fourth quarter 2006 due to the resolution of these previously identified
> problem loans and as overall low levels in the retail and commercial loans
> portfolios outweighed the expected increase in construction lending.  The
> allowance to loans ratio was 99 basis points in first quarter 2007 compared
> to 98 basis points in fourth quarter 2006.

> Nonperforming assets were $135.9 million on March 31, 2007, compared
> to $139.0 million on December 31, 2006.

ANSWER:  Paragraph 209 contains an incomplete quotation from the cited document

and purports to characterize the cited written document, the terms of which speak for themselves

and, therefore, no response is required.  To the extent a response is required, defendants deny the

allegations and characterizations contained in Paragraph 209 of the Second Amended Complaint

and refer to the complete document cited therein for the full contents and context thereof.

210.    Baker also stated in the press release:

> We are maintaining our focus on disciplined asset quality management
> with tightened guidelines in both retail and construction lending.  We still
> expect asset quality to be solid for the full year of 2007 with net charge-
> offs averaging between 30 and 40 basis points for the year.

ANSWER:  Paragraph 210 contains an incomplete quotation from the cited document

and purports to characterize the cited written document and statements by Mr. Baker, which

speak for themselves and, therefore, no response is required.   To the extent a response is

required, defendants deny the allegations and characterizations contained in Paragraph 210 of the

Second Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

211.    Lori Applebaum of Goldman Sachs had a sell rating on First Horizon as of April 19, 2007.

ANSWER:  Paragraph 211 purports to cite a third party without providing a supporting citation, thus defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 211 of the Second Amended Complaint, and therefore, deny those allegations.

212.    In late May and early June, First Horizon Stock closed around $40 per share.

ANSWER:  Defendants admit that First Horizon stock closed around $40 per share in late May and early June 2007, as from May 21, 2007 through June 11, 2007, First Horizon stock's daily closing price ranged from $38.43 per share to $40.52 per share.  Except as expressly admitted herein, defendants deny the allegations contained in Paragraph 212 of the Second Amended Complaint.

213.    At the June 25, 2007 meeting of the ALCO, it was reported that First Horizon's mortgage company had $820 million of notional principal swaps with Bear Stearns as the counterparty, and that Bear Stearns had just assumed $3.2 billion of loans to two hedge funds that it sponsored.

ANSWER:  Paragraph 213 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 213 and refer to the document and statements referenced therein for the full contents and context thereof.

214.    On July 17, 2007, Fitch downgraded the lower tranches of two Alt-A Trusts, offered and managed by First Horizon, series 2006 AA-3 and Series 2006-F-2.  Fitch downgraded the lowest two tranches (the BB tranche became B+, the B tranche was downgraded to CCC and assigned "distressed recovery" ratings) and put the BBB tranche on "ratings watch negative."

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 214 of the Second Amended Complaint, and therefore, deny those allegations.

215.   In a July 19, 2007 press release, First Horizon announced that charge-offs decreased during the second quarter of 2007:

> The net charge-off ratio decreased to 41 basis points in second quarter 2007 from 48 basis points in first quarter 2007 as net charge-offs declined to $23.0 million from $26.6 million in first quarter 2007.  Provision for loan losses increased to $44.4 million in second quarter 2007 from $28.5 million in first quarter 2007, with the increase split between recognition of $7.7 million of losses for a non-strategic loan portfolio that was sold during the quarter and additional provisioning.  Excluding the impact of the sold loans, the provision would have been $36.7 million for second quarter 2007.  The nonperforming asset ratio increased to 81 basis points in second quarter 2007 from 56 basis points in first quarter 2007.

ANSWER:   Paragraph 215 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 215 of the Second Amended Complaint and refer to the complete document referenced therein for the full contents and context thereof.

216.   First Horizon's charges decreased only because it failed to use appropriate models and processes to timely realize its losses.

ANSWER:  Defendants deny the allegations contained in Paragraph 216 of the Second Amended Complaint.

217.   On July 19, 2007, First Horizon Stock closed at $37.74 per share, down 24 cents. Over the next three months, First Horizon's share price decreased approximately 20%, reaching $29.65 on September 11, 2007.

ANSWER:  Defendants admit that on July 19, 2007, First Horizon stock closed at $37.50 per share.   Defendants further admit that First Horizon stock closed at $29.65 per share on

September 11, 2007.  Defendants deny the remaining allegations contained in Paragraph 217 of the Second Amended Complaint.

218.     The July 19, 2007 press release also announced that First Horizon would pursue the sale, closure or consolidation of 34 branches in its four national full-service banking markets of Atlanta, Baltimore, Dallas and Northern Virginia, while continuing to offer mortgage loans in these markets through First Horizon Home Loan Corporation.

ANSWER:  Paragraph 218 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 218 of the Second Amended Complaint and refer to the document cited therein for the full contents and contexts thereof.

219.     On July 24, 2007, Deutsche Bank reported on mortgage risks at banks based on their exposure to mortgages from risky metropolitan statistical areas (MSAs), defining a risky MSA as ones with the highest subprime delinquencies.  After identifying Countrywide as facing the highest risk on this measure, the report identified First Horizon as coming in at number two, based on the fact that eleven percent of its total loans were from the riskiest MSAs.  The bank facing the third highest risk had only four percent of its total loans from the riskiest MSAs.

ANSWER:  Paragraph 219 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 219 and refer to the document and statements referenced therein for the full contents and context thereof.

220.     In connection with a July 30, 2007 meeting of ALCO, a memo was circulated regarding the deplorable conditions in credit markets for credit.  Among the concerns expressed at the ALCO meeting was the level of HLTV loans that First Horizon might be obliged to retain if there was difficulty moving them.

ANSWER:  Paragraph 220 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 220 and refer to the document and statements referenced therein for the full contents and context thereof.

221.    At the August 27, 2007 meeting of ALCO, it was reported that markets for mortgage loans other than conventional, conforming loans were locked up and illiquid, as were markets for consumer loans.

ANSWER:  Paragraph 221 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 221 and refer to the document and statements referenced therein for the full contents and context thereof.

222.    Effective August 31, 2007, First Horizon closed its Pension Plan to new hires.

ANSWER:  Defendants admit the allegations contained in Paragraph 222 of the Second Amended Complaint.

223.    On September 12, 2007, First Horizon CEO Jerry Baker announced plans to cut up to 50 percent of its mortgage sales force and shrink the real estate portfolio on its balance sheets by making further changes in its consumer and construction lending businesses.  At that time, First Horizon noted that it was not planning to grow.  Instead, it was shrinking and cutting back as well as planning to make other adjustments, including:

- Shrinking the real estate portfolios on its balance sheet by making further changes in its consumer and construction lending business. New originations are expected to decline significantly as a result of continued product and program changes and the retention of only the most productive sales people.

- Cutting back-office support in consumer and construction lending as production is reduced.

- Exiting selected national markets for business banking.

- Transitioning the national cross-sales of deposit products to an Internet-based model, eliminating the need for banking specialists in mortgage offices.

ANSWER:  Defendants admit the allegations contained in Paragraph 223 of the Second Amended Complaint.

224.    The September 12, 2007 press release quoted Defendant Baker as stating:

"This strategic shift will reduce our real estate exposure and position us appropriately for the expected ongoing contraction of the housing market," said Baker.  "As we focus our energy on continuing to build our strong

banking franchise in Tennessee, we will enhance shareholder value by deemphasizing our more volatile national businesses, improving short-term profitability and increasing longer-term returns."

ANSWER:  Paragraph 224 contains an incomplete quotation from the cited document and purports to characterize the cited written document and statements by Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 224 of the Second Amended Complaint and refer to the complete document and statements cited therein for the full contents and context thereof.

225.    On October 17, 2007, First Horizon Stock closed at $25.04 per share.

ANSWER:  Defendants admit the allegations contained in Paragraph 225 of the Second Amended Complaint.

226.    After the close of the market on October 17, 2007, First Horizon announced that it experienced a loss in the third quarter of 2007 of $14.2 million, or 11 cents per share, compared with net income of $22.1 million, or 17 cents a share, a year earlier.  Reflecting the "deterioration" of credit markets, the company's mortgage banking operations posted a pre-tax loss of $45.8 million, up from a second quarter pre-tax loss of $16.1 million.  In an October 17, 2007 conference call, Bryan Jordan provided an estimate of its loan losses for the rest of 2007:

**Bob Patten - Morgan Keegan**

Can you give us a sense of the moving parts over the next two quarters, because now we are talking about charge going into '08 in terms of gains and charges left and where they are attributed to?

**Bryan Jordan**

Yeah, Bob, this is Bryan.  I think the bulk of the charges will be realized in the fourth quarter, and we are still within the original framework that we said, somewhere between $90 million and $100 million, so, probably another $20 million maybe $30 million in charges.  That will be offset by the premiums on the sale of the First Horizon branches.  The bulk of that will be in the first quarter, because that's when those divestitures close. We'll have a little bit in November that offsets the charges.  But we expect up to $40 million of net premium, they are offset by a little bit of severance and costs, whether we have yet to accrue it.

(October 17, 2007 Conference Call Transcript).

ANSWER:  Paragraph 226 contains an incomplete quotation from the cited document and purports to characterize the cited written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 226 of the Second Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

227.    Also, in this conference call, Bryan Jordan assured investors that FHN was on top of monitoring its problem loans:

> All right, the thing I would add is that in terms of our risk rating, we have seen a little bit pressure on downward migration.  We would expect that to continue in this part of the cycle.  In some sense, the depth and severity of what we are seeing in the markets will continue to pull it down, if this persists.  And so, we are very actively monitoring it.  **And we have got a tremendous amount of resources dedicated to managing problem assets.**

(Id.) (emphasis added).

ANSWER:  Paragraph 227 contains an incomplete quotation from the cited document and purports to characterize the cited written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 227 of the Second Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

228.    At that time, Defendant Jordan served on the EWRRMC, and knew or should have known, through, *inter alia*, the reporting to that Committee, of the many problems in First Horizon's processes and models which precluded timely and accurate recognition of its losses.

ANSWER:  Defendants admit that, on October 17, 2007, Defendant Jordan served on the

EWRRMC.   Defendants deny the remaining allegations of Paragraph 228 of the Second

Amended Complaint.

229.   Upon announcement of the third quarter results, First Horizon's share price dropped to $23.69 on October 18, 2007.

ANSWER:  Defendants admit that First Horizon stock closed at $23.69 per share on

October 18, 2007.  Defendants deny the remaining allegations contained in Paragraph 229 of the

Second Amended Complaint.

230.   At an October 31, 2007 meeting of ALCO, it was reported that a change was implemented in the Mortgage Company's interest rate sensitivity model to coincide with the current forecast model used by the Financial Planning Group.  The previous model used the replenishment rate rather than the sales force size, and assumed productivity which for the preceding quarters overestimated production volume.

ANSWER:  Paragraph 230 purports to characterize a written document, the terms of

which speak for themselves and, therefore, no response is required.  To the extent a response is

required, defendants deny the allegations and characterizations contained in Paragraph 230 and

refer to the document and statements referenced therein for the full contents and context thereof.

231.   As of November 27, 2007, First Horizon exceeded its servicing guideline limit. As of November 30, 2007, First Horizon was at 6.7%, well above its 5% limit on loans aged more than 120 days in its aged warehouse.

ANSWER:  Paragraph 231 purports to characterize a written document, the terms of

which speak for themselves and, therefore, no response is required.  To the extent a response is

required, defendants deny the allegations and characterizations contained in Paragraph 231 and

refer to the document and statements referenced therein for the full contents and context thereof.

232.   At a December 20, 2007 meeting of ALCO, Defendant Adams reported that First Horizon had potentially up to $800 million of one time close loans that could not be sold.

ANSWER:  Paragraph 232 purports to characterize a written document, the terms of

which speak for themselves and, therefore, no response is required.  To the extent a response is

required, defendants deny the allegations and characterizations contained in Paragraph 232 and

refer to the document and statements referenced therein for the full contents and context thereof.

233.   On December 21, 2007, First Horizon announced that its mortgage business expected to lose money in the fourth quarter of 2007 and that it expected to set aside an additional $150 million in anticipation of unpaid loans, over 50% higher than what Defendant Jordan had estimated two months earlier.  The loan loss provision for the fourth quarter exceeded First Horizon's combined provision for the first three quarters of 2007.  Many of these unpaid loans were a result of defaults from residential developers that borrowed money to buy properties in Florida, California, Virginia, Georgia and Nevada.  The December 21, 2007 press release stated:

> Additional Loan Loss Reserves
>
> First Horizon recently completed a review of its reserve for loan losses and real estate portfolios, with an emphasis on higher-risk markets.  As a result of that review, First Horizon expects to increase its reserves in the fourth quarter, with an anticipated total provision of approximately $150 million that should significantly exceed net charge-offs of roughly $50 million.  The additional reserves are largely attributable to inherent losses within its residential construction portfolios – One-Time Close and Homebuilder – from discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada....
>
> Mortgage Segment Impacts
>
> First Horizon expects its mortgage segment to report a fourth quarter 2007 pre-tax loss.  While based on preliminary estimates and subject to changing market conditions through the end of this quarter, this anticipated loss is driven by three areas:
>
> •   Approximately $70 million of goodwill impairment resulting from updated valuation of the mortgage segment;
>
> •   Volatility of mortgage rates and intra-mortgage spread widening since the beginning of December, which has adversely impacted gain-on-sale margins and hedging performance by roughly $40 million; and
>
> •   Potential adjustments to the carrying values of mortgage servicing and valuation of non-conforming products in light of current market conditions.

ANSWER:  Defendants admit that, on December 21, 2007, First Horizon announced that

it expected its mortgage business to report a loss for the fourth quarter; that it anticipated an

increase in its reserves of approximately $150 million; and that it attributed the increase in reserves to inherent losses in markets such as Florida, California, Virginia, Georgia and Nevada. The remaining allegations in Paragraph 233 of the Second Amended Complaint contain an incomplete quotation from the cited document and purport to characterize the written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 233 of the Second Amended Complaint and refer to the complete document cited therein for the full contents and context thereof.

234.    Throughout the fourth quarter of 2007, First Horizon's stock price continued to drop, closing the year at $17.78 per share.

ANSWER:   Defendants admit that First Horizon's stock price declined in 2007. Defendants deny the remaining allegations contained in Paragraph 234 of the Second Amended Complaint.  By way of further answer, defendants affirmatively state that on December 31, 2007, First Horizon stock closed at $18.15 per share.

235.    The OCC's discussions with the Audit Committee on underwriting standards, HLTV lending, the Internal Audit department, the Bank's ALLL methodology and other matters were the subject of a report at the January 14-15, 2008 meeting of the Board.  Also at this meeting, the Board received a report by regarding the ALLL model and practice.

ANSWER:   Paragraph 235 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 235 and refer to the document and statements referenced therein for the full contents and context thereof.

236.    On January 17, 2008, First Horizon announced a loss of $248.6 million or $1.97 per diluted share in the fourth quarter of 2007, compared to a net loss of $14.2 million or $.11 per diluted share in the third quarter of 2007 due to rising loan-loss reserves and a reduction in the value of mortgage servicing rights.  The Company also reduced its dividend by 56% to 20 cents per share.

ANSWER:  Defendants admit that, on January 17, 2008, First Horizon announced a loss of $248.6 million ($1.97 per diluted share) in the fourth quarter of 2007, compared to a net loss of $14.2 million ($0.11 per diluted share) in the third quarter of 2007.  Defendants further admit that First Horizon announced payment of a quarterly dividend of $0.20 per share.  Defendants deny the remaining allegations contained in Paragraph 236 of the Second Amended Complaint.

237.   With respect to loan losses, First Horizon stated:

> The net charge-off ratio was 93 basis points in fourth quarter 2007 compared to 57 basis points in third quarter 2007 as net charge-offs increased to $50.8 million from $31.4 million in third quarter 2007. Provision for loan losses increased to $156.6 million in fourth quarter 2007 from $43.3 million in third quarter 2007.  Provisioning for fourth quarter 2007 reflects recognition of inherent losses within residential construction portfolios, including One-Time Close and Homebuilder Finance, related to discontinued product structures and higher-risk national markets such as Florida, California, Virginia, Georgia and Nevada.  The nonperforming asset ratio increased to 166 basis points in fourth quarter 2007 from 113 basis points in third quarter 2007.

ANSWER:   Paragraph 237 contains an incomplete quotation from the referenced document and purports to characterize the referenced written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 237 of the Second Amended Complaint and refer to the complete document referenced therein for the full contents and context thereof.

238.   Supplemental materials contained in an 8-K  the same day disclosed that the consumer real estate, homebuilder, and "One Time Close" portfolios contained concentrations of loans in California, Virginia and Florida.  Loans issued in California comprised approximately 7.8% of total loans held by First Horizon.  (See 8-K  January 17, 2008, p. 17).

ANSWER:  Paragraph 238 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 238 of the

Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

239.   In the January 17, 2008 press release, Defendant Baker is quoted as stating:

> Current market conditions require definitive management actions to adequately address the operating environment and to position the company for consistent revenue growth and greater return for our shareholders . . . As such, we have acted in several key areas by increasing loan loss reserves, reducing our mortgage servicing assets and national lending businesses, implementing productivity enhancements, and selling or reducing low returning operations.  In combination with our dividend reduction, these changes should improve our capital position in 2008 and allow us to make the proper investments that leverage the fundamental strength of our Tennessee banking franchise . . .
>
> We will continue to make further significant adjustments to our mortgage and related lending businesses, including pursuing strategic alternatives to further reduce our exposure to these areas.

ANSWER:   Paragraph 239 purports to characterize a written document and the statements of Mr. Baker, which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 239 of the Second Amended Complaint and refer to the document and statements referenced therein for the full contents and context thereof.

240.   During this bout of bad news, First Horizon continued to make matches in Company Stock.

ANSWER:   Defendants admit that First Horizon made matching contributions to the Company Stock Fund in 2007 and 2008.  Defendants deny the remaining allegations contained in Paragraph 240 of the Second Amended Complaint.

241.   During a January 17, 2008 earnings conference call, First Horizon's Chief Financial Officer Bryan Jordan stated:

> . . . As we disclosed in late December the additional reserves primarily reflect **higher inherent losses in segments of our national one time close and home builder portfolios, which together represent $4.1 billion or about 19% of our total loan portfolio**.

> In Home Builder Finance we continue to see the greatest problems in weak national housing markets such as Florida, California, Arizona, Nevada, Virginia and Georgia. Where falling home prices are driving entire loss severities and where a large supplies of unsold homes are pressuring builders and consumers. **Florida and California alone represent about 22% of our total $2.1 billion builder portfolio but account for over 50% of our non-performers in this portfolio**. Our one time close portfolio is also experiencing significant pressures in these national markets.

(4Q 2007 Investors Conference Call) (emphasis added).

ANSWER: Paragraph 241 contains an incomplete quotation from the cited document and purports to characterize the cited written document and the statements of Mr. Jordan, which speak for themselves and, therefore, no response is required. To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 241 of the Second Amended Complaint and refer to the complete document and statements referenced therein for the full contents and context thereof.

242. That conference call continued:

> **Fred Cannon – KBW**
>
> Good morning. I wonder if you could walk us through a bit more on the one-time flows product, in particular. Essentially what went wrong on that product, in terms of the structure of it and the loss content you are seeing? **If I remember correctly, historically you have implied that you thought that was a fairly safe product and would perform like first mortgages; that isn't occurring. Now it sounds like it is performing more in line with the national homebuilder portfolio**.
>
> Also, was there any kind of breakdown in your risk management regarding that product?
>
> **Bryan Jordan**
>
> The one-time close is a product, just to restate, is an individual construction loan for an individual borrower to build a home. It is often made in a scenario where the homebuilder is – it also includes a take-out into a permanent structure. The average loan size is about $435,000 or so.

The issues that we are seeing in the portfolio are largely driven by a couple of major factors.  **In a lot of cases, the portfolio had an Alt-A structure or an Alt-A take-out.  A lot of the problems that we are seeing today are in the products that we significantly curtailed in 2006 and into 2007.**  For example, stated income product and other expanded approval products.  We are seeing the greatest deterioration in those products.  You have got the overall slowdown in the real estate markets driving the ability of buyers to sell the home they are in, move into this one; a number of different factors from the economy affecting it.  The biggest drivers in general have been the difficulties in the real estate market and the unavailability of financing and the ability to sell some of those products.

**Fred Cannon – KBW**

So just on that note, so essentially the risk characteristic that created this issue were alt-A stated income issues? Secondly, you said that essentially you would make this loan to an individual while you still had another mortgage on another property, and then therefore it was essentially a second home loan to individuals and that was another risk characteristic?

**Bryan Jordan**

It wasn't always a second home loan.  It was intended to be a first and that was part of the approval where you would sell the existing home, you would move the equity over.  But clearly **a [stepped] product is more susceptible to misrepresentation and fraud.**

**Dave Miller**

Fred, those expanded guideline type of products also tended to be more for some of the higher-risk markets.  So with the slowdown in some of those areas that sort of exacerbated the issue.

**Fred Cannon – KBW**

You are talking about my home state of California, I bet.

**Gerald L.  Baker**

That would be one, Fred.

(Id.) (emphasis added).

ANSWER:

243.   In addition to the previously announced winding down of the Homebuilder and One-Time Close product lines, the company announced that "[o]n the origination side, we have

eliminated virtually all non-GSE eligible product originations..." <u>Id</u>.  The company also noted in its supplemental 8-K filing on the same date that First Horizon had "tightened underwriting standards for one-time close and homebuilder finance products." (8-K, 1/17/2008, p. 4).

<u>ANSWER</u>:  Paragraph 243 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 243 of the Second Amended Complaint and refer to the documents cited therein for the full contents and context thereof.

244.    On January 17, 2008, Standard & Poor's Ratings Services cut its long-term credit rating on First Horizon to "BBB+ " from "A-, " as well as the counterparty credit rating on its subsidiary, First Tennessee, to "A-/A-2 " from "A/A-1."

<u>ANSWER</u>:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 244 of the Second Amended Complaint,, and therefore, deny those allegations

245.    On January 28, 2008, First Horizon announced that it would pull out of national home building and commercial real estate lending everywhere except in Tennessee and a few other parts of the Southeast.  (David Flaum, "First Horizon Cuts Back Lending," <u>Memphis Commercial Appeal</u> (January 29, 2008)).

<u>ANSWER</u>:  Paragraph 245 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 245 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

246.    Also in January 2008, First Horizon announced to investors that it was revamping its risk management and workout processes, including:

- Developing a more intensive "watch list" process;

- Enhancing risk grading protocols and training;

- Conducting comprehensive portfolio reviews;

- Deploying additional workout resources;

- Enhancing workout functions;

- Reviewing reserve models given recent history, conditions; and

- Refining certain loss probabilities and severities.

(January 30, 2008 Citigroup 2008 Financial Services Conference, p. 17) (emphasis added).

ANSWER:  Paragraph 246 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 246 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

247.   Within months, First Horizon substantially increased the number of employees dedicated to workouts.  For example, in C&I and Commercial Real Estate, First Horizon increased the number of full-time employees from 12 to 33.  With respect to "One Time Close" workouts, First Horizon expanded staff from 7 to 30 full-time employees.  (First Horizon Analyst Packet, Third Quarter 2008).

ANSWER:  Defendants admit that in C&I and Commercial Real Estate, First Horizon increased the number of full-time employees from 12 to 33 and with respect to "One Time Close" workouts, First Horizon expanded staff from 7 to 30 full-time employees.  Defendants deny the remaining allegations contained in Paragraph 247 of the Second Amended Complaint.

248.   On March 3, 2008, Moody's Investors Services downgraded First Horizon based on concerns about its exposure to commercial real estate.

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 248 of the Second Amended Complaint, and therefore, deny those allegations.

249.   On March 10, 2008, Fitch Ratings gave a negative outlook to First Horizon due to "continuing weakness in FHN's construction lending portfolio and rising non-performing assets in homebuilder finance portfolio and construction loans made directly to consumers for single family loans, which comprise approximately 20% of total loans."

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 249 of the Second Amended Complaint, and therefore, deny those allegations.

250.    On March 20, 2008, JPMorgan Securities Inc.  downgraded First Horizon shares to "Neutral," citing rapid deterioration of home equity loans as a major short-term risk.  In a note to clients, analyst Steven Alexopoulos pointed to evidence that loan losses for the industry are rapidly spreading from residential construction loans to home equity loans:

> "A weakening economy and declines in home prices are the two ingredients that tend to drive mounting home equity losses," he said. "Listening to what bank managements have said during the quarter, it appears to us that all of the pieces are in place for the industry to see meaningful deterioration in home equity loans in the first quarter." . . .

> First Horizon is especially at risk, as 18 percent of the Memphis, Tenn.-based bank's loans are home equity products, Alexopoulos noted.

("JPMorgan downgrades First Horizon," Associated Press, March 20, 2008).

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 250 of the Second Amended Complaint, and therefore, deny those allegations.

251.    On April 1, 2008, Morgan Stanley initiated coverage of First Horizon with "underweight" – that it will perform below its peers in the industry over the next 12 to 19 months.

ANSWER:   Defendants admit that Morgan Stanley rated First Horizon stock as "underweight" on April 1, 2008.   Defendants deny the remaining allegations contained in Paragraph 251 of the Second Amended Complaint.

252.    On April 28, 2008, First Horizon announced that it would no longer pay its dividend in cash, but would make it instead in shares of common stock, and that it was issuing up to $600 million in new shares priced at $10.00 per share, thereby diluting its existing shares of common stock.  (April 28, 2008 Press Release; April 29, 2008 Press Release).

ANSWER:   Paragraph 252 purports to characterize written documents, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is

required, defendants deny the allegations and characterizations contained in Paragraph 252 of the Second Amended Complaint and refer to the documents cited therein for the full contents and context thereof.

253.    Prior to and as of January 1, 2006, First Horizon did not properly align loan loss methodologies with accounting guidance using the current information it had about its loan portfolio and market conditions.  First Horizon's Allowance for Loan Losses was unreasonably low in 2006, increased to $229,919,000 as of June 30, 2007, and then more than doubled to $575,149,000 as of June 30, 2008.

ANSWER:  Defendants admit that as of June 30, 2007, First Horizon's Allowance for Loan Losses was a reported $229,919,000.  Defendants further admit that as of June 30, 2008, First Horizon's Allowance for Loan Losses was a reported $575,149,000.  Defendants deny the remaining allegations contained in Paragraph 253 of the Second Amended Complaint.

254.    First Horizon's Impaired Loans increased from $9,993,000 on December 31, 2006 to $50,761,000 on June 30, 2007 to $372,494,000 on June 30, 2008.

ANSWER:  Defendants admit the allegations contained in Paragraph 254 of the Second Amended Complaint.

255.    On May 21, 2008, First Horizon's share price declined more than 6 percent after a troubled California bank, Vineyard National Bancorp, revealed in a regulatory filing that it owed $53.3 million on a credit line for which First Horizon was the lead bank in the consortium that made the loan.

ANSWER:  Defendants admit that First Horizon's stock price declined and closed at $ 9.26 per share on May 21, 2008.  Defendants deny the remaining allegations contained in Paragraph 255 of the Second Amended Complaint.

256.    Other non-accrual loans increased from $89,747,000 on June 30, 2007 to $397,524,000 on June 30, 2008.

ANSWER:  Defendants admit the allegations contained in Paragraph 256 of the Second Amended Complaint.

257.    First Horizon admits that in 2008 and fourth quarter 2007 it "conducted focused portfolio management activities to identify problem credits and to ensure appropriate

provisioning and reserve levels." Plaintiffs believe and therefore aver that such focus should have been directed on First Horizon's provisioning and reserve levels as soon as it began its riskier practices – including increased use of subprime, Alt-A, nontraditional mortgages, ARMS, HELOCs, second-lien mortgages, interest-only loans, HLTV loans and construction loans to boost its lagging growth as mortgage lending became more competitive during the First Horizon Stock Claims Period.  By deferring proper reserving and provisioning First Horizon overstated earnings.

ANSWER:  The first sentence of Paragraph 257 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in the first sentence of Paragraph 257 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 257 of the Second Amended Complaint.

258.    On or about June 4, 2008, First Horizon announced that it had agreed to sell its mortgage business outside of Tennessee to MetLife Bank N.A.  for approximately $400 million. The deal included First Horizon's 230 offices in its loan-origination business outside of Tennessee, and its right to service $20 billion in mortgages.  In addition, the agreement provided that MetLife would service $65 billion of first mortgages that First Horizon is retaining currently, but will try to sell over the next few years.  First Horizon retained 21 mortgage offices in and around Tennessee.

ANSWER:  Defendants admit that on June 4, 2008, First Horizon announced that First Tennessee Bank had agreed to sell to MetLife Bank, N.A. more than 230 retail and wholesale offices nationwide and its loan origination and servicing platform.  Defendants further admit that as part of the agreement, First Horizon agreed to sell mortgage servicing assets on approximately $20 billion of first lien mortgage loans to MetLife Bank and enter into a sub-servicing agreement for the remainder of First Horizon's first lien servicing portfolio, which was expected to total approximately $65 billion after closing.  Defendants further admit that, after the sale, First Horizon retained 21 mortgage offices in and around Tennessee.  Defendants deny the remaining allegations of Paragraph 258 of the Second Amended Complaint.

259.    First Horizon estimated that it would take $50 million to $70 million in pre-tax charges related to both the MetLife deal and other expenses in the mortgage division.

ANSWER:  Defendants admit the allegations contained in Paragraph 259 of the Second Amended Complaint.

260.    First Horizon's sale of its national mortgage business and its January 2008 decision to discontinue home builder and commercial real estate lending through First Horizon Construction Lending offices were part of its decision to abandon its "Diversification Through National Expansion" strategy.

ANSWER:  Defendants deny the allegations contained in Paragraph 260 of the Second Amended Complaint.

261.    Instead, First Horizon decided to pursue a new strategy of "Strong Regional Financial Services Company," which included reducing its mortgage exposure to its banking footprint and eliminating non-bank real estate lending.  (First Horizon Analyst Packet – Third Quarter 2008 (August 5, 2008), pp. 5-6).

ANSWER:  Paragraph 261 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 261 of the Second Amended Complaint and refer to the document cited therein for the full contents and context thereof.

262.    On July 14, 2008, First Horizon announced that it lost $19.1 million during the second quarter, compared to earnings of $22.1 million during the same quarter the previous year. The company also stated that it would set aside $220 million to cover loan losses, compared to $44.4 million a year earlier, and net charge-offs were $127.7 million during the second quarter. The company also reaffirmed that charge-offs for the year would be between $385 million and $485 million.  ("First "Horizon Swings to $19.1M Loss, CEO Plans to Retire," Associated Press, July 15, 2008).

ANSWER:  Defendants admit the allegations contained in Paragraph 262 of the Second Amended Complaint.

263.    Throughout the First Horizon Stock Claims Period, although it lowered underwriting standards, was becoming heavily involved in high-risk mortgage and home equity lending (including subprime and Alt-A loans) and in loans backed by undeveloped collateral (i.e., commercial construction loans, One Time Close loans), and was increasing its holdings of

off-balance sheet assets, and although the housing boom was ending and the availability of credit was tightening, First Horizon did not fully account for its credit risks in setting loan loss provisions and reserves for the total outstanding loans reflected on its balance sheets, its off-balance sheet loan commitments, or the off-balance sheet securitizations for which it had recourse obligations.  It was not until mid-2008 that First Horizon began to fully account for its credit risks in its loan reserves and charge-offs:

|  | 12/31/03 | 12/31/04 | 12/31/05 | 12/31/06 | 06/30/07 | 12/31/07 | 06/30/08 |
|---|---|---|---|---|---|---|---|
| **Allowance to total outstanding loans** | 1.15% | .96% | .92% | .98% | 1.03% | 1.55% | 2.59% |
| **Net charge-offs to average loans** | .54 | .27% | .20% | .26% | .41% | .60% | 2.35% |
| **Nonperforming assets to loans, foreclosed real estate** | .42% | .37% | .29% | .52% | .81% | 1.57% | 3.88% |

ANSWER:  Defendants admit the allegations contained in the table in Paragraph 263 of the Second Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 263 of the Second Amended Complaint.

264.  Also on July 14, 2008, First Horizon announced that CEO Jerry Baker would resign from the company effective August 31, 2008, and that he would be succeeded by CFO Bryan Jordan.  (David Flaum, "First Horizon Chief to Step Down," Memphis Commercial Appeal, July 15, 2008).

ANSWER:  Defendants admit the allegations contained in Paragraph 264 of the Second Amended Complaint.

265.  On July 14, 2008, First Horizon's stock price hit a 12-year low when it dropped to $4.52 before closing at $5.04 per share.

ANSWER:  Defendants admit the allegations contained in Paragraph 265 of the Second Amended Complaint.

266.  The close of First Horizon's stock at $5.04 meant that the stock was down over 72% for 2008, causing the Plan's holdings to further depreciate.

ANSWER:  Defendants admit that First Horizon's stock price closed at $5.04 per share

on July 14, 2008.  Defendants deny the remaining allegations contained in Paragraph 266 of the

Second Amended Complaint.

267.    On July 31, 2008, First Horizon announced that its Emerging National Business
division would be discontinued and that it was terminating employment of the division's
president, Defendant Sarah Meyerrose.  (David Flaum, "Veteran Exec Departs at FHN,"
Memphis Commercial Appeal, August 1, 2008).

ANSWER:  Defendants admit the allegations contained in Paragraph 267 of the Second

Amended Complaint.

268.    On September 2, 2008, First Horizon executives announced that they expect that
as a result of "persisting market weakness and their ongoing efforts to aggressively address
problem loans," First Horizon's latest projections indicate that 2008 full-year net charge offs
could be approximately $100 million above the range announced in July 2008.

ANSWER:    Defendants admit the allegations contained in Paragraph 268 of the Second

Amended Complaint.

269.    The following day Standard & Poor's cut First Horizon's long-term counterparty
ratings one notch to BBB, two notches above junk status.  It also reduced the counterparty credit
rating on First Tennessee Bank N.A. Memphis one notch to BBB+/A-2.  ("S&P Cuts Ratings on
National City, First Horizon National," wsj.com (September 3, 2008)).

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to

the truth of the allegations contained in Paragraph 269 of the Second Amended Complaint, and

therefore, deny those allegations.

270.    Standard & Poor's also pointed out that First Horizon has seen credit deterioration
at its retail bank and "we expect nonperforming assets and net charge-offs to remain high
through the rest of 2008."  (Id.)

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to

the truth of the allegations contained in Paragraph 270 of the Second Amended Complaint.

271.    In 2008, First Horizon reported a net loss of $199.4 million.  In 2009, First
Horizon reported a net loss of $329.4 million,

ANSWER:  Paragraph 271 contains inaccurate and incomplete citations from defendants'

2008 and 2009 public filings and purports to characterize a written document, the terms of which

speak for themselves and, therefore, no response is required.   To the extent a response is

required, defendants deny the allegations and characterizations contained in Paragraph 271 of the

Second Amended Complaint and refer to the 2008 and 2009 public filings for the full contents

and context thereof.

272.    Plaintiffs contend that First Horizon, First Tennessee, Director Defendants, the Investment Committee, and members of the Investment Committee, the Administrative Committee and its members, and other fiduciaries knew or should have known of these problems with First Horizon's failure to manage and accurately report on its books these growing financial problems and knew or should have known that the price of First Horizon's stock was inflated until full and complete disclosure of the problems occurred.

ANSWER:  Defendants deny the allegations contained in Paragraph 272 of the Second Amended

Complaint.

**Recent Federal Investigations**

273.    The Federal Housing Authority ("FHA") is currently investigating First Tennessee's mortgage sales practices.  According to a U.S. Department of Housing and Urban Development ("HUD") press release issued January 12, 2010,[3] a subpoena was served on First Tennessee and fourteen other smaller mortgage companies "demanding s and data related to failed loans which resulted in claims paid out by the FHA mortgage insurance fund." HUD Inspector General Kenneth M.  Donohue explained that "[t]he goal of this initiative is to determine why there is such a high rate of defaults and claims with these companies and whether there is wrongdoing involved . ..  We are members of the President's Financial Fraud Enforcement Task Force and today's activities reflect our commitment to seeking information on red flags that may arise from data analysis."

ANSWER:  Defendants admit that the Federal Housing Authority has investigated First

Tennessee regarding the high rate of claims against the Federal Housing Authority insurance

program.  Defendants admit that in January 2010 the Federal Housing Authority served a

subpoena on First Tennessee.  The allegations summarizing the Federal Housing Authority's

---

[3]    This press release can be viewed at http://portal.hud.gov/portal/page/portal/HUD/press/press releases media advisories/2010/HUD_No._10-005 (last checked September 27, 2010).

press release in Paragraph 273 purport to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.   To the extent a response is required, defendants deny the allegations and characterizations in Paragraph 273 and refer to the document cited therein for the full contents and context thereof.  Defendants deny the remaining allegations contained in Paragraph 273 of the Second Amended Complaint.

274.   The HUD Press Release continued:

This initiative was prompted, in part, by the FHA Commissioner, David Stevens, who was alarmed by the incidence of claims against the FHA insurance fund by a number of poor performing companies and reached out to the HUD OIG for assistance.

FHA Commissioner David Stevens said, "We are taking risk management extremely seriously.   In addition to the policy changes we are implementing and additional changes we plan to announce later this month, we need to hold FHA lenders accountable for the high rates of defaults and claims against FHA.  The Inspector General's initiative will help us determine whether there is fraud and better manage risk in the long run.

The HUD OIG identified these direct endorsement companies from an analysis of loan data focusing on companies with a significant number of claims, a certain loan underwriting volume, a high ratio of defaults and claims compared to the national average, and claims that occurred earlier in the life of the mortgage.  These are key indicators of problems at the origination or underwriting stages.

ANSWER:   Paragraph 274 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the allegations and characterizations contained in Paragraph 274 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

275.   According to a Form 10-Q  by First Horizon on May 6, 2010,[4] two First Horizon subsidiaries, FTNFS and First Tennessee, along with executive officer Frank J. Gusmus, Jr.,

---

[4]   The First Horizon Form 10-Q can be viewed at http://ir.fhnc.com/secfiling.cfm?filingID=950123-10-45252 (last checked September 20, 2010).

"another current employee, and a former employee," have received written "Wells" notices from the Staff of the United States Securities and Exchange Commission (the "SEC") stating that the Staff intends to recommend that the SEC bring enforcement actions.  The SEC alleges that these entities and individuals aided and abetted a former FTNFS customer, Sentinel Management Group, Inc. ("Sentinel"), in violations of the federal securities laws.  The subject of the Wells notices is a 2006 year-end securities repurchase transaction between FTNFS with Sentinel.

ANSWER:  Defendants admit the allegations contained in the first sentence of Paragraph 275 of the Second Amended Complaint.  The remaining allegations of Paragraph 275 purports to characterize a written document, the terms of which speak for themselves and, therefore, no response is required.  To the extent a response is required, defendants deny the remaining allegations and characterizations contained in Paragraph 275 of the Second Amended Complaint and refer to the document referenced therein for the full contents and context thereof.

## VI.    THE LAW UNDER ERISA

276.    **The Statutory Requirements.**  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C.  § l104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ...  for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; ...  and in accordance with the s and instruments governing the plan insofar as such s and instruments are consistent with the provisions of this title and Title IV.

ANSWER:  Paragraph 276 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 276 of the Second Amended Complaint.

277.    **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of loyalty— that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ...  for the exclusive purpose of ...  providing benefits to participants and their beneficiaries...."

ANSWER:  Paragraph 277 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 277

of the Second Amended Complaint.

278.    The duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly if they occur.  A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the plan sponsor or fiduciaries themselves.

ANSWER:  Paragraph 278 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 278

of the Second Amended Complaint.

279.    **The Duty of Prudence.**    ERISA imposes on a plan fiduciary the duty of prudence— that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ...  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...."

ANSWER:  Paragraph 279 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 279

of the Second Amended Complaint.

280.    **The Duty to Inform.**    The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail: (1) a duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.    A disparity between the training and knowledge of fiduciaries and of participants—as exists in this case—can heighten the fiduciaries' duties to disclose and inform.

ANSWER:  Paragraph 280 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 280

of the Second Amended Complaint.

281.    **The Duty to Investigate and Monitor Investment Alternatives.**  For pension plans such as this one, the duties of loyalty and prudence entail a duty to independently investigate and continually monitor the merits of the investments offered by or in which Plan assets are invested, including the merits of offering and investing in employer securities, to ensure that each investment is a suitable investment for the plan.

ANSWER:  Paragraph 281 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 281

of the Second Amended Complaint.

282.   **The Duty to Monitor Appointed Fiduciaries.**    Fiduciaries with the
responsibility to appoint other fiduciaries have a concomitant duty to monitor the fiduciaries they
appoint.  The duty to monitor entails giving information to and reviewing the performance of the
appointed fiduciaries.  For defined contribution plans such as the Plan, monitoring fiduciaries
must ensure that appointed fiduciaries:

      a.    Possess the needed credentials and experience, or use qualified advisors
and service providers to fulfill their duties;

      b.    Are knowledgeable about Plan operations and goals, and the behavior and
characteristics of Plan participants;

      c.    Select investment options for the Plan based on the prudence of the
options for the Participants and not the fees to be generated by affiliates of the Plan's sponsor;

      d.    Review the reasonableness of the fees charged to the Plan in relation to the
services performed;

      e.    Are provided with adequate financial resources to discharge their duties;

      f.    Have adequate information to perform their duties of overseeing plan
investments in employer stock;

      g.    Have access to outside, impartial advisors when needed;

      h.    Maintain adequate records which  information on which they based
decisions and analysis of plan investment options; and

      i.    Report regularly to monitoring fiduciaries.

Monitoring fiduciaries must then review, comprehend, and approve the conduct of the

hands-on fiduciaries they appointed.

ANSWER:  Paragraph 282 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 282

of the Second Amended Complaint.

283.   **The Duty to Follow Plan s with Prudence.**  A fiduciary may not avoid liability
by rote reliance on the language of plan s without considering its impact on his fiduciary duties.

While the plan sponsor may specify the basic structure of a plan, within limits, the fiduciary may not blindly follow plan s if it would lead to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

ANSWER:  Paragraph 283 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 283

of the Second Amended Complaint.

284.    **The Duty to Wear "One Hat" at a Time.**  While a fiduciary is permitted to make business decisions in its own interest, it may do so only so long as it is not acting as a fiduciary at that time.  When acting as a fiduciary, ERISA requires that a fiduciary with two hats wear only one at a time, and wear only the fiduciary hat when making fiduciary decisions.

ANSWER:  Paragraph 284 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 284

of the Second Amended Complaint.

285.    **404(c) Defense Inapplicable.**  ERISA § 404(c), 29 U.S.C. § 1104(c), provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for the selection of imprudent investments for the plan. Before § 404(c) will apply, it must be shown that participants in fact exercised "independent control" over investment decisions within the meaning of 29 C.F.R. § 2550.404c-1.

ANSWER:  Paragraph 285 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 285

of the Second Amended Complaint.

286.    As alleged, Defendants failed to provide participants with complete and accurate information regarding First Horizon Stock in the Plan; the financial condition of the Company; the facts surrounding the selection of the funds offered to participants; and the comparison of those funds to other funds that an independent fiduciary would have selected.  The Department of Labor's § 404(c) regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant." Accordingly, § 404(c) does not apply here, and the Defendants remain liable for losses suffered by participants during the First Horizon Stock Claims Period.

ANSWER:  Defendants deny the allegations contained in Paragraph 286 of the Second

Amended Complaint.

287.    In addition, § 404(c) does not apply to any losses resulting from any matching contributions which were automatically invested by the Defendants in the First Horizon Stock, since participants did not exercise any control over those investments.

ANSWER:  Paragraph 287 contains conclusions of law, to which no response is required.  To the extent a response is required, defendants deny the allegations contained in Paragraph 287 of the Second Amended Complaint.

288.    Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely within Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  After Plaintiffs have had the opportunity to conduct further discovery, Plaintiffs will, to the extent necessary and appropriate, amend their Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that support each of the following counts below.

ANSWER:  Defendants deny the allegations contained in Paragraph 288 of the Second Amended Complaint.

## VII.   CLAIMS FOR RELIEF

### COUNT I

**Failure to Prudently and Loyally Manage The Plan's Investment in First Horizon Stock**

**(Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C.  § 1104 by First Horizon, Director Defendants, the Investment Committee and its members, the Administrative Committee and its members, and other John Doe Defendants)**

289.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of the Complaint as if fully set forth herein.

ANSWER:  Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 288 of the Second Amended Complaint as if contained herein in their entirety.

290.    At all relevant times, Defendants named in this Count acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and of the assets of the Plan.

ANSWER:  Paragraph 290 contains conclusions of law, to which no response is required. To the extent a response is required, defendants deny the allegations contained in Paragraph 290 of the Second Amended Complaint.

291.    By at least January 1, 2006, First Horizon, the Director Defendants, the Investment Committee, the members of the Investment Committee, the Administrative Committee and members of the Administrative Committee, and others including John Does, knew or should have known that First Horizon Stock was not a suitable and appropriate investment for the Plan due to the Company's undisclosed exposure to losses due to the deteriorating quality of its loan portfolio, its dependence on securitization of subprime, Alt-A and other troubled loans, the problems in its residential construction and other loans, and its failure to adequately account for and report those problems including not having adequate loan loss provisions and reserves.

ANSWER:  Defendants deny the allegations contained in Paragraph 291 of the Second Amended Complaint.

292.    Notwithstanding this knowledge, Defendants named in this Count breached their fiduciary duties by, among other things: failing to review the appropriateness of First Horizon Stock as an investment fund for the Plan, requiring participants to invest in the Company Stock Fund in order to receive a matching contribution from the Company, automatically investing Company matching contributions in the Company Stock Fund, acquiring new shares of First Horizon Stock at artificially inflated prices, and concentrating more than 50% of the Plan's assets in First Horizon Stock despite the risks associated with such a concentration.

ANSWER:  Defendants deny the allegations contained in Paragraph 292 of the Second Amended Complaint.

293.    Upon information and belief, Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, among other things: failing to engage independent fiduciaries that could make independent judgments regarding the Plan's investments in First Horizon Stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made First Horizon Stock an unsuitable investments for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and in each of these failures, by otherwise placing the Company's interests above those of the participants.

ANSWER:  Defendants deny the allegations contained in Paragraph 293 of the Second Amended Complaint.

294.    Upon information and belief, the Defendants named in this Count failed to wear their "fiduciary hats" when considering the Plan's investment in First Horizon stock.  First Horizon was and is a complex financial services business.  For these Defendants to do their jobs as investment fiduciaries, they needed to engage in a prudent process using the experience and knowledge of all the investment fiduciaries for review of this major Plan investment in First Horizon Stock.  Particularly given the complexity of First Horizon's business, these Defendants breached their fiduciary duties by failing to meet, share and consider information among

themselves in their fiduciary capacity to adequately monitor the Plan's investment in First Horizon Stock.

ANSWER:  Defendants deny the allegations contained in Paragraph 294 of the Second Amended Complaint.

295.    As a direct and proximate result of these breaches of fiduciary obligations as alleged, the Plan, and indirectly Plaintiffs and other Plan participants and beneficiaries, have lost millions of dollars.

ANSWER:  Defendants deny the allegations contained in Paragraph 295 of the Second Amended Complaint.

296.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

ANSWER:  Defendants deny the allegations contained in Paragraph 296 of the Second Amended Complaint.

## COUNT II

**Breach of Duties of Loyalty and Prudence by Causing the Plan to Invest in First Funds**

**(Violation of ERISA § 404, 29 U.S.C. § 1104 by Defendants First Horizon, First Tennessee, Director Defendants, the Investment Committee and its members, Highland Capital; Martin & Company, and John Doe Defendants)**

297.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

ANSWER:  Defendants incorporate by reference their foregoing answers to Paragraphs 1 through 296 of the Second Amended Complaint as if contained herein in their entirety.

298.    At all relevant times, these Count II Defendants named herein acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

ANSWER:  Paragraph 298 contains conclusions of law, to which no response is required. To the extent a response is required, defendants deny the allegations contained in Paragraph 298 of the Second Amended Complaint.

299.    These Count II Defendants, by their actions and omissions in authorizing or causing the Plan to invest in First Funds, to purchase products and services from First Horizon subsidiaries and affiliates, and to pay investment management and other fees in connection therewith to First Horizon subsidiaries and affiliates, put First Horizon's financial interests ahead of the Plan's interests.  In doing so, Count II Defendants breached their duties of prudence and loyalty to the Plan under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

ANSWER:  Defendants deny the allegations contained in Paragraph 299 of the Second

Amended Complaint.

300.    As a direct and proximate result of these breaches of duty, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost millions of dollars.  Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a), Count II Defendants are liable to restore all losses suffered by the Plan caused by their breaches of fiduciary duty in the selection of funds for the Plan and investment of Plan assets.

ANSWER:  Defendants deny the allegations contained in Paragraph 300 of the Second Amended Complaint.

## COUNT III[5]

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C. § 1104 by all Defendants)

301.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

ANSWER:  Defendants incorporate by reference their foregoing answers to Paragraphs 1

through 300 of the Second Amended Complaint as if contained herein in their entirety.

302.    At all relevant times, Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control in the management of the Plan and of Plan assets.

ANSWER:  Paragraph 302 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 302

of the Second Amended Complaint.

---

[5]    As noted, although the Court previously dismissed Count III, Plaintiffs reallege it in an abundance of caution, to ensure that they do not give up any appeal rights.

303.     Because investment in the Company Stock Fund was, by definition, not diversified, it carried an inherently high degree of risk.  This risk made Defendants' duty to provide complete and accurate information particularly important for the Company Stock Fund and investments of Plan assets in First Horizon Stock.

ANSWER:  Defendants deny the allegations contained in Paragraph 303 of the Second Amended Complaint.

304.     Defendants breached their duty to inform by failing to provide complete and accurate information regarding First Horizon Stock, the extent of the Company's exposure to losses in connection with the deteriorating quality of its residential construction loans and mortgages, the Company's artificial inflation of the value of the stock, and, generally, by conveying incomplete and inaccurate information about the soundness of First Horizon Stock and the Company Stock Fund as a retirement investment.

ANSWER:  Defendants deny the allegations contained in Paragraph 304 of the Second Amended Complaint.

305.     All Defendants breached their duty to inform by failing to provide complete and accurate information regarding the financial benefits that First Horizon and its affiliates were receiving in connection with investing Plan assets in the First Funds, and the fact that the First Funds were selected by Plan fiduciaries because of the fees generated to First Horizon and its affiliates rather than through a prudent selection process.

ANSWER:  Defendants deny the allegations contained in Paragraph 305 of the Second Amended Complaint.

306.     These actions and failures caused Plan participants and beneficiaries to make and maintain substantial investments in First Horizon Stock in the Company Stock Fund and in the First Funds at a time when Defendants knew or should have known that First Horizon Stock and the First Funds were not prudent investment options for the Plan or Plan participants.

ANSWER:  Defendants deny the allegations contained in Paragraph 306 of the Second Amended Complaint.

307.     As a direct and proximate result of these breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and other participants and beneficiaries, have lost millions of dollars.

ANSWER:  Defendants deny the allegations contained in Paragraph 307 of the Second Amended Complaint.

308.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C.   §§ 1132(a)(2) and 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of their fiduciary duties.

ANSWER:  Defendants deny the allegations contained in Paragraph 308 of the Second

Amended Complaint.

## COUNT IV

### Failure to Monitor the Plan's Fiduciaries

### (Breach of Fiduciary Duties in Violation of ERISA, 29 U.S.C. § 1104(a)(1) by First Horizon, First Tennessee, and the Director Defendants, and Against First Horizon Under Agency Principles)

309.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

ANSWER:  Defendants incorporate by reference their foregoing answers to Paragraphs 1

through 308 of the Second Amended Complaint as if contained herein in their entirety.

310.    At all relevant times, First Horizon, First Tennessee, and the Director Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), for the Plan because they were charged with, responsible for, and otherwise assumed the duty of, appointing, monitoring, and, when necessary, removing Plan fiduciaries, including but not limited to trustees, plan administrators, investment advisors, investment managers, and any other as yet unidentified First Horizon employees or agents to whom such duties were delegated.

ANSWER:  Paragraph 310 contains conclusions of law, to which no response is required.

To the extent a response is required, defendants deny the allegations contained in Paragraph 310

of the Second Amended Complaint.

311.    First Horizon and the Director Defendants breached their fiduciary duties by failing to adequately monitor the trustees, plan administrators, and other persons, if any, to whom management of Plan assets was delegated.  These Defendants knew or should have known that the other fiduciaries were imprudently allowing the Plan to offer First Horizon Stock and the First Funds and investing plan assets in them when it was not prudent to do so.  Despite this, they failed to take action to protect Plan participants from the failures of these other fiduciaries.

ANSWER:  Defendants deny the allegations contained in Paragraph 311 of the Second

Amended Complaint.

312.    The Defendant fiduciaries named in this Count, in discharging their monitoring and oversight duties, were required to disclose to other fiduciaries directly involved in investment of Plan assets accurate information about the financial condition and practices of the Company.  By remaining silent and failing to provide such information to the other fiduciaries, these Defendants breached their monitoring duties under ERISA.

ANSWER:  Defendants deny the allegations contained in Paragraph 312 of the Second Amended Complaint.

313.    In summary, Defendants named in this Count breached their monitoring duties by:

a.    failing to adequately monitor the investing fiduciaries' investment of Plan assets;

b.    failing to adequately monitor the Plan's other fiduciaries' implementation of Plan terms, including but not limited to investment of plan assets in First Horizon Stock and the First Funds;

c.    failing to disclose to the investing fiduciaries material facts about the financial condition and practices of the Company that Defendants named in this Count knew or should have known were material to loyal and prudent investment decisions about the Plan's acquisition and retention of First Horizon Stock in the Company Stock Fund and of the First Funds, and with respect to implementation of Plan terms; and

d.    failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets.

ANSWER:  Defendants deny the allegations contained in Paragraph 313 of the Second Amended Complaint.

314.    First Horizon is also liable for breaches of fiduciary duty by the Director Defendants, the Committee Defendants, and other agents and employees including John Does for the losses caused by them, under the law of agency, including principles of vicarious liability and *respondeat superior*.  First Horizon is liable as indemnitor of these Defendants under corporate law, First Horizon's articles of incorporation, and other s of corporate governance.

ANSWER:  Defendants deny the allegations contained in Paragraph 314 of the Second Amended Complaint.

315.    As a direct and proximate result of these breaches of fiduciary duties alleged, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, have suffered losses of millions of dollars.

ANSWER:  Defendants deny the allegations contained in Paragraph 315 of the Second

Amended Complaint.

316.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by the breaches of fiduciary duties by Defendants named in this Count.

ANSWER:  Defendants deny the allegations contained in Paragraph 316 of the Second

Amended Complaint.

## COUNT V

### Breach of Co-Fiduciary Duties

### (Breach of Co-Fiduciary Duties in Violation of ERISA § 405, 29 U.S.C.  § 1105, by All Defendants)

317.    Plaintiffs incorporate by reference the allegations contained in  the previous paragraphs of this Complaint as if fully set forth herein.

ANSWER:  Defendants incorporate by reference their foregoing answers to Paragraphs 1

through 316 of the Second Amended Complaint as if contained herein in their entirety.

318.    A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ANSWER:  Paragraph 318 contains conclusions of law, to which no response is required. To the extent a response is required, defendants deny the allegations in Paragraph 318 and refer to the statute cited therein for the full contents and context thereof..

319.    By virtue of all facts and events alleged herein, and at all relevant times, all Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a), 29 U.S.C. §1 104(a), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the breaches. Accordingly, Defendants are each liable for the others' violations pursuant to ERISA § 405(a)(2) and (3), 29 U.S.C.  § 1105(a)(2) and (3).

ANSWER:  Defendants deny the allegations contained in Paragraph 319 of the Second Amended Complaint.

320.    First Horizon, First Tennessee, Highland Capital and Martin & Company are liable under Section 405 because, among other things, they knowingly participated in and/or concealed the breaches by the Investment Committee and its members of their duty of loyalty by investing Plan assets in the First Funds in order to generate financial benefits for themselves, rather than because such funds were prudent retirement investments for Plan participants.

ANSWER:  Defendants deny the allegations contained in Paragraph 320 of the Second Amended Complaint.

321.    First Horizon and the Director Defendants are liable under Section 405 because their own fiduciary breaches in failing to appropriately monitor the fiduciaries they appointed enabled the appointed fiduciaries, such as the Committee Defendants, to breach their duties under ERISA by, among other things, continually selecting the Company Stock Fund and the First Funds as investment options for the Plan when it was imprudent or disloyal to do so.

ANSWER:  Defendants deny the allegations contained in Paragraph 321 of the Second Amended Complaint.

322.    Further, all Defendants knew that the other Defendants had breached their duties under Section 404 by continuing to offer the Company Stock Fund and/or the First Funds as investment options, and to direct and approve investment of matching contributions in First Horizon Stock, when it was imprudent, disloyal and contrary to ERISA to do so.  They then failed to make reasonable efforts to remedy the situation.

ANSWER:  Defendants deny the allegations contained in Paragraph 332 of the Second Amended Complaint.

323.     As a result of their breaches of Section 405 of ERISA, Defendants have caused the Plan to suffer financial losses for which they are jointly and severally liable, pursuant to Section 409 of ERISA.

ANSWER:  Defendants deny the allegations contained in Paragraph 323 of the Second Amended Complaint.

## VII.  CLASS ACTION ALLEGATIONS

324.     Plaintiffs brings this class action on behalf of a Class defined as:

Participants in and beneficiaries of the First Horizon National Corporation Savings Plan ("Plan"), excluding Defendants, whose accounts in the Plan were invested in First Horizon common stock between January 1, 2006 and July 14, 2008, and/or First Horizon's proprietary mutual or money market funds—the First Funds—between May 9, 2002 and June 5, 2006.

ANSWER:  Defendants admit that plaintiffs purport to bring this lawsuit as a class action, but deny that class action treatment is appropriate for this lawsuit.

325.     Class certification is appropriate under Rule 23(b)(1)(A) & (B), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

ANSWER:  Defendants deny the allegations contained in Paragraph 325 of the Second Amended Complaint.

326.     The Class consists of more than 15,000 individuals and is so numerous that joinder of all members is impracticable.

ANSWER:  Defendants deny the allegations contained in Paragraph 326 of the Second Amended Complaint.

327.     There are questions of law and fact common to the Class, which include:

a.       Whether all or some of Defendants are fiduciaries;

b.       Whether various of the Defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to offer the Company Stock Fund as an investment option given that Defendants knew or should have known that, because of First Horizon's undisclosed financial problems, purchases of First Horizon Stock were being made at inflated prices;

c.      Whether various of the Defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to make and maintain investments in First Horizon Stock at a time that it was not prudent to do so;

d.      Whether various of the Defendants failed to conduct a prudent investment selection process with respect to the First Funds to be offered by the Plan and instead selected First Funds because of their benefits to First Horizon and its affiliates;

e.      Whether the Company and the Director Defendants breached their fiduciary obligations to the Plan and participants by failing to prudently monitor the investment selection procedures and other activities of the Plan's other fiduciaries, including the administration of the Plan, such that the interests of the Plan and Plan participants were not adequately protected and served;

f.      Whether all of the Defendants, by failing to comply with their specific fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled and/or caused their co-fiduciaries to violate of ERISA and, despite knowledge of such breaches, failed to make reasonable efforts to remedy them, and are each liable for the others' violations pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a).

g.      Whether as a result of fiduciary breaches by the Defendants, the Plan, participants and beneficiaries have suffered losses.

ANSWER:  Defendants deny the allegations contained in Paragraph 327 of the Second

Amended Complaint.

328.    Plaintiffs' claims are typical of the Class.

ANSWER:  Defendants deny the allegations contained in Paragraph 328 of the Second

Amended Complaint.

329.    Plaintiffs will fairly and adequately protect the interests of the Class.  They have no interest that is antagonistic to or in conflict with the interest of the Class as a whole, and they have engaged competent counsel, experienced in class actions and ERISA actions of this nature.

ANSWER:  Defendants lack information or knowledge sufficient to form a belief as to

plaintiffs' counsel's qualifications, experience or knowledge.  Defendants deny the remaining

allegations contained in Paragraph 329 of the Second Amended Complaint.

330.    This action is properly maintainable as a class action for the following independent reasons and under these portions of Rule 23:

a.      Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, prosecution of separate actions by individual members of the Class would create the

risk of inconsistent adjudications which would establish incompatible standards of conduct for Defendants with respect to their obligations under the Plan.  Fed.R.Civ.P. 23(b)(1)(A).

    b.  The prosecution of separate actions by members of the Class would create a risk of adjudications for individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Fed.R.Civ.P. 23(b)(1)(B).

    c.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.  Fed.R.Civ.P. 23(b)(2).

    d.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Fed.R.Civ.P. 23(b)(3).

  <u>ANSWER</u>:  Defendants deny the allegations contained in Paragraph 330 of the Second Amended Complaint.

## VII.  <u>PRAYER FOR RELIEF</u>

  Defendants deny that this case is properly certifiable as a class action and deny that plaintiffs are entitled to any of the relief contained in the Second Amended Complaint or its Prayer for Relief.

## <u>DEFENDANTS' SPECIFIC DEFENSES</u>

### <u>FIRST DEFENSE</u>

  Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

### <u>SECOND DEFENSE</u>

  Plaintiffs' claims are barred, in whole or in part, to the extent they seek monetary damages.

### <u>THIRD DEFENSE</u>

  Plaintiffs' claims are barred because the plaintiffs exercised independent control over their plan accounts.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by application of ERISA § 404(c), 29 U.S.C. § 1104(c).

## FIFTH DEFENSE

Neither plaintiffs or the Plan, nor anyone else suffered a loss as a result of the actions or inactions of the defendants.

## SIXTH DEFENSE

One or more of the defendants are not fiduciaries within the meaning of ERISA § 3(21)(A).  Therefore, to the extent that plaintiffs' claims are premised on the fiduciary status of the defendants, these claims are barred against all defendants who are not fiduciaries of the Plans.

## SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole are in part, by the principle of laches.

## EIGHTH DEFENSE

The claims of any plaintiff or putative class member who has executed a waiver or release of claims against any or all of the defendants are barred.

## NINTH DEFENSE

The fees associated with the Plan are not excessive or unreasonable and have been properly disclosed.

## TENTH DEFENSE

Plaintiffs are not entitled to a jury trial.

## ELEVENTH DEFENSE

All disclosures provided to plaintiffs are fully compliant with applicable law and plaintiffs have not relied to their detriment on any such disclosures.

### TWELTFTH DEFENSE

Plaintiffs cannot meet the requirements of Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure.

### THIRTEENTH DEFENSE

At all relevant times, the Plan's investments in the Company Stock Fund and the First Funds, and defendants' conduct, have been substantively and procedurally prudent.

WHEREFORE, defendants respectfully request that judgment be entered in their favor, that plaintiffs' Second Amended Complaint be dismissed with prejudice, that plaintiffs be denied any remedy or relief, and that defendants be awarded any costs of this action, their attorneys' fees, and such other relief as the Court deems appropriate

Respectfully submitted,

First Horizon National Corporation, et al.

Date:  November 12, 2010

s/ Sari M. Alamuddin
Counsel for Defendants

R. Mark Glover
Baker Donelson
165 Madison Avenue
First Tennessee Building
Memphis, Tennessee  38103
Tel:  (901) 577-2222
Email:  mglover@bakerdonelson.com

*Local Counsel for Defendants*

Charles C. Jackson (*pro hac vice*)
Sari M. Alamuddin (*pro hac vice*)
Thomas F. Hurka (*pro hac vice*)
Christopher J. Boran (*pro hac vice* pending)
Morgan, Lewis & Bockius, LLP
77 West Wacker Drive, 5th Floor
Chicago, IL  60601
Tel:  (312) 324-1000
Email:  salamuddin@morganlewis.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 12, 2010, a true and correct copy of the foregoing document was served by electronic means through the Court's ECF System to:

> Ellen M. Doyle, edoyle@stemberfeinstein.com
> William T. Payne, wpayne@stemberfeinstein.com
> John Stember, jstember@stemberfeinstein.com
> Stephen M. Pincus, spincus@stemberfeinstein.com
> Joel R. Hurt, jhurt@stemberfeinstein.com
>
> Stember Feinstein Doyle & Payne, LLC
> 1705 Allegheny Building
> 429 Forbes Avenue
> Pittsburgh, PA 15219
> *Attorneys for Plaintiff*

> Signed:  s/ Sari M. Alamuddin